**VOLUME I OF II, PAGES A1 TO A448**

Miscellaneous Docket No. _____

# United States Court of Appeals for the Federal Circuit

IN RE TWITTER, INC., APPLE INC., MOTOROLA MOBILITY LLC,
HTC CORPORATION, HTC AMERICA, INC., LG ELECTRONICS, INC.,
LG ELECTRONICS U.S.A., INC., and
LG ELECTRONICS MOBILECOMM U.S.A., INC.,

*Petitioners.*

*On Petition for Writ of Mandamus to the United States District Court
for the Northern District of Texas, Wichita Falls Division
Case Nos. 7:14-cv-00014-O and 7:14-cv-00106-O
Honorable Reed O'Connor*

## APPENDIX IN SUPPORT OF PETITION
## FOR WRIT OF MANDAMUS

DAVID J. SILBERT
LEO L. LAM
JULIE A. DUNCAN
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
dsilbert@kvn.com
llam@kvn.com
jduncan@kvn.com

*Attorneys for Petitioner Twitter, Inc.*

WILLIAM C. ROOKLIDGE
MARK A. FINKELSTEIN
FRANK P. COTE
JONES DAY
3161 Michelson Drive
Suite 800
Irvine, CA 92612
Telephone: (949) 553-7502
Facsimile: (949) 553-7539
wrooklidge@jonesday.com
mafinkelstein@jonesday.com
fcote@jonesday.com

*Attorneys for Petitioner Apple Inc.*

*(Counsel Continued Inside)*

*(Counsel Continued)*

STEVEN D. MOORE
BONNIE M. GRANT
KILPATRICK TOWNSEND
STOCKTON LLP
Two Embarcadero Center
Eighth Floor
San Francisco, CA 94111
Telephone: (415) 576-0200
bgrant@kilpatricktownsend.com
smoore@kilpatricktownsend.com

D. CLAY HOLLOWAY
KILPATRICK TOWNSEND
STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)
cholloway@kilpatricktownsend.com

*Attorneys for Petitioner Motorola Mobility LLC*

STEVEN J. ROUTH
ORRICK HERRINGTON
& SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Tel.: (202) 339-8400
Fax: (202) 339-8500

STACEY E. STILLMAN
ORRICK HERRINGTON
& SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Tel: (650) 614-7400
Fax: (650) 614-7401

ROBERT M. ISACKSON
ORRICK HERRINGTON
& SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103-0001
Tel.: (212) 506-5000
Fax: (212) 506-5151

HSIWEN LO
ORRICK HERRINGTON
& SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irvine, CA 92614
Telephone: (949) 567-6700
hlo@orrick.com

*Attorneys for Petitioners LG Electronics, Inc., LG Electronics U.S.A., Inc.,
and LG Electronics MobileComm U.S.A., Inc.*

YAR R. CHAIKOVSKY
PHILIP OU
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road
Suite 100
Menlo Park, CA 94025-4004
Telephone: (650) 815-7400
ychaikovsky@mwe.com
pou@mwe.com

*Attorneys for Petitioners HTC Corporation and HTC America Inc.*

# TABLE OF CONTENTS

| DOCKET NO. | DATE FILED | DESCRIPTION | APX. NO. |
|---|---|---|---|
| 143 | 09/10/14 | Memorandum Opinion and Order | A1 |
| -- | -- | Docket Sheets | A31 |
| 6 | 02/19/14 | First Amended Complaint for Patent Infringement | A62 |
| 6-1 | 02/19/14 | Exhibit A: US 6,895,557 Bl | A146 |
| 6-2 | 02/19/14 | Exhibit B: US 7,765,482 B2 | A160 |
| 6-3 | 02/19/14 | Exhibit C: US 8,612,515 B2 | A176 |
| 89 | 06/10/14 | Defendants' Motion to Transfer to the Northern District of California | A195 |
| 90 | 06/10/14 | Defendants' Brief in Support of Their Motion to Transfer to the Northern District of California | A203 |
| 91 | 06/10/14 | Appendix in Support | A238 |
| | | 1. Declaration of Julie Duncan in support of Defendants' Motion to Transfer | A246 |
| | | 2. Combined Declaration and Power of Attorney for Utility Patent Application for U.S. Patent Application No. 09/357,836 (Exhibit A to Declaration of Julie Duncan) | A255 |
| | | 3. Press release jointly issued on March 8, 2000, by iPIX and PictureWorks Technology, Inc. (Exhibit B to Declaration of Julie Duncan) | A262 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | 4.  USPTO Patent Assignment Abstract of Title for U.S. Patent No. 6,895,557 to Wood et al. (Exhibit C to Declaration of Julie Duncan) | A267 |
| | | 5.  Press release regarding AdMission from Swiftsure Capital LLC (Exhibit D to Declaration of Julie Duncan) | A272 |
| | | 6.  USPTO Patent Assignment Abstract of Title for U.S. Patent No. 7,765,482 to Wood et al. (Exhibit E to Declaration of Julie Duncan) | A274 |
| | | 7.  AdMission Press Release regarding acquisition by Cobalt (Exhibit F to Declaration of Julie Duncan) | A277 |
| | | 8.  Delaware Division of Corporations Entity Details on Summit 6 LLC (Exhibit G to Declaration of Julie Duncan) | A280 |
| | | 9.  Wells Fargo Bank, N.A., Substitution of Trustee and Full Reconveyance dated August 30, 2013 (Exhibit H to Declaration of Julie Duncan) | A282 |
| | | 10. LinkedIn profile of Sarah Pate (Exhibit I to Declaration of Julie Duncan) | A284 |
| | | 11. Full Reconveyance recorded with the County Clerk Recorder of Contra Costa County, California, on October 17, 2013 (Exhibit J to Declaration of Julie Duncan) | A288 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | 12. Full Reconveyance recorded with the County Clerk Recorder of Contra Costa County, California, on July 16, 2013 (Exhibit K to Declaration of Julie Duncan) | A290 |
| | | 13. Scott F. Wilson's biography on the website of Swiftsure Capital LLC (Exhibit L to Declaration of Julie Duncan) | A292 |
| | | 14. Davinci Virtual Office Solutions' webpage advertising its virtual office at 4925 Greenville Ave., Dallas, TX 75206 (Exhibit M to Declaration of Julie Duncan) | A294 |
| | | 15. Davinci Virtual Office Solutions' "Contact Us" webpage (Exhibit N to Declaration of Julie Duncan) | A297 |
| | | 16. YP.com webpage advertising a personal injury law firm located at 4925 Greenville Ave., Suite 200, Dallas, TX 75206 (Exhibit O to Declaration of Julie Duncan) | A299 |
| | | 17. LeForce Law, PLLC "Contact Us" webpage (Exhibit P to Declaration of Julie Duncan) | A302 |
| | | 18. Dallas Geological Society "Contact Us" webpage (Exhibit Q to Declaration of Julie Duncan) | A307 |
| | | 19. Law Office of S. Craig Glickman "Locations" webpage (Exhibit R to Declaration of Julie Duncan) | A309 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | 20. The Coles Firm "Contact Us" webpage (Exhibit S to Declaration of Julie Duncan) | A311 |
| | | 21. Rothrock Law Firm PL webpage (Exhibit T to Declaration of Julie Duncan) | A313 |
| | | 22. Table C-5, U.S. District Courts—Median Time Intervals from Filing to Disposition of Civil Cases Terminated (Exhibit U to Declaration of Julie Duncan) | A317 |
| | | 23. Bellevue, Washington, to San Francisco, California - Google Maps (Exhibit V to Declaration of Julie Duncan) | A321 |
| | | 24. Bellevue, Washington, to Wichita Falls, Texas - Google Maps (Exhibit W to Declaration of Julie Duncan) | A323 |
| | | 25. March 29, 2013 trial transcript excerpt from Summit 6 LLC v. Research in Motion Corp. et al., No. 3:11-cv-00367-O (Exhibit X to Declaration of Julie Duncan) | A328 |
| | | 26. April 3, 2013 trial transcript excerpt from Summit 6 LLC v. Research in Motion Corp. et al., No. 3:11-cv-00367-O (Exhibit Y to Declaration of Duncan) | A331 |
| | | 27. Email from Peter Yoakum dated March 14, 2006, which was submitted as Defendants' Exhibit 2128 in Summit 6 LLC v. Research in Motion Corp. et al., No. 3:11-cv-00367-O (Exhibit Z to Declaration of Julie Duncan) | A345 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | 28. USPTO Final Office Action issued on May 21, 2014, in ex parte Reexamination No. 90/012,987 (Exhibit AA to Declaration of Julie Duncan) | A348 |
| | | 29. Deed of Trust recorded with the Auditor of Kitsap County, Washington, and signed by Peter Yoakum and Julie Yoakum on April 4, 2014 (Exhibit BB to Declaration of Julie Duncan) | A380 |
| | | 30. San Diego, California, to San Francisco, California - Google Maps (Exhibit CC to Declaration of Julie Duncan) | A398 |
| | | 31. Contact report for Scott Lewis from public records search engine PeopleSmart (Exhibit DD to Declaration of Julie Duncan) | A400 |
| | | 32. Gordon Gardiner's biography on Swiftsure Capital LLC's website (Exhibit EE to Declaration of Julie Duncan) | A404 |
| | | 33. Midway, Utah, to San Francisco, California - Google Maps (Exhibit FF to Declaration of Julie Duncan) | A406 |
| | | 34. Midway, Utah, to Wichita Falls, Texas - Google Maps (Exhibit GG to Declaration of Julie Duncan) | A408 |
| | | 35. USPTO Inter Partes Reexamination Filing Data (Exhibit HH to Declaration of Julie Duncan) | A414 |

| DOCKET NO. | DATE FILED | DESCRIPTION | APX. NO. |
|---|---|---|---|
| | | 36. USPTO Ex Parte Reexamination Filing Data (Exhibit II to Declaration of Julie Duncan) | A421 |
| | | 37. Orbitz estimate of travel times and costs for flights from San Diego Airport ("SAN") to San Francisco International Airport ("SFO") (Exhibit JJ to Declaration of Julie Duncan) | A434 |
| | | 38. Orbitz estimate of travel times and costs for flights from San Diego Airport ("SAN") to Wichita Falls Municipal Airport ("SPS") (Exhibit KK to Declaration of Julie Duncan) | A440 |
| | | 39. Orbitz estimate of travel times and costs for flights from Seoul, South Korea, to San Francisco International Airport ("SFO") (Exhibit LL to Declaration of Julie Duncan) | A449 |
| | | 40. Orbitz estimate of travel times and costs for flights from Seoul, South Korea, to Wichita Falls Municipal Airport ("SPS") (Exhibit MM to Declaration of Julie Duncan) | A455 |
| | | 41. Distance between Seoul, South Korea, and San Francisco, California - Geobytes.com (Exhibit NN to Declaration of Julie Duncan) | A465 |
| | | 42. Distance between Seoul, South Korea, and Wichita Falls, Texas - Geobytes.com (Exhibit OO to Declaration of Julie Duncan) | A467 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | 43. Distance between San Diego, California, and San Francisco, California - Geobytes.com (Exhibit PP to Declaration of Julie Duncan) | A469 |
| | | 44. Distance between San Francisco, California, and Wichita Falls, Texas- Geobytes.com (Exhibit QQ to Declaration of Julie Duncan) | A471 |
| | | 45. Samsung Telecommunications America – "Our Company" webpage (Exhibit RR to Declaration of Julie Duncan) | A473 |
| | | 46. Blackberry – "Contact Information" webpage (Exhibit SS to Declaration of Julie Duncan) | A475 |
| | | 47. Wichita Falls Municipal Airport – "Flights & Reservations" webpage (Exhibit TT to Declaration of Julie Duncan) | A478 |
| | | 48. Declaration of Ed Axelsen in support of Defendants' Motion to Transfer | A482 |
| | | 49. Declaration of Mark Buckley in support of Defendants' Motion to Transfer | A485 |
| | | 50. Declaration of Renee Brown in support of Defendants' Motion to Transfer | A490 |
| | | 51. Declaration of Stephanie Bariault in support of Defendants' Motion to Transfer | A494 |

| DOCKET NO. | DATE FILED | DESCRIPTION | APX. NO. |
|---|---|---|---|
| | | 52. Orbitz estimate of travel times and costs for flights from Seattle-Tacoma International Airport to San Francisco International Airport (Exhibit 1 to Declaration of Stephanie Bariault) | A501 |
| | | 53. Google Maps: Driving Directions showing distance from San Francisco International Airport to the San Francisco Courthouse. (Exhibit 2 to Declaration of Stephanie Bariault) | A507 |
| | | 54. Orbitz estimate of travel times and costs for flights from Seattle- Tacoma International Airport to Wichita Falls Municipal Airport (Exhibit 3 to Declaration of Stephanie Bariault) | A510 |
| | | 55. Google Directions from Dallas/Fort Worth International Airport ("DFW") to the Wichita Falls Courthouse (Exhibit 4 to Declaration of Stephanie Bariault) | A517 |
| | | 56. Orbitz estimate of travel times from Taiwan Taoyuan International Airport ("TPE") to San Francisco International Airport ("SFO") (Exhibit 5 to Declaration of Stephanie Bariault) | A520 |
| | | 57. Orbitz estimate of travel times from Taiwan Taoyuan International Airport ("TPE") to Wichita Falls Municipal Airport ("SPS") (Exhibit 6 to Declaration of Stephanie Bariault) | A527 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | 58. Directions from Dallas/Fort Worth Airport ("DFW") to Dallas Courthouse – Google Maps (Exhibit 7 to Declaration of Stephanie Bariault) | A535 |
| | | 59. Directions from Dallas/Fort Worth Airport ("DFW") to Fort Worth Courthouse – Google Maps (Exhibit 8 to Declaration of Stephanie Bariault) | A538 |
| | | 60. Declaration of Cecilia Son in support of Defendants' Motion to Transfer | A542 |
| 91-1 | 06/10/14 | Declaration of Julie Duncan In Support of Defendant's Motion to Transfer to the Northern District of California | A246 |
| | | Exhibit A:  Combined Declaration and Power of Attorney for Utility Patent Application for U.S. Patent Application No. 09/357,836 | A255 |
| | | Exhibit B: Press release jointly issued on March 8, 2000, by iPIX and PictureWorks Technology, Inc. | A262 |
| | | Exhibit C: Patent Assignment Abstract of Title for U.S. Patent No. 6,895,557 | A267 |
| | | Exhibit D: Webpage hosted by Swiftsure Capital | A272 |
| | | Exhibit E: Patent Assignment Abstract of Title for U.S. Patent No. 7,765,482 | A274 |
| | | Exhibit F: Press release dated May 7, 2008 | A277 |
| | | Exhibit G: Entity Details on Summit 6 LLC | A280 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | Exhibit H: Substitution of Trustee and Full Reconveyance that Wells Fargo Bank, N.A., recorded with the County Clerk-Recorder of Contra Costa County, California, on August 30, 2013 | A282 |
| | | Exhibit I: Sarah Pate's LinkedIn profile, last accessed on May 27, 2014 | A284 |
| | | Exhibit J: Full Reconveyance recorded with the County Clerk-Recorder of Contra Costa County, California, on October 17, 2013. | A288 |
| | | Exhibit K: Full Reconveyance recorded with the County Clerk-Recorder of Contra Costa County, California, on July 16, 2013. | A290 |
| | | Exhibit L: Scott F. Wilson's biography as hosted on Swiftsure Capital's website, last accessed on May 23, 2014, | A292 |
| | | Exhibit M: Davinci Virtual Office Solutions' webpage advertising its virtual office at 4925 Greenville Ave., Dallas, Texas, last accessed on May 23, 2014 | A294 |
| | | Exhibit N: Davinci Virtual Office Solutions' "Contact Us" webpage, last accessed on April 25, 2014, | A297 |
| | | Exhibit O: Yellowpages.com webpage. | A299 |
| | | Exhibit P: lefocelaw.com/contact-us/ webpage | A302 |
| | | Exhibit Q: dgs.org/memberships/applications web page | A307 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | Exhibit R: craigglickmanlaw.com/map webpage | A309 |
| | | Exhibit S:colesfirm.com/ContactUS.html webpage | A311 |
| | | Exhibit T: www.rothrocklawfirm.com webpage | A313 |
| | | Exhibit U: Table C-5, U.S. District Courts—Median Time Intervals from Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period ending March 31, 2014 | A317 |
| | | Exhibit V: Report from the website http://maps.google.com | A321 |
| | | Exhibit W: Report from the website http://maps.google.com. | A323 |
| | | Exhibit X: Excerpt from the March 29, 2013 trial transcript in *Summit 6 LLC v. Research in Motion Corp. et al.*, Cv. No. 3:11-cv-00367-O | A328 |
| | | Exhibit Y: Excerpt from the April 3, 2013 trial transcript in *Summit 6 LLC v. Research in Motion Corp. et al.*, Cv. No. 3:11-cv-00367-O | A331 |
| | | Exhibit Z: Email from Peter Yoakum dated 04/13/2006, which was submitted as Defendants' Exhibit 2029 in *Summit 6 LLC v. Research in Motion Corp. et al.*, Cv. No. 3:11-cv-00367-O | A345 |

| DOCKET NO. | DATE FILED | DESCRIPTION | APX. NO. |
|---|---|---|---|
| 91-2 | 06/10/14 | Exhibit AA: Final Office Action mailed on May 21, 2014, in *ex parte* reexamination proceeding No. 90/012,987 | A348 |
| | | Exhibit BB: Deed of Trust recorded on April 8, 2014, with the Auditor of Kitsap County, Washington, and signed by Peter Yoakum and Julie Yoakum on April 4, 2014 | A380 |
| | | Exhibit CC: Report from the website http://maps.google.com. | A398 |
| | | Exhibit DD: Report from public records search engine Peoplesmart. | A400 |
| | | Exhibit EE: Gordon Gardiner's biography on Swiftsure Capital's website | A404 |
| | | Exhibit FF: Report from the website http://maps.google.com. | A406 |
| 91-3 | 06/10/14 | Exhibit GG: Report from the website http://maps.google.com. | A408 |
| | | Exhibit HH: "*Inter Parte* [sic] Reexamination Filing Data – Septeber [sic] 30, 2013," published by the United States Patent and Trademark Office. | A414 |
| | | Exhibit II: "*Ex Parte* Reexamination Filing Data – September 30, 2013," published by the U.S. Patent and Trademark Office. | A421 |
| | | Exhibit JJ: Orbitz estimate of travel times and costs for June 9, 2014 flights from San Diego International Airport ("SAN") to San Francisco International Airport ("SFO") | A434 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | Exhibit KK: Orbitz estimate of travel times and costs for June 9, 2014 flights from San Diego International Airport ("SAN") to Wichita Falls Municipal Airport ("SPS") | A440 |
| 91-4 | 06/10/14 | Exhibit LL: Orbitz estimate of June 9, 2014 travel times from Seoul ("ICN" and/or "GMP") to San Francisco International Airport ("SFO") | A449 |
| | | Exhibit MM: Orbitz estimate of June 9, 2014 travel times from Seoul ("ICN" and/or "GMP") to Wichita Falls Municipal Airport ("SPS") | A455 |
| | | Exhibit NN: Printout from Geobytes.com calculating the distance between Seoul, South Korea, and San Francisco, California. | A465 |
| | | Exhibit OO: Printout from Geobytes.com calculating the distance between Seoul, South Korea, and Wichita Falls, Texas. | A467 |
| | | Exhibit PP: printout from Geobytes.com calculating the distance between San Diego, California, and San Francisco, California. | A469 |
| | | Exhibit QQ: Printout from Geobytes.com calculating the distance between San Francisco, California, and Wichita Falls, Texas. | A471 |
| | | Exhibit RR: samsungtelecom.com/life-at-samsung/our-company.asp. | A473 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | Exhibit SS: http://ca.blackberry.com/company/about-us/contact.html | A475 |
| | | Exhibit TT: flywichitafalls.net/flights-reservations/. | A478 |
| 91-5 | 06/10/14 | Declaration of Ed Axelsen in Support of Defendants' Motion to Transfer to the Northern District of California | A482 |
| | | Declaration of Mark Buckley in Support of Defendants' Motion to Transfer Venue | A485 |
| | | Declaration of Renee Brown in Support of Defendant Motorola Mobility LLC's Motion to Transfer | A490 |
| | | Declaration of Stephanie Bariault in Support of Defendants HTC Corporation's and HTC America, Inc's Motion to Transfer Venue | A494 |
| | | Exhibit 1: Orbitz estimate of travel times and costs for flights from Seattle-Tacoma International Airport ("SEA") to San Francisco International Airport ("SFO") sorted by quickest route. | A501 |
| | | Exhibit 2: Google Maps Driving Directions showing distance from San Francisco International Airport ("SFO") to the San Francisco Courthouse (located at 450 Golden Gate Avenue, San Francisco, CA 94102) | A507 |
| | | Exhibit 3: Orbitz estimate of travel times and costs for flights from Seattle-Tacoma International Airport ("SEA") to Wichita Falls Municipal Airport ("SPS"), sorted by | A510 |

| DOCKET NO. | DATE FILED | DESCRIPTION | APX. NO. |
|---|---|---|---|
| | | quickest route. | |
| | | Exhibit 4: Google Directions from Dallas/Fort Worth International Airport ("DFW") to the Wichita Falls Courthouse, located at 1000 Lamar Street, Wichita Falls, TX 76301 | A517 |
| | | Exhibit 5: Orbitz estimate of travel times from Taiwan Taoyuan International Airport ("TPE") to San Francisco International Airport ("SFO"), sorted by quickest route. | A520 |
| | | Exhibit 6: Orbitz estimate of travel times from Taiwan Taoyuan International Airport ("TPE") to Wichita Falls Municipal Airport ("SPS"), sorted by quickest route. | A527 |
| | | Exhibit 7: Google Directions from Dallas/Fort Worth Airport ("DFW") to Dallas Courthouse located at 1100 Commerce Street, Dallas, TX 75242 | A535 |
| | | Exhibit 8: Google Directions from Dallas/Fort Worth Airport ("DFW") to Fort Worth Courthouse, located at 501 West 10th Street, Fort Worth, TX 76102. | A538 |
| | | Declaration of Cecilia Son (LG Defendants) in Support of Motion to Transfer | A542 |
| 111 | 06/25/14 | Defendant Apple Inc.'s Motion to Sever | A547 |
| 112 | 06/25/14 | Memorandum in Support of Defendant Apple Inc.'s Motion to Sever | A552 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| 118 | 07/01/14 | Plaintiff Summit 6 LLC's Response to Defendants' Motion to Transfer to the Northern District of California | A566 |
| 118-1 | 07/01/14 | Appendix in Support of Plaintiff Summit 6 LLC's Response to Defendants' Motion to Transfer to the Northern District of California | A590 |
| | | Declaration of Richard Kamprath in Suport | A595 |
| | | Exhibit 1 – Jury Trial Transcript excerpts for VirnetX, Inc. v. Apple, Inc., U.S.D.C., Eastern District of Texas, Tyler Division, Civil Action No. 6:10-cv-417, dated Nov. 11, 2012 | A598 |
| | | Exhibit 2 – The Dallas Morning News article, dated Sept. 9, 2013 | A603 |
| | | Exhibit 3 – Tarrant County Appraisal District Business Property Page, dated May 27, 2014 | A606 |
| | | Exhibit 4 – Declaration of S. Pate, dated June 28, 2014 | A608 |
| | | Exhibit 5 – AT&T and Verizon headquarters information, dated July 1, 2014 | A613 |
| | | Exhibit 6 – Internet article from Silicon Valley Business Journal, dated February 5, 2014 | A620 |
| | | Exhibit 7 – U.S. District Courts Chart, dated March 13, 2013 | A625 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | Exhibit 8 – Scheduling Order for Summit 6, LLC, v. HTC Corporation, et al., U.S.D.C., Northern District, Wichita Falls Division, Civil Action No.7:14-cv-14-O, dated June 12, 2014 | A629 |
| | | Exhibit 9 – Jury Trial Transcript for Apple, Inc. v. Samsung Electronics Co, et al., U.S.D.C., Northern District of California, San Jose Division, Civil Action No. C-11-01846-LHK, dated July 30, 2012 | A642 |
| | | Exhibit 10 – Order for Kaneka Corporation v. JBS Hair, Inc., et al., U.S.D.C., Northern District of Texas, Dallas Division, Civil Action No. 3:10-cv-1430-P, dated July 5, 2011 | A669 |
| | | Exhibit 11 – Initial Disclosures of Defendant Motorola Mobility LLC for Summit 6, LLC, v. HTC Corporation, et al., U.S.D.C., Northern District, Wichita Falls Division, Civil Action No. 7:14-cv-14-O, dated June 20, 2014 | A685 |
| | | Exhibit 12 – Wichita Falls, Texas Per Diem Rates, dated July 1, 2014 | A694 |
| | | Exhibit 13 – Dallas, Texas Per Diem Rates, dated, July 1, 2014 | A696 |
| | | Exhibit 14 – Sunnyvale, Palo Alto, and San Jose, California Per Diem Rates, dated July 1, 2014 | A698 |
| | | Exhibit 15 – San Francisco, California Per Diem Rates, dated July 1, 2014 | A700 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | Exhibit 16 – LG Account Marketing Manager Job Information Sheet, dated April 16, 2014 | A702 |
| | | Exhibit 17 – Motorola Mobility Carrier Marketing Consultant Job Information Sheet, dated June 28, 2014 | A705 |
| 119 | 07/15/14 | Defendants' Reply Brief in Support of Their Motion to Transfer to the Northern District of California | A708 |
| 120 | 07/15/14 | Appendix to Defendants' Reply Brief in Support of Their Motion to Transfer to the Northern District of California | A725 |
| | | 1. Declaration of Doulas L. Clark in Support of Defendants' Motion to Transfer Venue Under 28 U.S.C. § 1404(a) | A731 |
| | | 2. Texas Secretary of State Business Organizations Inquiry Web Page (Exhibit A to Declaration of Douglas L. Clark) | A735 |
| | | 3. Franchise Tax Account Status for Summit 6 (Exhibit B to Declaration of Douglas L. Clark) | A739 |
| | | 4. Dallas County Tax Office Website (Exhibit C to Declaration of Douglas L. Clark) | A741 |
| | | 5. Web Pages from the Dallas County Tax Office Website (Exhibit D to Declaration of Douglas L. Clark) | A758 |

| Docket No. | Date Filed | Description | Apx. No. |
|---|---|---|---|
| | | 6. Summit 6's Initial Disclosures (Exhibit E to Declaration of Douglas L. Clark) | A764 |
| | | 7. Apple Inc.'s Initial Disclosures (Exhibit F to Declaration of Douglas L. Clark) | A773 |
| | | 8. Twitter, Inc.'s Initial Disclosures (Exhibit G to Declaration of Douglas L. Clark) | A785 |
| | | 9. HTC Corporation and HTC America, Inc.'s Initial Disclosures (Exhibit H to Declaration of Douglas L. Clark) | A797 |
| | | 10. Motorola Mobility LLC's Initial Disclosures (Exhibit I to Declaration of Douglas L. Clark) | A808 |
| | | 11. LG Electronics, Inc., LG Electronics USA, Inc. and LG Electronics MobileComm USA, Inc.'s Initial Disclosures (Exhibit J to Declaration of Douglas L. Clark) | A817 |
| | | 12. Selected Web Pages from the Tarrant Appraisal District Website (Exhibit K to Declaration of Douglas L. Clark) | A832 |
| | | 13. Supplemental Declaration of Mark Buckley in Support of Defendants' Motion to Transfer Venue Under 28 U.S.C. § 1404(a) | A839 |
| | | 14. | |
| 122 | 07/16/14 | Plaintiff Summit 6 LLC's Response to Defendant Apple Inc.'s Motion to Sever | A841 |

| DOCKET NO. | DATE FILED | DESCRIPTION | APX. NO. |
|---|---|---|---|
| 122.1 | 07/16/14 | Appendix in Support of Plaintiff Summit 6 LLC's Response to Defendant Apple Inc.'s Motion to Sever | A858 |
| | | Exhibit 1 – Memorandum and Opinion Order, *Smartflash LLC v Apple, Inc.,* No. 6:13-cv-447, United States District Court, Eastern District of Texas, Doc. 122, dated Apr. 4, 2014 | A862 |
| | | Exhibit 2 – Summit 6, LLC's Infringement Contentions to Apple, Inc. for U.S. Patent 7,765,482 (Claim 1 only) | A883 |
| | | Exhibit 3 – Twitter Developers website page, *"Get Help/Configuration,"* dated Aug. 25, 2012 | A940 |
| | | Exhibit 4 – Twitter Help Center website article, *"About the Twitter for iOS Integration,"* dated 2014 | A944 |
| | | Exhibit 5 – Apple Support website article, *"iOS: Using Facebook, Twitter, and Other Social Network Accounts,"* dated July 15, 2014 | A949 |
| | | Exhibit 6 - Order (Granting Facebook, Inc.'s Opposed Motion to Sever), *Summit 6, LLC v. Research in Motion,* No. 6:11-cv-367-O, United States District Court, Eastern District of Texas, Doc. 508, dated Feb. 6, 2013 | A953 |
| 123 | 07/30/14 | Defendant Apple Inc.'s Reply Brief Supporting Its Motion to Sever | A959 |

| DOCKET NO. | DATE FILED | DESCRIPTION | APX. NO. |
|---|---|---|---|
| 125 | 07/30/14 | Appendix in Support of Defendant Apple Inc.'s Reply Brief Supporting Its Motion to Sever | A974 |
| | | 1. Declaration of Lon Outland in Support of Defendant Apple Inc.'s Reply Supporting its Motion to Sever | A977 |
| | | 2. Excerpts of Plaintiff Summit 6 LLC's First Set Of Common Requests For Production to be Separately Answered by Each Defendant (Exhibit A) | A979 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| SUMMIT 6 LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| HTC CORPORATION, HTC | § | |
| AMERICA, INC., LG | § | Civil Action No. 7:14-cv-0014-O |
| ELECTRONICS, INC., LG | § | |
| ELECTRONICS USA, INC., LG | § | |
| ELECTRONICS MOBILECOMM | § | |
| USA, INC., MOTOROLA | § | |
| MOBILITY LLC, APPLE INC., and | § | |
| TWITTER, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion to Transfer to the Northern District of California, filed June 10, 2014 (ECF No. 89) and Defendant Apple Inc.'s Motion to Sever, filed June 25, 2014 (ECF No. 111). Having considered the motions, responses, replies, appendices, record, and for the reasons that follow, the Court denies Defendants' Motion to Transfer to the Northern District of California, and grants in part and denies in part Defendant Apple Inc.'s Motion to Sever.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Summit 6 LLC ("Summit 6") is a Dallas-based company which "provides media upload technology to device manufacturers, and providers of online services." *See* Summit 6 Overview, www.summit6.com (last visited September 5, 2014). Summit 6 is the owner by assignment of three United States Patents relating to processing digital images, specifically, U.S.

Patent Nos. 6,895,557 ("the '557 Patent"), 7,765,482 ("the '482 Patent"), and 8,612,515 ("the '515 Patent") (collectively, the "Patents-in-Suit"). The '557 Patent is entitled "Web-based Media Submission Tool," and relates to "the handling, manipulation and processing of digital content and more particularly to the transportation and Internet publishing of digital content, particularly image media objects and rich media." *See* U.S. Patent No. 6,895,557 col. 1 l. 11-12 (filed July 21, 1999). The '482 Patent is a continuation of the earlier '557 Patent, and is also entitled "Web-based Media Submission Tool," and relates to "the handling, manipulation and processing of digital content." *See* U.S. Patent No. 7,765,482 col. 1 l. 11-12 (filed October 8, 2004). The '515 Patent is entitled "System, Method and Apparatus for Media Submission," and, like the '557 and '482 Patents, relates to "the handling, manipulation and processing of digital content and more particularly to the transportation and Internet publishing of digital content, particularly image media objects and rich media." *See* U.S. Patent No. 6,895,515 col. 1 l. 11-12 (filed April 29, 2011).

In 2011, Summit 6 sued defendants Research in Motion Corp., Research in Motion Ltd., Samsung Electronics Co., Ltd., Samsung Telecommunications America LLC, Multiply Inc., and Facebook Inc. for infringing the '482 Patent and the '557 Patent in the Northern District of Texas. *See Summit 6 LLC v. Research in Motion Corp., et al.*, No. 3:11-cv-367-O. During the pendency of the case, the Court reviewed the technology, construed the '557 and '482 Patents, ruled on various evidentiary issues, presided over a jury trial on infringement and validity, and held a separate non-jury trial on inequitable conduct relating to the '482 Patent. The jury found infringement and awarded Summit 6 $15 million in damages. The Court entered judgment in favor of Summit 6 and the case is currently on appeal. *See Summit 6 LLC v. Samsung Electronics Co., Ltd.*, Federal Circuit Appeal No. 13-648.

On February 18, 2014, Summit 6 filed this patent infringement lawsuit alleging infringement of the '557 and '482 Patents, as well as the '515 Patent, against application developer Twitter, Inc. ("Twitter") and four mobile device manufacturers and their affiliates, namely, Apple Inc. ("Apple"), HTC Corporation and HTC America, Inc. (collectively, "HTC"), LG Electronics, Inc., LG Electronics USA, Inc., and LG Electronics MobileComm USA, Inc. (collectively, "LGE"), and Motorola Mobility LLC ("Motorola"). The gravamen of Summit 6's lawsuit is that Defendants are using Summit 6's patented technology without permission to produce and sell devices and/or operate online services capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location. *See generally* First Amended Compl., ECF No. 6. Summit 6 alleges that all Defendants have infringed, and continue to infringe, directly, contributorily, and/or through the inducement of others, the claim inventions of the '482 Patent and the '515 Patent. *See id.* As to Twitter, Summit 6 alleges that Twitter has infringed, and continues to infringe, directly, contributorily, and/or through the inducement of others, the claim inventions of the three Patents-in-Suit through certain of its upload services. *See id.* ¶¶ 107-119, 205-217, 219-230. Twitter's accused upload services include "the Twitter Application for iPhone, the Twitter Application for iPad, the Twitter Application for Android Tablet, and any other Twitter Application capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the Twitter content upload functionality integrated into the native sharing options for iOS and Android devices; Twitter's [Application Programming Interfaces] APIs related to obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; Twitter's mobile website; and Twitter's website-related infrastructure." *See id.* ¶¶ 107, 205, 219. As to the mobile device manufacturers, Summit 6 alleges infringement of the '482 Patent and the '515 Patent based on each

3

device's messaging technology, including use of "MMS functionality," "Message-related APIs," "the integrated Twitter content upload functionality," and "MMS-to-Twitter functionality." *See id.* ¶¶ 23, 35, 47, 59, 71, 83, 95, 121, 133, 145, 153, 169, 181, 193. Summit 6 seeks injunctive relief, as well as damages, attorney's fees and costs.

Defendants deny infringement and have asserted the affirmative defense that the Patents-in-Suit are invalid, and, with regard to the '482 and '515 Patents, that the Patents are unenforceable due to inequitable conduct of the inventors and prior owners of these patents. Defendants Motorola, Twitter and HTC have also filed counterclaims for declaratory judgment of non-infringement and invalidity of the Patents-in-Suit. *See generally* Apple Inc.'s Ans. & Aff. Def., ECF No. 49; Def. Motorola's Ans. & Countercl., ECF No. 51; Twitter, Inc.'s Ans. & Countercl., ECF No. 53; Ans. & Aff. Def. & Countercl. of HTC Def., ECF No. 66; Ans. of LGE Def., ECF No. 64.

Plaintiff Summit 6 is a Delaware limited liability company with its principal place of business in Dallas, Texas. First Amended Compl. ¶¶ 219-230; App. Supp. Resp. Ex. 4 (Pate Decl.) ¶¶ 12-18, ECF No. 118-1. Defendants' places of incorporation and principal places of business are scattered. Defendant Apple is a California corporation with its headquarters in Cupertino, California, which is in the Northern District of California.. App. Supp. Mot. Transfer Ex. 240 (Buckley Decl.) ¶ 5, ECF No. 91-5. Defendant Twitter is a Delaware corporation with its principal place of business in San Francisco, California, which is in the Northern District of California. *Id.* Ex. 238 (Axelsen Decl.) ¶ 4. Defendant HTC Corporation is a Taiwanese corporation with its principal place of business in Taiwan, ROC. *Id.* Ex. 249 (Bariault Decl.) ¶ 2. Defendant HTC America, Inc. is incorporated in Washington and has its principal place of business in Bellevue, Washington. *Id.* Defendant LG Electronics Mobilecomm U.S.A., Inc. ("LGE MobileComm") is a

4

California corporation with its headquarters in San Diego, California, which is in the Southern District of California. *Id.* Ex. 297 (Son Decl.) ¶ 3. Defendant LG Electronics, Inc. ("LGE Inc.") is a Korean company with its headquarters in Seoul, South Korea. *Id.* ¶ 4. Defendant LG Electronics USA, Inc. is a wholly-owned subsidiary of LGE Inc., and has a warehouse facility in Fort Worth, Texas *Id.* ¶¶ 4, 21-22. Defendant Motorola is a Delaware limited liability company with its principal place of business in Chicago, Illinois. *Id.* Ex. 245 (Brown Decl.) ¶ 3.

Defendants move to transfer all proceedings against them to the Northern District of California under 28 U.S.C. § 1404(a). In the event the Court denies the motion to transfer venue, Apple has filed a contingent motion to sever and transfer. The motions have been fully briefed and are ripe for adjudication.

## II.    MOTION TO TRANSFER VENUE

### A.    Legal Standard

Under 28 U.S.C. § 1404(a), a district court may transfer any civil case "[f]or the convenience of the parties and witnesses, in the interest of justice . . . to any other district or division where it might have [originally] been brought." The decision to transfer a pending case is committed to the sound discretion of the district court. *Jarvis Christian Coll. v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1988).

A threshold inquiry is whether the suit "might have been brought" in the proposed transferee district. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 312 (5th Cir. 2008) (en banc) (*Volkswagen II*). Once a defendant satisfies that burden, the Court weighs certain factors to determine if transfer is warranted. *Id.* n.9; *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507-08 (1947). "It is well settled that the party moving for a change of venue bears the burden of demonstrating why the forum

should be changed." *Dupre v. Spanier Marine Corp.*, 810 F. Supp. 823, 825 (S.D. Tex. 1993). Placing the burden on the moving party to show "good cause" for the transfer "reflects the appropriate deference to which the plaintiffs' choice of venue is entitled." *Volkswagen II*, 545 F.3d at 315. The burden on the movant is "significant," and for a transfer to be granted, the transferee venue must be "clearly more convenient than the venue chosen by the plaintiff." *Id.*

When considering whether to grant a motion to transfer venue, courts must consider a series of public and private interest factors, none of which is dispositive. *Id.* "The private interest factors are: '(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive.'" *Id.* (quoting *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (*Volkswagen I*) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981)). "The public interest factors are: '(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws . . . .'" *Id.* A court may transfer venue when these factors show that a different venue would be more convenient for the parties involved. *Id.* at 314. "Although [these factors] are appropriate for most transfer cases, they are not necessarily exhaustive or exclusive." *Id.* at 315. Further, "none [of these factors] can be said to be of dispositive weight." *Id.* (quoting *Action Indus., Inc. v. U.S. Fid. & Guar. Corp.*, 358 F.3d 337, 340 (5th Cir. 2004)). When transferring venues would simply shift inconveniences, transfer is inappropriate. *First Fitness Int'l, Inc. v. Thomas*, 533 F. Supp. 2d 651, 658 (N.D. Tex. 2008). Fifth Circuit precedent clarifies that the plaintiff's choice of venue is not a distinct factor in the § 1404(a) analysis, but "when the

6

transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Volkswagen II*, 545 F.3d at 314-15.

The purpose of § 1404(a) "is to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotations omitted).  As a result, in addition to the private and public interest factors, "in appropriate circumstances, courts have analyzed the goal of preventing unnecessary inconvenience and expense under the rubric of 'judicial economy.'" *Patent Harbor, LLC v. Twentieth Century Fox Home Entm't, LLC*, 2012 WL 1903875, at *2 (E.D. Tex. May 25, 2012).  Further, "courts have consistently held that judicial economy plays a paramount role in trying to maintain an orderly, effective, administration of justice." *Id.* (quoting *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010)) (additional citation omitted); *see also* 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in *the interest of justice . . .* ") (emphasis added).  In certain cases, the potential "inconvenience" of the parties may be outweighed by judicial economy considerations.  *See, e.g., Patent Harbor*, 2012 WL 1903875 at *2 ; *ColorQuick LLC v. Vistaprint Ltd.*, 2010 WL 5136050, at *7 (E.D. Tex. Jul. 22, 2010), *mandamus denied*, *In re Vistaprint, Ltd.*, 628 F.3d 1342 (Fed. Cir. 2010) (denying transfer where most convenience factors weighed in favor of transfer since "[t]he parties and the judiciary would benefit from the Court's familiarity with the patent-in-suit, which would require a substantial investment of time, energy and money to replicate.")

### B.   Summary of Parties' Arguments

Defendants argue that transferring this case to the Northern District of California is proper because the majority of the public and private interest factors considered by the Fifth Circuit weigh

in favor of transfer.  *See* Defs.' Br. Supp. Mot. Transfer 9, ECF No. 90.  Specifically, Defendants contend that the Northern District of California could compel third-party witnesses, would be more convenient for known witnesses, would have easier access to sources of proof, and trial would be more expeditious and less expensive.  *Id.* at 9-10.  Defendants argue that Wichita Falls would be an inconvenient forum for all traveling witnesses because Wichita Falls does not have a major airport, and therefore all flights must connect through Dallas/Fort Worth.  *Id.* at 14.  In particular, Defendants note that travel time for witnesses located in the State of Washington, in San Diego, California,  in Taiwan, and in Korea will be shorter if the trial is held in California rather than in Texas.  *Id.* at 15. In short, Defendants argue that because the parties have extensive connections to the Northern District of California but lack relevant connections to the Northern District of Texas, a transfer of venue is warranted.

Summit 6 opposes transfer, arguing that Defendants fail to meet their burden of showing the transferee venue is "clearly more convenient than the venue chosen by Plaintiff."  Pl.'s Resp. Mot. Transfer 17 (quoting *Volkswagen II*, 545 F.3d at 315), ECF No. 118.  Summit 6 contends that Defendants' motion ignores ties to the Northern District of Texas, and misleadingly focuses on undisclosed "likely" witnesses, unknown "potential" witnesses, and hypothetical third parties.  *Id.* at 1.  Summit 6 also argues that the Court's past experience with two of the three Patents-in-Suit weighs in favor of denying transfer:

> Defendants pay scant lip-service to the previous Summit 6 case against Facebook, Samsung, and others.  They minimize the fact that this very Court proceeded all the way through pre-trial on two of the three Patents-in-Suit, and went through a liability trial, an inequitable conduct trial, and post-trial briefing for one of the Patents-in-Suit.  *Summit 6, LLC v. RIM*, Case No. 3:11-cv-0367-O (N.D. Tex. filed Feb. 23, 2011) (O'Connor, J.).

*Id.* at 3.   According to Summit 6, "[t]his Court's past experience is significant, it substantially overlaps with the issues in the current case, and will likely involve similar or identical evidence as that in the current case.  *Id.* at 9.

### C.    Analysis

#### 1.    Proper Venue

The threshold question in a § 1404(a) analysis is whether the civil action might have been originally brought in the transferee court, here, the Northern District of California.  *Volkswagen II*, 545 F.3d at 312.  Summit 6 does not dispute that this case could have been originally brought in the Northern District of California.  The next question, then, is whether transferring the case would be for the convenience of parties and witnesses, and in the interest of justice.  To make this determination, the Court must consider and weigh the private and public interest factors set forth above.

#### 2.    Private Interest Factors

##### a.    *Relative Ease of Access to Sources of Proof*

The first private interest factor is relative ease of access to sources of proof.  *See Volkswagen II*, 545 F.3d at 316.   Defendants contend that it will be substantially more convenient to access sources of proof in the proposed transferee venue because the vast majority of sources of proof and documents relevant to the claims of infringement asserted against the majority of Defendants are located in the Northern District of California.  Through declarations, Defendants provide evidence that Apple's and Twitter's potentially relevant evidence and sources of proof are located in the transferee venue.  *See* App. Supp. Mot. Transfer Ex. 238 (Axelsen Decl.) ¶ 10, ECF No. 91-5 (Twitter); *id.* Ex. 238 (Buckley Decl.) ¶ 4 (Apple).  Defendant Motorola's relevant documents are

9

either in Chicago, Illinois (Motorola's principal place of business), or in Sunnyvale, California, where it has an office. *Id*. Ex. 245 (Brown Decl.) ¶ 10. HTC has no documents or proof in California, but instead in Taiwan or Bellevue, Washington. *Id*. Ex. 249 (Bariault Decl.) ¶¶ 5, 10-11. LGE MobileComm's relevant U.S.-based documents are located either in San Diego, California (its principal place of business), or in San Jose, California, where it has an office. *Id*. Ex. 297 (Son Decl.) ¶¶ 12-16.

In response, citing declarations submitted by Defendants, Summit 6 emphasizes that HTC has no documents or proof in California, but instead in Taiwan or Bellevue, Washington, and that LGE Inc.'s proof is in Seoul, Korea, not California. Further, Summit 6 argues that "although LG MobileComm states that most of its sources of proof are located in San Jose, California, it appears that at least some of this evidence is actually located in New Jersey." Pl.'s Resp. Mot. Transfer 19 (citing *Vertical Computer Sys., Inc. v. LG Electronics MobileComm USA, Inc.*, 2013 WL 2241947, at *3 (E.D. Tex. May 21, 2013) (noting that LGE argued in support of venue transfer to New Jersey that "several business functions related to LGE MobileComm's mobile phone business have been transitioning to LG Electronics, U.S.A., Inc. in New Jersey[]")). Through a declaration, Summit 6 provides evidence that its documents are, and have been, in Dallas, Texas since 2009. App. Supp. Resp. Ex. 4 (Pate Decl.) ¶¶ 14, 18-19.

"[T]his factor almost invariably turns on which party will most likely have the greater volume of relevant documents and their presumed physical location in relation to the venues under consideration." *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 869 (E.D. Tex. 2012). In patent infringement cases, the majority of relevant evidence comes from the accused infringers. *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). Thus, "the place where the

defendant's documents are kept weighs in favor of transfer to that location." *Id.* (citation omitted).

The location of Apple's, Twitter's, and, in a more limited fashion, LGE MobileComm's, physical evidence lends weight to transfer. However, Defendants fail to establish that the greater volume and presumed physical location of documents and evidence relevant to the case are concentrated in or near the transferee forum. Defendant HTC Corporation's documents and other physical evidence relevant to the accused products are all located in Taiwan. App. Supp. Mot. Transfer Ex. 249 (Bariault Decl.) ¶ 5. Defendant HTC America, Inc.'s documents and other physical evidence relevant to the accused products are located in Washington. *Id.* ¶ 10. Defendant Motorola's documents and other physical evidence relevant to the accused products are located at its Illinois headquarters and at an office in California. *Id.* Ex. 245 (Brown Decl.) ¶ 13. LGE Inc.'s documents are located in Seoul, Korea. *Id.* Ex. 298 (Son Decl.) ¶ 4. Summit 6's documents and other physical evidence are in Texas. App. Supp. Resp. Ex. 4 (Pate Decl.) ¶¶ 14, 18-19.

Based on the evidence presented, where sources of proof originate from varied locations, including California, Washington, Texas, Illinois, Taiwan, and perhaps Korea and New Jersey, the Court concludes this factor is neutral. *See Frito-Lay*, 867 F. Supp. 2d at 869 (holding that where "the sources of proof originate from varied locations, this factor is neutral."); *Perritt v. Jenkins*, 2011 WL 3511468, at *3 (E.D. Tex. July 18, 2011) ("Because sources of proof originate from varied locations, this factor is neutral."); *see also Konami Dig. Entm't Co. Ltd. v. Harmonix Music Sys.*, 2009 WL 781134, at *4 (E.D. Tex. Mar. 23, 2009) ("While Defendants point to [the transferee district] as the location of significant sources of proof, they ignore the remaining sources of proof which originate from other locations.").

Further, the Court agrees with Summit 6 that Defendants' "conclusory statements that [their]

11

documents related to research, design, development, testing and marketing are located in California (or Taiwan or Washington) are too vague to meet their burden." *See* Pl.'s Resp. Mot. Trans. 16. *See generally Core Wireless Licensing, S.A.R.L. v. Apple, Inc.*, 2013 WL 682849, at *3 (E.D. Tex. Feb. 22, 2013) (holding as too speculative Apple, Inc.'s statement that "virtually all Apple business documents and records relating to the research, design, development, marketing strategy, and product revenue related to the Accused products are located in or near Cupertino."), *mandamus denied*, *In re Apple Inc.*, 743 F.3d 1377 (Fed. Cir. 2014). The declarations filed in this case regarding sources of proof and documents are equally conclusory and vague, making it difficult for the Court to weigh this factor.

In short, Defendants have not shown that the Northern District of California is clearly a more convenient forum to access sources of proof for all parties. Accordingly, this factor is neutral.

### b. *Cost of Attendance for Willing Witnesses*

The second private interest factor is the cost of attendance of willing witnesses. *See Volkswagen II*, 545 F.3d at 317. "[I]t is the convenience of non-party witnesses, rather than of party witnesses, that is more important and accorded greater weight in a transfer of venue analysis." *Frito Lay*, 867 F. Supp. 2d at 871. The Fifth Circuit established the "100-mile" rule to determine the convenience of the transferee district to the witnesses and parties. "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of the convenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 204-06. Where witnesses are from widely scattered locations, a trial court should not consider its "central location . . . in the absence of witnesses within the plaintiff's choice of venue." *In re Genentech*, 566 F.3d at 1344.

12

Defendants have identified over twenty party witnesses likely to possess specific knowledge relevant to the accused products who reside in the Northern District of California. Defs.' Br. Supp. Mot. Transfer 11-15. Defendants also list Lisa T. Wood, the first named inventor of all three Patents-in-Suit, who resides in the transferee district. Defendants further assert: "To the extent that Summit 6's infringement allegations require Defendants to call trial witnesses with relevant knowledge of the MMS functionalities within the Android operating system used in some of Defendants' accused products (e.g., Google employees), such Google employees are believed to reside in the Northern District of California." *Id.* at 12.

In response, Summit 6 notes that Defendants focus on the convenience of party witnesses, rather than non-party witnesses. Pl.'s Resp. Mot. Transfer 14-15. Summit 6 also accuses Defendants of "cherry-pick[ing] a large number of redundant witnesses, [and] ignoring those with highly relevant information outside of California. For example, Motorola neglects to mention that one of the witnesses in its initial disclosure (Andy Koziol) is located in Chicago, Illinois[.]" *Id.* at 13. Summit 6 lists third-party witnesses who do not reside in California, including one of the inventors who lives in the Czech Republic, the attorney who prosecuted two of the Patents-in-Suit in front of the United States Patent and Trademark Office who resides in Reston, Virginia, and several customers and licensees that use Summit 6's inventions that are in Texas. App. Supp. Resp. Ex. 4 (Pate Decl.) 2-3, ECF No. 118-1.

Inconvenience to the party-witnesses residing in the Northern District of California will increase as the distance they must travel increases, and traveling to a local court would be more convenient than traveling to Texas. *See Volkswagen I*, 371 F.3d at 204-06. While Summit 6 has pointed to a handful of non-party witnesses who will also be inconvenienced, overall the Court

concludes that this factor weighs in favor of transfer. *See generally In re Genentech*, 566 F.3d at 1348 (reversing trial court's decision to deny venue transfer from Eastern District of Texas to Northern District of California, in part, due to "a substantial number of witnesses with material and relevant information residing in either the transferee venue or the state of California who will be unnecessarily inconvenienced in having to travel to Texas to testify.").

        c.     *Availability of Compulsory Process to Secure Attendance of Witnesses*

Federal Rule of Civil Procedure 45(b)(2) allows a federal court to compel a witness' attendance at a trial or hearing by subpoena. The Court's subpoena power is limited by Rule 45(b)(3), to those witnesses who work or reside less than 100 miles from the courthouse. *See Volkswagen II*, 545 F.3d at 316. This factor would weigh in favor of transfer if the majority of non-party witnesses are located in the Northern District of California. *See id.* The Court gives more weight to those specifically identified witnesses and affords less weight to vague assertions that witnesses are likely located in a particular forum. *Core Wireless Licensing*, 2013 WL 682849, at *3. "The factor will weigh the heaviest in favor of transfer when a transferee venue is said to have 'absolute subpoena power' [which is] subpoena power for both depositions and trials." *Eolas Techs., Inc. v. Adobe Sys., Inc.*, 2010 WL 3835762, at *5 (E.D. Tex. Sept. 28, 2010), *mandamus denied*, *In re Google Inc.*, 412 F. App'x 295 (Fed. Cir. 2011) (citations omitted and punctuation altered).

As described above, the parties have identified potential third-party witnesses located not just in California, but elsewhere in the United States and in foreign countries. As neither district would have absolute subpoena power, on the record presented, the Court concludes this factor is neutral.

14

*See Eolas Techs., Inc.*, 2010 WL 3835762, at *5 (finding this factor neutral where neither district would have absolute subpoena power).

> d.    *All Practical Problems that Make Trial of Case Easy, Expeditious, and Inexpensive*

In addition to repeating prior arguments concerning convenience of witnesses and location of sources of proof, Defendants argue that trying this case in the Northern District of California would resolve many practical problems, including that Wichita Falls does not have an international airport, while the transferee district can be accessed via three international airports. Defendants also point out that their operations will be disrupted if their employees have to travel to Wichita Falls. Defs.' Br. Supp. Mot. Transfer 19-21. Summit 6 argues that concerns of judicial economy weigh against transfer. Pl.'s Resp. Mot. Transfer 9-12. For the reasons set forth in a separate section below, *see infra* at 19-22, while Defendants raise valid practical problems, the Court concludes that this factor weighs against transfer.[1] *See PersonalWeb Techs., LLC v. NEC Corp. of Am., Inc.*, 2013 WL 960033, at *5 (E.D. Tex. Mar. 21, 2013) (citing *Volkswagen II*, 566 F.3d at 1351) ("Practical problems include those that are rationally based on judicial economy.")

> **2.    The Public Interest Factors**

> a.    *Court Congestion*

To determine court congestion, "courts commonly consider the Federal Judicial

---

[1] In the Joint Report for Contents of Scheduling Order, HTC, LGE and Motorola request that, in the event the Court denies the current motion, the Court preside over the trial of this civil action in Dallas or Fort Worth, thereby minimizing the additional inconvenience of having witnesses travel from Dallas/Fort Worth International Airport to Wichita Falls. *See* Joint Report at 4-5, ECF No. 92. The Court declines to address the issue of intra-district transfer at this time, though the parties may re-urge it at a later time. In the interim, the Court will endeavor to accommodate out-of-town counsel by permitting them to confer on locations for pretrial conferences. The Court notes that United States Magistrate Judge Robert K. Roach has presided over several preliminary matters and has provided the option for telephonic discovery hearings.

caseload statistics." *USPG Portfolio Two, LLC v. John Hancock Real Estate Fin., Inc.*, 2011 WL 1103372, at *5 (N.D. Tex. Mar. 25, 2011) (Fitzwater, J.). Court congestion can be measured by "whether a trial may be speedier in another court because of a less crowded docket." *In re Genentech*, 566 F.3d at 1347. The Federal Circuit has described court congestion as "the most speculative [factor]" since "case-disposition statistics may not always tell the whole story." *Id.*

The evidence presented by both parties shows that the median time to trial in the Northern District of California (2.3 years) is greater than in the Northern District of Texas (1.68 years). *See* App. Supp. Resp. Ex. 7 (March 2013 U.S. District Courts Chart), ECF No. 118-1; App. Supp. Mot. Transfer 73-75 (March 2013 U.S. District Courts Chart), ECF No.91-1. Though Defendants also cite statistics for the median time interval from filing to disposition to argue this factor is neutral, the median time to disposition is of limited relevance. *See In re Genentech*, 566 F.3d at 1347 (in patent infringement case, court congestion can be measured by "whether a *trial* may be speedier in another court because of a less crowded docket.") (emphasis added). Summit 6 also correctly notes that this Court has set the case for trial on November 30, 2015, which is less time than the Northern District of Texas median time to trial, and approximately half the time reflected in the statistics for the Northern District of California. App. Supp. Resp. Ex. 8 (Scheduling Order), ECF No. 118-1.[2]

In sum, based on the evidence presented concerning a faster median time from filing to trial in this district, coupled with the deadlines and trial date set forth in the June 12, 2014 Scheduling Order (ECF No. 93), the Court concludes that, overall, this Court would likely be able to resolve this

---

[2] While Summit 6 also argues that transfer of the case to California would delay the case and therefore increase the cost, which would disadvantage the smaller party (Summit 6) and be advantageous to the Defendants, *see* Pl.'s Resp. Mot. Transfer 7, these concerns do not factor into the Court's analysis. *See In re Radmax, Ltd.*, 720 F.3d 285, 289 (5th Cir. 2013) (holding that "garden-variety delay associated with transfer is not to be taken into consideration when ruling on a § 1404(a) motion to transfer.")

action more quickly than the transferee court.  Thus, this factor weighs in favor of keeping the case in this Court.

### b.    *Local Interest in Having Localized Interests Decided at Home*

The Court considers local interest in this litigation because "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Volkswagen I*, 371 F.3d at 206 (quoting *Gulf Oil*, 330 U.S. at 508-09).  Defendants argue that the transferee district has a strong local interest in resolving this dispute because, among other things, "Summit 6's infringement allegations call into question the work and reputation of thousands of people in and around the Northern District of California[.]"  Defs.' Br. Supp. Mot. Transfer 23. Defendants also argue this factor weighs in favor of transfer since: (i) one of Summit 6's two employees resides in Northern California; (ii) this action concerns claimed inventions conceived and developed in the Northern District of California; (iii) many of the actions giving rise to Defendants' inequitable conduct defense (including the due diligence performed on Point2 prior art) took place in the Northern District of California; and (iv) considered collectively, Defendants employ nearly 20,000 employees in the Northern District of California, where the majority of Defendants are either headquartered or have offices, and which is also where they developed many of the accused products and services.  *Id.* at 22.  Defendants contend this case has minimal connections with the Northern District of Texas, despite Summit 6 maintaining its principal place of business in Dallas, Texas for several years.  Specifically, Defendants argue that Summit 6's "presence in this District is recent, ephemeral, and an artifact of litigation." *Id.* at 24 (quoting *In re Zimmer Holdings*, 609 F.3d 1378, 1381 (Fed. Cir. 2009)).

It is undisputed that a number of Defendants are headquartered or have offices in the

Northern District of California, that the research and design of some of the accused products took place in the Northern District of California, and that, therefore, the Northern District of California has a local interest in this dispute. *See In re Hoffmann-La Roche*, 587 F.3d 1333, 1336-37 (Fed. Cir. 2009) (encouraging courts to consider the work and reputation of individuals involved in developing the accused products). The Northern District of Texas, however, also has a local interest in the outcome of this case since: Summit 6's principal place of business is in this District;[3] Summit 6 has been a Dallas-based company, paying property taxes, and working with Dallas-based Sell.com for almost ten years; all of Summit 6's corporate records, hard-copy documents, historic software packages, and other business materials are located in Dallas and have been since 2009; and Summit 6 has paid property taxes in Dallas every year since 2009, and paid franchise taxes in 2013. App. Supp. Resp. Ex. 4 (Pate Decl.) at 2-3; First Amended Compl. ¶ 4. Contrary to Defendants' argument, this is not an instance where Plaintiff lacks any ties with the transferor forum. *Compare Odom v. Microsoft Corp.*, 596 F. Supp. 2d 995, 1003 (E.D. Tex. 2009) (granting transfer where transferor forum had no meaningful connection to case) *with Eolas Techs.*, 2010 WL 3835762, at *4 (denying transfer in part based on plaintiff's ties with the transferor forum) and *Novelpoint Learning LLC v. Leapfrog Enters, Inc.*, 2010 WL 5068146, at *5 (E.D. Tex. Dec. 6, 2010) (same). Further, on this record, where Defendants have failed to marshal any evidence of forum manipulation, the Court is not willing to disregard Summit 6's connections to this District as ephemeral or an "artifact of litigation." *See generally In re Hoffmann-La Roche*, 587 F.3d at 1336-

---

[3] The Court does not give weight to Summit 6's choice of venue. *See In re Volkswagen II*, 545 F.3d at 315. The Court, however, does consider Summit 6's location in determining whether transfer would be more convenient for it, just as the Court considers every other party's location for the same purpose. *See id.*

18

37 (holding that connection with forum should be discounted where evidence revealed plaintiff's counsel's deliberate acts to manipulate venue in anticipation of litigation by sending all documents to the offices of its litigation counsel in Texas).

In sum, each district has a local interest in the outcome of this dispute.  Thus, this factor is neutral.

<p align="center">c.      *Familiarity with the Law and Conflicts of Law*</p>

The parties agree that the third and fourth public interest factors — familiarity of the forum with the law that will govern the case and avoidance of unnecessary problems of conflicts of laws — are neutral.  Accordingly, the Court need not address these factors in detail.

### 3.      Judicial Economy

"Generally, a court should transfer a case where most of the witnesses and evidence in the case are closer to the transferee venue, with few or no convenience factors favoring the venue chosen by the plaintiff."  *In re Nintendo Co.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009).  In certain circumstances, however, the Federal Circuit has found that "[c]onsideration of interest of justice, which includes judicial economy, may be determinative to a particular transfer motion, even if the convenience of the parties and witnesses might call for a different result."  *Regents of Univ. of Cal. v. Eli Lilly and Co.*, 119 F.3d 1559, 1565 (Fed. Cir. 1997) (citation and internal marks omitted); *see also In re Aliphcom*, Misc. No. 971, 449 F. App'x 33, 34-35 (Fed. Cir. Feb. 9, 2011); *Patent Harbor, LLC*, 2012 WL 1903875 at *2; *ColorQuick LLC*, 2010 WL 5136050 at *7; 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 3854, pp. 439-40 (2d ed. 1986) (suggesting that "the interests of justice may be decisive in ruling on a transfer motion even though the convenience of parties and witnesses point in a different direction.").

Summit 6 argues that judicial economy weighs in favor of denying transfer as this Court will give the parties a more expeditious and less expensive trial because the Court is "exceedingly familiar" with the Patents-in-Suit and many of the issues at hand, after this Court heard the previous *Summit 6* case. *Id.* Summit 6 notes that the Court has significant experience:

> (1) construing terms from both the ʼ557 and ʼ482 Patents; (2) ruling on summary judgment motions related to validity and infringement of both the ʼ557 and ʼ482 Patents; (3) ruling on evidentiary issues, (4) holding a liability trial on infringement and validity for the ʼ482 Patent; and (5) holding an inequitable conduct trial relating to facts that would be the same across both the ʼ482 Patent and the newly-issued ʼ515 Patent.

*Id.* Summit 6 argues that the instant case is likely to involve "similar or identical evidence" as the first *Summit 6* case, and therefore the Court should keep the case in the interest of judicial economy. *Id.*

Defendants counter that the relevance of the previous *Summit 6* case is overstated and any judicial economy is minimal because:

> (1) this case involves different defendants, different claims, an additional patent, and different accused products and services and, in Apple's case, a different operating system altogether; (2) none of the products and services accused here was at issue in the prior matter; (3) the five adjudged claims of the ʼ482 patent are currently under reexamination; and (4) the PTO recently issued a Final Rejection that held all five claims unpatentable.

Defs.' Reply Br. Supp. Mot. Transfer 8, ECF No. 119. In addition, Defendants argue that judicial economy concerns do not control when another venue is clearly more convenient. Defs.' Br. Supp. Mot. Transfer 20 (citing *In re Zimmer Holdings, Inc.*, 609 F.3d 1378 (Fed. Cir. 2010); *In re Verizon Bus. Network Servs., Inc.*, 635 F.3d 559 (Fed. Cir. 2011)).

The Court finds that the cases upon which Defendants rely are distinguishable. In *In re Zimmer*, the Federal Circuit overruled a district court that had denied transfer to a more convenient

venue because the patentee had a pending suit in the transferor venue involving one of numerous patents asserted in the two cases.  609 F.3d at 1382.  The Federal Circuit found that overlap of only one out of numerous patents was not compelling enough to deny a transfer to a clearly more convenient venue based solely on judicial economy grounds.  *Id.*  In *In re Verizon*, the Federal Circuit found that the " . . . [district court]'s previous claim construction in a case that settled more than five years before the filing of this lawsuit to be too tenuous" a reason to deny transfer. 635 F.3d at 562.  In contrast, the Court notes that the previous and instant *Summit 6* cases are more closely related in subject matter and much closer in time than in the cases cited by the Defendants. The previous *Summit 6* litigation, though not concurrent, was filed in 2011, went to trial in 2013, and involved two out of three of the patents at issue in this case.  Unlike *In re Zimmer* and *In re Verizon*, both of which only made it to early stages in litigation, the first *Summit 6* case was tried before a jury and finally litigated in this Court.

Although Defendants assert that the opportunity for judicial economy based on this Court's familiarity with the Patents-in-Suit is overstated and the efficiencies are minimal, the Court finds this argument unpersuasive.  An evaluation of the public and private interest factors should not ignore this forum's knowledge and experience with the patents and technology, and with the inequitable conduct defenses, as well as the judicial resources the Court previously invested in the first *Summit 6* dispute.  *See, e.g., Realtime Data, LLC v. Stanley*, 2010 WL 1064474, at *3 (E.D. Tex. Mar. 18, 2010) ("Where there are related lawsuits involving the same plaintiff, the same patent, and similar technology, transfer to another venue will prevent the parties from taking advantage of the built-in efficiencies that result from having related cases before the same judge.") (citation and internal marks omitted); *Novartis Vaccines and Diagnostics, Inc. v. Bayer Healthcare, LLC*, 2009 WL

3157455, at *5 (E.D. Tex. Sept. 28, 2009) (concluding that because the two actions involve the same patent, "[t]he two cases involve the same claim construction issues and transferring the case will only consume unnecessarily additional judicial resources."); *In re Google*, 412 F. App'x 295, 296 (Fed. Cir. 2011) ("Courts have consistently held that judicial economy plays a paramount role in trying to maintain an orderly, effective, administration of justice and having one trial court decide all of these claims clearly furthers that objective."); *ColorQuick*, 2010 WL 5136050 at *2, 7, 8 (denying transfer where court, in previous case involving the patent-in-suit, had "reviewed technical tutorials, familiarized itself with the patented technology, held a *Markman* hearing, and issued a claim construction opinion").[4]

Further, "the risk of inconsistent claim construction is an important consideration when assessing the importance of judicial economy in transfer analysis." *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, 2010 WL 2771842, at *7 n.8 (E.D. Tex. July 13, 2010); *see also Zoltar Satellite Sys. v. LG Elecs. Mobile Commc'ns Co.*, 402 F. Supp. 2d 731, 735, 736-37 (E.D. Tex. 2005) (in cases involving "highly technical subject matter, such as patent litigation[,]" court's familiarity with patents-in-suit and judicial economy must be considered in transfer analysis).[5]

---

[4] The Court remains mindful that judicial economy concerns generally do not overcome an otherwise compelling case for transfer. *See, e.g., In re Morgan Stanley*, 417 F. App'x 947, 950 (Fed. Cir. 2011) (noting that the proper administration of justice may be to transfer to a far more convenient venue even when the trial court has some familiarity with a matter from prior litigation.). Here, however, the majority of the public and private interest factors are neutral, and the Court concludes that transferring this action now would result in a waste of judicial and party resources and create burdens and redundancies by compelling another court to familiarize itself with the Patents-in-Suit.

[5] Summit 6 correctly notes that at least one Defendant has acknowledged the importance of allowing the same court to hear cases "involv[ing] some of the same claim terms, inventors, patent counsel, and technologies" because it allows "similar, and in some instances identical, issues or claim construction, invalidity, and enforceability." *See* Pl.'s Resp. Mot. Transfer 9-10 (citing HTC's Memorandum of Law in Support of Motion to Transfer Venue in *Flashpoint Tech. Inc. v. HTC Corp.*, 1:14-cv-00317 (E.D.N.C. Nov. 7, 2013)).

### 4.    Conclusion

The Court has considered the private and public interest factors together and does not assign dispositive weight to any one factor. *See Volkswagen I*, 371 F.3d at 203. The majority of private and public interest factors are neutral, though the convenience of witnesses weighs slightly in favor of transfer and court congestion weighs slightly against transfer. Based on the unique factual circumstances presented, the Court concludes that any additional convenience in the transferee venue is outweighed by the concerns of judicial economy and uniformity of claim construction, which favor this Court. Because Defendants have failed to meet their burden to show good cause that this case should be transferred to the Northern District of California, the motion to transfer venue is denied.[6]

## III.   DEFENDANT APPLE INC.'S CONTINGENT MOTION TO SEVER

Apple has filed a contingent motion to sever requesting that the Court, pursuant to 35 U.S.C. § 299 and Fed. R. Civ. P. 21, "sever Summit 6's claims against Apple from Summit 6's claims against the other defendants." *See* Mem. Supp. Def. Apple's Mot. Sever ("Apple's Mot. Sever"), 1, ECF No. 112. Apple further requests that, "to the extent this Court does not transfer this entire action pursuant to the defendants' pending joint motion to transfer to the Northern District of California . . . , this Court transfer at least the severed action against Apple to the Northern District of California." *Id.* Summit 6 opposes the motion. *See* Pl.'s Resp. Def. Apple's Mot. Sever 1, ECF No. 122.

---

[6] To the extent it can be argued that this conclusion relies on fewer than all the private and public interest factors, or emphasizes certain factors over others, the Court notes that "[a]lthough [these] factors are appropriate for most transfer cases, they are not necessarily exhaustive or exclusive." *Volkswagen II*, 545 F.3d at 315.

## A.    Applicable Legal Standard

In *In re EMC*, the Federal Circuit addressed the proper standard to evaluate whether joinder of a defendant is proper under Rule 20. *In re EMC Corp.*, 677 F.3d 1351, 1359 (Fed. Cir. 2012). It clarified that in patent cases "joinder is not appropriate where different products or processes are involved." *Id.* "Unless there is an actual link between the facts underlying each claim of infringement, independently developed products using differently sourced parts are not part of the same transaction, even if they are coincidentally identical." *Id.* "[T]he mere fact that infringement of the same claims of the same patent is alleged does not support joinder, even though the claims would raise common questions of claim construction and patent invalidity." *Id.* at 1357. However, the Federal Circuit made clear that *In re EMC* is not an absolute bar to joinder, and the Court must assess whether the challenged actions are part of the "same transaction, occurrence, or series of transactions or occurrences." *Id.* (using the "transaction or occurrence" test).

The Federal Circuit in *In re EMC* also made clear that "even if joinder is not permitted under Rule 20, the district court has considerable discretion to consolidate cases for discovery and for trial under Rule 42." *Id.* at 1360. Rule 42 states: "If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). Further, "district courts have the discretion to refuse joinder in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness." *In re EMC*, 677 F.3d at 1360 (quoting *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010)). "In a complicated patent litigation a large number of defendants might prove unwieldy, and a district court would be justified in exercising its discretion to deny joinder 'when

different witnesses and documentary proof would be required.'" *Id.* (quoting *Acevdeo*, 600 F.3d at 522).

Ordinarily, issues of joinder and severance are governed by the Federal Rules of Civil Procedure, Rules 20, 21 and 42. Effective September 16, 2011, joinder in patent cases is governed by the Leahy-Smith America Invents Act ("AIA") under which "accused infringers may not be joined in one action as defendants . . . based solely on allegations that they each have infringed the patent or patents in suit." 35 U.S.C. § 299(b). Instead, defendants in patent infringement cases may be joined only if:

> (1) [a]ny right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of *the same transaction, occurrence, or series of transactions and occurrences* relating to the making, using, importing into the United States, offering for sale, or selling *of the same accused product or process*; and
>
> (2) questions of fact common to all defendants or counterclaim defendants will arise in the action.

35 U.S.C. § 299(a) (emphasis added). The AIA's joinder requirement is more stringent than Rule 20, and adds a requirement that the transaction or occurrence must relate to making, using, or selling of the same accused product or process. *In re Nintendo*, 544 F. App'x 934, 939 (Fed. Cir. 2013).[7] Thus the AIA limits the number of accused infringers that can be joined as defendants in one lawsuit, thereby creating the possibility of more lawsuits on the same patent. *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1293 (Fed. Cir. 2014). If parties are misjoined in violation of the AIA, Federal Rule of Civil Procedure 21 provides the remedy of severance. Fed.

---

[7] Before the AIA, courts permitted joinder of defendants accused of infringing the same patents because there was a common nucleus of operative facts or law in the claims against all the defendants. *See, e.g., Mymail, Ltd. v. Am. Online, Inc.*, 223 F.R.D. 455, 457 (E.D. Tex. 2004).

R. Civ. P. 21.  Under Rule 21, on motion, or on its own, the court may at any time, on just terms, add or drop a party, or sever any claims against a party.  *Id.*

### B.    Analysis

The propriety of severance in this action hinges on the AIA's first requirement, namely, whether the right to relief against Apple and the other Defendants arises out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process.  *See* 35 U.S.C. § 299(a).  In support of its motion, Apple argues that these AIA requirements are not met since: (1) the accused Apple products are distinct from the accused products and services of the other Defendants, and (2) the facts underlying Summit 6's infringement claims against Apple are distinct from the facts underlying Summit 6's infringement claims against the other Defendants.  Apple also argues that, in addition to being prohibited by the AIA, Apple's joinder with Twitter and the other co-Defendants would be highly prejudicial and confusing to a jury.  Apple's Mot. Sever at 3-9.

In opposition, Summit 6 argues that joinder is permissible since Apple's accused products meet the sameness requirements for joinder, even though they run on the iOS platform and not the Android platform.   *See* Pl.'s Resp. Def. Apple's Mot. Sever 5, ECF No. 122.  Summit 6 further contends that there are common underlying facts with regard to all Defendants, thereby satisfying the same transaction or occurrence test.  *See* Pl.'s Resp. Def. Apple's Mot. Sever 7, ECF No. 122.  Summit 6 states that all handset defendants have common underlying facts, including: "(1) information related to limits on MMS message size, (2) carrier requirements related to MMS messages, and (3) any other third-party requirements related to sending photos via MMS." *Id*. at 7-8.

 Summit 6 further posits that there are common underlying facts related to Twitter integration and

photo size restrictions for Twitter. *Id.* at 8. In addition, Summit 6 argues Apple's presence in the suit would not be prejudicial or tend to confuse a jury, and that severance of Apple's case could result in "an unnecessary risk of inconsistent claim construction and adjudication." *See id.* at 10. According to Summit 6, severance would be "a duplicative use of judicial resources" and would "only cause delay and increase costs for the parties and the Court." *See id.* at 10-11. Finally, Summit 6 argues that even if this Court grants Apple's Motion to Sever, this Court should consolidate the defendants for pre-trial matters and should deny the transfer of this case to the Northern District of California.

Summit 6's Complaint joining Apple with the co-Defendants fails the threshold statutory requirements of 35 U.S.C. § 299. *See also In re EMC*, 677 F.3d at 1359 ("joinder is not appropriate where different products or processes are involved."). Summit 6's infringement actions against Apple and the remaining Defendants do not implicate "the same accused product[s] or process[es]" 35 U.S.C. § 299. As summarized by Apple:

> S6's attempt to join together the defendants based on the existence of two purported "facts" — "MMS functionality" and "Twitter integration," — that allegedly "link" the defendants, rings hollow. Neither of these "facts" establishes that the accused products are the "same," nor do they constitute a "substantial evidentiary overlap in the facts" that give rise to S6's claims against each defendant.

The Court agrees. Summit 6's claims against Apple relate to Apple's products, including the iPhone, iPad, and iPad Touch, and Apple's iOS-based proprietary services, including iMessaging, MMS Messaging, Message-related APIs and Twitter integration/functionality on Apple devices. *See* First Am. Compl. ¶¶ 95, 193. Summit 6's claims against LGE, HTC and Motorola relate to their Android-based proprietary services for MMS Messaging, Message-related APIs and Twitter integration/functionality on their devices. *See id.* ¶¶ 23, 35, 47, 59, 71, 83, 121,133, 145, 157, 169,

27

181. Finally, Summit 6's claims against Twitter do not involve any products but relate to Twitter's upload services.  *See id.* ¶¶ 12, 107, 205, 219.

In sum, Apple's accused products are not the same as the accused products of the remaining Defendants, a requirement for joinder under the AIA.   Accordingly, the Court will grant Apple's motion to sever.[8]

The Court, however, denies Apple's motion to transfer the severed action to the Northern District of California.  It is undisputed that Apple is headquartered in the Northern District of California, the development of Apple's accused products occurred in California, and the bulk of Apple's physical evidence relevant to this lawsuit and employees with relevant knowledge are in the Northern District of California. *See* App. Supp. Mot. Transfer Ex. 240 (Buckley Decl.) ¶¶ 5-8, ECF No. 91-5.  This evidence would result in the factors concerning ease of access to sources of proof, cost of attendance of willing witnesses, and availability of compulsory process to weigh in favor of transfer. *See In re Nintendo*, 589 F.3d at 1198 ("Generally, a court should transfer a case where most of the witnesses and evidence in the case are closer to the transferee venue, with few or no convenience factors favoring the venue chosen by the plaintiff.").  Nevertheless, the final private interest factor and all of the contested public interest factors continue to weigh in favor of retaining the litigation in this district.  Considering all of these factors, the Court finds that avoidance of piecemeal litigation and the risk of inconsistent claim construction defeat any additional convenience to Apple and its witnesses of litigating in their home forum.  In addition, Apple is not the only Defendant in this suit, and even if Apple is transferred to another district court, this case must

---

[8] The Court's determination that Summit 6's Complaint joining Apple with co-Defendants fails the threshold statutory requirements of 35 U.S.C. § 299 obviates the need to consider Apple's remaining arguments in support of its motion to sever, or Summit 6's responses to these arguments.

proceed with the other Defendants. "Piecemeal litigation in the complex and technical area of patent and trademark law is especially undesirable." *Datatreasury Corp. v. First Data Corp.*, 243 F. Supp. 2d 591, 594 (N.D. Tex. 2003) (Kaplan, M.J.). Further, "[b]y permitting two different courts to interpret the same patent claims, there is a heightened risk of inconsistent rulings which, in turn, promotes uncertainty and impedes the administration of justice." *Id.* at 596; *see also U.S. Ethernet Innovations*, 2010 WL 2771842, at *7 n.8 ("the risk of inconsistent claim construction is an important consideration when assessing the importance of judicial economy in transfer analysis."); *Zoltar Satellite*, 402 F. Supp. 2d at 736-37 (in cases involving "highly technical subject matter, such as patent litigation[,]" court's familiarity with patents-in-suit and judicial economy must be considered in transfer analysis).

Finally, in light of overlapping issues, common subject matter and closely related questions, and to permit efficient case management, the Court orders the newly severed action consolidated with the original filed case as to all issues through pretrial only. *See* Fed. R. Civ. P. 42(a).

## IV.    CONCLUSION

Based on the foregoing, the Court **denies** Defendants' Motion to Transfer to the Northern District of California, and **grants in part** and **denies in part** Defendant Apple Inc.'s Motion to Sever. Specifically, Apple Inc.'s motion to sever is **granted** and its motion to transfer venue is **denied**. The Court **orders** that all claims against Defendant Apple be severed into a separate cause of action. The Court further **orders** the above-severed case consolidated with the original filed action, Cause No. 7-14-cv-0014-O, which is the lead case. All parties are instructed to file any future motions in the lead case. The severed action remains active for trial.

**SO ORDERED this 10th day of September 2014.**

Reed O'Connor

UNITED STATES DISTRICT JUDGE

JURY,LEAD

# U.S. District Court
## Northern District of Texas (Wichita Falls)
### CIVIL DOCKET FOR CASE #: 7:14-cv-00014-O

Summit 6 LLC v. HTC Corporation, et al
Assigned to: Judge Reed C O'Connor
Cause: 28:1331 Fed. Question

Date Filed: 02/18/2014
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Summit 6 LLC**                    represented by    **Douglas A Cawley**
McKool Smith
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-4972
Fax: 214/978-4044
Email: dcawley@mckoolsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Ashley N Moore**
McKool Smith PC
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-6337
Fax: 214/978-4044
Email: amoore@mckoolsmith.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley W Caldwell**
Caldwell Cassady Curry, P.C.
2101 Cedar Springs Road
Suite 1000
Dallas, TX 75201
214-888-4848
Fax: 214-888-4849
Email: bcaldwell@caldwellcc.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Colleen Elizabeth Bloss**
McKool Smith PC

**– A31 –**

300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-6380
Fax: 214/978-4044
Email: cbloss@mckoolsmith.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mitchell Reed Sibley**
McKool Smith PC
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-4931
Fax: 214/978-4044
Email: msibley@mckoolsmith.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Phillip M Aurentz**
McKool Smith PC
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-4206
Fax: 214/978-4044
Email: paurentz@mckoolsmith.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Richard Alan Kamprath**
McKool Smith
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-4210
Fax: 214/978-4044
Email: rkamprath@mckoolsmith.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Theodore Stevenson , III**
McKool Smith
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978-4000
Fax: 214/978-4044 FAX
Email: tstevenson@mckoolsmith.com

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

## V.

**Defendant**

**HTC Corporation**                    represented by  **Bryan K James**
McDermott Will & Emery LLP
275 Middlefield Road
Suite 100
Menlo Park, CA 94025-4004
650/815-7400
Email: bjames@mwe.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Darryl John Ong**
McDermott Will & Emery LLP
275 Middlefield Road
Suite 100
Menlo Park, CA 94025
650/815-7652
Fax: 650/815-7401
Email: djong@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**E Leon Carter**
Carter Scholer Arnett Hamada &
Mockler PLLC
8150 N. Central Expressway
5th Floor
Dallas, TX 75206
214/550-8188
Fax: 214/550-8185
Email: lcarter@carterscholer.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Linda R Stahl**
Carter Scholer Arnett Hamada Mockler
PLLC
8150 N. Central Expressway
5th Floor
Dallas, TX 75206
214-550-8188
Fax: 214-550-8185

**– A33 –**

Email: lstahl@carterscholer.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mashhood Rassam**
McDermott Will & Emery LLP
275 Middlefield Road
Suite 100
Menlo Park, CA 94025
650/815-7648
Email: mrassam@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Philip Ou**
275 Middlefield Road
Suite 100
Menlo Park, CA 94025
650/815-7400
Fax: 650/815-7401
Email: pou@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Yar R Chaikovsky**
McDermott Will & Emery LLP
275 Middlefield Road
Suite 100
Menlo Park, CA 94025
650/815-7447
Fax: 650/469-1484
Email: ychaikovsky@mwe.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**HTC America Inc**                represented by **Bryan K James**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Darryl John Ong**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**– A34 –**

**E Leon Carter**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Linda R Stahl**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mashhood Rassam**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Philip Ou**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Yar R Chaikovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**LG Electronics Inc**                    represented by **Deborah L Sterling**
Quilling Selander Lownds Winslett &
Moser PC
2001 Bryan Street
Suite 1800
Dallas, TX 75201
214/880-1893
Fax: 214/871-2100
Email: dsterling@qslwm.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Hsiwen Lo**
Orrick Herrington & Sutcliffe LLP
2050 Main Street
Suite 1100
Irvine, CA 92614
949/567-6700
Email: hlo@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**– A35 –**

*Bar Status: Not Admitted*

**Robert M Isackson**
Orrick Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
212/506-5000
Email: rmisackson@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Stacey E Stillman**
Orrick Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
650/614-7400
Fax: 650/614-7401
Email: sstillman@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Steven J Routh**
Orrick Herrington & Sutcliffe LLP
1152 15th St NW
Washington, DC 20005
202/339-8400
Email: srouth@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**LG Electronics USA Inc**              represented by  **Deborah L Sterling**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Hsiwen Lo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Robert M Isackson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**– A36 –**

**Stacey E Stillman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Steven J Routh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**LG Electronics MobileComm USA Inc**       represented by **Deborah L Sterling**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Hsiwen Lo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Robert M Isackson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Stacey E Stillman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Steven J Routh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Motorola Mobility LLC**       represented by **Akarsh P Belagodu**
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE`
Suite 2800
Atlanta, GA 30309
404/815-6500

**– A37 –**

Email:
abelagodu@kilpatricktownsend.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Bonnie M Grant**
Kilpatrick Townsend Stockton LLP
Two Embarcadero Center
Eighth Floor
San Francisco, CA 94111
415/576-0200
Email: bgrant@kilpatricktownsend.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**D Clay Holloway**
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
404/815-6500
Email:
cholloway@kilpatricktownsend.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael K Hurst**
Gruber Hurst Johansen & Hail LLP
1445 Ross Ave
Suite 2500
Dallas, TX 75202
214-855-6800
Fax: 214-855-6808
Email: mhurst@ghjlaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Shayne E O'Reilly**
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309
404/815-6500
Email: soreilly@kilpatricktownsend.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**– A38 –**

**Steven D Moore**
Kilpatrick Townsend & Stockton LLP
Two Embarcadero Center
Eighth Floor
San Francisco, CA 94111
415/576-0200
Email: smoore@kilpatricktownsend.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Joshua M Sandler**
Kane Russell Coleman & Logan PC
3700 Thanksgiving Tower
1601 Elm St
Dallas, TX 75201
214/777-4297
Fax: 214/777-4299
Email: jsandler@ghjhlaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**Apple Inc.**                represented by    **Mark A Finkelstein**
*TERMINATED: 09/10/2014*                       Jones Day
                                               3161 Michelson Drive
                                               Suite 800
                                               Irvine, CA 92612
                                               949/553-7502
                                               Fax: 949/553-7539
                                               Email: mafinkelstein@jonesday.com
                                               *LEAD ATTORNEY*
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*
                                               *Bar Status: Not Admitted*

                                               **Douglas L Clark**
                                               Jones Day
                                               3161 Michelson Drive
                                               Suite 800
                                               Irvine, CA 92612
                                               949/553-7577
                                               Fax: 949/553-7539
                                               Email: dlclark@jonesday.com
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*
                                               *Bar Status: Not Admitted*

                                               **Frank P Cote**

**– A39 –**

Jones Day
3161 Michelson Drive
Suite 800
Irvine, CA 92612
949/553-7540
Fax: 949/553-7539
Email: fcote@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hilda C Galvan**
Jones Day
PO Box 660623
2727 N Harwood St
Dallas, TX 75266-0623
214/969-5180
Fax: 214/969-5100
Email: hcgalvan@jonesday.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Michelle Stover**
Jones Day
3161 Michelson Drive
Suite 800
Irvine, CA 92612
949-553-7596
Fax: 949-851-3939
Email: mstover@jonesday.com
*TERMINATED: 08/26/2014*
*PRO HAC VICE*
*Bar Status: Not Admitted*

**William C Rooklidge**
Jones Day
3161 Michelson Drive
Suite 800
Irvine, CA 10022
949/553-7501
Fax: 949/553-7539
Email: wrooklidge@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Twitter Inc.**                        represented by **Leo L Lam**
                                        Keker & Van Nest LLP
                                        633 Battery Street

**– A40 –**

San Francisco, CA 94111-1809
415/391-5400
Fax: 415/397-7188
Email: llam@kvn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Brett C Govett**
Fulbright & Jaworski
2200 Ross Ave
Suite 2800
Dallas, TX 75201-2784
214/855-8118
Fax: 214/855-8200 FAX
Email:
brett.govett@nortonrosefulbright.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**David J Silbert**
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111-1809
415/391-5400
Fax: 415/397-7188
Email: dsilbert@kvn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julie Anne Duncan**
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111
415/391-5400
Fax: 415/397-7188
Email: jduncan@kvn.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Counter Claimant**

**Motorola Mobility LLC**            represented by   **Michael K Hurst**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Shayne E O'Reilly**
(See above for address)

District Version 5.1.1

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Joshua M Sandler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Counter Defendant**

**Summit 6 LLC**                    represented by **Douglas A Cawley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Ashley N Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley W Caldwell**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mitchell Reed Sibley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Phillip M Aurentz**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Richard Alan Kamprath**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**Twitter Inc.**                          represented by   **Leo L Lam**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Not Admitted*

                                                           **Brett C Govett**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Admitted/In Good Standing*

                                                           **David J Silbert**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Not Admitted*

                                                           **Julie Anne Duncan**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Not Admitted*

V.

**Counter Defendant**

**Summit 6 LLC**                          represented by   **Douglas A Cawley**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Admitted/In Good Standing*

                                                           **Ashley N Moore**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Admitted/In Good Standing*

                                                           **Bradley W Caldwell**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Admitted/In Good Standing*

                                                           **Mitchell Reed Sibley**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Admitted/In Good Standing*

                                                           **Phillip M Aurentz**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Bar Status: Admitted/In Good Standing*

**Richard Alan Kamprath**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**HTC America Inc**               represented by   **Bryan K James**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Darryl John Ong ,**
McDermott Will & Emery LLP

275 Middlefield Road
Suite 100
Menlo Park, CA 94025
650/815-7652
Fax: 650/815-7401
Email: djong@mwe.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**E Leon Carter**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Linda R Stahl**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mashhood Rassam**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Philip Ou**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**– A44 –**

**Yar R Chaikovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**HTC Corporation**                  represented by   **Bryan K James**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**E Leon Carter**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Linda R Stahl**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mashhood Rassam**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Philip Ou**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Yar R Chaikovsky**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Counter Defendant**

**Summit 6 LLC**                  represented by   **Douglas A Cawley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Ashley N Moore**

– A45 –

(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley W Caldwell**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mitchell Reed Sibley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Phillip M Aurentz**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Richard Alan Kamprath**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**Motorola Mobility LLC**                    represented by   **Akarsh P Belagodu**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Bonnie M Grant**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**D Clay Holloway**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Shayne E O'Reilly**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Steven D Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Joshua M Sandler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Counter Defendant**

**Summit 6 LLC**                      represented by **Douglas A Cawley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Ashley N Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley W Caldwell**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mitchell Reed Sibley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Phillip M Aurentz**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Richard Alan Kamprath**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/18/2014 | 1 | COMPLAINT WITH JURY DEMAND against All Defendants filed by Summit 6 LLC. (Filing fee $400; Receipt number 0539-5857356) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas should seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership (Attachments: # 1 Exhibit(s), # 2 Exhibit(s), # 3 Exhibit(s), # 4 Cover Sheet) (Cawley, Douglas) Filing fee receipt modified on 2/18/2014 (twd). (Entered: 02/18/2014) |
| 02/18/2014 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Summit 6 LLC. (Cawley, Douglas) (Entered: 02/18/2014) |
| 02/18/2014 | 3 | New Case Notes: A filing fee has been paid. File to Judge O Connor. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Roach). Clerk to provide copy to plaintiff if not received electronically. (plp) Modified on 2/18/2014 (plp). (Entered: 02/18/2014) |
| 02/19/2014 | 4 | Summons Issued as to All Defendants. (trt) (Entered: 02/19/2014) |
| 02/19/2014 | 5 | Report to Patent/Trademark Office of Initiating Document. Form AO 120 e-mailed to notice_of_suit@uspto.gov. (trt) (Entered: 02/19/2014) |
| 02/19/2014 | 6 | AMENDED COMPLAINT WITH JURY DEMAND against All Defendants filed by Summit 6 LLC. (Attachments: # 1 Exhibit(s), # 2 Exhibit(s), # 3 Exhibit(s)) (Cawley, Douglas) (Entered: 02/19/2014) |
| 02/19/2014 | 7 | NOTICE of Attorney Appearance by Phillip M Aurentz on behalf of Summit 6 LLC. (Filer confirms contact info in ECF is current.) (Aurentz, Phillip) (Entered: 02/19/2014) |
| 03/04/2014 | 8 | Unopposed Motion for Extension of Time to File Answer filed by Summit 6 LLC (Attachments: # 1 Proposed Order) (Kamprath, Richard) (Entered: 03/04/2014) |
| 03/05/2014 | 9 | ELECTRONIC ORDER granting 8 Motion for Extension of Time to File Answer. The deadline for the HTC Defendants to answer or otherwise respond is hereby extended to May 19, 2014. (Ordered by Judge Reed C O'Connor on 3/5/2014) (chmb) (Entered: 03/05/2014) |
| 03/07/2014 | 10 | Unopposed Motion for Extension of Time to File Answer *for Motorola Mobility* filed by Summit 6 LLC (Attachments: # 1 Proposed Order) (Kamprath, Richard) (Entered: 03/07/2014) |
| 03/07/2014 | 11 | SUMMONS Returned Executed as to HTC America Inc ; served on 2/26/2014. (Kamprath, Richard) Modified to exclude HTC Corporation per Attorney on 3/12/2014 (plp). (Entered: 03/07/2014) |
| 03/07/2014 | 12 | SUMMONS Returned Executed as to Apple Inc. ; served on 2/26/2014. |

|  |  | (Kamprath, Richard) (Entered: 03/07/2014) |
|---|---|---|
| 03/07/2014 | 13 | SUMMONS Returned Executed as to Motorola Mobility LLC ; served on 2/26/2014. (Kamprath, Richard) (Entered: 03/07/2014) |
| 03/07/2014 | 14 | SUMMONS Returned Executed as to LG Electronics MobileComm USA Inc ; served on 2/26/2014; LG Electronics USA Inc ; served on 2/25/2014. (Attachments: # 1 Additional Page(s)) (Kamprath, Richard) Modified to exclude LG Electronics Inc per Atty on 3/7/2014 (plp). (Entered: 03/07/2014) |
| 03/09/2014 | 15 | ELECTRONIC ORDER granting 10 Motion for Extension of Time to File Answer. The deadline for Defendant Motorola Motility to respond or otherwise answer is hereby extended to May 5, 2014. (Ordered by Judge Reed C O'Connor on 3/9/2014) (chmb) (Entered: 03/09/2014) |
| 03/10/2014 | 16 | Unopposed Motion for Extension of Time to File Answer *Apple* filed by Summit 6 LLC (Attachments: # 1 Proposed Order) (Kamprath, Richard) (Entered: 03/10/2014) |
| 03/11/2014 | 17 | Unopposed Motion for Extension of Time to File Answer *LG Defendants* filed by Summit 6 LLC (Attachments: # 1 Proposed Order) (Kamprath, Richard) (Entered: 03/11/2014) |
| 03/11/2014 | 18 | ELECTRONIC ORDER granting 16 Motion for Extension of Time to File Answer. The deadline for Defendant Apple Inc. to file an answer or otherwise respond is hereby extended to May 5, 2014. (Ordered by Judge Reed C O'Connor on 3/11/2014) (chmb) (Entered: 03/11/2014) |
| 03/12/2014 | 19 | ELECTRONIC ORDER granting 17 Motion for Extension of Time to File Answer. The deadline for the LG Defendants to answer or otherwise respond is hereby extended to May 19, 2014. (Ordered by Judge Reed C O'Connor on 3/12/2014) (chmb) (Entered: 03/12/2014) |
| 03/13/2014 | 20 | SUMMONS Returned Executed as to Twitter Inc. ; served on 3/7/2014. (Kamprath, Richard) (Entered: 03/13/2014) |
| 03/16/2014 | 21 | NOTICE of Attorney Appearance by Hilda C Galvan on behalf of Apple Inc.. (Filer confirms contact info in ECF is current.) (Galvan, Hilda) (Entered: 03/16/2014) |
| 03/20/2014 | 22 | Unopposed Motion for Extension of Time to File Answer *Twitter* filed by Summit 6 LLC (Attachments: # 1 Proposed Order) (Kamprath, Richard) (Entered: 03/20/2014) |
| 03/21/2014 | 23 | ELECTRONIC ORDER granting 22 Motion for Extension of Time to File Answer. The deadline for Defendant Twitter to file an answer or other responsive pleading is hereby extended to May 5, 2014. (Ordered by Judge Reed C O'Connor on 3/21/2014) (chmb) (Entered: 03/21/2014) |
| 03/21/2014 | 24 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-5927000) filed by Apple Inc. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order) (Finkelstein, Mark) (Entered: 03/21/2014) |
| 03/22/2014 | 25 | ELECTRONIC ORDER granting 24 Application for Admission Pro Hac Vice of |

| | | |
|---|---|---|
| | | Mark Finkelstein. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 3/22/2014) (chmb) (Entered: 03/22/2014) |
| 03/24/2014 | 26 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-5929104) filed by Apple Inc. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Amendment) (Rooklidge, William) (Entered: 03/24/2014) |
| 03/25/2014 | 27 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-5931824) filed by Apple Inc. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order) (Stover, Michelle) (Entered: 03/25/2014) |
| 03/25/2014 | 28 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-5931981) filed by Apple Inc. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order) (Clark, Douglas) (Entered: 03/25/2014) |
| 03/26/2014 | 29 | ELECTRONIC ORDER granting 26 Application for Admission Pro Hac Vice of William C. Rooklidge. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 3/26/2014) (chmb) (Entered: 03/26/2014) |
| 03/26/2014 | 30 | ELECTRONIC ORDER granting 27 Application for Admission Pro Hac Vice of Michelle Stover. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 3/26/2014) (chmb) (Entered: 03/26/2014) |
| 03/26/2014 | 31 | ELECTRONIC ORDER granting 28 Application for Admission Pro Hac Vice of Douglas C. Clark. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 3/26/2014) (chmb) (Entered: 03/26/2014) |
| 03/26/2014 | 32 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-5934737) filed by Apple Inc. (Attachments: # 1 Exhibit(s) Certificate of Standing, # 2 Proposed Order) (Cote, Frank) (Entered: 03/26/2014) |
| 03/27/2014 | 33 | ELECTRONIC ORDER granting 32 Application for Admission Pro Hac Vice of Frank P. Cote. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 3/27/2014) (chmb) (Entered: 03/27/2014) |
| 04/30/2014 | 34 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-6008299) filed by Twitter Inc. (Attachments: # 1 Affidavit(s) Certificate of the Clerk of the Supreme Court, # 2 Proposed Order Order for Admission Pro Hac Vice) (Silbert, David) (Entered: 04/30/2014) |
| 04/30/2014 | 35 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-6008538) filed by Twitter Inc. (Attachments: # 1 Exhibit(s) Certificate of Good Standing California Supreme Court, # 2 Exhibit(s) Certificate of Good Standing California State Bar, # 3 |

| | | |
|---|---|---|
| | | Proposed Order) (Duncan, Julie) (Entered: 04/30/2014) |
| 04/30/2014 | 36 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-6009624) filed by Twitter Inc. (Attachments: # 1 Affidavit(s) Cert. of Good Standing from Calif. Supreme Court, # 2 Affidavit(s) Cert. of Good Standing (from Calif. State Bar), # 3 Proposed Order) (Lam, Leo) (Entered: 04/30/2014) |
| 05/01/2014 | 37 | ELECTRONIC ORDER granting 34 Application for Admission Pro Hac Vice of David J. Silbert. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/1/2014) (chmb) (Entered: 05/01/2014) |
| 05/01/2014 | 38 | ELECTRONIC ORDER granting 35 Application for Admission Pro Hac Vice of Julie A. Duncan. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/1/2014) (chmb) (Entered: 05/01/2014) |
| 05/01/2014 | 39 | ELECTRONIC ORDER granting 36 Application for Admission Pro Hac Vice of Leo L. Lam. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/1/2014) (chmb) (Entered: 05/01/2014) |
| 05/01/2014 | 40 | NOTICE of Attorney Appearance by Brett C Govett on behalf of Twitter Inc.. (Filer confirms contact info in ECF is current.) (Govett, Brett) (Entered: 05/01/2014) |
| 05/01/2014 | 41 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Bonnie M. Grant (Filing fee $25; Receipt number 0539-6011489) filed by Motorola Mobility LLC (Attachments: # 1 Exhibit(s) Certificate of Good Standing, # 2 Proposed Order) (Hurst, Michael) (Entered: 05/01/2014) |
| 05/01/2014 | 42 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Akarsh P. Belagodu (Filing fee $25; Receipt number 0539-6011550) filed by Motorola Mobility LLC (Attachments: # 1 Exhibit(s) Certificate of Good Standing, # 2 Proposed Order) (Hurst, Michael) (Entered: 05/01/2014) |
| 05/01/2014 | 43 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney D. Clay Holloway (Filing fee $25; Receipt number 0539-6011584) filed by Motorola Mobility LLC (Attachments: # 1 Exhibit(s) Certificate of Good Standing, # 2 Proposed Order) (Hurst, Michael) (Entered: 05/01/2014) |
| 05/01/2014 | 44 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Steven D. Moore (Filing fee $25; Receipt number 0539-6011601) filed by Motorola Mobility LLC (Attachments: # 1 Exhibit(s) Certificate of Good Standing California Supreme Court, # 2 Exhibit(s) Certificate of Good Standing Georgia Supreme Court, # 3 Exhibit(s) List of Court Admissions, # 4 Proposed Order) (Hurst, Michael) (Entered: 05/01/2014) |
| 05/02/2014 | 45 | ELECTRONIC ORDER granting 41 Application for Admission Pro Hac Vice of Bonnie M. Grant. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/2/2014) (chmb) (Entered: 05/02/2014) |
| 05/02/2014 | 46 | ELECTRONIC ORDER granting 42 Application for Admission Pro Hac Vice of |

| | | |
|---|---|---|
| | | Akarsh B. Belagodu. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/2/2014) (chmb) (Entered: 05/02/2014) |
| 05/02/2014 | 47 | ELECTRONIC ORDER granting 43 Application for Admission Pro Hac Vice of D. Clay Holloway. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/2/2014) (chmb) (Entered: 05/02/2014) |
| 05/02/2014 | 48 | ELECTRONIC ORDER granting 44 Application for Admission Pro Hac Vice of Steven Moore. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/2/2014) (chmb) (Entered: 05/02/2014) |
| 05/05/2014 | 49 | ANSWER to 6 Amended Complaint with Jury Demand filed by Apple Inc.. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas should seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. (Galvan, Hilda) (Entered: 05/05/2014) |
| 05/05/2014 | 50 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Apple Inc.. (Galvan, Hilda) (Entered: 05/05/2014) |
| 05/05/2014 | 51 | ANSWER to 6 Amended Complaint filed by Motorola Mobility LLC. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas should seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership., COUNTERCLAIM against All Plaintiffs filed by Motorola Mobility LLC (Sandler, Joshua) (Entered: 05/05/2014) |
| 05/05/2014 | 52 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Motorola Mobility LLC identifying Corporate Parent/Other Affiliate Google Inc. for Motorola Mobility LLC. (Sandler, Joshua) (Entered: 05/05/2014) |
| 05/05/2014 | 53 | ANSWER to 6 Amended Complaint with Jury Demand filed by Twitter Inc.. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas should seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership., COUNTERCLAIM against Summit 6 LLC filed by Twitter Inc. (Silbert, David) (Entered: 05/05/2014) |
| 05/05/2014 | 54 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Twitter Inc.. (Silbert, David) (Entered: 05/05/2014) |
| 05/07/2014 | 55 | Order for Scheduling Order Proposal: Joint Report due by 6/9/2014. See Order for further specifics. (Ordered by Judge Reed C O'Connor on 5/7/2014) (trt) (Entered: 05/07/2014) |
| 05/14/2014 | 56 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-6037801) filed by HTC America Inc, HTC Corporation (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order) (Ou, Philip) (Entered: 05/14/2014) |

| 05/14/2014 | 57 | ELECTRONIC ORDER granting 56 Application for Admission Pro Hac Vice of Philip Ou. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/14/2014) (chmb) (Entered: 05/14/2014) |
| --- | --- | --- |
| 05/15/2014 | 58 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Bryan K. James (Filing fee $25; Receipt number WF001878) filed by HTC America Inc, HTC Corporation (Attachments: # 1 Proposed Order) (plp) (Entered: 05/15/2014) |
| 05/15/2014 | 59 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Shayne E. O'Reilly (Filing fee $25; Receipt number 0539-6042829) filed by Motorola Mobility LLC (Attachments: # 1 Exhibit(s) Certificate of Good Standing, # 2 Proposed Order) (Hurst, Michael) (Entered: 05/15/2014) |
| 05/16/2014 | 60 | ELECTRONIC ORDER granting 58 Application for Admission Pro Hac Vice of Bryan K. James. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/16/2014) (chmb) (Entered: 05/16/2014) |
| 05/16/2014 | 61 | ELECTRONIC ORDER granting 59 Application for Admission Pro Hac Vice of Shayne E. O'Reilly. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/16/2014) (chmb) (Entered: 05/16/2014) |
| 05/16/2014 | 62 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-6045618) filed by HTC America Inc, HTC Corporation (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order) (Rassam, Mashhood) (Entered: 05/16/2014) |
| 05/17/2014 | 63 | ELECTRONIC ORDER granting 62 Application for Admission Pro Hac Vice of Mashhood Rassam. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/17/2014) (chmb) (Entered: 05/17/2014) |
| 05/19/2014 | 64 | ANSWER to 6 Amended Complaint with Jury Demand filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas should seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. (Sterling, Deborah) (Entered: 05/19/2014) |
| 05/19/2014 | 65 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc. (Sterling, Deborah) (Entered: 05/19/2014) |
| 05/19/2014 | 66 | ANSWER to 6 Amended Complaint with Jury Demand filed by HTC America Inc, HTC Corporation. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas should seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership., COUNTERCLAIM against Summit 6 LLC filed by HTC America Inc, HTC Corporation (Chaikovsky, Yar) (Entered: 05/19/2014) |

| 05/19/2014 | 67 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by HTC America Inc, HTC Corporation identifying Corporate Parent/Other Affiliate HTC Corporation for HTC America Inc. (Chaikovsky, Yar) (Entered: 05/19/2014) |
|---|---|---|
| 05/20/2014 | 68 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-6050983) filed by HTC America Inc, HTC Corporation (Attachments: # 1 Certificate of Standing, # 2 Proposed Order) (Ong, Darryl) (Entered: 05/20/2014) |
| 05/21/2014 | 69 | ELECTRONIC ORDER granting 68 Application for Admission Pro Hac Vice of Darryl Ong. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/21/2014) (chmb) (Entered: 05/21/2014) |
| 05/22/2014 | 70 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $25; Receipt number 0539-6056581) filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc (Stillman, Stacey) (Entered: 05/22/2014) |
| 05/23/2014 | 71 | ELECTRONIC ORDER granting 70 Application for Admission Pro Hac Vice of Stacey Stillman. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/23/2014) (chmb) (Entered: 05/23/2014) |
| 05/23/2014 | 72 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Steven J. Routh (Filing fee $25; Receipt number 0539-6058566) filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc (Stillman, Stacey) (Entered: 05/23/2014) |
| 05/23/2014 | 73 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Robert M. Isackson (Filing fee $25; Receipt number 0539-6058583) filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc (Stillman, Stacey) (Entered: 05/23/2014) |
| 05/23/2014 | 74 | ANSWER to Counterclaim filed by Summit 6 LLC. Related document: 53 Answer to Amended Complaint,,, Counterclaim,, (Kamprath, Richard) (Entered: 05/23/2014) |
| 05/23/2014 | 75 | ANSWER to Counterclaim filed by Summit 6 LLC. Related document: 51 Answer to Amended Complaint,,, Counterclaim,, (Kamprath, Richard) (Entered: 05/23/2014) |
| 05/24/2014 | 76 | ELECTRONIC ORDER granting 72 Application for Admission Pro Hac Vice of Steven J. Routh. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/24/2014) (chmb) (Entered: 05/24/2014) |
| 05/24/2014 | 77 | ELECTRONIC ORDER granting 73 Application for Admission Pro Hac Vice of Robert Isackson. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/24/2014) (chmb) (Entered: 05/24/2014) |
| 05/27/2014 | 78 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Hsiwen Lo (Filing fee $25; Receipt number 0539-6062376) filed by LG |

| | | |
|---|---|---|
| | | Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc (Stillman, Stacey) (Entered: 05/27/2014) |
| 05/27/2014 | 79 | ELECTRONIC ORDER granting 78 Application for Admission Pro Hac Vice of Hsiwen Lo. If not already done, Applicant must register as an ECF User within 14 days (LR 5.1(f)). (Ordered by Judge Reed C O'Connor on 5/27/2014) (chmb) (Entered: 05/27/2014) |
| 05/27/2014 | 80 | *Motorola Mobility LLC's* AMENDED ANSWER to 6 Amended Complaint with Jury Demand filed by Motorola Mobility LLC, COUNTERCLAIM against Summit 6 LLC filed by Motorola Mobility LLC (Grant, Bonnie) (Entered: 05/27/2014) |
| 05/27/2014 | 81 | AMENDED ANSWER to 6 Amended Complaint with Jury Demand filed by Apple Inc. (Cote, Frank) (Entered: 05/28/2014) |
| 05/29/2014 | 82 | Notice of Correction of Signature Omission, correcting signature omission in 81 Amended Answer to Complaint filed by Apple Inc.. (Cote, Frank) (Entered: 05/29/2014) |
| 06/04/2014 | 83 | ANSWER to Counterclaim filed by Summit 6 LLC. Related document: 66 Answer to Amended Complaint,,, Counterclaim,, (Sibley, Mitchell) (Entered: 06/04/2014) |
| 06/04/2014 | 84 | ANSWER to Counterclaim filed by Summit 6 LLC. Related document: 80 Amended Answer to Complaint, Counterclaim (Sibley, Mitchell) (Entered: 06/04/2014) |
| 06/09/2014 | 85 | NOTICE of *Compliance regarding Initial Disclosures* filed by Apple Inc. (Clark, Douglas) (Entered: 06/09/2014) |
| 06/09/2014 | 86 | Joint MOTION to Extend Time for the Parties to File a Joint Report and Exchange Initial Disclosures filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Summit 6 LLC, Twitter Inc. (Attachments: # 1 Proposed Order) (Aurentz, Phillip) (Entered: 06/09/2014) |
| 06/09/2014 | 87 | NOTICE of *Compliance* filed by Summit 6 LLC (Kamprath, Richard) (Entered: 06/09/2014) |
| 06/10/2014 | 88 | ELECTRONIC ORDER granting 86 Motion to Extend Time. The deadline for the parties' Joint Report is hereby extended to June 11, 2014. The deadline for the parties to serve their Initial Disclosures is hereby extended to June 20, 2014. (Ordered by Judge Reed C O'Connor on 6/10/2014) (chmb) (Entered: 06/10/2014) |
| 06/10/2014 | 89 | Joint MOTION to Transfer Case out of District/Division *Defendants' Motion to Transfer to the Northern District of California* filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. (Attachments: # 1 Proposed Order) (Silbert, David) (Entered: 06/10/2014) |
| 06/10/2014 | 90 | Brief/Memorandum in Support filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. re 89 Joint MOTION to Transfer Case out of District/Division *Defendants' Motion to Transfer to the* |

| | | |
|---|---|---|
| | | *Northern District of California* (Attachments: # 1 Unpublished Case Law) (Silbert, David) (Entered: 06/10/2014) |
| 06/10/2014 | 91 | Appendix in Support filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. re 89 Joint MOTION to Transfer Case out of District/Division *Defendants' Motion to Transfer to the Northern District of California,* 90 Brief/Memorandum in Support of Motion, (Attachments: # 1 Pt. 1 - APPX001-102, # 2 Pt. 2 - APPX103-162, # 3 Pt. 3 - APPX163-203, # 4 Pt. 4 - APPX 204-236, # 5 Pt. 5 - APPX 237-301) (Silbert, David) (Entered: 06/10/2014) |
| 06/11/2014 | 92 | Proposal for contents of scheduling and discovery order by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Summit 6 LLC, Twitter Inc.. (Attachments: # 1 Exhibit(s) Scheduling Order, # 2 Exhibit(s) Discovery Order, # 3 Exhibit(s) ESI Order) (Cawley, Douglas) (Entered: 06/11/2014) |
| 06/12/2014 | 93 | SCHEDULING ORDER: Jury Trial set for 11/30/2015 09:00 AM in US Courthouse, Courtroom 222, 1000 Lamar Street, Wichita Falls, TX 76301-3431 before Judge Reed C O'Connor. Joinder of Parties due by 9/10/2014. Amended Pleadings due by 9/10/2014. Motions due by 8/3/2015. Deadline for mediation is on or before 6/3/2015. Discovery due by 7/3/2015. Pretrial Materials due by 10/21/2015. Pretrial Order due by 10/21/2015. (Ordered by Judge Reed C O'Connor on 6/12/2014) (trt) (Entered: 06/12/2014) |
| 06/12/2014 | 94 | ORDER: Attached as exhibits to the parties' Joint Report Regarding Contents of Scheduling Order ("Joint Report") (ECF No. 92 ) are: Joint Motion for Entry of a Discovery Order (Exhibit B) (ECF No. [92-2]) and Joint Motion for Entry of an ESI Order (Exhibit C) (ECF No. [92-3]). In order for the Court to consider these exhibits as motions, and grant any relief sought, the joint motions must be filed as separate docket entries, rather than merely as exhibits appended to the Joint Motion. Accordingly, the Court directs the parties to file as separate docket entries the Joint Motion for Entry of a Discovery Order and the Joint Motion for Entry of an ESI Order, on or before Friday, June 13, 2014 at 3:00 p.m. (Ordered by Judge Reed C O'Connor on 6/12/2014) (plp) (Entered: 06/12/2014) |
| 06/13/2014 | 95 | Joint MOTION for Discovery *Order* filed by Summit 6 LLC (Attachments: # 1 Exhibit(s) Proposed Order) (Cawley, Douglas) (Entered: 06/13/2014) |
| 06/13/2014 | 96 | Joint MOTION for Discovery *ESI Order* filed by Summit 6 LLC (Attachments: # 1 Exhibit(s) Proposed Order) (Cawley, Douglas) (Entered: 06/13/2014) |
| 06/13/2014 | 97 | Order Referring Motion. re: 96 Joint MOTION for Discovery *ESI Order,* 95 Joint MOTION for Discovery *Order* Motion(s) referred to Magistrate Judge Robert K Roach. (Ordered by Judge Reed C O'Connor on 6/13/2014) (trt) (Entered: 06/13/2014) |
| 06/17/2014 | 98 | DISCOVERY ORDER: Pursuant to the District Court's Order Referring Motion (Docket No. 97 ), comes on for consideration the Joint Motion for Discovery Order (Docket No. 95 ). Having considered the said motion together with the Proposal for Scheduling Order (Docket No. 92 ) reflecting matters of agreement among the parties, I find that the following order should be entered to govern |

| | | certain matters of discovery in this cause. (Ordered by Magistrate Judge Robert K Roach on 6/17/2014) (plp) (Entered: 06/17/2014) |
|---|---|---|
| 06/17/2014 | 99 | ORDER FOR SCHEDULING TELEPHONIC HEARING: Pursuant to the District Court's Order Referring Motion, comes now before me for consideration the parties' Joint Motion for Discovery ESI Order (Docket No. 96 ). To assist the Court in the resolution of the issues in dispute regarding the manner and content of production of electronically store information (ESI), a telephonic hearing shall be promptly scheduled. See order for further specifics. (Ordered by Magistrate Judge Robert K Roach on 6/17/2014) (plp) (Entered: 06/17/2014) |
| 06/18/2014 | 100 | Joint MOTION for Protective Order filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Summit 6 LLC, Twitter Inc. (Attachments: # 1 Proposed Order, # 2 Exhibit(s) Case Law, # 3 Exhibit(s) Case Law, # 4 Exhibit(s) Case Law) (Cawley, Douglas) (Entered: 06/18/2014) |
| 06/19/2014 | 101 | Order Referring Motion re: 100 Joint MOTION for Protective Order Motion(s) referred to Magistrate Judge Robert K Roach. (Ordered by Judge Reed C O'Connor on 6/19/2014) (trt) (Entered: 06/19/2014) |
| 06/19/2014 | 102 | ORDER: In light of the numerous disputes between the parties in their Joint Motion for Protective Order filed June 18, 2014 (see ECF No. 100), the Court concludes that the proposed interim protective order is warranted. Accordingly, the Court directs Plaintiff to submit the proposed protective order in Word or Wordperfect format via e-mail to: oconnor_orders@txnd.uscourts.gov. and to include the case number and the document number of the referenced motion in the subject line. (Ordered by Judge Reed C O'Connor on 6/19/2014) (trt) (Entered: 06/19/2014) |
| 06/20/2014 | 103 | ELECTRONIC ORDER SETTING HEARING VIA TELEPHONE CONFERENCE: It is ORDERED that a telephone conference hearing re: 96 Joint MOTION for Discovery *ESI Order* and 100 Joint MOTION for Protective Order is hereby set for 10:00 am on Thursday, June 26, 2014. Plaintiff's counsel shall be responsible for initiating said telephone conference to the Court's courtroom telephone at (940) 235-4751. Please include Feriale Millen at (214) 753-2651 in the conference call. The hearing will be recorded using the Court's FTR System. Counsel requesting stenographic reporting of the proceeding shall make his own arrangements for a reporter at counsel's own cost and expense. (Ordered by Magistrate Judge Robert K Roach on 6/20/2014) (mjchmb - plp) (Entered: 06/20/2014) |
| 06/20/2014 | 104 | NOTICE of *Compliance* filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc (Lo, Hsiwen) (Entered: 06/20/2014) |
| 06/20/2014 | 105 | NOTICE of *Compliance* filed by Motorola Mobility LLC (Hurst, Michael) (Entered: 06/20/2014) |
| 06/20/2014 | 106 | NOTICE of *Service of Initial Disclosures* filed by Twitter Inc. (Duncan, Julie) (Entered: 06/20/2014) |
| 06/24/2014 | 107 | PROTECTIVE ORDER. (Ordered by Judge Reed C O'Connor on 6/24/2014) (trt) (Entered: 06/24/2014) |

| 06/25/2014 | 108 | NOTICE of Attorney Appearance by E Leon Carter on behalf of HTC America Inc, HTC Corporation. (Filer confirms contact info in ECF is current.) (Carter, E) (Entered: 06/25/2014) |
|---|---|---|
| 06/25/2014 | 109 | NOTICE of Attorney Appearance by Linda R Stahl on behalf of HTC America Inc, HTC Corporation. (Filer confirms contact info in ECF is current.) (Stahl, Linda) (Entered: 06/25/2014) |
| 06/25/2014 | 110 | NOTICE of *Compliance* filed by HTC America Inc, HTC Corporation (Stahl, Linda) (Entered: 06/25/2014) |
| 06/25/2014 | 111 | MOTION to Sever filed by Apple Inc. (Attachments: # 1 Proposed Order) (Galvan, Hilda) (Entered: 06/25/2014) |
| 06/25/2014 | 112 | Brief/Memorandum in Support filed by Apple Inc. re 111 MOTION to Sever (Galvan, Hilda) (Entered: 06/25/2014) |
| 06/25/2014 | 113 | Appendix in Support filed by Apple Inc. re 112 Brief/Memorandum in Support of Motion, 111 MOTION to Sever (Galvan, Hilda) (Entered: 06/25/2014) |
| 06/26/2014 | 114 | ELECTRONIC Minute Entry for proceedings held before Magistrate Judge Robert K Roach: Motion Hearing via Telephone Conference held on 6/26/2014 re 96 Motion for Discovery ESI Order, 100 Motion for Protective Order. ESI Order and Protective Order will be prepared and filed. Attorney Appearances: Plaintiff - Ashley N Moore, Douglas A Cawley; Defense - Apple Inc. - Hilda C Galvan; LG - Deborah L Sterling, Stacey E Stillman, Steven J Routh; HTC - Philip Ou, Yar R Chaikovsky; Twitter Inc - Leo L Lam, Julie Anne Duncan, Ryan Peterson; Motorola Mobility LLC - D Clay Holloway, Steve Hopkins. (Court Reporter: Digital File) (No exhibits) Time in Court - 2:45. (plp) (Entered: 06/26/2014) |
| 06/26/2014 | 115 | PROTECTIVE ORDER REGARDING THE DISCLOSURE AND USE OF DISCOVERY MATERIALS (Ordered by Magistrate Judge Robert K Roach on 6/26/2014) (plp) (Entered: 06/26/2014) |
| 06/26/2014 | 116 | ESI ORDER (Ordered by Magistrate Judge Robert K Roach on 6/26/2014) (plp) (Entered: 06/26/2014) |
| 06/27/2014 | 117 | NOTICE of *Compliance* filed by Summit 6 LLC (Sibley, Mitchell) (Entered: 06/27/2014) |
| 07/01/2014 | 118 | RESPONSE filed by Summit 6 LLC re: 89 Joint MOTION to Transfer Case out of District/Division *Defendants' Motion to Transfer to the Northern District of California* (Attachments: # 1 Exhibit(s), # 2 Case Law) (Cawley, Douglas) (Entered: 07/01/2014) |
| 07/15/2014 | 119 | REPLY filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. re: 89 Joint MOTION to Transfer Case out of District/Division *Defendants' Motion to Transfer to the Northern District of California* (Stover, Michelle) (Entered: 07/15/2014) |
| 07/15/2014 | 120 | Appendix in Support filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. re 119 Reply, *Motion to Transfer* (Stover, Michelle) (Entered: 07/15/2014) |

| 07/15/2014 | 121 | Appendix in Support filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. re 119 Reply, *Motion to Transfer* (Stover, Michelle) (Entered: 07/15/2014) |
|---|---|---|
| 07/16/2014 | 122 | RESPONSE filed by Summit 6 LLC re: 111 MOTION to Sever (Attachments: # 1 Appendix, # 2 Case Law) (Cawley, Douglas) (Entered: 07/16/2014) |
| 07/30/2014 | 123 | REPLY filed by Apple Inc. re: 111 MOTION to Sever (Galvan, Hilda) (Entered: 07/30/2014) |
| 07/30/2014 | 124 | ***Disregard, counsel will refile*** Appendix in Support filed by Apple Inc. re 123 Reply *Brief Supporting its Motion to Sever* (Galvan, Hilda) Modified on 7/30/2014 (twd). (Entered: 07/30/2014) |
| 07/30/2014 | 125 | Appendix in Support filed by Apple Inc. re 123 Reply *Brief Supporting its Motion to Sever* (Galvan, Hilda) (Entered: 07/30/2014) |
| 07/30/2014 | 126 | Appendix in Support filed by Apple Inc. re 123 Reply *Brief Supporting its Motion to Sever, Unpublished Authorities* (Attachments: # 1 Additional Page(s) Exhibits 1-8 of Appendix, # 2 Additional Page(s) Exhibit 9 of Appendix) (Galvan, Hilda) (Entered: 07/30/2014) |
| 08/04/2014 | 127 | MOTION for Protective Order *Against Disclosure of Defendants' Protected Information to Dr. Mark T. Jones* filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc (Attachments: # 1 Proposed Order Against Disclosure) (Lo, Hsiwen) (Entered: 08/04/2014) |
| 08/04/2014 | 128 | Brief/Memorandum in Support filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc re 127 MOTION for Protective Order *Against Disclosure of Defendants' Protected Information to Dr. Mark T. Jones and Objections* (Lo, Hsiwen) (Entered: 08/04/2014) |
| 08/04/2014 | 129 | Appendix in Support filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc re 128 Brief/Memorandum in Support of Motion, *127 Objections and Motion for Protective Order* (Attachments: # 1 Appendix Attachment) (Lo, Hsiwen) (Entered: 08/04/2014) |
| 08/05/2014 | 130 | ORDER OF REFERRAL: Before the Court is LGE Defendants Motion for Protective Order Against Disclosure of Defendants' Protected Information to Dr. Mark T. Jones, filed August 4, 2014 (ECF No. 127 ). The Court hereby REFERS the motion, and all related responses, replies, briefs in support, appendices, etc., to United States Magistrate Judge Robert K. Roach for hearing, if necessary, and determination. See 28 U.S.C. § 636(b)(1). Future pleadings concerning these specific motions shall be filed with a transmittal letter addressed to Magistrate Judge Roach so copies can be sent directly to him without delay. (Ordered by Judge Reed C O'Connor on 8/5/2014) (plp) (Entered: 08/05/2014) |
| 08/07/2014 | 131 | ORDER SCHEDULING TELEPHONIC HEARING: It is ORDERED that a telephone conference hearing is hereby scheduled for Thursday, August 14, 2014 at 10:00 a.m. CST. Counsel for LGE Defendants shall initiate the conference call to the Court at (940) 235-4751. The Courts law clerk, Feriale Millen, at (214) 753-2651, shall be included in the telephone conference. (Ordered by Magistrate Judge Robert K Roach on 8/7/2014) (plp) (Entered: 08/07/2014) |

| | | |
|---|---|---|
| 08/11/2014 | 132 | NOTICE of *Compliance* filed by LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc (Lo, Hsiwen) (Entered: 08/11/2014) |
| 08/11/2014 | 133 | NOTICE of *Compliance* filed by Apple Inc. (Clark, Douglas) (Entered: 08/11/2014) |
| 08/12/2014 | 134 | NOTICE of *Compliance* filed by Motorola Mobility LLC (Grant, Bonnie) (Entered: 08/12/2014) |
| 08/12/2014 | 135 | NOTICE of *Compliance* re: 93 Scheduling Order, filed by Twitter Inc. (Silbert, David) (Entered: 08/12/2014) |
| 08/12/2014 | 136 | NOTICE of *Compliance* filed by HTC America Inc, HTC Corporation (Ou, Philip) (Entered: 08/12/2014) |
| 08/14/2014 | 137 | ORDER ON 127 LGE DEFENDANTS' OBJECTIONS AND MOTIONFOR PROTECTIVE ORDER: LGE Defendants Objections and Motion for Protective Order (Docket No. 127) are hereby DENIED. (Ordered by Magistrate Judge Robert K Roach on 8/14/2014) (plp) (Entered: 08/14/2014) |
| 08/25/2014 | 138 | NOTICE of *Compliance* filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. (Duncan, Julie) (Entered: 08/25/2014) |
| 08/26/2014 | 139 | Unopposed MOTION to Withdraw as Attorney *, Michelle Stover* filed by Apple Inc. (Attachments: # 1 Proposed Order) (Galvan, Hilda) (Entered: 08/26/2014) |
| 08/26/2014 | 140 | ELECTRONIC ORDER granting 139 Motion to Withdraw as Attorney. Attorney Michelle Stover terminated (Ordered by Judge Reed C O'Connor on 8/26/2014) (chmb) (Entered: 08/26/2014) |
| 08/26/2014 | 141 | NOTICE of *Compliance* filed by Summit 6 LLC (Cawley, Douglas) (Entered: 08/26/2014) |
| 09/07/2014 | 142 | Notice of Filing of Official Electronic Transcript of Telephone Conference re Motion for Discovery ESI Order and Motion for Protective Order Proceedings held on 06/26/2014 before Judge Robert K. Roach. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. Parties are notified of their duty to review the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Redaction Request - Transcript must be filed within 21 days. If no such Request is filed, the transcript will be made available via PACER without redaction after 90 calendar days. If redaction request filed, this transcript will not be accessible via PACER; see redacted transcript. The clerk will mail a copy of this notice to parties not electronically noticed. (98 pages). Redaction Request due 9/29/2014. Redacted Transcript Deadline set for 10/8/2014. Release of Transcript Restriction set for 12/8/2014. (Rehling, Kathy) (Entered: 09/07/2014) |
| 09/10/2014 | 143 | Memorandum Opinion and Order: Based on the foregoing, the Court denies Defendants Motion to Transfer to the Northern District of California, and grants in |

| | | |
|---|---|---|
| | | part and denies in part Defendant Apple Inc.s Motion to Sever. Specifically, Apple Inc.s motion to sever is granted and its motion to transfer venue is denied. The Court orders that all claims against Defendant Apple be severed into a separate cause of action. The Court further orders the above-severed case consolidated with the original filed action, Cause No. 7-14-cv-0014-O, which is the lead case. All parties are instructed to file any future motions in the lead case. The severed action remains active for trial. (Ordered by Judge Reed C O'Connor on 9/10/2014) (trt) (Entered: 09/10/2014) |
| 09/10/2014 | | MEMBER CASE (7-14-cv-106-O Summit 6 LLC v Apple Inc) opened and consolidated into LEAD CASE 7-14-cv-014-O per 143 Memorandum Opinion and Order. (trt) (Entered: 09/11/2014) |
| 09/11/2014 | 144 | NOTICE of Attorney Appearance by Colleen Elizabeth Bloss on behalf of All Plaintiffs. (Filer confirms contact info in ECF is current.) (Bloss, Colleen) (Entered: 09/11/2014) |
| 09/22/2014 | 145 | ***DISREGARD PER ATTORNEYS***MOTION To Limit Number of Asserted Claims filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. (Attachments: # 1 Proposed Order) (Duncan, Julie) Modified text per chambers on 9/24/2014 (trt). (Entered: 09/22/2014) |
| 09/22/2014 | 146 | ***DISREGARD PER ATTORNEYS***Brief/Memorandum in Support filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. re 145 MOTION To Limit Number of Asserted Claims (Attachments: # 1 Exhibit(s) Appendix of Unpublished Authorities) (Duncan, Julie) Modified text per chambers on 9/24/2014 (trt). (Entered: 09/22/2014) |
| 09/22/2014 | 147 | ***DISREGARD PER ATTORNEYS***Appendix in Support filed by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Twitter Inc. re 145 MOTION To Limit Number of Asserted Claims (Duncan, Julie) Modified text per chambers on 9/24/2014 (trt). (Entered: 09/22/2014) |
| 10/01/2014 | 148 | Joint STIPULATION *Regarding Reducing the Number of Asserted Claims and Prior Art References* by Apple Inc., HTC America Inc, HTC Corporation, LG Electronics Inc, LG Electronics MobileComm USA Inc, LG Electronics USA Inc, Motorola Mobility LLC, Summit 6 LLC, Twitter Inc.. (Ou, Philip) (Entered: 10/01/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | | |
| 10/15/2014 14:14:50 | | | |
| **PACER Login:** | kv0743:4029684:0 | **Client Code:** | summit6 |
| **Description:** | Docket Report | **Search Criteria:** | 7:14-cv-00014-O |
| **Billable Pages:** | 26 | **Cost:** | 2.60 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| **SUMMIT 6 LLC,** §<br>§<br>**Plaintiff,** §<br>§<br>**v.** §<br>§<br>**HTC CORPORATION,** §<br>**HTC AMERICA, INC.,** §<br>**LG ELECTRONICS, INC.,** §<br>**LG ELECTRONICS USA, INC.,** §<br>**LG ELECTRONICS MOBILECOMM** §<br>**USA, INC.,** §<br>**MOTOROLA MOBILITY LLC,** §<br>**APPLE INC., and** §<br>**TWITTER INC.,** §<br>§<br>**Defendants.** § | **CIVIL ACTION NO.  7:14-cv-00014**<br><br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Summit 6 LLC ("Summit 6") files this First Amended Complaint for Patent Infringement against Defendants HTC Corporation ("HTC Corp."), HTC America, Inc. ("HTC America"), LG Electronics, Inc. ("LGE Inc."), LG Electronics USA, Inc. ("LGE USA"), LG Electronics Mobilecomm USA, Inc. ("LGE MobileComm"), Motorola Mobility LLC ("Motorola"), Apple Inc. ("Apple"), and Twitter Inc. ("Twitter") (HTC Corp., HTC America, LGE Inc., LGE USA, LGE MobileComm, Motorola, Apple, and Twitter, collectively "Defendants") and allege as follows:

## BACKGROUND

1.    For approximately two decades, Summit 6 and its predecessor companies PictureWorks and AdMission have pioneered the development of numerous digital content technologies, resulting in several patents.  When the first digital cameras came to the U.S. market in the early 1990s, the inventors, while working at a company called PictureWorks, developed

image-transfer software that allowed users to transfer pictures from their cameras to their computers. Through its partnerships with Kodak, Casio, Epson, Fuji and others, PictureWorks was able to bundle its software with the leading digital imagery hardware of the day, reaching users all across America.

2.     Although their camera-to-computer software was successful, the inventors recognized the next hurdle users would face: sharing images with others over a network. Noticing the difficulties the digital imaging industry encountered on this front, the inventors devoted their expertise to developing a simple solution to this problem. This solution culminated in the ideas patented in U.S. Patent Nos. 6,895,557 ("the '557 Patent"), 7,765,482 ("the '482 Patent"), and 8,612,515 ("the '515 Patent") (collectively "the Patents-in-Suit").

3.     Summit 6's patented ideas help countless users and companies easily and efficiently transfer digital content such as digital photos. Websites and smartphone manufacturers such as eBay, Facebook, The Dallas Morning News, Cars.com, Yellowpages.com, The New York Times, Photobucket, and Blackberry (formerly Research in Motion) have all recognized the value associated with Summit 6's technology and have taken licenses to the Patents-in-Suit. And in April 2013, a jury validated Summit 6's innovation by finding that the multimedia messaging service ("MMS") on Samsung's phones infringed Summit 6's '482 Patent.

## **PARTIES**

4.     Plaintiff Summit 6 is a Delaware limited liability company with its principal place of business at 4925 Greenville Ave., Suite 200, Dallas, Texas 75206.

5.     Defendant HTC Corp. is a Taiwanese corporation with its principal place of business at No. 88, Section 3, Zhongxing Road, Xindian District, New Taipei City, 231, Taiwan. HTC Corp. designs, manufactures, uses, imports into the United States, sells, and/or offers for

sale in the United States cell phones, tablets, and other computing devices that obtain digital content, pre-process it, and transmit it to another device, server, or location via multimedia messages ("MMS messages"), applications, Application Programing Interfaces ("APIs"), and/or functionality added to the native content sharing options (collectively "upload services and/or devices"). HTC Corp.'s upload services and/or devices are marketed, offered for sale, and/or sold throughout the United States, including within this District. HTC Corp. can be served with process by way of letters rogatory, in accordance with Fed. R. Civ. P. 4(f).

6. Defendant HTC America is a Washington corporation with its principal place of business at 13920 SE Eastgate Way, Suite 400, Bellevue, Washington 98005. HTC America designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States cell phones, tablets, and other computing devices that obtain digital content, pre-process it, and transmit it to another device, server, or location via multimedia messages ("MMS messages"), applications, Application Programing Interfaces ("APIs"), and/or functionality added to the native content sharing options (collectively "upload services and/or devices"). HTC America's upload services and/or devices are marketed, offered for sale, and/or sold throughout the United States, including within this District. HTC America can be served with process by serving National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

7. Defendant LGE Inc. is a Korean corporation with its principal place of business at LG Twin Tower 128, Yeoui-daero, Yengdeungpo-gu, Seoul 150-721, Korea. LGE Inc. designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States cell phones, tablets, and other computing devices that obtain digital content, pre-process it, and transmit it to another device, server, or location via multimedia messages ("MMS messages"), applications, Application Programing Interfaces ("APIs"), and/or functionality added to the native content sharing options (collectively "upload services and/or devices"). LGE

Inc.'s upload services and/or devices are marketed, offered for sale, and/or sold throughout the United States, including within this District.  LGE Inc. can be served with process, by serving in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, in accordance with Fed. R. Civ. P. 4(f).

8.      Defendant LGE USA is a Delaware corporation with its principal place of business at 920 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  LGE USA designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States cell phones, tablets, and other computing devices that obtain digital content, pre-process it, and transmit it to another device, server, or location via multimedia messages ("MMS messages"), applications, Application Programing Interfaces ("APIs"), and/or functionality added to the native content sharing options (collectively "upload services and/or devices").  LGE USA's upload services and/or devices are marketed, offered for sale, and/or sold throughout the United States, including within this District.  LGE USA can be served with process by serving United States Corporation Company, 211 E. 7th Street Suite 620, Austin, Texas 78701.

9.      Defendant LGE MobileComm is a California corporation with its principal place of business at 10101 Old Grove Road, San Diego, CA 92131.  LGE MobileComm designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States cell phones, tablets, and other computing devices that obtain digital content, pre-process it, and transmit it to another device, server, or location via multimedia messages ("MMS messages"), applications, Application Programing Interfaces ("APIs"), and/or functionality added to the native content sharing options (collectively "upload services and/or devices").  LGE MobileComm's upload services and/or devices are marketed, offered for sale, and/or sold throughout the United States, including within this District.  LGE MobileComm can be served

with process by serving National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

10.    Defendant Motorola is a Delaware corporation with its principal place of business at 600 North U.S. Highway 45, Libertyville, Illinois 60048.  Motorola designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States cell phones, tablets, and other computing devices that obtain digital content, pre-process it, and transmit it to another device, server, or location via multimedia messages ("MMS messages"), applications, Application Programing Interfaces ("APIs"), and/or functionality added to the native content sharing options (collectively "upload services and/or devices").  Motorola's upload services and/or devices are marketed, offered for sale, and/or sold throughout the United States, including within this District.  Motorola can be served with process by serving CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

11.    Defendant Apple is a California corporation, with its principal place of business at 1 Infinite Loop, M/S 38-3TX, Cupertino, California 95014.  Apple designs, manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States cell phones, tablets, and other computing devices that obtain digital content, pre-process it, and transmit it to another device, server, or location via multimedia messages ("MMS messages"), iMessages, applications, Application Programing Interfaces ("APIs"), and/or functionality added to the native content sharing options (collectively "upload services and/or devices").  Apple's upload services and/or devices are marketed, offered for sale, and/or sold throughout the United States, including within this District.  Apple can be served with process by serving CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

12.    Defendant Twitter is a Delaware corporation, with its principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94103.  Twitter designs,

manufactures, uses, imports into the United States, sells, and/or offers for sale in the United States services, servers, applications, Application Programming Interfaces ("APIs"), and/or functionality added to the native content sharing options within cell phones, tablets, and other computing devices that transmit pre-processing parameters; receive pre-processed digital content; obtain digital content, pre-process it, and transmit it to another device, server, or location; and/or distribute pre-processed digital content to a another device, server, or location (collectively "upload services").  Twitter makes, uses, sells, imports, and/or offers applications, APIs, and/or functionality added to the native content sharing options for devices from co-defendants HTC Corp., HTC America, LGE Inc., LGE USA, LGE MobileComm, Motorola, and Apple.  Twitter's upload services are marketed, offered for sale, and/or sold throughout the United States, including within this District.  Twitter can be served with process by way of the Texas Secretary of State, in accordance with Fed. R. Civ. P. 4(h).

## JURISDICTION AND VENUE

13.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, including 35 U.S.C. §§ 271 and 281-285.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1338.

14.     Venue is proper in the Wichita Falls Division of the Northern District of Texas pursuant to 28 U.S.C. §§ 1391 and 1400(b).

15.     This Court has personal jurisdiction over Defendants.  Defendants have conducted and do conduct business within the State of Texas.  Defendants, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), ship, distribute, offer for sale, sell, design, manufacture, and advertise products and/or services that infringe the Patents-in-Suit in the United States, the State of Texas, and the Northern District of Texas.  Defendants, directly and through subsidiaries and intermediaries, have purposefully and voluntarily placed one or

more of their infringing upload services and/or devices, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in the Northern District of Texas. These infringing upload services and/or devices have been and continue to be purchased and used by consumers in the Northern District of Texas. Defendants have committed acts of patent infringement with the State of Texas and, more particularly, within the Northern District of Texas.

## THE ASSERTED PATENTS

16.     On May 17, 2005, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 6,895,557, entitled "Web-Based Media Submission Tool," to Lisa T. Wood, Scott M. Lewis, and Robin T. Fried. Summit 6 is the owner by assignment of the '557 Patent and possesses all rights of recovery under the '557 Patent. A true and correct copy of the '557 Patent is attached hereto as Exhibit A and incorporated herein by reference.

17.     On July 27, 2010, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 7,765,482, entitled "Web-Based Media Submission Tool," to Lisa T. Wood, Scott M. Lewis, and Robin T. Fried. Summit 6 is the owner by assignment of the '482 Patent and possesses all rights of recovery under the '482 Patent. A true and correct copy of the '482 Patent is attached hereto as Exhibit B and incorporated herein by reference.

18.     On December 17, 2013, The U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 8,612,515, entitled "System, Method, and Apparatus for Media Submission," to Lisa T. Wood, Scott M. Lewis, and Robin T. Fried. Summit 6 is the owner by assignment of the '515 Patent and possesses all rights of recovery under the '515 Patent. A true and correct copy of the '515 Patent is attached hereto as Exhibit C and incorporated herein by reference.

19.     The Patents-in-Suit are valid and enforceable.

## GENERAL ALLEGATIONS

20.     Defendants have and continue to make, use, import into the United States, market, offer for sale, and/or sell in the United States upload services and/or devices that infringe the Patents-in-Suit, and/or induce or contribute to the infringement of the Patents-in-Suit by others, including other co-defendants and end users.

21.     Summit 6 has been damaged as a result of Defendants' infringing conduct. Defendants are therefore liable to Summit 6 in an amount that adequately compensates Summit 6 for Defendants' infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT I

### Infringement of the '482 Patent

22.     Summit 6 repeats and realleges the allegations in paragraphs 1-21 as though fully set forth herein.

### HTC Corp. Infringes the '482 Patent

23.     HTC Corp. has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by at least claims 1, 4, 6, 8-10, 12-14, 16-19, 21-23, 25, 35, 38, 40-42, 44-46, and 49-50 of the '482 Patent (hereinafter the "'482 HTC Asserted Claims"), including, but not limited to HTC Corp.'s upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: Desire, One, One max, One mini, Droid DNA, Evo 4G LTE, Droid Incredible 4G LTE, One SV, One X+, Desire C, One X, One VX, One S, One V, EVO Design 4G, Vivid, Rezound, Rhyme, Sensation, Hero S, and any other HTC Corp. mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or

location; the HTC Messaging Application, including its MMS functionality; HTC Corp.'s Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality.  Further discovery may reveal additional infringing products, models, and/or functionality.

24.    HTC Corp. makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '482 HTC Asserted Claims.  Upon information and belief, HTC Corp. also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '482 HTC Asserted Claims.  HTC Corp. also directly infringes the '482 HTC Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

25.    HTC Corp. has and continues to induce and contribute to infringement of the '482 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 HTC Asserted Claims, including, but not limited to HTC Corp.'s upload services and/or devices listed above.  HTC Corp. provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '482 HTC Asserted Claims.

26.    HTC Corp. indirectly infringes the '482 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.  HTC Corp. received notice of the '482 Patent at least as of the date this lawsuit was filed.  HTC Corp. provides the accused upload

services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '482 Patent. Through its manufacture and sale of the accused upload services and/or devices, HTC Corp. specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '482 Patent.

27. HTC Corp. specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '482 HTC Asserted Claims in the United States. For example, HTC Corp. provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of HTC Corp.'s products in an infringing way. Such instructions include at least "HTC Desire 601 User Guide,"[1] "Your HTC One User Guide,"[2] "HTC One Max User Guide,"[3] and other similar user guides and support documentation available on HTC Corp.'s support website.[4] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '482 HTC Asserted Claims. HTC Corp. knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '482 HTC Asserted Claims. HTC Corp. thus knows that its actions actively induce infringement. HTC Corp. performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

28. HTC Corp. indirectly infringes the '482 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. §

---

[1] Available on HTC Corp.'s website at
http://dl4.htc.com/web_materials/Manual/HTC_Desire_601/HTC_Desire_601_Virgin_Mobile_User_Guide.pdf.
[2] Available on HTC Corp.'s website at
http://dl4.htc.com/web_materials/Manual/HTC_One/HTC_One_ATT_User_Guide.pdf.
[3] Available on HTC Corp.'s website at
http://dl4.htc.com/web_materials/Manual/HTC_One_max/HTC_One_max_Sprint_User_Guide.pdf.
[4] *See* http://www.htc.com/us/support/.

271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices.  HTC Corp. received notice of the '482 Patent at least as of the date this lawsuit was filed.

29.    HTC Corp.'s upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.  When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and transmit digital media in an infringing manner.  Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

30.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on HTC Corp.'s upload services and/or devices.

31.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

32.    HTC Corp.'s accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices.

The accused upload services and/or devices are especially made or adapted to infringe the '482 Patent.  Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '482 Patent, HTC Corp.'s sales of its infringing products have no substantial non-infringing uses.

33.    Accordingly, a reasonable inference is that HTC Corp. offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

34.    HTC Corp.'s acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, HTC Corp. will continue to infringe the '482 Patent.

**HTC America Infringes the '482 Patent**

35.    HTC America has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by the '482 HTC Asserted Claims, including, but not limited to HTC America's upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: Desire, One, One max, One mini, Droid DNA, Evo 4G LTE, Droid Incredible 4G LTE, One SV, One X+, Desire C, One X, One VX, One S, One V, EVO Design 4G, Vivid, Rezound, Rhyme, Sensation, Hero S, and any other HTC America mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the HTC Messaging

Application, including its MMS functionality; HTC America's Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality. Further discovery may reveal additional infringing products, models, and/or functionality.

36.    HTC America makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '482 HTC Asserted Claims. Upon information and belief, HTC America also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '482 HTC Asserted Claims. HTC America also directly infringes the '482 HTC Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

37.    HTC America has and continues to induce and to contribute to infringement of the '482 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 HTC Asserted Claims, including, but not limited to HTC America's upload services and/or devices listed above. HTC America provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '482 HTC Asserted Claims.

38.    HTC America indirectly infringes the '482 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices. HTC America received notice of the '482 Patent at least as of the date this lawsuit was filed. HTC America provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers,

and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '482 Patent. Through its manufacture and sale of the accused upload services and/or devices, HTC America specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '482 Patent.

39.     HTC America specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '482 HTC Asserted Claims in the United States. For example, HTC America provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of HTC America's products in an infringing way. Such instructions include at least "HTC Desire 601 User Guide,"[5] "Your HTC One User Guide,"[6] "HTC One Max User Guide,"[7] and other similar user guides and support documentation available on HTC America's support website.[8] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '482 HTC Asserted Claims. HTC America knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '482 HTC Asserted Claims. HTC America thus knows that its actions actively induce infringement. HTC America performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

40.     HTC America indirectly infringes the '482 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of

---

[5] Available on HTC America's website at
http://dl4.htc.com/web_materials/Manual/HTC_Desire_601/HTC_Desire_601_Virgin_Mobile_User_Guide.pdf.
[6] Available on HTC America's website at
http://dl4.htc.com/web_materials/Manual/HTC_One/HTC_One_ATT_User_Guide.pdf.
[7] Available on HTC America's website at
http://dl4.htc.com/web_materials/Manual/HTC_One_max/HTC_One_max_Sprint_User_Guide.pdf.
[8] *See* http://www.htc.com/us/support/.

activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices.  HTC America received notice of the '482 Patent at least as of the date this lawsuit was filed.

41.     HTC America's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.  When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner.  Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

42.     A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on HTC America's upload services and/or devices.

43.     A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

44.     HTC America's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices.

The accused upload services and/or devices are especially made or adapted to infringe the '482 Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '482 Patent, HTC America's sales of its infringing products have no substantial non-infringing uses.

45.     Accordingly, a reasonable inference is that HTC America offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

46.     HTC America's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law. Unless enjoined by this Court, HTC America will continue to infringe the '482 Patent.

### LGE Inc. Infringes the '482 Patent

47.     LGE Inc. has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1, 4, 6, 8-10, 12-14, 16-19, 21-23, 25, 35, 38, 40-42, 44-46, and 49-50 of the '482 Patent (hereinafter the "'482 LGE Asserted Claims"), including, but not limited to LGE Inc.'s upload services and/or devices. The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: D820 Red, Optimus F3Q D520, G Flex AT&T D950, G Flex T-Mobile D959, G Flex Sprint LS995, G2 Verizon VS980 White, D820 T-Mobile Black, D820 Sprint Black, D820 Sprint White, G2 Verizon VS980, G2 AT&T D800, G2 T-Mobile D801, G2 Sprint LS980, G2 Sprint LS980 White, G2

AT&T D800 White, D2 T-Mobile D801 White, Wine III UN530, Optimus F6 MS500, Optimus F6 D500, Enact VS890, Exalt VN360, Optimus F3 MS659, Optimus F3 P659, Optimus F3 VM720, Rumor Reflex S LN272S Blue, Rumor Reflex S LN272S Red, Fluid AN160, Optimus F7 LG870, Optimus F3 LS720 Titanium Silver, Optimus F7 US780, Optimus F3 LS720 Purple, LGE960W, Optimus F5 AS870, Optimus G Pro E980, Optimus G Pro E980 White, Envoy II UN160, Optimus Exceed VS840PP, Revere 2 VN150S, Cosmos 3 VN251S, Optimus Zone VS410PP, Lucid2 VS870, Spirit 4G MS870, LGE960, Optimus REGARD LW770, Mach LS860, Optimus G LS970, Optimus L9 P769, Freedom UN272, Optimus G E970, Venice LG730, Escape P870, Spectrum 2 VS930, Splendor US730, Intuition VS950, Motion 4G MS770, Optimus Zip LGL75C, Optimus Plus AS695, Optimus Elite VM696, Elite LS696, Viper LS840, Xpression C395, A340, Rumor Reflex LG272, Rumor Reflex LN272, Optimus M+ MS695, Lucid VS840, Spectrum VS920, Connect 4G MS840, Extravert VN271, Optimus Net L45C, and any other LGE Inc. mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the LG Messaging Application, including its MMS functionality; LGE Inc.'s Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality.  Further discovery may reveal additional infringing products, models, and/or functionality.

48.    LGE Inc. makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '482 LGE Asserted Claims. Upon information and belief, LGE Inc. also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the'482 LGE Asserted Claims.  LGE Inc. also directly infringes the '482 LGE Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

49.    LGE Inc. has and continues to induce and to contribute to infringement of the '482 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 LGE Asserted Claims, including, but not limited to LGE Inc.'s upload services and/or devices listed above.  LGE Inc. provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '482 LGE Asserted Claims.

50.    LGE Inc. indirectly infringes the '482 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.  LGE Inc. received notice of the '482 Patent at least as of the date this lawsuit was filed.  LGE Inc. provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '482 Patent.  Through its manufacture and sale of the accused upload services and/or devices, LGE Inc. specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '482 Patent.

51.    LGE Inc. specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '482 LGE Asserted Claims in the United States.  For example, LGE Inc. provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of LGE Inc.'s products in an infringing way. Such instructions include at least "LG G2 User Guide,"[9] "User Guide, LG Optimus F3,"[10]

---

[9] Available on LGE Inc.'s website at http://www.lg.com/us/support/software-manuals#.

"Owner's Manual, LG Envoy II,"[11] and other similar user guides and support documentation available on LGE Inc.'s support website.[12]  When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '482 LGE Asserted Claims. LGE Inc. knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '482 LGE Asserted Claims. LGE Inc. thus knows that its actions actively induce infringement.  LGE Inc. performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

52.    LGE Inc. indirectly infringes the '482 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices.  LGE Inc. received notice of the '482 Patent at least as of the date this lawsuit was filed.

53.    LGE Inc.'s upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.  When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner.  Upon information and belief, the accused upload services and/or devices cannot operate in an

---

[10] Available on LGE Inc.'s website at http://www.lg.com/us/support/software-manuals#.
[11] Available on LGE Inc.'s website at http://www.lg.com/us/support/software-manuals#.
[12] *See* http://www.lg.com/us/support.

acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

54.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on LGE Inc.'s upload services and/or devices.

55.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

56.    LGE Inc.'s accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '482 Patent.   Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '482 Patent, LGE Inc.'s sales of its infringing products have no substantial non-infringing uses.

57.    Accordingly, a reasonable inference is that LGE Inc. offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

58.    LGE Inc.'s acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, LGE Inc. will continue to infringe the '482 Patent.

### LGE USA Infringes the '482 Patent

59.    LGE USA has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by the '482 LGE Asserted Claims, including, but not limited to LGE USA's upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: D820 Red, Optimus F3Q D520, G Flex AT&T D950, G Flex T-Mobile D959, G Flex Sprint LS995, G2 Verizon VS980 White, D820 T-Mobile Black, D820 Sprint Black, D820 Sprint White, G2 Verizon VS980, G2 AT&T D800, G2 T-Mobile D801, G2 Sprint LS980, G2 Sprint LS980 White, G2 AT&T D800 White, D2 T-Mobile D801 White, Wine III UN530, Optimus F6 MS500, Optimus F6 D500, Enact VS890, Exalt VN360, Optimus F3 MS659, Optimus F3 P659, Optimus F3 VM720, Rumor Reflex S LN272S Blue, Rumor Reflex S LN272S Red, Fluid AN160, Optimus F7 LG870, Optimus F3 LS720 Titanium Silver, Optimus F7 US780, Optimus F3 LS720 Purple, LGE960W, Optimus F5 AS870, Optimus G Pro E980, Optimus G Pro E980 White, Envoy II UN160, Optimus Exceed VS840PP, Revere 2 VN150S, Cosmos 3 VN251S, Optimus Zone VS410PP, Lucid2 VS870, Spirit 4G MS870, LGE960, Optimus REGARD LW770, Mach LS860, Optimus G LS970, Optimus L9 P769, Freedom UN272, Optimus G E970, Venice LG730, Escape P870, Spectrum 2 VS930, Splendor US730, Intuition VS950, Motion 4G MS770, Optimus Zip LGL75C, Optimus Plus AS695, Optimus Elite VM696, Elite LS696, Viper LS840, Xpression C395, A340, Rumor Reflex LG272, Rumor Reflex LN272, Optimus M+

MS695, Lucid VS840, Spectrum VS920, Connect 4G MS840, Extravert VN271, Optimus Net L45C, and any other LGE USA mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the LG Messaging Application, including its MMS functionality; LG USA's Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality. Further discovery may reveal additional infringing products, models, and/or functionality.

60.    LGE USA makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '482 LGE Asserted Claims. Upon information and belief, LGE USA also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '482 LGE Asserted Claims. LGE USA also directly infringes the '482 LGE Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

61.    LGE USA has and continues to induce and to contribute to infringement of the '482 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 LGE Asserted Claims, including, but not limited to LGE USA's upload services and/or devices listed above. LGE USA provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '482 LGE Asserted Claims.

62.    LGE USA indirectly infringes the '482 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use

customers of the accused upload services and/or devices. LGE USA received notice of the '482 Patent at least as of the date this lawsuit was filed. LGE USA provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '482 Patent. Through its manufacture and sale of the accused upload services and/or devices, LGE USA specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '482 Patent.

63.    LGE USA specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '482 LGE Asserted Claims in the United States. For example, LGE USA provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of LGE USA's products in an infringing way. Such instructions include at least "LG G2 User Guide,"[13] "User Guide, LG Optimus F3,"[14] "Owner's Manual, LG Envoy II,"[15] and other similar user guides and support documentation available on LGE USA's support website.[16] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '482 LGE Asserted Claims. LGE USA knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '482 LGE Asserted Claims. LGE USA thus knows that its actions actively induce infringement. LGE USA performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

---

[13] Available on LGE USA's website at http://www.lg.com/us/support/software-manuals#.
[14] Available on LGE USA's website at http://www.lg.com/us/support/software-manuals#.
[15] Available on LGE USA's website at http://www.lg.com/us/support/software-manuals#.
[16] *See* http://www.lg.com/us/support.

64.    LGE USA indirectly infringes the '482 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices.  LGE USA received notice of the '482 Patent at least as of the date this lawsuit was filed.

65.    LGE USA's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.  When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner.  Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

66.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on LGE USA's upload services and/or devices.

67.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

68.    LGE USA's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a

material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '482 Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '482 Patent, LGE USA's sales of its infringing products have no substantial non-infringing uses.

69.    Accordingly, a reasonable inference is that LGE USA offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

70.    LGE USA's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, LGE USA will continue to infringe the '482 Patent.

### LGE MobileComm Infringes the '482 Patent

71.    LGE MobileComm has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by the '482 LGE Asserted Claims, including, but not limited to LGE MobileComm's upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: D820 Red, Optimus F3Q D520, G Flex AT&T D950, G Flex T-Mobile D959, G Flex Sprint LS995, G2 Verizon VS980 White, D820 T-Mobile Black, D820 Sprint Black, D820

Sprint White, G2 Verizon VS980, G2 AT&T D800, G2 T-Mobile D801, G2 Sprint LS980, G2

Sprint LS980 White, G2 AT&T D800 White, D2 T-Mobile D801 White, Wine III UN530,

Optimus F6 MS500, Optimus F6 D500, Enact VS890, Exalt VN360, Optimus F3 MS659,

Optimus F3 P659, Optimus F3 VM720, Rumor Reflex S LN272S Blue, Rumor Reflex S

LN272S Red, Fluid AN160, Optimus F7 LG870, Optimus F3 LS720 Titanium Silver, Optimus

F7 US780, Optimus F3 LS720 Purple, LGE960W, Optimus F5 AS870, Optimus G Pro E980,

Optimus G Pro E980 White, Envoy II UN160, Optimus Exceed VS840PP, Revere 2 VN150S,

Cosmos 3 VN251S, Optimus Zone VS410PP, Lucid2 VS870, Spirit 4G MS870, LGE960,

Optimus REGARD LW770, Mach LS860, Optimus G LS970, Optimus L9 P769, Freedom

UN272, Optimus G E970, Venice LG730, Escape P870, Spectrum 2 VS930, Splendor US730,

Intuition VS950, Motion 4G MS770, Optimus Zip LGL75C, Optimus Plus AS695, Optimus

Elite VM696, Elite LS696, Viper LS840, Xpression C395, A340, Rumor Reflex LG272, Rumor

Reflex LN272, Optimus M+ MS695, Lucid VS840, Spectrum VS920, Connect 4G MS840,

Extravert VN271, Optimus Net L45C, and any other LGE MobileComm mobile device capable

of obtaining digital content, pre-processing it, and transmitting it to another device, server, or

location; the LG Messaging Application, including its MMS functionality; LGE MobileComm's

Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-

Twitter functionality.  Further discovery may reveal additional infringing products, models,

and/or functionality.

      72.    LGE MobileComm makes, uses, sells, offers for sale, or imports into the United

States these upload services and/or devices and thus directly infringes at least the '482 LGE

Asserted Claims.  Upon information and belief, LGE MobileComm also uses these upload

services and/or devices via its internal use and testing in the United States, directly infringing

each of the '482 LGE Asserted Claims.  LGE MobileComm also directly infringes the '482 LGE

Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

73.     LGE MobileComm has and continues to induce and to contribute to infringement of the '482 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 LGE Asserted Claims, including, but not limited to LGE MobileComm's upload services and/or devices listed above.   LGE MobileComm provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '482 LGE Asserted Claims.

74.     LGE MobileComm indirectly infringes the '482 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.   LGE MobileComm received notice of the '482 Patent at least as of the date this lawsuit was filed.   LGE MobileComm provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '482 Patent.   Through its manufacture and sale of the accused upload services and/or devices, LGE MobileComm specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '482 Patent.

75.     LGE MobileComm specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '482 LGE Asserted Claims in the United States.   For example, LGE MobileComm provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of LGE

MobileComm's products in an infringing way. Such instructions include at least "LG G2 User Guide,"[17] "User Guide, LG Optimus F3,"[18] "Owner's Manual, LG Envoy II,"[19] and other similar user guides and support documentation available on LGE MobileComm's support website.[20] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '482 LGE Asserted Claims. LGE MobileComm knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '482 LGE Asserted Claims. LGE MobileComm thus knows that its actions actively induce infringement. LGE MobileComm performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

76.    LGE MobileComm indirectly infringes the '482 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices. LGE MobileComm received notice of the '482 Patent at least as of the date this lawsuit was filed.

77.    LGE MobileComm's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location. When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner.

---

[17] Available on LGE MobileComm's website at http://www.lg.com/us/support/software-manuals#.
[18] Available on LGE MobileComm's website at http://www.lg.com/us/support/software-manuals#.
[19] Available on LGE MobileComm's website at http://www.lg.com/us/support/software-manuals#.
[20] *See* http://www.lg.com/us/support.

Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

78.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on LGE MobileComm's upload services and/or devices.

79.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

80.    LGE MobileComm's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '482 Patent.   Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '482 Patent, LGE MobileComm's sales of its infringing products have no substantial non-infringing uses.

81.    Accordingly, a reasonable inference is that LGE MobileComm offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for

**– A90 –**

use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

82.    LGE MobileComm's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, LGE MobileComm will continue to infringe the '482 Patent.

**Motorola Infringes the '482 Patent**

83.    Motorola has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1, 4, 6, 8-10, 12-14, 16-19, 21-23, 25, 35, 38, 40-42, 44-46, and 49-50 of the '482 Patent (hereinafter the "'482 Motorola Asserted Claims"), including, but not limited to Motorola's upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: Moto X, Moto G, Droid Maxx, Droid Ultra, Droid Mini, Moto X Developer Edition (GSM Networks), Moto X Developer Edition Verizon, Droid Maxx Developer Edition, Droid Razr M, Droid Razr Maxx HD, Motorola Photon Q 4G LTE, and any other Motorola mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the Motorola MMS Application, including its MMS functionality; Motorola's Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality.  Further discovery may reveal additional infringing products, models, and/or functionality.

84.    Motorola makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '482 Motorola Asserted Claims.  Upon information and belief, Motorola also uses these upload services and/or devices

via its internal use and testing in the United States, directly infringing each of the '482 Motorola Asserted Claims. Motorola also directly infringes the '482 Motorola Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

85.     Motorola has and continues to induce and to contribute to infringement of the '482 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 Motorola Asserted Claims, including, but not limited to Motorola's upload services and/or devices listed above. Motorola provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '482 Motorola Asserted Claims.

86.     Motorola indirectly infringes the '482 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices. Motorola received notice of the '482 Patent at least as of the date this lawsuit was filed. Motorola provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '482 Patent. Through its manufacture and sale of the accused upload services and/or devices, Motorola specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '482 Patent.

87.     Motorola specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '482 Motorola Asserted Claims in the

United States. For example, Motorola provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of Motorola's products in an infringing way. Such instructions include at least "Moto G User Guide,"[21] "Moto X User Guide,"[22] "User's Guide, Droid Ultra,"[23] and other similar user guides and support documentation available on Motorola's support website.[24] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '482 Motorola Asserted Claims. Motorola knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '482 Motorola Asserted Claims. Motorola thus knows that its actions actively induce infringement. Motorola performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

88. Motorola indirectly infringes the '482 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices. Motorola received notice of the '482 Patent at least as of the date this lawsuit was filed.

89. Motorola's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location. When the accused upload services and/or devices are used to send digital content of a certain size and/or

---

[21] Available on Motorola's website at https://motorola-global-portal.custhelp.com/ci/fattach/get/745538/1385483328/redirect/1/filename/68017554027a.pdf.
[22] Available on Motorola's website at https://motorola-global-portal.custhelp.com/ci/fattach/get/753825/1386258990/redirect/1/filename/Xfon_UG_KK_68017630001b.pdf.
[23] Available on Motorola's website at https://motorola-global-portal.custhelp.com/ci/fattach/get/675621/1377023134/redirect/1/filename/68017476001A.pdf.
[24] *See* https://motorola-global-portal.custhelp.com/app/home/.

dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner. Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

90.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on Motorola's upload services and/or devices.

91.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices. Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

92.    Motorola's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '482 Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '482 Patent, Motorola's sales of its infringing products have no substantial non-infringing uses.

93.    Accordingly, a reasonable inference is that Motorola offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a

material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

94.    Motorola's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.    Unless enjoined by this Court, Motorola will continue to infringe the '482 Patent.

**Apple Infringes the '482 Patent**

95.    Apple has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1, 4, 6, 8-10, 12-14, 16-23, 25, 35-38, 40-42, 44-46, and 49-51 of the '482 Patent (hereinafter the "'482 Apple Asserted Claims"), including, but not limited to Apple's upload services and/or devices.    The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, iPhone 5, iPhone 5S, iPhone 5C, iPad (first generation), iPad 2, iPad (third generation), iPad (fourth generation), iPad Air, iPad Mini (first generation), iPad Mini (second generation), iPod Touch (third generation), iPod Touch (fourth generation), iPod Touch (fifth generation), and any other Apple mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; Apple's Messages Application, including both its MMS functionality and its iMessage functionality and infrastructure; Apple's Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality.    Further discovery may reveal additional infringing products, models, and/or functionality.

96.     Apple makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '482 Apple Asserted Claims.  Additionally, upon information and belief Apple creates the source code related to at least some of these upload services and/or devices.  These acts are a direct infringement of the '482 Apple Asserted Claims.  Upon information and belief, Apple also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '482 Apple Asserted Claims.  Apple also directly infringes the '482 Apple Asserted Claims when its mobile devices and/or servers execute the code responsible for the operation of the accused upload services and/or devices.

97.     Apple has and continues to induce and to contribute to infringement of the '482 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 Apple Asserted Claims, including, but not limited to Apple's upload services and/or devices listed above.  Apple provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '482 Apple Asserted Claims.

98.     Apple indirectly infringes the '482 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.  Apple received notice of the '482 Patent at least as of the date this lawsuit was filed.  Apple provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services

and/or devices to infringe the '482 Patent. Through its manufacture and sale of the accused upload services and/or devices, Apple specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '482 Patent.

99.    Apple specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '482 Apple Asserted Claims in the United States. For example, Apple provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of Apple's products in an infringing way. Such instructions include at least "iPhone User Guide for iPhone OS 3.1 Software,"[25] "iPhone User Guide For iOS 7 (October 2013),"[26] "iPad User Guide For iOS 7 (October 2013),"[27] "iPod touch User Guide For iOS 7 (October 2013),"[28] "MFMessageComposeViewController Class Reference,"[29] and other similar user guides and support documentation available on Apple's support[30] and developer[31] websites. When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '482 Apple Asserted Claims. Apple knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '482 Apple Asserted Claims. Apple thus knows that its actions actively induce infringement. Apple performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of

---

[25] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/0/MA616/en_US/iPhone_iOS3.1_User_Guide.pdf.
[26] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/1000/MA1565/en_US/iphone_user_guide.pdf.
[27] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/1000/MA1595/en_US/ipad_user_guide.pdf.
[28] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/1000/MA1596/en_US/ipod_touch_user_guide.pdf.
[29] Available on Apple's website at
https://developer.apple.com/library/ios/documentation/MessageUI/Reference/MFMessageComposeViewController_class/Reference/Reference.html.
[30] *See* http://www.apple.com/support/.
[31] *See* https://developer.apple.com/.

the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

100.    Apple indirectly infringes the '482 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices.  Apple received notice of the '482 Patent at least as of the date this lawsuit was filed.

101.    Apple's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.  When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner.  Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

102.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on Apple's upload services and/or devices.

103.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

104.    Apple's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location are each a material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices.  The accused upload services and/or devices are especially made or adapted to infringe the '482 Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '482 Patent, Apple's sales of its infringing products have no substantial non-infringing uses.

105.    Accordingly, a reasonable inference is that Apple offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

106.    Apple's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, Apple will continue to infringe the '482 Patent.

**Twitter Infringes the '482 Patent**

107.    Twitter has and continues to directly infringe the '482 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1, 4, 6, 8-10, 12-14, 16-23, 25, 35-38, 40-42, 44-46, and 49-51 of the '482 Patent (hereinafter the "'482 Twitter Asserted Claims"), including, but not limited to Twitter's upload services.  The accused upload services that infringe one or more of the above-listed claims include, but are not limited to, at least the following: the Twitter Application for iPhone, the

Twitter Application for iPad, the Twitter Application for Android, the Twitter Application for Android Tablet, and any other Twitter Application capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the Twitter content upload functionality integrated into the native sharing options for iOS and Android devices; Twitter's APIs related to obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; Twitter's mobile website; and Twitter's website-related infrastructure. Further discovery may reveal additional infringing products, models, and/or functionality.

108.    Twitter makes, uses, sells, offers for sale, or imports into the United States these upload services and thus directly infringes at least the '482 Twitter Asserted Claims. Additionally, upon information and belief, Twitter creates the source code related to each of these upload services.  These acts are a direct infringement of the '482 Twitter Asserted Claims. Upon information and belief, Twitter also uses these upload services via its internal use and testing in the United States, directly infringing each of the '482 Twitter Asserted Claims. Twitter also directly infringes the '482 Twitter Asserted Claims when it executes its code responsible for the operation of the accused upload services.

109.    Twitter has and continues to induce and to contribute to infringement of the '482 Patent by intending that others, including co-defendants HTC Corp., HTC America, LGE Inc., LGE USA, LGE MobileComm, Motorola, and Apple, make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '482 Twitter Asserted Claims, including, but not limited to Twitter's upload services listed above.  Twitter provides these upload services to others, such as co-defendants, manufacturers, customers, resellers, application developers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services that infringe the '482 Twitter Asserted Claims.

110.    Twitter indirectly infringes the '482 Patent by inducing infringement by others, such as co-defendants, manufacturers, customers, resellers, application developers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by co-defendants, manufacturers, customers, resellers, application developers, and/or end-use customers of the accused upload services.  Twitter received notice of the '482 Patent at least as of the date this lawsuit was filed. Twitter provides the accused upload services to others, such as co-defendants, manufacturers, customers, resellers, application developers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services to infringe the '482 Patent.  Through its manufacture and sale of the accused upload services, Twitter specifically intended co-defendants, manufacturers, customers, resellers, application developers, and/or end-use customers to infringe the '482 Patent.

111.    Twitter specifically intends for others, such as co-defendants, to directly infringe the '482 Twitter Asserted Claims in the United States.  For example, Twitter provides its accused upload services to HTC Corp. for integration into HTC Corp.'s accused upload services and/or devices.  For example, Twitter provides its accused upload services to HTC America for integration into HTC America's accused upload services and/or devices.  For example, Twitter provides its accused upload services to LGE Inc. for integration into LGE Inc.'s accused upload services and/or devices.  For example, Twitter provides its accused upload services to LGE USA for integration into LGE USA's accused upload services and/or devices.  For example, Twitter provides its accused upload services to LGE MobileComm for integration into LGE MobileComm's accused upload services and/or devices.  For example, Twitter provides its accused upload services to Motorola for integration into Motorola's accused upload services and/or devices.  For example, Twitter provides its accused upload services to Apple for

integration into Apple's accused upload services and/or devices. When co-defendants include the integrated Twitter content upload functionality in their accused upload services and/or devices, they directly infringe the '482 Twitter Asserted Claims. Twitter knows that providing the integrated Twitter content upload functionality to co-defendants induces co-defendants to directly infringe the '482 Twitter Asserted Claims. Twitter thus knows that its actions actively induce infringement. Twitter performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

112. Twitter also specifically intends for others, such as manufacturers, customers, resellers, application developers, and end-use customers, to directly infringe the '482 Twitter Asserted Claims in the United States. For example, Twitter provides instructions to manufacturers, customers, resellers, application developers, and end-use customers regarding the use and operation of Twitter's accused services in an infringing way. Such instructions include at least "Getting started with Twitter for iPhone,"[32] "Getting started with Twitter for Android,"[33] "Using mobile.twitter.com on a smartphone or tablet,"[34] "POST statuses/update_with_media,"[35] and other similar user guides and support documentation available on Twitter's support[36] and developer[37] websites. When manufacturers, customers, resellers, application developers, and end-use customers follow such instructions, they directly infringe the '482 Twitter Asserted Claims. Twitter knows that by providing such instructions, manufacturers, customers, resellers, application developers, and end-use customers follow those instructions, and directly infringe the

[32] Available on Twitter's website at https://support.twitter.com/articles/20169500.
[33] Available on Twitter's website at https://support.twitter.com/groups/54-mobile-apps/topics/223-android/articles/168930-getting-started-with-twitter-for-android.
[34] Available on Twitter's website at https://support.twitter.com/groups/54-mobile-apps/topics/224-mobile-web/articles/20113771-using-mobile-twitter-com-on-a-smartphone-or-tablet.
[35] Available on Twitter's website at https://dev.twitter.com/docs/api/1.1/post/statuses/update_with_media.
[36] *See* https://support.twitter.com/.
[37] *See* https://dev.twitter.com/.

'482 Twitter Asserted Claims. Twitter thus knows that its actions actively induce infringement. Twitter performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '482 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

113. Twitter indirectly infringes the '482 Patent, by contributing to infringement by others, such as co-defendants, customers, resellers, application developers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by co-defendants, customers, resellers, application developers, and/or end-use customers of the accused upload services. Twitter received notice of the '482 Patent at least as of the date this lawsuit was filed.

114. Twitter's upload services allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location. When the accused upload services are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices pre-process and send digital media in an infringing manner. Upon information and belief, the accused upload services cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

115. A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on Twitter's upload services.

116. A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused

upload services.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

117.    Twitter's accused upload services, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location are each a material part of the invention of the '482 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services.  The accused upload services are especially made or adapted to infringe the '482 Patent.  Because the manufacturing, offering for sale, sales, and use of the accused upload services infringe the '482 Patent, Twitter's sales of its infringing products have no substantial non-infringing uses.

118.    Accordingly, a reasonable inference is that Twitter offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '482 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

119.    Twitter's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, Twitter will continue to infringe the '482 Patent.

## COUNT II

### Infringement of the '515 Patent

120.    Summit 6 repeats and realleges the allegations in paragraphs 1-119 as though fully set forth herein.

### HTC Corp. Infringes the '515 Patent

121.    HTC Corp. has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1-3, 6, 7, 10, 11, 14-20, 23-30, 33-39, 44, and 48 of the '515 Patent (hereinafter the "'515 HTC Asserted Claims"), including, but not limited to HTC Corp.'s upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: Desire, One, One max, One mini, Droid DNA, Evo 4G LTE, Droid Incredible 4G LTE, One SV, One X+, Desire C, One X, One VX, One S, One V, EVO Design 4G, Vivid, Rezound, Rhyme, Sensation, Hero S, and any other HTC Corp. mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality.  Further discovery may reveal additional infringing products, models, and/or functionality.

122.    HTC Corp. makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '515 HTC Asserted Claims.  Upon information and belief, HTC Corp. also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '515 HTC Asserted Claims.  HTC Corp. also directly infringes the '515 HTC Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

123.    HTC Corp. has and continues to induce and to contribute to infringement of the '515 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 HTC Asserted Claims, including, but not limited to HTC Corp.'s upload services and/or devices listed above.  HTC Corp. provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-

use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '515 HTC Asserted Claims.

124.    HTC Corp. indirectly infringes the '515 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.  HTC Corp. received notice of the '515 Patent at least as of the date this lawsuit was filed.  HTC Corp. provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '515 Patent.  Through its manufacture and sale of the accused upload services and/or devices, HTC Corp. specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '515 Patent.

125.    HTC Corp. specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '515 HTC Asserted Claims in the United States.  For example, HTC Corp. provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of HTC Corp.'s products in an infringing way.  Such instructions include at least "HTC Desire 601 User Guide,"[38] "Your HTC One User Guide,"[39] "HTC One Max User Guide,"[40] and other similar user guides and support documentation available on HTC Corp.'s support website.[41]  When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '515 HTC

[38] Available on HTC Corp.'s website at
http://dl4.htc.com/web_materials/Manual/HTC_Desire_601/HTC_Desire_601_Virgin_Mobile_User_Guide.pdf.
[39] Available on HTC Corp.'s website at
http://dl4.htc.com/web_materials/Manual/HTC_One/HTC_One_ATT_User_Guide.pdf.
[40] Available on HTC Corp.'s website at
http://dl4.htc.com/web_materials/Manual/HTC_One_max/HTC_One_max_Sprint_User_Guide.pdf.
[41] *See* http://www.htc.com/us/support/.

Asserted Claims.   HTC Corp. knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '515 HTC Asserted Claims.   HTC Corp. thus knows that its actions actively induce infringement. HTC Corp. performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

126.   HTC Corp. indirectly infringes the '515 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices.   HTC Corp. received notice of the '515 Patent at least as of the date this lawsuit was filed.

127.   HTC Corp.'s upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.   When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital content in an infringing manner.   Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

128.   A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on HTC Corp.'s upload services and/or devices.

129.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.    Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

130.    HTC Corp.'s accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '515 Patent.    Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '515 Patent, HTC Corp.'s sales of its infringing products have no substantial non-infringing uses.

131.    Accordingly, a reasonable inference is that HTC Corp. offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

132.    HTC Corp.'s acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.    Unless enjoined by this Court, HTC Corp. will continue to infringe the '515 Patent.

**HTC America Infringes the '515 Patent**

133.    HTC America has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by the '515 HTC Asserted Claims, including, but not limited to HTC America's upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: Desire, One, One max, One mini, Droid DNA, Evo 4G LTE, Droid Incredible 4G LTE, One SV, One X+, Desire C, One X, One VX, One S, One V, EVO Design 4G, Vivid, Rezound, Rhyme, Sensation, Hero S, and any other HTC America mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality.  Further discovery may reveal additional infringing products, models, and/or functionality.

134.    HTC America makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '515 HTC Asserted Claims.  Upon information and belief, HTC America also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '515 HTC Asserted Claims.  HTC America also directly infringes the '515 HTC Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

135.    HTC America has and continues to induce and to contribute to infringement of the '515 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 HTC Asserted Claims, including, but not limited to HTC America's upload services and/or devices listed above.  HTC America provides these upload services and/or devices to others, such as manufacturers, customers,

resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '515 HTC Asserted Claims.

136.     HTC America indirectly infringes the '515 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices. HTC America received notice of the '515 Patent at least as of the date this lawsuit was filed. HTC America provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '515 Patent. Through its manufacture and sale of the accused upload services and/or devices, HTC America specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '515 Patent.

137.     HTC America specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '515 HTC Asserted Claims in the United States. For example, HTC America provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of HTC America's products in an infringing way. Such instructions include at least "HTC Desire 601 User Guide,"[42] "Your HTC One User Guide,"[43] "HTC One Max User Guide,"[44] and other similar user guides and support documentation available on HTC America's support website.[45] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the

---

[42] Available on HTC America's website at
http://dl4.htc.com/web_materials/Manual/HTC_Desire_601/HTC_Desire_601_Virgin_Mobile_User_Guide.pdf.
[43] Available on HTC America's website at
http://dl4.htc.com/web_materials/Manual/HTC_One/HTC_One_ATT_User_Guide.pdf.
[44] Available on HTC America's website at
http://dl4.htc.com/web_materials/Manual/HTC_One_max/HTC_One_max_Sprint_User_Guide.pdf.
[45] *See* http://www.htc.com/us/support/.

'515 HTC Asserted Claims.   HTC America knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '515 HTC Asserted Claims.   HTC America thus knows that its actions actively induce infringement.   HTC America performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

138.    HTC America indirectly infringes the '515 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices.   HTC America received notice of the '515 Patent at least as of the date this lawsuit was filed.

139.    HTC America's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.   When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner.   Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

140.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on HTC America's upload services and/or devices.

141.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.    Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

142.    HTC America's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '515 Patent.    Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '515 Patent, HTC America's sales of its infringing products have no substantial non-infringing uses.

143.    Accordingly, a reasonable inference is that HTC America offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

144.    HTC America's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.    Unless enjoined by this Court, HTC America will continue to infringe the '515 Patent.

**LGE Inc. Infringes the '515 Patent**

145.    LGE Inc. has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1-3, 6, 7, 10, 11, 14-20, 23-30, 33-39, 44, and 48 of the '515 Patent (hereinafter the "'515 LGE Asserted Claims"), including, but not limited to LGE Inc.'s upload services and/or devices. The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: D820 Red, Optimus F3Q D520, G Flex AT&T D950, G Flex T-Mobile D959, G Flex Sprint LS995, G2 Verizon VS980 White, D820 T-Mobile Black, D820 Sprint Black, D820 Sprint White, G2 Verizon VS980, G2 AT&T D800, G2 T-Mobile D801, G2 Sprint LS980, G2 Sprint LS980 White, G2 AT&T D800 White, D2 T-Mobile D801 White, Wine III UN530, Optimus F6 MS500, Optimus F6 D500, Enact VS890, Exalt VN360, Optimus F3 MS659, Optimus F3 P659, Optimus F3 VM720, Rumor Reflex S LN272S Blue, Rumor Reflex S LN272S Red, Fluid AN160, Optimus F7 LG870, Optimus F3 LS720 Titanium Silver, Optimus F7 US780, Optimus F3 LS720 Purple, LGE960W, Optimus F5 AS870, Optimus G Pro E980, Optimus G Pro E980 White, Envoy II UN160, Optimus Exceed VS840PP, Revere 2 VN150S, Cosmos 3 VN251S, Optimus Zone VS410PP, Lucid2 VS870, Spirit 4G MS870, LGE960, Optimus REGARD LW770, Mach LS860, Optimus G LS970, Optimus L9 P769, Freedom UN272, Optimus G E970, Venice LG730, Escape P870, Spectrum 2 VS930, Splendor US730, Intuition VS950, Motion 4G MS770, Optimus Zip LGL75C, Optimus Plus AS695, Optimus Elite VM696, Elite LS696, Viper LS840, Xpression C395, A340, Rumor Reflex LG272, Rumor Reflex LN272, Optimus M+ MS695, Lucid VS840, Spectrum VS920, Connect 4G MS840, Extravert VN271, Optimus Net L45C, and any other LGE Inc. mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the integrated Twitter content upload functionality; and the MMS-to-

Twitter functionality.   Further discovery may reveal additional infringing products, models, and/or functionality.

146.    LGE Inc. makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '515 LGE Asserted Claims. Upon information and belief, LGE Inc. also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '515 LGE Asserted Claims.   LGE Inc. also directly infringes the '515 LGE Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

147.    LGE Inc. has and continues to induce and to contribute to infringement of the '515 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 LGE Asserted Claims, including, but not limited to LGE Inc.'s upload services and/or devices listed above.   LGE Inc. provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '515 LGE Asserted Claims.

148.    LGE Inc. indirectly infringes the '515 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.   LGE Inc. received notice of the '515 Patent at least as of the date this lawsuit was filed.   LGE Inc. provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '515 Patent.   Through its manufacture and sale of the accused

upload services and/or devices, LGE Inc. specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '515 Patent.

149.   LGE Inc. specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '515 LGE Asserted Claims in the United States. For example, LGE Inc. provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of LGE Inc.'s products in an infringing way. Such instructions include at least "LG G2 User Guide,"[46] "User Guide, LG Optimus F3,"[47] "Owner's Manual, LG Envoy II,"[48] and other similar user guides and support documentation available on LGE Inc.'s support website.[49] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '515 LGE Asserted Claims. LGE Inc. knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '515 LGE Asserted Claims. LGE Inc. thus knows that its actions actively induce infringement. LGE Inc. performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

150.   LGE Inc. indirectly infringes the '515 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices. LGE Inc. received notice of the '515 Patent at least as of the date this lawsuit was filed.

---

[46] Available on LGE Inc.'s website at http://www.lg.com/us/support/software-manuals#.
[47] Available on LGE Inc.'s website at http://www.lg.com/us/support/software-manuals#.
[48] Available on LGE Inc.'s website at http://www.lg.com/us/support/software-manuals#.
[49] *See* http://www.lg.com/us/support.

151.    LGE Inc.'s upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location. When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner. Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

152.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on LGE Inc.'s upload services and/or devices.

153.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices. Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

154.    LGE Inc.'s accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '515 Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '515 Patent, LGE Inc.'s sales of its infringing products have no substantial non-infringing uses.

155.    Accordingly, a reasonable inference is that LGE Inc. offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

156.    LGE Inc.'s acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, LGE Inc. will continue to infringe the '515 Patent.

## LGE USA Infringes the '515 Patent

157.    LGE USA has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by the '515 LGE Asserted Claims, including, but not limited to LGE USA's upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: D820 Red, Optimus F3Q D520, G Flex AT&T D950, G Flex T-Mobile D959, G Flex Sprint LS995, G2 Verizon VS980 White, D820 T-Mobile Black, D820 Sprint Black, D820 Sprint White, G2 Verizon VS980, G2 AT&T D800, G2 T-Mobile D801, G2 Sprint LS980, G2 Sprint LS980 White, G2 AT&T D800 White, D2 T-Mobile D801 White, Wine III UN530, Optimus F6 MS500, Optimus F6 D500, Enact VS890, Exalt VN360, Optimus F3 MS659, Optimus F3 P659, Optimus F3 VM720, Rumor Reflex S LN272S Blue, Rumor Reflex S LN272S Red, Fluid AN160, Optimus F7 LG870, Optimus F3 LS720 Titanium Silver, Optimus F7 US780, Optimus F3 LS720 Purple, LGE960W, Optimus F5 AS870, Optimus G Pro E980, Optimus G Pro E980 White, Envoy II

UN160, Optimus Exceed VS840PP, Revere 2 VN150S, Cosmos 3 VN251S, Optimus Zone VS410PP, Lucid2 VS870, Spirit 4G MS870, LGE960, Optimus REGARD LW770, Mach LS860, Optimus G LS970, Optimus L9 P769, Freedom UN272, Optimus G E970, Venice LG730, Escape P870, Spectrum 2 VS930, Splendor US730, Intuition VS950, Motion 4G MS770, Optimus Zip LGL75C, Optimus Plus AS695, Optimus Elite VM696, Elite LS696, Viper LS840, Xpression C395, A340, Rumor Reflex LG272, Rumor Reflex LN272, Optimus M+ MS695, Lucid VS840, Spectrum VS920, Connect 4G MS840, Extravert VN271, Optimus Net L45C, and any other LGE USA mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality.  Further discovery may reveal additional infringing products, models, and/or functionality.

158.   LGE USA makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '515 LGE Asserted Claims.  Upon information and belief, LGE USA also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '515 LGE Asserted Claims.  LGE USA also directly infringes the '515 LGE Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

159.   LGE USA has and continues to induce and to contribute to infringement of the '515 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 LGE Asserted Claims, including, but not limited to LGE USA's upload services and/or devices listed above.  LGE USA provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-

use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '515 LGE Asserted Claims.

160.    LGE USA indirectly infringes the '515 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices. LGE USA received notice of the '515 Patent at least as of the date this lawsuit was filed. LGE USA provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '515 Patent. Through its manufacture and sale of the accused upload services and/or devices, LGE USA specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '515 Patent.

161.    LGE USA specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '515 LGE Asserted Claims in the United States. For example, LGE USA provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of LGE USA's products in an infringing way. Such instructions include at least "LG G2 User Guide,"[50] "User Guide, LG Optimus F3,"[51] "Owner's Manual, LG Envoy II,"[52] and other similar user guides and support documentation available on LGE USA's support website.[53] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '515 LGE Asserted Claims. LGE USA knows that by providing such instructions, manufacturers, customers, resellers, and

[50] Available on LGE USA's website at http://www.lg.com/us/support/software-manuals#.
[51] Available on LGE USA's website at http://www.lg.com/us/support/software-manuals#.
[52] Available on LGE USA's website at http://www.lg.com/us/support/software-manuals#.
[53] *See* http://www.lg.com/us/support.

end-use customers follow those instructions, and directly infringe the '515 LGE Asserted Claims. LGE USA thus knows that its actions actively induce infringement. LGE USA performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

162.    LGE USA indirectly infringes the '515 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices. LGE USA received notice of the '515 Patent at least as of the date this lawsuit was filed.

163.    LGE USA's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location. When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and send digital media in an infringing manner. Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

164.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on LGE USA's upload services and/or devices.

165.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a

staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

166.    LGE USA's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices. The accused upload services and/or devices are especially made or adapted to infringe the '515 Patent.  Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '515 Patent, LGE USA's sales of its infringing products have no substantial non-infringing uses.

167.    Accordingly, a reasonable inference is that LGE USA offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

168.    LGE USA's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, LGE USA will continue to infringe the '515 Patent.

**LGE MobileComm Infringes the '515 Patent**

169.    LGE MobileComm has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or

methods covered by the '515 LGE Asserted Claims, including, but not limited to LGE MobileComm's upload services and/or devices. The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: D820 Red, Optimus F3Q D520, G Flex AT&T D950, G Flex T-Mobile D959, G Flex Sprint LS995, G2 Verizon VS980 White, D820 T-Mobile Black, D820 Sprint Black, D820 Sprint White, G2 Verizon VS980, G2 AT&T D800, G2 T-Mobile D801, G2 Sprint LS980, G2 Sprint LS980 White, G2 AT&T D800 White, D2 T-Mobile D801 White, Wine III UN530, Optimus F6 MS500, Optimus F6 D500, Enact VS890, Exalt VN360, Optimus F3 MS659, Optimus F3 P659, Optimus F3 VM720, Rumor Reflex S LN272S Blue, Rumor Reflex S LN272S Red, Fluid AN160, Optimus F7 LG870, Optimus F3 LS720 Titanium Silver, Optimus F7 US780, Optimus F3 LS720 Purple, LGE960W, Optimus F5 AS870, Optimus G Pro E980, Optimus G Pro E980 White, Envoy II UN160, Optimus Exceed VS840PP, Revere 2 VN150S, Cosmos 3 VN251S, Optimus Zone VS410PP, Lucid2 VS870, Spirit 4G MS870, LGE960, Optimus REGARD LW770, Mach LS860, Optimus G LS970, Optimus L9 P769, Freedom UN272, Optimus G E970, Venice LG730, Escape P870, Spectrum 2 VS930, Splendor US730, Intuition VS950, Motion 4G MS770, Optimus Zip LGL75C, Optimus Plus AS695, Optimus Elite VM696, Elite LS696, Viper LS840, Xpression C395, A340, Rumor Reflex LG272, Rumor Reflex LN272, Optimus M+ MS695, Lucid VS840, Spectrum VS920, Connect 4G MS840, Extravert VN271, Optimus Net L45C, and any other LGE MobileComm mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality. Further discovery may reveal additional infringing products, models, and/or functionality.

170.    LGE MobileComm makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '515 LGE Asserted Claims.  Upon information and belief, LGE MobileComm also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the'515 LGE Asserted Claims.  LGE MobileComm also directly infringes the '515 LGE Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

171.    LGE MobileComm has and continues to induce and to contribute to infringement of the '515 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 LGE Asserted Claims, including, but not limited to LGE MobileComm's upload services and/or devices listed above.  LGE MobileComm provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '515 LGE Asserted Claims.

172.    LGE MobileComm indirectly infringes the '515 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.  LGE MobileComm received notice of the '515 Patent at least as of the date this lawsuit was filed.  LGE MobileComm provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '515 Patent.  Through its manufacture and sale of

the accused upload services and/or devices, LGE MobileComm specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '515 Patent.

173.    LGE MobileComm specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '515 LGE Asserted Claims in the United States.  For example, LGE MobileComm provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of LGE MobileComm's products in an infringing way.  Such instructions include at least "LG G2 User Guide,"[54] "User Guide, LG Optimus F3,"[55] "Owner's Manual, LG Envoy II,"[56] and other similar user guides and support documentation available on LGE MobileComm's support website.[57] When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '515 LGE Asserted Claims.  LGE MobileComm knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '515 LGE Asserted Claims.  LGE MobileComm thus knows that its actions actively induce infringement.  LGE MobileComm performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

174.    LGE MobileComm indirectly infringes the '515 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the

---

[54] Available on LGE MobileComm's website at http://www.lg.com/us/support/software-manuals#.
[55] Available on LGE MobileComm's website at http://www.lg.com/us/support/software-manuals#.
[56] Available on LGE MobileComm's website at http://www.lg.com/us/support/software-manuals#.
[57] *See* http://www.lg.com/us/support.

accused upload services and/or devices.  LGE MobileComm received notice of the '515 Patent at least as of the date this lawsuit was filed.

175.    LGE MobileComm's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.  When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and upload digital media in an infringing manner.  Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

176.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on LGE MobileComm's upload services and/or devices.

177.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.    Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

178.    LGE MobileComm's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices.  The accused upload services and/or devices are especially made or adapted to infringe the '515

Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '515 Patent, LGE MobileComm's sales of its infringing products have no substantial non-infringing uses.

179.    Accordingly, a reasonable inference is that LGE MobileComm offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

180.    LGE MobileComm's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law. Unless enjoined by this Court, LGE MobileComm will continue to infringe the '515 Patent.

### Motorola Infringes the '515 Patent

181.    Motorola has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1-3, 6, 7, 10, 11, 14-20, 23-30, 33-39, 44, and 48 of the '515 Patent (hereinafter the "'515 Motorola Asserted Claims"), including, but not limited to Motorola's upload services and/or devices. The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: Moto X, Moto G, Droid Maxx, Droid Ultra, Droid Mini, Moto X Developer Edition (GSM Networks), Moto X Developer Edition Verizon, Droid Maxx Developer Edition, Droid Razr M, Droid Razr Maxx HD, Motorola Photon Q 4G LTE, and any other Motorola mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the integrated

Twitter content upload functionality; and the MMS-to-Twitter functionality.  Further discovery may reveal additional infringing products, models, and/or functionality.

182.    Motorola makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '515 Motorola Asserted Claims.  Upon information and belief, Motorola also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '515 Motorola Asserted Claims.  Motorola also directly infringes the '515 Motorola Asserted Claims when its mobile devices execute the code responsible for the operation of the accused upload services and/or devices.

183.    Motorola has and continues to induce and to contribute to infringement of the '515 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 Motorola Asserted Claims, including, but not limited to Motorola's upload services and/or devices listed above.  Motorola provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '515 Motorola Asserted Claims.

184.    Motorola indirectly infringes the '515 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.  Motorola received notice of the '515 Patent at least as of the date this lawsuit was filed.  Motorola provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services

and/or devices to infringe the '515 Patent.  Through its manufacture and sale of the accused

upload services and/or devices, Motorola specifically intended its manufacturers, customers,

resellers, and/or end-use customers to infringe the '515 Patent.

185.    Motorola specifically intends for others, such as manufacturers, customers,

resellers, and end-use customers, to directly infringe the '515 Motorola Asserted Claims in the

United States.    For example, Motorola provides instructions to manufacturers, customers,

resellers and end-use customers regarding the use and operation of Motorola's products in an

infringing way.    Such instructions include at least "Moto G User Guide,"[58] "Moto X User

Guide,"[59] "User's Guide, Droid Ultra,"[60] and other similar user guides and support

documentation available on Motorola's support website.[61]    When manufacturers, customers,

resellers, and end-use customers follow such instructions, they directly infringe the '515

Motorola Asserted Claims.  Motorola knows that by providing such instructions, manufacturers,

customers, resellers, and end-use customers follow those instructions, and directly infringe the

'515 Motorola Asserted Claims.    Motorola thus knows that its actions actively induce

infringement.  Motorola performed the acts that constitute induced infringement, and would

induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or

willful blindness that the induced acts would constitute infringement.

186.    Motorola indirectly infringes the '515 Patent, by contributing to infringement by

others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. §

271(c) in this District and elsewhere in the United States.  Direct infringement is the result of

activities performed by the customers, resellers, and/or end-use customers of the accused upload

---

[58] Available on Motorola's website at https://motorola-global-
portal.custhelp.com/ci/fattach/get/745538/1385483328/redirect/1/filename/68017554027a.pdf.
[59] Available on Motorola's website at https://motorola-global-
portal.custhelp.com/ci/fattach/get/753825/1386258990/redirect/1/filename/Xfon_UG_KK_68017630001b.pdf.
[60] Available on Motorola's website at https://motorola-global-
portal.custhelp.com/ci/fattach/get/675621/1377023134/redirect/1/filename/68017476001A.pdf.
[61] *See* https://motorola-global-portal.custhelp.com/app/home/.

services and/or devices.  Motorola received notice of the '515 Patent at least as of the date this lawsuit was filed.

187.    Motorola's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location.  When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and upload digital media in an infringing manner.  Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

188.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on Motorola's upload services and/or devices.

189.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services and/or devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

190.    Motorola's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices.  The accused upload services and/or devices are especially made or adapted to infringe the '515 Patent.  Because the manufacturing, offering for sale, sales, and use of the accused upload

services and/or devices infringe the '515 Patent, Motorola's sales of its infringing products have no substantial non-infringing uses.

191.    Accordingly, a reasonable inference is that Motorola offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

192.    Motorola's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, Motorola will continue to infringe the '515 Patent.

### Apple Infringes the '515 Patent

193.    Apple has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1-3, 6, 7, 10, 11, 14-30, 33-41, 43, 44, 47-48, and 50-53 of the '515 Patent (hereinafter the "'515 Apple Asserted Claims"), including, but not limited to Apple's upload services and/or devices.  The accused upload services and/or devices that infringe one or more of the above-listed claims include, but are not limited to, at least the following: iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, iPhone 5, iPhone 5S, iPhone 5C, iPad (first generation), iPad 2, iPad (third generation), iPad (fourth generation), iPad Air, iPad Mini (first generation), iPad Mini (second generation), iPod Touch (third generation), iPod Touch (fourth generation), iPod Touch (fifth generation), and any other Apple mobile device capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; Apple's Messages

Application, including its iMessage functionality and infrastructure; Apple's Messaging-related APIs; the integrated Twitter content upload functionality; and the MMS-to-Twitter functionality. Further discovery may reveal additional infringing products, models, and/or functionality.

194.    Apple makes, uses, sells, offers for sale, or imports into the United States these upload services and/or devices and thus directly infringes at least the '515 Apple Asserted Claims.   Additionally, upon information and belief Apple drafts the source code related to at least some of these upload services and/or devices.   These acts are a direct infringement of the '515 Apple Asserted Claims.   Upon information and belief, Apple also uses these upload services and/or devices via its internal use and testing in the United States, directly infringing each of the '515 Apple Asserted Claims.   Apple also directly infringes the '515 Apple Asserted Claims when its mobile devices and/or its servers execute the code responsible for the operation of the accused upload services and/or devices.

195.    Apple has and continues to induce and to contribute to infringement of the '515 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 Apple Asserted Claims, including, but not limited to Apple's upload services and/or devices listed above.   Apple provides these upload services and/or devices to others, such as manufacturers, customers, resellers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services and/or devices that infringe the '515 Apple Asserted Claims.

196.    Apple indirectly infringes the '515 Patent by inducing infringement by others, such as manufacturers, customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, customers, resellers, and/or end-use customers of the accused upload services and/or devices.   Apple received notice of the '515

Patent at least as of the date this lawsuit was filed. Apple provides at least the accused upload services and/or devices to others, such as manufacturers, customers, resellers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services and/or devices to infringe the '515 Patent. Through its manufacture and sale of the accused upload services and/or devices, Apple specifically intended its manufacturers, customers, resellers, and/or end-use customers to infringe the '515 Patent.

197.    Apple specifically intends for others, such as manufacturers, customers, resellers, and end-use customers, to directly infringe the '515 Apple Asserted Claims in the United States. For example, Apple provides instructions to manufacturers, customers, resellers and end-use customers regarding the use and operation of Apple's products in an infringing way. Such instructions include at least "iPhone User Guide for iPhone OS 3.1 Software,"[62] "iPhone User Guide For iOS 7 (October 2013),"[63] "iPad User Guide For iOS 7 (October 2013),"[64] "iPod touch User Guide For iOS 7 (October 2013),"[65] "MFMessageComposeViewController Class Reference,"[66] and other similar user guides and support documentation available on Apple's support[67] and developer[68] websites. When manufacturers, customers, resellers, and end-use customers follow such instructions, they directly infringe the '515 Apple Asserted Claims. Apple knows that by providing such instructions, manufacturers, customers, resellers, and end-use customers follow those instructions, and directly infringe the '515 Apple Asserted Claims.

---

[62] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/0/MA616/en_US/iPhone_iOS3.1_User_Guide.pdf.
[63] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/1000/MA1565/en_US/iphone_user_guide.pdf.
[64] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/1000/MA1595/en_US/ipad_user_guide.pdf.
[65] Available on Apple's website at
http://manuals.info.apple.com/MANUALS/1000/MA1596/en_US/ipod_touch_user_guide.pdf.
[66] Available on Apple's website at
https://developer.apple.com/library/ios/documentation/MessageUI/Reference/MFMessageComposeViewController_
class/Reference/Reference.html.
[67] *See* http://www.apple.com/support/.
[68] *See* https://developer.apple.com/.

Apple thus knows that its actions actively induce infringement. Apple performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

198.    Apple indirectly infringes the '515 Patent, by contributing to infringement by others, such as customers, resellers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the customers, resellers, and/or end-use customers of the accused upload services and/or devices. Apple received notice of the '515 Patent at least as of the date this lawsuit was filed.

199.    Apple's upload services and/or devices allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location. When the accused upload services and/or devices are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices must necessarily pre-process and upload digital media in an infringing manner. Upon information and belief, the accused upload services and/or devices cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

200.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on Apple's upload services and/or devices.

201.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused

upload services and/or devices.    Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

202.    Apple's accused upload services and/or devices, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services and/or devices.    The accused upload services and/or devices are especially made or adapted to infringe the '515 Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services and/or devices infringe the '515 Patent, Apple's sales of its infringing products have no substantial non-infringing uses.

203.    Accordingly, a reasonable inference is that Apple offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

204.    Apple's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.    Unless enjoined by this Court, Apple will continue to infringe the '515 Patent.

**Twitter Infringes the '515 Patent**

205.    Twitter has and continues to directly infringe the '515 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1-3, 5-7, 10, 11, 14-19, 21-30, 33-38, 40, 41, 44, and 48 of the '515 Patent (hereinafter the "'515 Twitter Asserted Claims"), including, but not limited to Twitter's upload services.    The

accused upload services that infringe one or more of the above-listed claims include, but are not limited to, at least the following: the Twitter Application for iPhone, the Twitter Application for iPad, the Twitter Application for Android, the Twitter Application for Android Tablet, and any other Twitter Application capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; the Twitter content upload functionality integrated into the native sharing options for iOS and Android devices; Twitter's APIs related to obtaining digital content, pre-processing it, and transmitting it to another device, server, or location; Twitter's mobile website; and Twitter's website-related infrastructure.  Further discovery may reveal additional infringing products, models, and/or functionality.

206.    Twitter makes, uses, sells, offers for sale, or imports into the United States these upload services and thus directly infringes at least the '515 Twitter Asserted Claims. Additionally, upon information and belief, Twitter creates the source code related to each of these upload services.  These acts are a direct infringement of the '515 Twitter Asserted Claims. Upon information and belief, Twitter also uses these upload services via its internal use and testing in the United States, directly infringing each of the '515 Twitter Asserted Claims. Twitter also directly infringes the '515 Twitter Asserted Claims when it executes its code responsible for the operation of the accused upload services.

207.    Twitter has and continues to induce and to contribute to infringement of the '515 Patent by intending that others, including co-defendants HTC Corp., HTC America, LGE Inc., LGE USA, LGE MobileComm, Motorola, and Apple, make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '515 Twitter Asserted Claims, including, but not limited to Twitter's upload services listed above.  Twitter provides these upload services to others, such as co-defendants, manufacturers, customers, resellers, application

developers, and end-use consumers who in turn use, offer for sale, or sell in the United States these upload services that infringe the '515 Twitter Asserted Claims.

208.    Twitter indirectly infringes the '515 Patent by inducing infringement by others, such as co-defendants, manufacturers, customers, resellers, application developers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.    Direct infringement is the result of activities performed co-defendants, the manufacturers, customers, resellers, application developers, and/or end-use customers of the accused upload services.  Twitter received notice of the '515 Patent at least as of the date this lawsuit was filed.  Twitter provides at least the accused upload services to others, such as co-defendants, manufacturers, customers, resellers, application developers, and/or end-use customers, in the United States, who, in turn, offer for sale, sell, or use these upload services to infringe the '515 Patent.  Through its manufacture and sale of the accused upload services, Twitter specifically intended co-defendants, manufacturers, customers, resellers, application developers, and/or end-use customers to infringe the '515 Patent.

209.    Twitter specifically intends for others, such as co-defendants, to directly infringe the '515 Twitter Asserted Claims in the United States.  For example, Twitter provides its accused upload services to HTC Corp. for integration into HTC Corp.'s accused upload services and/or devices.    For example, Twitter provides its accused upload services to HTC America for integration into HTC America's accused upload services and/or devices.  For example, Twitter provides its accused upload services to LGE Inc. for integration into LGE Inc.'s accused upload services and/or devices.  For example, Twitter provides its accused upload services to LGE USA for integration into LGE USA's accused upload services and/or devices.  For example, Twitter provides its accused upload services to LGE MobileComm for integration into LGE MobileComm's accused upload services and/or devices.  For example, Twitter provides its

accused upload services to Motorola for integration into Motorola's accused upload services and/or devices. For example, Twitter provides its accused upload services to Apple for integration into Apple's accused upload services and/or devices. When co-defendants include the integrated Twitter content upload functionality in their accused upload services and/or devices, they directly infringe the '515 Twitter Asserted Claims. Twitter knows that providing the integrated Twitter content upload functionality to co-defendants induces co-defendants to directly infringe the '515 Twitter Asserted Claims. Twitter thus knows that its actions actively induce infringement. Twitter performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

210.    Twitter also specifically intends for others, such as manufacturers, customers, resellers, application developers, and end-use customers, to directly infringe the '515 Twitter Asserted Claims in the United States. For example, Twitter provides instructions to manufacturers, customers, resellers, application developers, and end-use customers regarding the use and operation of Twitter's accused services in an infringing way. Such instructions include at least "Getting started with Twitter for iPhone,"[69] "Getting started with Twitter for Android,"[70] "Using mobile.twitter.com on a smartphone or tablet,"[71] "POST statuses/update_with_media,"[72] and other similar user guides and support documentation available on Twitter's support[73] and developer[74] websites. When manufacturers, customers, resellers, application developers, and end-use customers follow such instructions, they directly infringe the '515 Twitter Asserted

[69] Available on Twitter's website at https://support.twitter.com/articles/20169500.
[70] Available on Twitter's website at https://support.twitter.com/groups/54-mobile-apps/topics/223-android/articles/168930-getting-started-with-twitter-for-android.
[71] Available on Twitter's website at https://support.twitter.com/groups/54-mobile-apps/topics/224-mobile-web/articles/20113771-using-mobile-twitter-com-on-a-smartphone-or-tablet.
[72] Available on Twitter's website at https://dev.twitter.com/docs/api/1.1/post/statuses/update_with_media.
[73] *See* https://support.twitter.com/.
[74] *See* https://dev.twitter.com/.

Claims. Twitter knows that by providing such instructions, manufacturers, customers, resellers, application developers, and end-use customers follow those instructions, and directly infringe the '515 Twitter Asserted Claims. Twitter thus knows that its actions actively induce infringement. Twitter performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '515 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

211.    Twitter indirectly infringes the '515 Patent, by contributing to infringement by others, such as co-defendants, customers, resellers, application developers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by co-defendants, customers, resellers, application developers, and/or end-use customers of the accused upload services. Twitter received notice of the '515 Patent at least as of the date this lawsuit was filed.

212.    Twitter's upload services allow for the obtaining of digital content, pre-processing it, and transmitting it to another device, server, or location. When the accused upload services are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services and/or devices pre-process and send digital media in an infringing manner. Upon information and belief, the accused upload services cannot operate in an acceptable manner absent the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location.

213.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is especially made or especially adapted to operate on Twitter's upload services.

214.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location is not a

staple article or commodity of commerce and that its use is required for operation of the accused upload services. Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

215. Twitter's accused upload services, with the ability to obtain digital content, pre-process it, and transmit it to another device, server, or location, are each a material part of the invention of the '515 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services. The accused upload services are especially made or adapted to infringe the '515 Patent. Because the manufacturing, offering for sale, sales, and use of the accused upload services infringe the '515 Patent, Twitter's sales of its infringing products have no substantial non-infringing uses.

216. Accordingly, a reasonable inference is that Twitter offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '515 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

217. Twitter's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law. Unless enjoined by this Court, Twitter will continue to infringe the '515 Patent.

## COUNT III

### Infringement of the '557 Patent

218. Summit 6 repeats and realleges the allegations in paragraphs 1-217 as though fully set forth herein.

### Twitter Infringes the '557 Patent

219.    Twitter has and continues to directly infringe the '557 Patent by making, using, selling, offering for sale, or importing into the United States products and/or methods covered by claims 1, 2, 4, 7, 10-16, 18, 23-29, 31, 33-38, and 41-44 of the '557 Patent (hereinafter the "'557 Twitter Asserted Claims"), including, but not limited to Twitter's upload services.  The accused upload services that infringe one or more of the above-listed claims include, but are not limited to, at least the following: Twitter's mobile website, mobile.twitter.com, and related infrastructure when used on a smartphone or tablet device, and any other Twitter website and related infrastructure capable of obtaining digital content, pre-processing it, and transmitting it to another device, server, or location.  Further discovery may reveal additional infringing products, models, and/or functionality.

220.    Twitter makes, uses, sells, offers for sale, or imports into the United States these upload services and thus directly infringes at least the '557 Twitter Asserted Claims.  Additionally, upon information and belief, Twitter creates the source code related to each of these upload services.  These acts are a direct infringement of the '557 Twitter Asserted Claims.  Upon information and belief, Twitter also uses these upload services via its internal use and testing in the United States, directly infringing each of the '557 Twitter Asserted Claims.  Twitter also directly infringes the '557 Twitter Asserted Claims when it executes its code responsible for the operation of the accused upload services.

221.    Twitter has and continues to induce and to contribute to infringement of the '557 Patent by intending that others make, use, import into, offer for sale, or sell in the United States, products and/or methods covered by the '557 Twitter Asserted Claims, including, but not limited to Twitter's upload services listed above.  Twitter provides these upload services to others, such as co-defendants, manufacturers, customers, resellers, application developers, and end-use

consumers who in turn use in the United States these upload services that infringe the '557 Twitter Asserted Claims.

222.    Twitter indirectly infringes the '557 Patent by inducing infringement by others, such as co-defendants, manufacturers, customers, resellers, application developers, and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.    Direct infringement is the result of activities performed co-defendants, the manufacturers, customers, resellers, application developers, and/or end-use customers of the accused upload services.    Twitter received notice of the '557 Patent at least as of the date this lawsuit was filed.    Twitter provides at least the accused upload services to others, such as co-defendants, manufacturers, customers, resellers, application developers, and/or end-use customers, in the United States, who, in turn, use these upload services to infringe the '557 Patent.    Through its manufacture and sale of the accused upload services, Twitter specifically intended co-defendants, manufacturers, customers, resellers, application developers, and/or end-use customers to infringe the '557 Patent.

223.    Twitter specifically intends for others, such as manufacturers, customers, resellers, application developers, and end-use customers, to directly infringe the '557 Twitter Asserted Claims in the United States.    For example, Twitter provides instructions to manufacturers, customers, resellers, application developers, and end-use customers regarding the use and operation of Twitter's accused services in an infringing way.    Such instructions include at least "Using mobile.twitter.com on a smartphone or tablet,"[75] "I'm having trouble with mobile.twitter.com,"[76] "FAQs about mobile.twitter.com,"[77] and other similar user guides and

---

[75] Available on Twitter's website at https://support.twitter.com/articles/20113771-using-mobile-twitter-com-on-a-smartphone-or-tablet.

[76] Available on Twitter's website at https://dev.twitter.com/docs/api/1.1/post/statuses/update_with_media.

[77]    Available on Twitter's website at https://support.twitter.com/groups/54-mobile-apps/topics/224-mobile-web/articles/20169900-faqs-about-mobile-twitter-com.

support documentation available on Twitter's support[78] and developer[79] websites. When manufacturers, customers, resellers, application developers, and end-use customers follow such instructions, they directly infringe the '557 Twitter Asserted Claims. Twitter knows that by providing such instructions, manufacturers, customers, resellers, application developers, and end-use customers follow those instructions, and directly infringe the '557 Twitter Asserted Claims. Twitter thus knows that its actions actively induce infringement. Twitter performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '557 Patent, and with knowledge or willful blindness that the induced acts would constitute infringement.

224.   Twitter indirectly infringes the '557 Patent, by contributing to infringement by others, such as co-defendants, customers, resellers, application developers, and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by co-defendants, customers, resellers, application developers, and/or end-use customers of the accused upload services. Twitter received notice of the '557 Patent at least as of the date this lawsuit was filed.

225.   Twitter's upload services allow for the obtaining of digital content, pre-processing it, and transmitting it to or receiving it at another device, server, or location. When the accused upload services are used to send digital content of a certain size and/or dimension over carrier networks and/or wi-fi networks, the accused upload services pre-process that digital content in an infringing manner. Upon information and belief, the accused upload services cannot operate in an acceptable manner absent the ability to pre-process media objects.

---

[78] *See* https://support.twitter.com/.
[79] *See* https://dev.twitter.com/.

226.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to or receive it at another device, server, or location is especially made or especially adapted to operate on Twitter's upload services.

227.    A reasonable inference to be drawn from the facts set forth is that the ability to obtain digital content, pre-process it, and transmit it to or receive it at another device, server, or location is not a staple article or commodity of commerce and that its use is required for operation of the accused upload services.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

228.    Twitter's accused upload services, with the ability to obtain digital content, pre-process it, and transmit it to or receive it at another device, server, or location, are each a material part of the invention of the '557 Patent and are especially made for the infringing manufacturing, offering for sale, sales, and use of the accused upload services.  The accused upload services are especially made or adapted to infringe the '557 Patent.  Because the manufacturing, offering for sale, sales, and use of the accused upload services infringe the '557 Patent, Twitter's sales of its infringing products have no substantial non-infringing uses.

229.    Accordingly, a reasonable inference is that Twitter offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '557 Patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

230.    Twitter's acts have caused, and unless restrained and enjoined, will continue to cause irreparable injury and damage to Summit 6 and its affiliates for which there is no adequate remedy at law.  Unless enjoined by this Court, Twitter will continue to infringe the '557 Patent.

## **DEMAND FOR JURY TRIAL**

Summit 6 hereby demands a jury for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Summit 6 respectfully requests that this Court enter judgment in its favor and grant the following relief:

A.      that Defendants' accused products infringe the claims of the Patents-in-Suit;

B.      award Summit 6 damages in an amount adequate to compensate Summit 6 for Defendants' accused products' infringement of the claims of the Patents-in-Suit, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

C.      award enhanced damages pursuant to 35 U.S.C. § 284;

D.      award Summit 6 pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

E.      award Summit 6 its costs of court;

F.      enter an order declaring that this is an exceptional case and award Summit 6 its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.      order an accounting for damages;

H.      enter a preliminary and permanent injunction enjoining Defendants, and all others in active concert with Defendants, from further infringement of the Patents-in-Suit;

I.      award a compulsory future royalty for any patent of the Patents-in-Suit for which an injunction does not issue; and

J.      award such further relief as the Court deems just and proper.

Dated:  February 19, 2014                    Respectfully submitted,

                                             **MCKOOL SMITH, P.C.**

                                             By:  /s/ Douglas A. Cawley
                                             Douglas A. Cawley
                                             Lead Attorney
                                             Texas State Bar No. 04035500
                                             dcawley@mckoolsmith.com
                                             Theodore Stevenson III
                                             Texas State Bar No. 19196650
                                             tstevenson@mckoolsmith.com
                                             Phillip M. Aurentz
                                             Texas State Bar No. 24059404
                                             paurentz@mckoolsmith.com
                                             Ashley N. Moore
                                             Texas State Bar No. 24074748
                                             amoore@mckoolsmith.com
                                             Mitchell R. Sibley
                                             Texas State Bar No. 24073097
                                             msibley@mckoolsmith.com
                                             Richard A. Kamprath
                                             Texas State bar No. 24078767
                                             rkamprath@mckoolsmith.com
                                             McKool Smith, P.C.
                                             300 Crescent Court, Suite 1500
                                             Dallas, Texas 75201
                                             Telephone: (214) 978-4000
                                             Telecopier: (214) 978-4044

                                             Bradley W. Caldwell
                                             Texas State Bar No. 24040630
                                             bcaldwell@caldwellcc.com
                                             Caldwell Cassady & Curry
                                             2101 Cedar Springs Road, Suite 1000
                                             Dallas, Texas 75201
                                             Telephone: (214) 888-4848
                                             Telecopier: (214) 888-4849

                                             **ATTORNEYS FOR PLAINTIFF
                                             SUMMIT 6 LLC**

# Exhibit A

Case 7:14-cv-00014-O   Document 6-1



US006895557B1

(12) **United States Patent**
Wood et al.

(10) Patent No.: **US 6,895,557 B1**
(45) Date of Patent: **May 17, 2005**

(54) **WEB-BASED MEDIA SUBMISSION TOOL**

(75) Inventors: **Lisa T. Wood**, Danville, CA (US);
**Scott M. Lewis**, Danville, CA (US);
**Robin T. Fried**, Berkeley, CA (US)

(73) Assignee: **IPIX Corporation**, San Ramone, CA
(US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/357,836**

(22) Filed: **Jul. 21, 1999**

(51) Int. Cl.[7] ................................................. G09G 5/00
(52) U.S. Cl. ...................... 715/744; 715/748; 715/769;
707/102; 709/236
(58) Field of Search ............................. 707/1, 10, 3, 4,
707/2, 100, 102, 513, 523, 101; 345/418,
473, 769, 770, 744; 709/219, 246, 232;
382/305

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,001,628 | A | | 3/1991 | Johnson et al. ............... 364/200 |
| 5,327,265 | A | | 7/1994 | McDonald ................... 358/527 |
| 5,555,388 | A | | 9/1996 | Shaughnessy ............... 395/427 |
| 5,678,046 | A | | 10/1997 | Cahill et al. ............... 395/616 |
| 5,760,917 | A | | 6/1998 | Sheridan .................... 358/442 |
| 5,761,404 | A | | 6/1998 | Murakami et al. .......... 395/182 |
| 5,781,773 | A | * | 7/1998 | Vanderpool et al. ........ 395/611 |
| 5,799,063 | A | | 8/1998 | Krane |
| 5,813,009 | A | | 9/1998 | Johnson et al. ............. 707/100 |
| 5,819,032 | A | * | 10/1998 | De Vries et al. ........... 709/250 |
| 5,845,299 | A | * | 12/1998 | Arora et al. ................ 707/513 |
| 5,890,170 | A | * | 3/1999 | Sidana ....................... 707/501 |
| 6,012,068 | A | * | 1/2000 | Boezeman et al. .......... 707/104 |
| 6,017,157 | A | * | 1/2000 | Garfinkle et al. ........... 396/639 |
| 6,028,603 | A | * | 2/2000 | Wang et al. ................. 345/350 |
| 6,035,323 | A | * | 3/2000 | Narayen et al. ............. 709/201 |
| 6,202,061 | B1 | * | 3/2001 | Khosla et al. ................. 707/3 |
| 6,301,607 | B2 | * | 10/2001 | Barraclough et al. ....... 709/204 |
| 9,381,029 | | * | 4/2002 | Tipirneni ................... 358/1.14 |
| 6,489,980 | B1 | * | 12/2002 | Scott et al. ................. 345/854 |

| | | | | |
|---|---|---|---|---|
| 6,505,160 | B1 | * | 1/2003 | Levy et al. .................. 704/270 |
| 6,516,340 | B2 | | 2/2003 | Boys |

FOREIGN PATENT DOCUMENTS

EP       0930 774 A2     7/1999     ............ H04N/1/21

OTHER PUBLICATIONS

Thilo Horstmann and Richard Bentley, "Distributed Author-
ing on the Web with the BSCW Shared Workspace System,"
StandardView vol. 5, No. 1, pp. 9–16, Mar. 1997.*
Doug Dean, 15 Seconds: Down and Dirty Browser Upload-
ing with a VB ASP Component, pp. 1–10, Mar. 11, 1999.*
Peter Persits, 15 Seconds: Browser–based uploading Under
the Microscope, pp. 1–7, Nov. 21, 1998.*
Netscape Communications Corp., Help File of Netscape
Composer 4.75, Copyright 1994–1998, p. 9.*

* cited by examiner

*Primary Examiner*—John Cabeca
*Assistant Examiner*—Tadesse Hailu
(74) *Attorney, Agent, or Firm*—Frost Brown Todd LLC

(57) **ABSTRACT**

The present invention, generally speaking, provides an
improved web-based media submission tool. As with some
existing tools, operation of the tool is drag and drop or the
user can "click" to browse a directory to select media
objects. Unlike existing tools, the tool provides the user an
opportunity to confirm the submission, for example by
generating a thumbnail image of an image file that has been
dragged and dropped. Batch submission is provided for in
which a user drags and drops a plurality of images or other
media objects. Submission from a web page to a web page
is also provided for. The submission tool is configurable to
perform a variable amount of intelligent preprocessing on
media objects prior to upload. In the case of digital images,
the tool can perform sizing and formatting, for example.
Information capture is performed with information being
uploaded together with the media objects. In an exemplary
embodiment, information capture is both user-transparent
(e.g., user ID and/or password) and user-visible (e.g., the
user can provide captions for media objects). The submis-
sion of information about the user and the media objects
facilitates automatic integration of the media objects within
existing databases.

**74 Claims, 5 Drawing Sheets**





Homes
Realtor Services
Getting Started
Send Photos
Homes
Financing
Offer & Closing
Help
Today's Rates
30-Year Fixed 6.75%
15-Year Fixed 6.45%
1-Year Adjustable 5.6%
*National average rates
Find a Loan
Rate News
Highlights
Welcome to Homes!
We hope you enjoy our site
Please send us your feedback
Home & Rate Trackers
Receive free e-mail updates
Adding Photos to your listings
Get better exposure for your listings by including some pictures of the property. Its easy! Just locate the folder on your computer containing your photos, and then drag them into the boxes below. Select a descriptive caption for each photo and then click the "Send Photos" button.
Frequently Asked Questions
Drag Photo Here
Front View
Drag Photo Here
Front View
Drag Photo Here
Front View
Drag Photo Here
Front View
Listing Name
Send Photos

FIG. 1



Picture? PIC
Digital Image Processing by PictureWorks
☐ ($.25 charge) (optional)
Adding a photo of your item
Get better exposure for your items by including a picture. Its easy! Just locate the folder on your computer containing your photos, and then drag a photo into the box below.
Click Here to Select Images
SurroundView?
Digital Image Processing by PictureWorks
☐ ($2.00 charge) (optional)
Adding a SurroundView
Really show off your item. Add a SurroundView. Its easy! Just locate the folder on your computer containing your photos, and then drag up to six photos into the boxes below. The photos will be combined into an animated presentation.
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images

*FIG. 2*

**U.S. Patent**    May 17, 2005    Sheet 3 of 5    US 6,895,557 B1

PWImageControl Interface:

| Interface Name | Type | Definition | Signature |
|---|---|---|---|
| ScaleImage | function | Scales an image in place or to a temporary file | ScaleImage( destinationType as String, changeDimensions as Integer, destWidth As Integer, destHeight As Integer, destQuality As Integer, '0-100 generateOutputFilename As Boolean ' create tempfile ) As String |
| DelTempFile | sub | Deletes temporary file created with ScaleImage | DelTempfile() |
| fileName | String property | Name of file shown in image well | fileName as String |
| imageName | String property | String value from image caption box | imageName as String |
| ClearImage | sub | Clears the image from the display and redisplays the logo and instructional text | ClearImage() |
| backgroundColor | String property | Hexidecimal RGB string value in format "FFFFFF" or "#FFFFFF" | backgroundColor as String |
| textColor | String property | Hexidecimal RGB string value in format "FFFFFF" or "#FFFFFF" | textColor as String |

*FIG. 3*

PMMediaSendControl Interface:

| Interface Name | Type | Definition | Signature |
|---|---|---|---|
| SubmitMediaRequest | function | Transfers image and returns a status code. The action is successful if the return code is 0. If non-zero return code examine ServerRetString for a reason. | SubmitMediaRequest( UserID As String, 'partner UID Password As String, 'partner password ServiceType As String, '"HOST" or "MIRROR" IndustryCode As Integer, e.g., 65=real estate MediaType As Integer, '1=image 2=video 3=sound OpCode As Integer, '1=Add, 2=Update, 3=Delete IPAddr As String, 'Destination IP address filename As String, 'File to send MediaGroupID As String, 'Used to build unique key MediaExtendedID As String, ' "" MediaSequenceNum As Integer, Desc1 As String, '255 chars Desc2 As String, '255 chars Desc3 As String preScaled as Integer) as Integer '255 chars |
| ServerRetString | String property | Return value from SubmitMediaRequest. If call made on HOST service, this string contains the IMG SRC url | ServerRetString as String |

FIG. 4A

```
Usage Example (VB Script)
tempFileName=DragImage1.ScaleImage(320, 240, 89, 1) 'scale the image object 'DragImage1'
result=UplHandler.SubmitMediaRequest(                'transmit to mad central
        UserID,
        Password,
        ServiceType,
        0,
        1,
        1,
        ipAddress,
        tempFileName,
        misNum.Value,
        zipcode,
        imageCount,
        title,
        desc2,
        desc3,
        1)

DragImage3.DelTempFile                 'delete the temp file
```

## FIG. 4B

## FIG. 4

| FIG. 4A |
|---------|
| FIG. 4B |

US 6,895,557 B1

**1**

## WEB-BASED MEDIA SUBMISSION TOOL

The present application is related by subject matter to U.S. application Ser. No. 09/440,461, now U.S. Pat. No. 6,732,162.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to the handling, manipulation and processing of digital content and more particularly to the transportation and Internet publishing of digital content, particularly image media objects and rich media.

#### 2. State of the Art

Much of the phenomenal success of the web is attributable to its graphical nature. Literally, a picture is worth a thousand words. The capture of digital images has become routine, using digital cameras and scanners. Nevertheless, although the handling of images by website creators has achieved a high degree of automation, for the average technology user (the "imaging civilian"), manipulating and sharing digital images over the Internet remains a cumbersome and daunting process. Piecemeal solutions that have been devised for handling digital images require a level of sophistication that is beyond that of the ordinary user. For example, transferring a digital image may require first downloading a FTP program, then installing it, then running it and connecting to an FTP server by typing the server name in the connection dialog, then navigating to the proper subdirectory, selecting the files to be uploaded, making sure that the program is in binary transfer mode, then sending the files. For the imaging civilian, such an involved process can be daunting to say the least.

Additionally, as technologies advance and casual users begin to experiment with other media objects, such as streaming video, 3D objects, slide shows, graphics, movies, and even sound files that accompany imaging data, the processes required to share these rich media types on the Internet becomes exponentially more complicated and prohibitive. As the realization of the Internet as an interactive, content rich medium becomes more and more a reality, the need for enabling the use and distribution of rich content and media on the Internet will become the gating factor to its long term success.

A broad-based solution to the foregoing problem requires a web-based media submission tool that allows for submission of media objects in a convenient, intuitive manner. A company named Caught in the Web, has attempted to create a broad-based media submission tool known as "ActiveUpload". ActiveUpload allows an arbitrary file to be dragged and dropped onto a web page control for upload to the web server. An ActiveUpload control allows users to, without leaving a web page, transfer files to a server (Internet or intranet) by selecting the files on the user's desktop that the user wants to transfer, then dragging them onto the web page. For example, a user, having visited a web page, can contribute pictures, documents, zip files, etc., without having to leave the web page and use an FTP program. Standard web authoring tools can be used to integrate ActiveUpload into web pages and change the behavior of the control.

Although Caught in the Web's ActiveUpload tool simplifies the user experience, it does little toward furthering "backend" automation in the handling and distribution of media objects and has no built in "intelligence" to streamline the process of handling and transporting rich media objects from the front end.

### SUMMARY OF THE INVENTION

The present invention, generally speaking, provides an improved web-based media submission tool. As with some

**2**

existing tools, operation of the tool is drag and drop or the user can "click" to browse a directory to select media objects. Unlike existing tools, the tool provides several unique and valuable functions. For example, the tool provides the user an opportunity to confirm the submission with a visual representation, for example by generating a thumbnail image of the rich media file that has been selected. Additionally, batch submission is provided to allow a user to drag and drop or select a plurality of images or other media objects. Submission from a web page to a web page is also provided for. Even more importantly, the submission tool is configurable to perform a variable amount of intelligent preprocessing on media objects prior to upload. In the case of digital images, the tool can perform sizing and formatting, for example. Information capture is performed with information being uploaded together with the media objects. In an exemplary embodiment, information capture is both user-transparent (e.g., user ID and/or password) and user-visible (e.g., the user can provide captions for media objects). The submission of information about the user and the media objects facilitates automatic integration of the media objects within existing databases.

### BRIEF DESCRIPTION OF THE DRAWING

The present invention may be further understood from the following description in conjunction with the appended drawing. In the drawing:

FIG. **1** is a diagram of an exemplary web page providing media object acquisition functions;

FIG. **2** is a diagram of another exemplary web page providing image acquisition functions;

FIG. **3** is a table pertaining to a first portion of the Prepare and Post component design; and

FIG. **4** is a table pertaining to a second portion of the Prepare and Post component design.

### DETAILED DESCRIPTION OF THE PRFERRED EMBODIMENTS

The following describes the Prepare and Post™ tools, which prepares and submits media objects from inside a standard browser, referred to as the first location, to a second location or server. The media objects may be pictures (images), movies, videos, graphics, sound clips, etc. Although in the following description the submission of images is described in greatest detail, the same principles apply equally to media obejcts of all descriptions.

The Prepare and Post tools refers to browser-side components which together provide the ability to submit and transport media objects over the web to be stored and served. Using the Prepare and Post tools, end users can submit images in an immediate, intuitive manner. No technical sophistication is required. In particular, understanding technical terms such as JPEG, resolution, pixel, kilobyte, transfer protocol, IP address, FTP etc., is not required, since the Prepare and Post tools handles all of these tasks for the user. The benefits of the Prepare and Post tool are:

  a) to the image submitter, the ability to submit media objects to web pages immediately without needing to overcome technical obstacles;

  b) to the image submitter, the ability to submit media objects to web pages "as is" without making modifications to the media objects prior to sending;

  c) to PictureWorks web site partner, access to a uniform, standardized, reliable and secure channel for media acquisition;

US 6,895,557 B1

**3**

d) to PictureWorks web site partner, access to contributed media "made to order", it meets their imaging specifications every time without human intervention;

e) to PictureWorks web site partner, the ability to provide web site visitors with an easy, error free way to contribute media;

f) to PictureWorks web site partner, access to contributed media in "real time" with no time delays.

The two primary components used in the Prepare and Post tools which carry out these functions are 1) the media object identifier and 2) the media sender.

In general, the media object identifier functions to provide a graphical interface for placing and associating a media object from a user's desktop onto a web page. The media sender carriers out the function of transmitting media objects to a second location.

There are two ways media objects on the first location become associated with a media object identifier. The first is through a "drag and drop" behavior where the user clicks on a media object to select the one they want to submit. The media object is then dragged to the media object identifier. Releasing the mouse button associates the media object with the media object identifier. This behavior is allowed in web browsers that support drag and drop functionality. The Prepare and Post tools enable these browsers to accept media objects via drag and drop by providing the media object identifier as an ActiveX component.

The second way to associate a media object on the first location with the media object identifier is to click on the media object identifier to browse for media objects, then select the media object of choice. This method is made available for web browsers where the media object identifier needs to be a pure Java component. (Such "signed applet browers" like Netscape Navigator) In this instance, the user may be asked to choose a media object in a similar manner as when choosing a file to be opened, either by graphical navigation or by specifying a path name. For example, a prompt associated with the media object identifier may be displayed prompting the user to click within the media object identifier. Clicking within the media object identifier brings up a browse dialog. Using the browse dialog, the user selects the desired media object, which is then placed in the media object identifier. The Prepare and Post tools will generate a visual representation or thumbnail of the media object, a feature currently not available in signed applet browsers.

Real estate is an example of a prime application of the Prepare and Post tools. "Curb appeal" is of great importance in the realty industry and can only be judged by "drive-bys," which are time-consuming and laborious, or by the availability of images. The Prepare and Post tools make real estate images readily available with a minimal amount of effort.

Referring to FIG. **1**, an example is shown of a realty web page featuring the described Prepare and Post tools functionality. The user associates images with a media object identifier via the methods described above and selects appropriate captions for the images, e.g., living room, family room, etc. The captions may be typed in or selected from menus. The user also supplies identifying information, in this instance the MLS listing number. When the user clicks the Send button, the images are uploaded and processed

**4**

immediately according to the configuration of the Prepare and Post tools.

The Prepare and Post tools also support a batch interface, allowing a plurality of images to be submitted simultaneously as in the case of a professional photographer, for example. The opportunity for user confirmation is again provided, e.g., by displaying a visual representation of the images in the batch.

If a mistake is made such that the wrong image is placed in a media object identifier, the correct image may be placed in the media object identifier. The correct image will replace the mistaken image. Alternatively, the user may remove an image from a media object identifier by right-clicking on the media object identifier and selecting Remove within a resulting pop-up menu.

Note that any number of media object identifiers may be provided on a web page and that the media object identifiers may be separate or grouped. This is evident in FIG. **2**. The number of media object identifiers provided on a page can be pre-configured and fixed, allowing no user intervention, or the media object identifiers can be generated dynamically, allowing the user to determine how many media object identifiers they need for media submission. FIG. **2** shows a web page with various sizes of media object identifiers. If a media object identifier is separate, its image will be transmitted separately to the second location. If an media object identifier is part of a group, its image will be transmitted to the second location as part of a group of images that are stored together and cataloged together. Media object identifiers that are associated together as a group are noted as such in the web page interface and transparently in the media object identifier object code. Moreover, a web page may have multiple groups of media object identifiers, or "groups of groups."

The usefulness of images is greatly enhanced by capturing and identifying information about the images and submitting the identifying information with the images. Information may be image-specific, user-specific or both. The submission of information about the user and the media objects facilitates automatic integration of the media objects into existing databases. Information capture may be overt or covert or both. This unique automatic database integration enables the images to be served with the proper web page data. Overt information capture relies upon the user to make menu selections of appropriate captions as illustrated in FIG. **1**, or to make text entries within text fields, or both. The Prepare and Post tools are easily customized to accept menu selections and text fields for different applications. Covert information capture occurs by having the web browser automatically pass to the Prepare and Post tools known information such as a user ID or, password used to access the web page.

A key differentiator of the Prepare and Post tools is the browser, or client-side intelligence built into the tools. This intelligence directly provides features including those already outlined such as associating data with media objects, generating a visual representation of the media objects and generating media object identifiers dynamically or in a pre-set manner. Other features are also provided via this intelligence, specifically, the ability to control the width and height of the media object identifier and the ability to

US 6,895,557 B1

5

preprocess the media objects in any number of ways prior to transporting to a second location. In the case of an image media object for example, the Prepare and Post tools may resize the image, (i.e., increase or decrease its size as defined by either physical dimensions, pixel count, or kilobytes). Compression, for example, is a type of sizing. The Prepare and Post tools may also change the image's file format (a way of a media object being identified as to a "type" or "kind" of media), change the quality setting of the image, crop the image or change the aspect ratio, add text or annotations, encode or combine (including stitching) the media object, or enhance the media object by changing image values, for example, relating to contrast or saturation. This intelligence may be executed in a manner that is transparent to the end user. This transparency allows the end user to submit media to the Prepare and Post tools "as is," since the tools will automatically prepare it to meet the requirements of the second location. Note that, although image submission may involve client-side processing, image processing is not required.

The Prepare and Post tools are available for customers to integrate into their own web pages. The Prepare and Post tools are easily integrated into web sites (customers) to allows those sites to accept media objects from web site visitors (users). Appendix A is a generic HTML HostTemplate illustrating how Prepare and Post components are integrated into a web page. The HTML template file (which is a complete working example) contains instructions and a few small code snippets that the customer pastes into the web page. Integrating the Prepare and Post components requires an Initialization Section, a Configuration Section, an ImageWell (media object identifier) Section, a Submission Section and an ImageUpLoad Control Section. To include the Prepare and Post tools media object identifiers on a web page, the customer cuts and pastes code snippets for these sections from the template into the web page.

The Initialization Section consists of a few lines of JavaScript code that will download all of the needed Prepare and Post submission components.

The Configuration Section overrides various configurable default settings that the customer can control. In the Configuration Section, the media object identifier component is sized and configured to perform any preprocessing of the image that may be desired prior to upload. Configurable parameters include both fixed values for all submissions (per submission values) and fixed values for all images within a submission (per image values), as will be explained presently.

Fixed values for all submissions include DefaultImageWidth and DefaultImageHeight, as well as DefaultControlWidth and DefaultControlHeight. The former specify the default width and height of the images after they have been compressed for transmission. The latter specify the default width and height of all media object identifiers. To create media object identifiers having different sizes, the customer specifies the desired size when creating the media object identifier. Another fixed value for all submissions is Quality. This determines the quality level of the images after they have been compressed for transmission (0 is the lowest quality/highest compression and 100 is the highest quality/ lowest compression).

Fixed values for all media objects within a submission include Key1 and Key2. Key1 is the primary value that determines the filename of the resulting image file and, consequently, its URL. It is important that each submitted

6

image have a unique name to prevent one image from overwriting another. Key2 is an optional secondary key that is appended to Key1 before the image's filename and URL are created. While default values for Key1 and Key2 can be specified in the configuration section, more likely this value will be supplied from a field in the web form. If the web page form contains a control named "Key1," then its value will be used for this key. For example, the field Key1 might be labeled as "MLS Number" on the web page. Similarly, the field Key2-might be labeled "Zip Code" on the web page. A sequence number is appended to the Key1/Key2 combination. When there are multiple media object identifiers on a page, this will ensure that each image has a unique key.

All media object identifiers on a web page must be contained within an HTML form. A single line of JavaScript code is inserted into the web page (within the HTML form) in each place where a media object identifier is desired. The Media object identifier Section can specify the width and height for each media object identifier. If the width and height are omitted, then the default width and heigth from the Configuration Section are used.

The Submission Code Section contains HTML code that creates the button that submits both the images to the second locations and the form to the customer's server. Within the Submission Code Section, an HTML "href" parameter is required for the Send Button that causes the images to be sent. After the images have been sent, the web page form will be submitted in the standard manner. The form must define two hidden fields named "url" and imagecount." The imagecount field will contain the number of images actually transmitted. In an exemplary embodiment, the URL for images **2** through "n" are generated by replacing the initial sequence number at the end of the returned URL with the desired image number.

The ImageUpload Control Section holds a small piece of JavaScript code that is placed at the very end of the body section of the web page. This code creates the non-visible Image Upload control, or media sender, that performs the transfer of images from the user's machine to the second location.

The Prepare and Post components support multiple browsers and dynamically adjust their behavior according to the type of browser that is currently running. For example, under supported versions of Microsoft's browsers, media object identifiers are implemented as ActiveX controls, while under supported Netscape browsers, media object identifiers are implemented as Java Applets. This multiple browser support is completely automatic.

FIGS. **3** and **4** present further details of the media object identifier and media sender components, respectively.

From the foregoing description, it will be appreciated that the present media submission tool, besides offering convenience to the end user, offers convenience and flexibility to technology partners. In particular, web page integration is designed to facilitate automatic server-side integration of media content.

It will be apparent to those of ordinary skill in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential character thereof. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes which come within the meaning and range of equivalents thereof are intended to be embraced therein.

US 6,895,557 B1

7                                                                                          8

APPENDIX A

HostTemplate generic.htm

```
<HTML>
<HEAD>
<!--*********************************************** Begin Initialization Section -->
<!--***** This section of code must appear at      -->
<!--***** the beginng of the <HEAD> section of     -->
<!--***** your web page. Copy this code and        -->
<!--***** paste it directly into your web page.    -->
<SCRIPT type="text/javascript" src="http://157.22.134.49/company/pwtcomponents.js"> </SCRIPT>
<SCRIPT type="text/javascript" src="http://157.22.134.49/company/company.js"> </SCRIPT>
<!--*********************************************** End Initialization Section -->
</HEAD>
<BODY>
<!--*********************************************** Begin Configuration Section -->
<!--***** This section of code must appear         -->
<!--***** anywhere after the initialization        -->
<!--***** section (above), and before the          -->
<!--***** the <FORM> that contains the image       -->
<!--***** wells.                                    -->
<!--*****                                           -->
<!--***** This section defines data values         -->
<!--***** needed by the image wells. You can       -->
<!--***** modify these values to suit   -->
<!--***** your needs.                              -->
<SCRIPT Language="Javascript">
PWT.Key1 = "name-your-image here";      // If the <FORM> contains fields named 'Key1'
PWT.Key2 = " ";                         //   & 'Key2' their values will be used.
PWT.Quality = 93;
PWT.DefaultImageWidth = 640;
PWT.DefaultImageHeight = 480;
PWT.DefaultControlWidth = 326;          // Includes a 3 pixel border
PWT.DefaultControlHeight = 246;         //   Include a 3 pixel border
</SCRIPT>
<!--*********************************************** End Configuration Section -->
<FORM>
This sample displays a working image well.
<BR>
<!--*********************************************** Begin ImageWell Section -->
<!--***** This code creates an image well on       -->
<!--***** the web page. While this template        -->
<!--***** only contains a single image well,       -->
<!--***** you can use as many as you like.         -->
<!--***** Copy this code into your web page        -->
<!--***** anywhere within your <FORM> where        -->
<!--***** you want an image well to appear.        -->
<SCRIPT Language="Javascript">
PWT.addimagecontrol( );                 // or "PWT.addimagecontrol(640,480);" to override
                                        // the default width and height.
</SCRIPT>
<!--*********************************************** End ImageWell Section -->
<BR>
This text is after the image well.
<P>
<!--*********************************************** Begin Submission Code Section -->
<!--***** You can use any type of button you       -->
<!--***** wish, but rather than it being a         -->
<!--***** standard SUBMIT button, it must          -->
<!--***** instead contain the parameter:           -->
<!--*****                                           -->
<!--*****       onclick="PWT.Submit( )"            -->
<!--*****                                           -->
<!--***** (as shown in the example below).         -->
<!--***** After the images have been sent,         -->
<!--***** your web page FORM will be submitted     -->
<!--***** in the standard manner.                  -->
<!--*****                                           -->
<!--***** Your FORM must define two hidden         -->
<!--***** fields named "url" & "imagecount"        -->
<!--***** (see examples below). The "url"          -->
<!--***** field will be populated with the         -->
<!--***** resulting URL of the first (or only)     -->
<!--***** image submitted, and the "imagecount"    -->
<!--***** field will contain the number of         -->
<!--***** images actually transmitted. The URL     -->
<!--***** for images 2 thru n can be generated     -->
<!--***** by replacing the initial sequence        -->
<!--***** number (which will always be "1")        -->
<!--***** at the end of the returned URL with      -->
```

US 6,895,557 B1

9                                                                                          10

APPENDIX A-continued

HostTemplate generic.htm

```
-->
<!--***** the desired image number.              -->
<INPUT type="hidden" name="url">
<INPUT type="hidden" name="imagecount">
<INPUT type="button" value="Submit Images" onclick="PWT.Submit( )">
</FORM>
<!--*********************************************** End Submission Code Section -->
<!--*********************************************** Begin ImageUpload Control Section -->
<!--***** This section of code must appear at    -->
<!--***** the end of the <BODY> section of       -->
<!--***** your web page. Copy this code and      -->
<!--***** paste it directly into your web page.  -->
<SCRIPT Language="Javascript">
PWT.adduploadcontrol( );
</SCRIPT>
<!--*********************************************** End ImageUpload Control Section -->
</BODY>
</HTML>
```

What is claimed is:

1. A method comprising the steps of:

accessing at least one media object identifier, the media object identifier being embedded within a third-party web site, the media object identifier including a graphical user interface for acquiring media objects;

associating a media object with the media object identifier; and

pre-processing the media object by the media object identifier for the requirements of the third-party web site, the pre-processing being done without additional user selection of the pre-processing.

2. The method of claim **1** wherein the pre-processing includes one of the following steps:

reducing the file size of the media object,

compressing the media object for purposes of transportation,

changing the file format of the media object,

changing the aspect ratio or otherwise cropping the media object,

adding text or other annotation to the media object,

encoding or otherwise converting the media object,

processing the media object in a manner that completely fills the media object identifier or maintains the aspect ratio of the media object within the media object identifier,

changing the orientation or otherwise rotating the media object,

combining (including stitching) multiple media objects, or

enhancing the image by changing its contrast or saturation values.

3. The methods of claims **1** or **2** wherein the media object is associated with the media object identifier by dragging a visual representation of the media object to the graphical user interface of the media object identifier.

4. The methods of claims **1** or **2** wherein the media object is associated with the media object identifier by browsing and selecting files.

5. The methods of claims **1** or **2** wherein more than one media object is associated or processed simultaneously.

6. The methods of claims **1** or **2** wherein more than one media object identifier is generated dynamically or generated from pre-set instructions.

7. The method of claim **1** wherein the pre-processing includes reducing the size of the media object.

8. The method of claim **1** wherein the pre-processing includes modifying the format of the media object.

9. The method of claim **1** wherein the media object identifier allows display of the media object in context on the web page.

10. The method of claim **1** wherein the media object is a digital image.

11. The method of claim **1**, wherein the media object identifier is configurable to control the pre-processing.

12. The method of claim **11**, wherein the media object identifier is configurable by operators of the third party web site to control the pre-processing.

13. The method of claim **1**, wherein requirements relate to presentation requirements of the third party web site.

14. The method of claim **1**, wherein the pre-processed media object is uploaded to a remote server which enables the media object to be displayed on the web site.

15. A method comprising the steps of:

accessing a web site containing a media object identifier, the media object identifier including a graphical user interface for acquiring media objects;

associating a media object with the media object identifier; and

pre-processing the media object by the media object identifier for the requirements of a web site, the pre-processing including checking a file size of the media object and if the file size of the media object is larger than a predetermined maximum file size reducing the file size of the media object, the pre-processing being done without user selection of the pre-processing.

16. The method of claim **15** wherein the pre-processing further includes one of the following steps:

compressing the media object for purposes of transportation,

changing the file format of the media object,

changing the aspect ratio or otherwise cropping the media object,

adding text or other annotation to the media object,

encoding or otherwise converting the media object,

processing the media object in a manner that completely fills the media object identifier or maintains the aspect ratio of the media object within the media object identifier,

US 6,895,557 B1

11

changing the orientation or otherwise rotating the media object,

Combining (including stitching) of multiple media objects, or

Enhancing the image by changing its contrast or saturation values.

**17**. The method of claim **15** wherein the media object is associated with the media object identifier by dragging a visual representation of the media object to the graphical user interface of the media object identifier.

**18**. The method of claim **15** wherein the media object is associated with the media object identifier by browsing and selecting files.

**19**. The method of claim **15** wherein more than one media object is associated or processed simultaneously.

**20**. The method of claim **15** wherein more than one media object identifier is generated dynamically or generated from pre-set instructions.

**21**. The method of claim **15** wherein the media object identifier allows display of the media object in context on the web page.

**22**. The method of claim **15** wherein the media object identifier is embedded in the web site.

**23**. The method of claim **15** wherein the media object is a digital image.

**24**. The method of claim **15**, wherein the media object identifier is configurable to control the pre-processing.

**25**. The method of claim **24**, wherein the media object identifier is configurable by operators of the web site to control the pre-processing.

**26**. The method of claim **15**, wherein requirements relate to presentation requirements of the third party web site.

**27**. The method of claim **15**, wherein the pre-uploaded processed media object is uploaded to a remote server which enables the media object to be displayed on the web site.

**28**. A computer readable medium containing a program adapted to implement the method of:

associating a media object with a media object identifier, the media object identifier being embedded within a third-party web site, the media object identifier including a graphical user interface for acquiring media objects; and

pre-processing the media object by the media object identifier for the requirements of the third-party web site, the pre-processing being done without user selection of the pre-processing.

**29**. The computer readable medium containing a program of claim **28** wherein the pre-processing includes one of the following steps:

reducing the file size of the media object,

compressing the media object for purposes of transportation,

changing the file format of the media object,

changing the aspect ratio or otherwise cropping the media object,

adding text or other annotation to the media object,

encoding or otherwise converting the media object,

processing the media object in a manner that completely fills the media object identifier or maintains the aspect ratio of the media object within the media object identifier,

changing the orientation or otherwise rotating the media object,

combining (including stitching) of multiple media objects, or

12

enhancing the image by changing its contrast or saturation values.

**30**. The computer readable medium containing a program of claim **28** wherein more than one media object identifier is generated dynamically or generated from pre-set instructions.

**31**. The computer readable medium containing a program of claim **28** wherein the pre-processing includes reducing the size of the media object.

**32**. The computer readable medium containing a program of claim **28** wherein the pre-processing includes modifying the format of the media object.

**33**. The computer readable medium containing a program of claim **28** wherein the media object is a digital image.

**34**. The computer readable medium containing a program of claim **28**, wherein the media object identifier is configurable to control the pre-processing.

**35**. The computer readable medium containing a program of claim **34**, wherein the media object identifier is configurable by operators of the third party web site to control the pre-processing.

**36**. The computer readable medium containing a program of claim **28**, wherein requirements relate to presentation requirements of the third party web site.

**37**. A computer readable medium containing a program adapted to implement the method of:

associating a media object with a media object identifier at a web site, the media object identifier including a graphical user interface for acquiring media objects; and

pre-processing the media object by the media object identifier for the requirements of a web site, the pre-processing including checking a file size of the media object and if the file size of the media object is larger than a predetermined maximum file size reducing the file size of the media object, the pre-processing being done without user selection of the pre-processing.

**38**. The computer readable medium containing a program of claim **37** wherein the preprocessing further includes one of the following steps:

compressing the media object for purposes of transportation,

changing the file format of the media object,

changing the aspect ratio or otherwise cropping the media object,

adding text or other annotation to the media object,

encoding or otherwise converting the media object,

processing the media object in a manner that completely fills the media object identifier or maintains the aspect ratio of the media object within the media object identifier,

changing the orientation or otherwise rotating the media object,

combining (including stitching) of multiple media objects, or

enhancing the image by changing its contrast or saturation values.

**39**. The computer readable medium containing a program of claim **37** wherein more than one media object identifier is generated dynamically or generated from pre-set instructions.

**40**. The computer readable medium containing a program of claim **37** wherein the media object identifier is embedded in the web site.

**41**. The computer readable medium containing a program of claim **37** wherein the media object is a digital image.

US 6,895,557 B1

13

**42**. The computer readable medium containing a program of claim **37**, which the media object identifier is configurable to control the pre-processing.

**43**. The computer readable medium containing a program of claim **42**, wherein the media object identifier is configurable by operators of the web site to control the pre-processing.

**44**. The computer readable medium containing a program of claim **37**, wherein requirements relate to presentation requirements of the web site.

**45**. A method comprising:

acquiring a media object with a web page displayed at a local computer;

pre-processing the media object at the local computer without user selection of the pre-processing, wherein the web page contains parameters used to control the pre-processing; and

uploading the pre-processed media object from the local computer to a remote server.

**46**. The method of claim **45**, wherein the web page includes an embedded graphical user interface for acquiring media objects.

**47**. The method of claim **46**, wherein the graphical user interface embedded in the web page is positioned within a rectangular region of the web page display.

**48**. The method of claim **46**, wherein the media object is acquired by a user dragging and dropping the media object into the graphical user interface.

**49**. The method of claim **46**, wherein the graphical user interface can be used to select media objects from a file system of the local computer.

**50**. The method of claim **45**, wherein the web page includes code for acquiring the media object.

**51**. The method of claim **50**, wherein the code includes media object identifier.

**52**. The method of claim **51**, wherein the media object identifier is an active X or Java applet component.

**53**. The method of claim **45**, wherein the remote server enables the media object to be displayed in a destination web site.

**54**. The method of claim **45**, wherein the pre-processing includes changing a file type of media object.

**55**. The method of claim **45**, wherein pre-processing comprises resizing the media object.

**56**. The method of claim **45**, wherein the local computer displays the web page using a browser.

**57**. The method of claim **45**, wherein the media object is a digital image.

**58**. The method of claim **45**, wherein the uploading is done after the user selects a submit button displayed on the web page.

**59**. The method of claim **58**, wherein the pre-processing occurs after the user selects the submit button but before uploading.

14

**60**. A computer readable medium containing a program adapted to implement a method of:

acquiring a media object with a web page displayed at a local computer;

pre-processing the media object at the local computer without user selection of the pre-processing, wherein the web page contains parameters used to control the pre-processing; and

uploading the pre-processed media object from the local computer to a remote server.

**61**. The computer readable medium containing a program of claim **60**, wherein the web page includes an embedded graphical user interface for acquiring media objects.

**62**. The computer readable medium containing a program of claim **61**, wherein the graphical user interface embedded in the web page is positioned within a rectangular region of the web page display.

**63**. The computer readable medium containing a program of claim **61**, wherein the media object is acquired by a user dragging and dropping the media object into the graphical user interface.

**64**. The computer readable medium containing a program of claim **61**, wherein the graphical user interface can be used to select media objects from a file system of the local computer.

**65**. The computer readable medium containing a program of claim **60**, wherein the web page includes code for acquiring the media object.

**66**. The computer readable medium containing a program of claim **65**, wherein the code includes a media object identifier.

**67**. The computer readable medium containing a program of claim **66**, wherein the media object identifier is an active X or Java applet component.

**68**. The computer readable medium containing a program of claim **60**, wherein the remote server enables the media object to be displayed in a destination web site.

**69**. The computer readable medium containing a program of claim **60**, wherein the pre-processing includes changing a file type of media object.

**70**. The computer readable medium containing a program of claim **60**, wherein pre-processing comprises resizing the media object.

**71**. The computer readable medium containing a program of claim **60**, wherein the local computer displays the web page using a browser.

**72**. The computer readable medium containing a program of claim **60**, wherein the media object is a digital image.

**73**. The computer readable medium containing a program of claim **60**, wherein the uploading is done after the user selects a submit button displayed on the web page.

**74**. The computer readable medium containing a program of claim **73**, wherein the pre-processing occurs after the user selects the submit button but before the uploading.

\* \* \* \* \*

# Exhibit B



US007765482B2

(12) **United States Patent**     (10) **Patent No.:**   **US 7,765,482 B2**

Wood et al.     (45) **Date of Patent:**     **Jul. 27, 2010**

(54) **WEB-BASED MEDIA SUBMISSION TOOL**

(75) Inventors: **Lisa T. Wood**, Danville, CA (US); **Scott M. Lewis**, Danville, CA (US); **Robin T. Fried**, Berkeley, CA (US)

(73) Assignee: **Summit 6 LLC**, Dallas, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 737 days.

(21) Appl. No.: **10/961,720**

(22) Filed: **Oct. 8, 2004**

(65) **Prior Publication Data**

US 2005/0060180 A1    Mar. 17, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 09/357,836, filed on Jul. 21, 1999, now Pat. No. 6,895,557.

(51) **Int. Cl.**
*G06F 3/00*      (2006.01)

(52) **U.S. Cl.** ...................... **715/744**; 715/748; 715/769; 709/201; 709/219

(58) **Field of Classification Search** ................. 715/744, 715/748, 769.704; 709/201, 219
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,802,008 A | 1/1989 | Walling |
| 4,862,200 A | 8/1989 | Hicks |
| 5,001,628 A | 3/1991 | Johnson et al. |
| 5,327,265 A | 7/1994 | McDonald |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0930 774 A2    7/1999

(Continued)

OTHER PUBLICATIONS

Office Action dated Sep. 6, 2002 for U.S. Appl. No. 09/440,461.

(Continued)

*Primary Examiner*—Tadeese Hailu
(74) *Attorney, Agent, or Firm*—Duane S. Kobayashi

(57) **ABSTRACT**

The present invention, generally speaking, provides an improved web-based media submission tool. As with some existing tools, operation of the tool is drag and drop or the user can "click" to browse a directory to select media objects. Unlike existing tools, the tool provides the user an opportunity to confirm the submission, for example by generating a thumbnail image of an image file that has been dragged and dropped. Batch submission is provided for in which a user drags and drops a plurality of images or other media objects. Submission from a web page to a web page is also provided for. The submission tool is configurable to perform a variable amount of intelligent preprocessing on media objects prior to upload. In the case of digital images, the tool can perform sizing and formatting, for example. Information capture is performed with information being uploaded together with the media objects. In an exemplary embodiment, information capture is both user-transparent (e.g., user ID and/or password) and user-visible (e.g., the user can provide captions for media objects). The submission of information about the user and the media objects facilitates automatic integration of media objects within existing databases.

**51 Claims, 5 Drawing Sheets**



**US 7,765,482 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,404,316 | A * | 4/1995 | Klingler et al. | 715/723 |
| 5,477,353 | A | 12/1995 | Yamasaki | |
| 5,555,388 | A | 9/1996 | Shaughnessy | |
| 5,608,542 | A | 3/1997 | Krahe et al. | |
| 5,666,215 | A * | 9/1997 | Fredlund et al. | 358/487 |
| 5,678,046 | A | 10/1997 | Cahill et al. | |
| 5,729,741 | A * | 3/1998 | Liaguno et al. | 707/104.1 |
| 5,754,172 | A * | 5/1998 | Kubota et al. | 715/203 |
| 5,760,917 | A | 6/1998 | Sheridan | |
| 5,761,404 | A | 6/1998 | Murakami et al. | |
| 5,765,152 | A | 6/1998 | Erickson | |
| 5,778,164 | A * | 7/1998 | Watkins et al. | 358/1.18 |
| 5,778,198 | A | 7/1998 | Kadota | |
| 5,781,725 | A | 7/1998 | Saito | |
| 5,781,773 | A | 7/1998 | Vanderpool et al. | |
| 5,794,217 | A * | 8/1998 | Allen | 705/27 |
| 5,799,063 | A | 8/1998 | Krane | |
| 5,802,314 | A | 9/1998 | Tullis et al. | |
| 5,813,009 | A | 9/1998 | Johnson et al. | |
| 5,819,032 | A | 10/1998 | De Vries et al. | |
| 5,819,092 | A * | 10/1998 | Ferguson et al. | 717/113 |
| 5,844,969 | A | 12/1998 | Goldman et al. | |
| 5,845,299 | A | 12/1998 | Arora et al. | |
| 5,848,415 | A | 12/1998 | Guck | |
| 5,852,435 | A * | 12/1998 | Vigneaux et al. | 345/428 |
| 5,859,956 | A | 1/1999 | Sugiyama et al. | |
| 5,890,170 | A | 3/1999 | Sidana | |
| 5,897,622 | A * | 4/1999 | Blinn et al. | 705/26 |
| 5,923,846 | A * | 7/1999 | Gage et al. | 709/213 |
| 6,012,068 | A * | 1/2000 | Boezeman et al. | 707/104.1 |
| 6,017,157 | A * | 1/2000 | Garfinkle et al. | 396/639 |
| 6,018,774 | A | 1/2000 | Mayle et al. | |
| 6,028,603 | A | 2/2000 | Wang et al. | |
| 6,035,323 | A * | 3/2000 | Narayen et al. | 709/201 |
| 6,058,417 | A * | 5/2000 | Hess et al. | 709/219 |
| 6,084,581 | A * | 7/2000 | Hunt | 715/202 |
| 6,085,195 | A | 7/2000 | Hoyt et al. | |
| 6,088,732 | A | 7/2000 | Smith et al. | |
| 6,104,468 | A * | 8/2000 | Bryniarski et al. | 355/18 |
| 6,119,101 | A * | 9/2000 | Peckover | 705/26 |
| 6,125,352 | A * | 9/2000 | Franklin et al. | 705/26 |
| 6,128,600 | A * | 10/2000 | Imamura et al. | 705/27 |
| 6,128,655 | A * | 10/2000 | Fields et al. | 709/219 |
| 6,133,985 | A * | 10/2000 | Garfinkle et al. | 355/40 |
| 6,167,382 | A * | 12/2000 | Sparks et al. | 705/26 |
| 6,167,568 | A * | 12/2000 | Gandel et al. | 717/176 |
| 6,177,934 | B1 * | 1/2001 | Sugiura et al. | 715/748 |
| 6,182,116 | B1 * | 1/2001 | Namma et al. | 709/204 |
| 6,182,279 | B1 * | 1/2001 | Buxton | 717/100 |
| 6,199,082 | B1 * | 3/2001 | Ferrel et al. | 715/205 |
| 6,202,061 | B1 * | 3/2001 | Khosla et al. | 707/3 |
| 6,233,590 | B1 * | 5/2001 | Shaw et al. | 715/201 |
| 6,237,010 | B1 * | 5/2001 | Hui et al. | 715/205 |
| 6,281,874 | B1 | 8/2001 | Sivan et al. | |
| 6,301,586 | B1 * | 10/2001 | Yang et al. | 707/104.1 |
| 6,301,607 | B2 | 10/2001 | Barraclough et al. | |
| 6,330,572 | B1 | 12/2001 | Sitka | |
| 6,343,302 | B1 * | 1/2002 | Graham | 715/205 |
| 6,374,260 | B1 * | 4/2002 | Hoffert et al. | 707/104.1 |
| 6,381,029 | B1 | 4/2002 | Tipirneni | |
| 6,456,591 | B1 * | 9/2002 | Mishra | 370/229 |
| 6,489,954 | B1 * | 12/2002 | Powlette | 715/733 |
| 6,489,980 | B1 * | 12/2002 | Scott et al. | 715/854 |
| 6,505,160 | B1 | 1/2003 | Levy et al. | |
| 6,510,418 | B1 * | 1/2003 | Case et al. | 705/26 |
| 6,516,340 | B2 | 2/2003 | Boys | |
| 6,522,418 | B2 * | 2/2003 | Yokomizo et al. | 358/1.15 |
| 6,535,296 | B1 * | 3/2003 | Oak | 358/1.15 |
| 6,539,420 | B1 | 3/2003 | Fields et al. | |
| 6,542,936 | B1 | 4/2003 | Mayle et al. | |
| 6,567,983 | B1 * | 5/2003 | Shiimori | 725/105 |

| | | | | |
|---|---|---|---|---|
| 6,583,799 | B1 | 6/2003 | Manolis et al. | |
| 6,621,938 | B1 | 9/2003 | Tanaka et al. | |
| 6,628,417 | B1 | 9/2003 | Naito et al. | |
| 6,657,702 | B1 * | 12/2003 | Chui et al. | 355/40 |
| 6,693,635 | B1 * | 2/2004 | Yokomizo | 345/428 |
| 6,711,297 | B1 * | 3/2004 | Chang et al. | 382/240 |
| 6,732,162 | B1 | 5/2004 | Wood et al. | |
| 6,799,165 | B1 | 9/2004 | Boesjes | |
| 6,853,461 | B1 * | 2/2005 | Shiimori | 358/1.15 |
| 6,871,231 | B2 | 3/2005 | Morris | |
| 6,895,557 | B1 | 5/2005 | Wood et al. | |
| 6,930,709 | B1 | 8/2005 | Creamer et al. | |
| 7,010,587 | B1 | 3/2006 | Shiimori | |
| 7,032,030 | B1 | 4/2006 | Codignotto | |
| 7,036,081 | B2 * | 4/2006 | Powlette | 715/747 |
| 7,043,527 | B2 | 5/2006 | Shiimori et al. | |
| 7,146,575 | B2 | 12/2006 | Manolis et al. | |
| 7,158,172 | B2 | 1/2007 | Kawaoka et al. | |
| 7,246,147 | B2 * | 7/2007 | Kim et al. | 709/203 |
| 7,257,158 | B1 * | 8/2007 | Figueredo et al. | 375/240.01 |
| 7,280,702 | B2 * | 10/2007 | Chang et al. | 382/240 |
| 7,308,413 | B1 * | 12/2007 | Tota et al. | 705/7 |
| 7,313,604 | B2 | 12/2007 | Wood et al. | |
| 7,315,386 | B1 * | 1/2008 | Shiimori et al. | 358/1.15 |
| 2002/0067500 | A1 * | 6/2002 | Yokomizo et al. | 358/1.15 |
| 2005/0239454 | A1 | 10/2005 | Kawashima et al. | |
| 2005/0262437 | A1 * | 11/2005 | Patterson et al. | 715/517 |
| 2008/0201236 | A1 * | 8/2008 | Field et al. | 705/26 |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1076302 A1 | 2/2001 |
| JP | 8-153183 | 6/1996 |
| JP | 11-69072 | 3/1999 |
| JP | 11-184943 | 7/1999 |
| WO | WO 97/04353 A1 | 2/1997 |
| WO | WO 98/49631 A2 | 11/1998 |
| WO | WO 99/19811 A3 | 4/1999 |

## OTHER PUBLICATIONS

Office Action dated Apr. 21, 2003 for U.S. Appl. No. 09/440,461.
Office Action dated Nov. 23, 2001 for U.S. Appl. No. 09/357,836.
Office Action dated Jun. 5, 2002 for U.S. Appl. No. 09/357,836.
Office Action dated Nov. 8, 2002 for U.S. Appl. No. 09/357,836.
Office Action dated Jun. 4, 2003 for U.S. Appl. No. 09/357,836.
Thilo Horstmann and Richard Bentley, "Distributed Authoring on the Web with the BSCW Shared Workspace System", Standard View vol. 5, No. 1, pp. 9-16, Mar. 1997.
Doug Dean, 15 Seconds: Down and Dirty Browser Uploading with a VB ASP Componenet, pp. 1-10, Mar. 11, 1999.
Peter Persits, 15 Seconds: Browser-based uploading Under the Microscope, pp. 1-7, Nov. 21, 1998.
Netscape Communications Corp., Help File of Netscape Composer 4.75, Copyright 1994-1998, p. 9.
Emily Cohen, "Set Your Sites High," PC Magazine, May 26, 1998.
Plante et al., "The NCSA Astronomy Digital Image Library: From Data Archiving to Data Publishing," Sep. 21, 1998.
Augot et al., "Secure Delivery of Images over Open Networks," Proceedings of the IEEE, vol. 87, Issue 7, pp. 1251-1266, Jul. 1999.
Persits, Peter, "Browser-Based File Uploading Under the Microscope," 15 Seconds, Nov. 21, 1998.
Dean, Doug, "Down and Dirty Browser Uploading with a VB ASP Component," Mar. 11, 1999.
Horstmann et al., "Distributed Authoring on the Web with the BSCW Shared Workspace System," StandardView, vol. 5, No. 1, Mar. 1997.
Netscape Communications Corporation, "Creating Web Pages," Apr. 27, 1999.
Steinberg, Jill, "New Start-Up Releases Java Application and Enabling Software," JavaWorld, Oct. 1, 1996.
Bilson, Rob, "Net-It Central 1.0," IDM, Jul. 31, 1997.
Warp 10 Technologies Inc., Jul. 10, 1998.
Pictra Incorporated, Nov. 11, 1998.
Letter from Terry Anderson to Craig Hamway, Oct. 16, 1997.

**US 7,765,482 B2**

Page 3

PictureWorks ADP Demo, May 1, 1998.
Letter from Terry Anderson to Ken Karutz, May 1, 1998.
Email from Scott Lewis to Lisa Wood, Jul. 2, 1998.
Email from Robin Fried to Scott Lewis et al., Jul. 5, 1998.
Email from Scott Lewis to Robin Fried, Jul. 8, 1998.
Email from Robin Fried to Martha White, Jul. 9, 1998.
Email from Robin Fried to Scott Lewis et al., Jul. 9, 1998.
Email from Don Strickland to Scott Lewis et al., Jul. 14, 1998.
Emails from Scott Lewis to Lisa Wood et al., Jul. 17-18, 1998.
PictureWorks Technology, Inc. Board Update, Jun. 20, 1998.
Letter from Terry Anderson, Jul. 22, 1998.
Email from Don Strickland to Lisa Wood et al., Jul. 22, 1998.
Emails from Don Strickland, Jul. 27 and Aug. 7, 1998.
Email from Robin Fried to Scott Lewis et al., Jul. 28, 1998.
Email from Scott Lewis to Lisa Wood et al., Jul. 29, 1998.
Prioritized Activities For Enterprise Team, Jul. 31, 1998.
Email from Don Strickland to Criag Hamway, Aug. 2, 1998.
Board Update from Don Strickland, Aug. 7, 1998.
Email from Lisa Wood, Aug. 10, 1998.
Email from Scott Lewis to Terry Anderson, Aug. 13, 1998.
Letter from Terry Anderson to Randy Kau, Aug. 14, 1998.
Email from Kirby Lunger to Don Strickland et al., Aug. 14, 1998.
Email from Kirby Lunger to Lisa Wood, Aug. 26, 1998.
Email from Terry Anderson to Don Strickland, Aug. 25, 1998.
Email from Kirby Lunger to Lisa Wood, Aug. 31, 1998.
Email from Robin Fried to Scott Lewis et al., Sep. 1, 1998.
Email from Scott Lewis to Lisa Wood et al., Sep. 1, 1998.
Email from Don Strickland to Terry Anderson et al., Sep. 8, 1998.
Email from Scott Lewis to Jeff Paradise, Sep. 11, 1998.
Letter from Terry Anderson to Howard Latham, Sep. 15, 1998.
Email from Scott Lewis to Jim McCarthy, Sep. 17, 1998.
Email from Terry Anderson to Don Strickland et al., Sep. 18, 1998.
Email from Scott Lewis to Lisa Wood et al., Sep. 22, 1998.
Letter from Anthony Delli Colli to Wayne Mangold, Sep. 18, 1998.
Email from Scott Lewis to Lisa Wood et al., Sep. 23, 1998.
Email from Robin Fried to Stu Roberson, Sep. 21, 1998.
Letter from Terry Anderson to Sei-Wai Lee, Sep. 24, 1998.
Email from Scott Lewis to Lisa Wood, Sep. 25, 1998.
Email from Terry Anderson to Lisa Wood et al., Sep. 29, 1998.
Letter from Scott Lewis to Karim El-Fishaway, Oct. 2, 1998.
Email from Anthony Delli Colli to Stu Roberson et al., Oct. 2, 1998.
PictureWorks presentation to eBay, Oct. 16, 1998.
Letter from Scott Lewis to Gary Dillabough, Oct. 20, 1998.
Email from Don Strickland to PWT Employees, Oct. 31, 1998.
Press Release, Moore Data Management Services and PictureWorks
Technology Inc., Announce Partnership to Revolutionize Use of Real
Estate Photos on the Internet, Nov. 6, 1998.
Press Release, PictureWorks Technology Inc., Streamlines Posting of
Photos to the Internet, Nov. 6, 1998.
Email from Laurie Fleming to Andrew Hunter et al., Nov. 13, 1998.
Letter from Scott Lewis to Wayne Graves, Nov. 16, 1998.
Email from Scott Lewis to Terry Anderson et al., Nov. 20, 1998.
Screenshots from Prepare and Post Video, Nov. 20, 1998.
Laura Roe, "New Software Gives Real Estate a View of the Future,"
National Real Estate Investor, Dec. 1, 1998.
PictureWorks Information, Dec. 9, 1998.
PictureWorks Prepare & Post, Fourth Quarter, 1998.
Prepare & Post Product Overview, Fourth Quarter, 1998.

Letter from Terry Anderson to Neil Shafran, Jan. 12, 1999.
Letter from Stu Roberson to James Rowley, Jan. 29, 1999.
Product Picks, Realtor Magazine, Feb. 1, 1999.
PictureWorks Kodak Presentation, Feb. 24, 1999.
Letter from Don Strickland to Phil Ashe, Mar. 2, 1999.
PictureWorks ADP Presentation, Mar. 11, 1999.
PictureWorks Press Release, "Picture Works Releases New Free
Digital Imaging Software; MediaCenter Offers Essential Tools for
Web Imaging," Mar. 31, 1999.
PictureWorks Press Release, "PictureBay.com to Give-Away 30
Digital Cameras in 30 Days," Apr. 12, 1999.
PictureWorks    Press    Release,    "PictureWorks    Technology's
PictureBay Solves #1 Frustration of eBay Members, Adding Pictures
to Auctions," Apr. 12, 1999.
PictureWorks Press Release, "PictureWorks Technology's Rimfire
Empowers any Website to Easily Accept, Process, and Display Visi-
tor Photos and Media," Apr. 12, 1999.
Rimfire real-time integrated media brochure, Apr. 12, 1999.
Letter from Terry Anderson to Jonathan Graff, Apr. 26, 1999.
Sales Update, Apr. 30, 1999.
"Picture Works Plans to Become Powerhouse in Internet Imaging—
Exlusive Interview with CEO," The Future Image Report, vol, 7,
Issue 1, May 1, 1999.
Email from Laurie Fleming to Terry Anderson et al., May 7, 1999.
Roland Woerner et al., "eBay for Dummies," Chapter 12, May 10,
1999.
Letter from Scott Lewis to Rolan Woerner, May 10, 1999.
Letter from Stu Roberson to Jim Ferras, May 25, 1999.
Rimfire real-time integrated media, May 27, 1999.
Letter from Scott Lewis to Candace Gates, May 28, 1999.
Letter of Intent between PictureWorks Technology, Inc. and Auction
Universe, May 31, 1999.
Email from Scott Lewis to Matthew Lengfelder, Jun. 1, 1999.
"Casio and PictureWorks Announce Co-Branding and Distribution
Agreement; MediaCenter Offers Essential Tools for Web Imaging,"
Jun. 3, 1999.
Sales Update, Jun. 4, 1999.
Email from Laurie Fleming to Terry Anderson et al., Jun. 7, 1999.
PictureWorks pricing for prototype, Jun. 9, 1999.
PictureWorks proposal, Jun. 9, 1999.
PictureWorks scope of work, Jun. 9, 1999.
Letter from Terry Anderson to Amazon, Jun. 9, 1999.
"PictureWorks Announces Co-Branding and Distribution Agree-
ments with On-Line Photo Services Companies," Jun. 14, 1999.
PictureWorks Polaroid presentation, Jun. 15, 1999.
Email from Lisa Wood to Don Strickland et al., Jun. 30, 1999.
East Bay Business Times, "PictureWorks Founder Keeps True to
Original Vision," Jul. 2, 1999.
PictureWorks Technology Proposal, Jul. 9, 1999.
Press Release, "Picture Works Releases New, Free Imaging Weblica-
tion; MediaCenter 1.1 Offers Essential Photo Tools for Internet Imag-
ing and Web Publishing, Ideal for Digital Camera Users," Jul. 19,
1999.
Press Release, "Picturebay is the Fastest and Easiest Way to Add
Pictures to Auctions," Aug. 3, 1999.
Picturebay Screenshot, Oct. 13, 1999.

* cited by examiner



Homes
Realtor Services
Getting Started
Send Photos
Homes
Financing
Offer & Closing
Help
Today's Rates
30–Year Fixed 6.75%
15–Year Fixed 6.45%
1–Year Adjustable 5.6%
*National average rates
Find a Loan
Rate News
Highlights
Welcome to Homes!
We hope you enjoy our site
Please send us your feedback
Home & Rate Trackers
Receive free e-mail updates
Adding Photos to your listings
Get better exposure for your listings by including some pictures of the property. Its easy! Just locate the folder on your computer containing your photos, and then drag them into the boxes below. Select a descriptive caption for each photo and then click the "Send Photos" button.
Frequently Asked Questions
1
Drag Photo Here
Front View
Drag Photo Here
Front View
Drag Photo Here
Front View
Drag Photo Here
Front View
Listing Name
Send Photos

FIG. 1



Picture? PIC
Digital Image Processing by PictureWorks
($.25 charge) (optional)
Adding a photo of your item
Get better exposure for your items by including a picture. Its easy! Just locate the folder on your computer containing your photos, and then drag a photo into the box below.
Click Here to Select Images
SurroundView?
Digital Image Processing by PictureWorks
($2.00 charge) (optional)
Adding a SurroundView
Really show off your item. Add a SurroundView. Its easy! Just locate the folder on your computer containing your photos, and then drag up to six photos into the boxes below. The photos will be combined into an animated presentation.
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images

*FIG. 2*

U.S. Patent          Jul. 27, 2010          Sheet 3 of 5          US 7,765,482 B2

PWImageControl Interface:

| Interface Name | Type | Definition | Signature |
|---|---|---|---|
| ScaleImage | function | Scales an image in place or to a temporary file | ScaleImage( destinationType as String, changeDimensions as Integer, destWidth as Integer, destHeight As Integer, destQuality As Integer, '0–100 generateOutputFilename As Boolean ' create tempfile ) As String |
| DelTempFile | sub | Deletes temporary file created with ScaleImage | DelTempFile() |
| fileName | String property | Name of file shown in image well | fileName as String |
| imageName | String property | String value from image caption box | imageName as String |
| ClearImage | sub | Clears the image from the display and redisplays the logo and instructional text | ClearImage() |
| backgroundColor | String property | Hexideciaml RGB string value in format "FFFFFF" or "#FFFFFF" | backgroundColor as String |
| textColor | String property | Hexideciaml RGB string value in format "FFFFFF" or "#FFFFFF" | textColor as String |

*FIG. 3*

**PWMediaSendControl Interface:**

| Interface Name | Type | Definition | Signature |
|---|---|---|---|
| SubmitMediaRequest | function | Transfers image and returns a status code. The action is successful if the return code is 0. If non-zero return code examine ServerRetString for a reason. | SubmitMediaRequest(<br>UserID As String, 'partner UID<br>Password As String, partner password<br>ServiceType As String, '"HOST" or "MIRROR"<br>IndustryCode As Integer, 'e.g., 65=real estate<br>MediaType As Integer, '1=image 2=video 3=sound<br>OpCode As Integer, '1=Add, 2=Update, 3=Delete<br>IPAddr As String, 'Destination IP address<br>filename As String, 'File to send<br>MediaGroupID As String, 'Used to build unique key<br>MediaExtendedID As String,<br>MediaSequenceNum As Integer, ' ""<br>Desc1 As String, '255 chars<br>Desc2 As String, '255 chars<br>Desc3 As String<br>preScaled as Integer '255 chars |
| ServerRetString | String property | Return value from SubmitMediaRequest. If call made on HOST service, this string contains the IMG SRC url | ServerRetString as String |

*FIG. 4A*

```
Usage Example (VB Script)
tempFileName=DragImage1.ScaleImage(320, 240, 89, 1)   'scale the image object 'DragImage1'
result=UplHandler.SubmitMediaRequest(                  'transmit to mad central
    UserID,
    Password,
    ServiceType,
    0,
    1,
    1,
    ipAddress,
    tempFileName,
    misNum.Value,
    zipcode,
    imageCount,
    title,
    desc2,
    desc3,
    1)
DragImage3.DelTempFile                                  'delete the temp file
```

*FIG. 4B*

*FIG. 4*

| FIG. 4A |
|---------|
| FIG. 4B |

US 7,765,482 B2

1

**WEB-BASED MEDIA SUBMISSION TOOL**

This application is a continuation of U.S. application Ser. No. 09/357,836, filed Jul. 21, 1999 now U.S. Pat. No. 6,895,557. Priority to or reliance on all other applications is expressly disclaimed.

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the handling, manipulation and processing of digital content and more particularly to the transportation and Internet publishing of digital content, particularly image media objects and rich media.

2. State of the Art

Much of the phenomenal success of the web is attributable to its graphical nature. Literally, a picture is worth a thousand words. The capture of digital images has become routine, using digital cameras and scanners. Nevertheless, although the handling of images by web-site creators has achieved a high degree of automation, for the average technology user (the "imaging civilian"), manipulating and sharing digital images over the Internet remains a cumbersome and daunting process. Piecemeal solutions that have been devised for handling digital images require a level of sophistication that is beyond that of the ordinary user. For example, transferring a digital image may require first downloading a FTP program, then installing it, then running it and connecting to an FTP server by typing the server name in the connection dialog, then navigating to the proper subdirectory, selecting the files to be uploaded, making sure that the program is in binary transfer mode, then sending the files. For the imaging civilian, such an involved process can be daunting to say the least.

Additionally, as technologies advance and casual users begin to experiment with other media objects, such as streaming video, 3D objects, slide shows, graphics, movies, and even sound files that accompany imaging data, the processes required to share these rich media types on the Internet becomes exponentially more complicated and prohibitive. As the realization of the Internet as an interactive, content rich medium becomes more and more a reality, the need for enabling the use and distribution of rich content and media on the Internet will become the gating factor to its long term success.

A broad-based solution to the foregoing problem requires a web-based media submission tool that allows for submission of media objects in a convenient, intuitive manner. A company named Caught in the Web, has attempted to create a broad-based media submission tool known as "ActiveUpload". ActiveUpload allows an arbitrary file to be dragged and dropped onto a web page control for upload to the web server. An ActiveUpload control allows users to, without leaving a web page, transfer files to a server (Internet or intranet) by selecting the files on the user's desktop that the user wants to transfer, then dragging them onto the web page. For example, a user, having visited a web page, can contribute pictures, documents, zip files, etc., without having to leave the web page and use an FTP program. Standard web authoring tools can be used to integrate ActiveUpload into web pages and change the behavior of the control.

Although Caught in the Web's ActiveUpload tool simplifies the user experience, it does little toward furthering "back-end" automation in the handling and distribution of media objects and has no built in "intelligence" to streamline the process of handling and transporting rich media objects from the front end.

2

SUMMARY OF THE INVENTION

The present invention, generally speaking, provides an improved web-based media submission tool. As with some existing tools, operation of the tool is drag and drop or the user can "click" to browse a directory to select media objects. Unlike existing tools, the tool provides several unique and valuable functions. For example, the tool provides the user an opportunity to confirm the submission with a visual representation, for example by generating a thumbnail image of the rich media file that has been selected. Additionally, batch submission is provided to allow a user to drag and drop or select a plurality of images or other media objects. Submission from a web page to a web page is also provided for. Even more importantly, the submission tool is configurable to perform a variable amount of intelligent preprocessing on media objects prior to upload. In the case of digital images, the tool can perform sizing and formatting, for example. Information capture is performed with information being uploaded together with the media objects. In an exemplary embodiment, information capture is both user-transparent (e.g., user ID and/or password) and user-visible (e.g., the user can provide captions for media objects). The submission of information about the user and the media objects facilitates automatic integration of the media objects within existing databases.

BRIEF DESCRIPTION OF THE DRAWING

The present invention may be further understood from the following description in conjunction with the appended drawing. In the drawing:

FIG. 1 is a diagram of an exemplary web page providing media object acquisition functions;

FIG. 2 is a diagram of another exemplary web page providing image acquisition functions;

FIG. 3 is a table pertaining to a first portion of the Prepare and Post component design; and

FIG. 4 is a table pertaining to a second portion of the Prepare and Post component design.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following describes the Prepare and Post™ tools, which prepares and submits media objects from inside a standard browser, referred to as the first location, to a second location or server. The media objects may be pictures (images), movies, videos, graphics, sound clips, etc. Although in the following description the submission of images is described in greatest detail, the same principles apply equally to media objects of all descriptions.

The Prepare and Post tools refers to browser-side components which together provide the ability to submit and transport media objects over the web to be stored and served. Using the Prepare and Post tools, end users can submit images in an immediate, intuitive manner. No technical sophistication is required. In particular, understanding technical terms such as JPEG, resolution, pixel, kilobyte, transfer protocol, IP address, FTP etc., is not required, since the Prepare and Post tools handles all of these tasks for the user. The benefits of the Prepare and Post tool are:

a) to the image submitter, the ability to submit media objects to web pages immediately without needing to overcome technical obstacles;

b) to the image submitter, the ability to submit media objects to web pages "as is" without making modifications to the media objects prior to sending.

US 7,765,482 B2

**3**

c) to PictureWorks web site partner, access to a uniform, standardized, reliable and secure channel for media acquisition;

d) to PictureWorks web site partner, it meets their imaging specifications every time without human intervention;

e) to PictureWorks web site partner, the ability to provide web site visitors with an easy, error free way to contribute media;

f) to PictureWorks web site partner, access to contributed media in "real time" with no time delays.

The two primary components used in the Prepare and Post tools which carry out these functions are 1) the media object identifier and 2) the media sender.

In general, the media object identifier functions to provide a graphical interface for placing and associating a media object from a user's desktop onto a web page. The media sender carriers out the function of transmitting media objects to a second location.

There are two ways media objects on the first location become associated with a media object identifier. The first is through a "drag and drop" behavior where the user clicks on a media object to select the one they want to submit. The media object is then dragged to the media object identifier. Releasing the mouse button associates the media object with the media object identifier. This behavior is allowed in web browsers that support drag and drop functionality. The Prepare and Post tools enable these browsers to accept media objects via drag and drop by providing the media object identifier as an ActiveX component.

The second way to associate a media object on the first location with the media object identifier is to click on the media object identifier to browse for media objects, then select the media object of choice. This method is made available for web browsers where the media object identifier needs to be a pure Java component. (Such "signed applet browsers" like Netscape Navigator) In this instance, the user may be asked to choose a media object in a similar manner as when choosing a file to be opened, either by graphical navigation or by specifying a path name. For example, a prompt associated with the media object identifier may be displayed prompting the user to click within the media object identifier. Clicking within the media object identifier brings up a browse dialog. Using the browse dialog, the user selects the desired media object, which is then placed in the media object identifier. The Prepare and Post tools will generate a visual representation or thumbnail of the media object, a feature currently not available in signed applet browsers.

Real estate is an example of a prime application of the Prepare and Post tools. "Curb appeal" is of great importance in the realty industry and can only be judged by "drive-bys," which are time-consuming and laborious, or by the availability of images. The Prepare and Post tools make real estate images readily available with a minimal amount of effort.

Referring to FIG. **1**, an example is shown of a realty web page featuring the described Prepare and Post tools functionality. The user associates images with a media object identifier via the methods described above and selects appropriate captions for the images, e.g., living room, family room, etc. The captions may be typed in or selected from menus. The user also supplies identifying information, in this instance the MLS listing number. When the user clicks the Send button, the images are uploaded and processed immediately according to the configuration of the Prepare and Post tools.

The Prepare and Post tools also support a batch interface, allowing a plurality of images to be submitted simultaneously as in the case of a professional photographer, for example.

**4**

The opportunity for user confirmation is again provided, e.g., by displaying a visual representation of the images in the batch.

If a mistake is made such that the wrong image is placed in an media object identifier, the correct image may be placed in the media object identifier. The correct image will replace the mistaken image. Alternatively, the user may remove an image from a media object identifier by right-clicking on the media object identifier and selecting Remove within a resulting pop-up menu.

Note that any number of media object identifiers may be provided on a web page and that the media object identifiers may be separate or grouped. This is evident in FIG. **2**. The number of media object identifiers provided on a page can be pre-configured and fixed, allowing no user intervention, or the media object identifiers can be generated dynamically, allowing the user to determine how many media object identifiers they need for media submission. FIG. **2** shows a web page with various sizes of media object identifiers. If a media object identifier is separate, its image will be transmitted separately to the second location. If an media object identifier is part of a group, its image will be transmitted to the second location as part of a group of images that are stored together and cataloged together. Media object identifiers that are associated together as a group are noted as such in the web page interface and transparently in the media object identifier object code. Moreover, a web page may have multiple groups of media object identifiers, or "groups of groups."

The usefulness of images is greatly enhanced by capturing and identifying information about the images and submitting the identifying information with the images. Information may be image-specific, user-specific or both. The submission of information about the user and the media objects facilitates automatic integration of the media objects within existing databases. Information capture may be overt or covert or both. This unique automatic database integration enables the images to be served with the proper web page data. Overt information capture relies upon the user to make menu selections of appropriate captions as illustrated in FIG. **1**, or to make text entries within text fields, or both. The Prepare and Post tools are easily customized to accept menu selections and text fields for different applications. Covert information capture occurs by having the web browser automatically pass to the Prepare and Post tools known information such as a user ID or password used to access the web page.

A key differentiator of the Prepare and Post tools is the browser, or client-side intelligence built into the tools. This intelligence directly provides features including those already outlined such as associating data with media objects, generating a visual representation of the media objects and generating media object identifiers dynamically or in a preset manner. Other features are also provided via this intelligence, specifically, the ability to control the width and height of the media object identifier and the ability to preprocess the media objects in any number of ways prior to transporting to a second location. In the case of an image media object for example, the Prepare and Post tools may resize the image, (i.e., increase or decrease its size as defined by either physical dimensions, pixel count, or kilobytes). Compression, for example, is a type of sizing. The Prepare and Post tools may also change the image's file format (a way of a media object being identified as to a "type" or "kind" of media), change the quality setting of the image, crop the image or change the aspect ratio, add text or annotations, encode or combine (including stitching) the media object, or enhance the media object by changing image values, for example, relating to contrast or saturation. This intelligence may be executed in a

US 7,765,482 B2

5

manner that is transparent to the end user. This transparency allows the end user to submit media to the Prepare and Post tools "as is," since the tools will automatically prepare it to meet the requirements of the second location. Note that, although image submission may involve client-side process-ing, image processing is not required.

The Prepare and Post tools are available for customers to integrate into their own web pages. The Prepare and Post tools are easily integrated into web sites (customers) to allows those sites to accept media objects from web site visitors (users). Appendix A is a generic HTML HostTemplate illus-trating how Prepare and Post components are integrated into a web page. The HTML template file (which is a complete working example) contains instructions and a few small code snippets that the customer pastes into the web page. Integrat-ing the Prepare and Post components requires an Initializa-tion Section, a Configuration Section, an ImageWell (media object identifier) Section, a Submission Section and an ImageUpLoad Control Section. To include the Prepare and Post tools media object identifiers on a web page, the cus-tomer cuts and pastes code snippets for these sections from the template into the web page.

The Initialization Section consists of a few lines of JavaS-cript code that will download all of the needed Prepare and Post submission components.

The Configuration Section overrides various configurable default settings that the customer can control. In the Configu-ration Section, the media object identifier component is sized and configured to perform any preprocessing of the image that may be desired prior to upload. Configurable parameters include both fixed values for all submissions (per submission values) and fixed values for all images within a submission (per image values), as will be explained presently.

Fixed values for all submissions include DefaultImage Width and DefaultImageHeight, as well as include Default-ControlWidth and DefaultControlHeight. The former specify the default width and height of the images after they have been compressed for transmission. The latter specify the default width and height of all media object identifiers. To create media object identifiers having different sizes, the cus-tomer specifies the desired size when creating the media object identifier. Another fixed value for all submissions is Quality. This determines the quality level of the images after they have been compressed for transmission (0 is the lowest quality/highest compression and 100 is the highest quality/lowest compression).

Fixed values for all media objects within a submission include Key1 and Key2. Key1 is the primary value that deter-mines the filename of the resulting image file and, conse-quently, its URL. It is important that each submitted image have a unique name to prevent one image from overwriting another. Key2 is an optional secondary key that is appended to Key1 before the image's filename and URL are created. While default values for Key1 and Key2 can be specified in the configuration section, more likely this value will be sup-plied from a field in the web form. If the web page form contains a control named "Key1," then its value will be used

6

for this key. For example, the field Key1 might be labeled as "MLS Number" on the web page. Similarly, the field Key2 might be labeled "Zip Code" on the web page. A sequence number is appended to the Key1/Key2 combination. When there are multiple media object identifiers on a page, this will ensure that each image has a unique key.

All media object identifiers on a web page must be con-tained within an HTML form. A single line of JavaScript code is inserted into the web page (within the HTML form) in each place where a media object identifier is desired. The Media object identifier Section can specify the width and height for each media object identifier. If the width and height are omit-ted, then the default width and height from the Configuration Section are used.

The Submission Code Section contains HTML code that creates the button that submits both the images to the second locations and the form to the customer's server. Within the Submission Code Section, an HTML "href" parameter is required for the Send Button that causes the images to be sent. After the images have been sent, the web page form will be submitted in the standard manner. The form must define two hidden fields named "url" and imagecount." The imagecount field will contain the number of images actually transmitted. In an exemplary embodiment, the URL for images 2 through "n" are generated by replacing the initial sequence number at the end of the returned URL with the desired image number.

The ImageUpload Control Section holds a small piece of JavaScript code that is placed at the very end of the body section of the web page. This code creates the non-visible Image Upload control, or media sender, that performs the transfer of images from the user's machine to the second location.

The Prepare and Post components support multiple brows-ers and dynamically adjust their behavior according to the type of browser that is currently running. For example, under supported versions of Microsoft's browsers, media object identifiers are implemented as ActiveX controls, while under supported Netscape browsers, media object identifiers are implemented as Java Applets. This multiple browser support is completely automatic.

FIGS. 3 and 4 present further details of the media object identifier and media sender components, respectively.

From the foregoing description, it will be appreciated that the present media submission tool, besides offering conve-nience to the end user, offers convenience and flexibility to technology partners. In particular, web page integration is designed to facilitate automatic server-side integration of media content.

It will be apparent to those of ordinary skill in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential character thereof. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes which come within the meaning and range of equivalents thereof are intended to be embraced therein.

APPENDIX A

HostTemplate generic.htm

```
<HTML>
<HEAD>
<!--*************************************************** Begin Initialization Section -->
<!--***** This section of code must appear at          -->
<!--***** the beginng of the <HEAD> section of         -->
```

US 7,765,482 B2

7                                                              8

APPENDIX A-continued

HostTemplate generic.htm

```
<!--***** your web page. Copy this code and     -->
<!--***** paste it directly into your web page.  -->
<SCRIPT type="text/javascript" src="http://157.22.134.49/company/pwtcomponents.js"></SCRIPT>
<SCRIPT type="text/javascript" src="http://157.22.134.49/company/company.js"></SCRIPT>
<!--************************************************* End Initialization Section -->
</HEAD>
<BODY>
<!--************************************************* Begin Configuration Section -->
<!--***** This section of code must appear        -->
<!--***** anywhere after the initialization       -->
<!--***** section (above), and before the         -->
<!--***** the <FORM> that contains the image      -->
<!--***** wells.                                   -->
<!--*****                                          -->
<!--***** This section defines data values        -->
<!--***** needed by the image wells. You can      -->
<!--***** modify these values to suit             -->
<!--***** your needs.                             -->
<SCRIPT Language="Javascript">
PWT.Key1 = "name-your-image-here";    // If the <FORM> contains fields named 'Key1'
PWT.Key2 = " ";                        //  & 'Key2' their values will be used.
PWT.Quality = 93;
PWT.DefaultImageWidth = 640;
PWT.DefaultImageHeight = 480;
PWT.DefaultControlWidth = 326;         // Includes a 3 pixel border
PWT.DefaultControlHeight = 246;        // Include a 3 pixel border
</SCRIPT>
<!--************************************************* End Configuration Section -->
<FORM>
This sample displays a working image well.
<BR>
<!--************************************************* Begin ImageWell Section -->
<!--***** This code creates an image well on      -->
<!--***** the web page. While this template       -->
<!--***** only contains a single image well,      -->
<!--***** you can use as many as you like.        -->
<!--***** Copy this code into your web page       -->
<!--***** anywhere within your <FORM> where       -->
<!--***** you want an image well to appear.       -->
<SCRIPT Language="Javascript">
PWT.addimagecontrol( );                // or "PWT.addimagecontrol(640,480);" to override
                                       // the default width and height.
</SCRIPT>
<!--************************************************* End ImageWell Section -->
<BR>
This text is after the image well.
<P>
<!--************************************************* Begin Submission Code Section -->
<!--***** You can use any type of button you      -->
<!--***** wish, but rather than it being a        -->
<!--***** standard SUBMIT button, it must         -->
<!--***** instead contain the parameter:          -->
<!--*****                                          -->
<!--*****      onclick="PWT.Submit( )"            -->
<!--*****                                          -->
<!--***** (as shown in the example below).        -->
<!--***** After the images have been sent,        -->
<!--***** your web page FORM will be submitted    -->
<!--***** in the standard manner.                 -->
<!--*****                                          -->
<!--***** Your FORM must define two hidden        -->
<!--***** fields named "url" & "imagecount"       -->
<!--***** (see examples below). The "url"         -->
<!--***** field will be populated with the        -->
<!--***** resulting URL of the first (or only)    -->
<!--***** image submitted, and the "imagecount"   -->
<!--***** field will contain the number of        -->
<!--***** images actually transmitted. The URL    -->
<!--***** for images 2 thru n can be generated    -->
<!--***** by replacing the initial sequence       -->
<!--***** number (which will always be "1")       -->
<!--***** at the end of the returned URL with     -->
<!-->
<!--***** the desired image number.               -->
<INPUT type="hidden" name="url">
<INPUT type="hidden" name="imagecount">
```

US 7,765,482 B2

9                                                                          10

APPENDIX A-continued

HostTemplate generic.htm

```
<INPUT type="button" value="Submit Images" onclick="PWT.Submit( )">
</FORM>
<!--************************************* End Submission Code Section -->
<!--************************************* Begin ImageUpload Control Section -->
<!--***** This section of code must appear at        -->
<!--***** the end of the <BODY> section of           -->
<!--***** your web page. Copy this code and          -->
<!--***** paste it directly into your web page.      -->
<SCRIPT Language="Javascript">
PWT.adduploadcontrol( );
</SCRIPT>
<!--************************************* End ImageUpload Control Section -->
</BODY>
</HTML>
```

What is claimed is:

**1**. A computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing, comprising:

  a. receiving pre-processing parameters from a remote device, said pre-processing parameters including a specification of an amount of digital content, said digital content including one or more of image content, video content, and audio content;

  b. receiving an identification of a group of one or more items of digital content for transmission, a collective digital content of said group of one or more items of digital content being limited by said received pre-processing parameters;

  c. pre-processing said identified group of one or more items of digital content using said received pre-processing parameters, said received pre-processing parameters controlling said client device in a placement of said identified group of one or more items of digital content into a specified form in preparation for publication to one or more devices that are remote from a server device and said client device; and

  d. transmitting said pre-processed group of one or more items of digital content to said server device for subsequent publishing to said one or more devices that are remote from said server device and said client device.

**2**. The method of claim **1**, wherein said receiving pre-processing parameters comprises receiving a specification of a number of items of digital content.

**3**. The method of claim **1**, wherein said receiving pre-processing parameters comprises receiving a specification of a maximum number of items of digital content.

**4**. The method of claim **1**, wherein said receiving an identification comprises receiving an identification of a plurality of items of digital content.

**5**. The method of claim **1**, wherein said receiving an identification comprises receiving a click command at said client device.

**6**. The method of claim **1**, wherein said pre-processing comprises reducing a file size or compressing said digital content.

**7**. The method of claim **1**, wherein said pre-processing comprises changing a quality of said digital content.

**8**. The method of claim **1**, further comprising transmitting identifying information for said pre-processed group of one or more items of digital content.

**9**. The method of claim **1**, wherein said previously received pre-processing parameters enable said client device to place said identified group of one or more items of digital content into a specified form in preparation for publication to one or more devices on which said identified group of one or more items of digital content is to be electronically displayed.

**10**. The method of claim **1**, wherein said pre-processing comprises resizing said digital content.

**11**. A computer implemented method of pre-processing media objects in a local device for subsequent transmission to a remote device, comprising:

  a. receiving pre-processing parameters from a remote device, said pre-processing parameters including a specification of an amount of media data;

  b. receiving an identification of a group of one or more media objects for transmission, a collective media data of said group of one or more media objects being limited by said received pre-processing parameters;

  c. pre-processing said identified group of one or more media objects using said received pre-processing parameters, wherein said pre-processing comprises changing a file format of said media object; and

  d. transmitting said pre-processed group of one or more media objects to the remote device.

**12**. A computer implemented method of pre-processing media objects in a local device for subsequent transmission to a remote device, comprising:

  a. receiving pre-processing parameters from a remote device, said pre-processing parameters including a specification of an amount of media data;

  b. receiving an identification of a group of one or more media objects for transmission, a collective media data of said group of one or more media objects being limited by said received pre-processing parameters;

  c. pre-processing said identified group of one or more media objects using said received pre-processing parameters, wherein said pre-processing comprises encoding or otherwise converting said media object; and

  d. transmitting said pre-processed group of one or more media objects to the remote device.

**13**. A computer implemented method of pre-processing digital content in a client device for subsequent electronic publishing, comprising:

  a. receiving an identification of digital content, said digital content including one or more of image content, video content, and audio content;

  b. pre-processing said identified digital content at said client device in accordance with one or more pre-processing parameters that are received from a device separate from said client device to produce pre-processed digital content, said one or more pre-processing parameters controlling said client device in a placement of said

US 7,765,482 B2

**11**

digital content into a specified form in preparation for publication to one or more devices that are remote from a server device and said client device;

c. retrieving information that enables identification of a user, said retrieved information being available to said client device prior to said received identification; and

d. transmitting a message from said client device to said server device for subsequent publishing device to said one or more devices that are remote from said server device and said client device, said transmitted message including said pre-processed digital content and said retrieved information.

**14**. The method of claim **13**, wherein said pre-processing comprises reducing a file size or compressing said digital content.

**15**. The method of claim **13**, wherein said pre-processing comprises changing a quality of said digital content.

**16**. The method of claim **13**, wherein said pre-processing comprises pre-processing in accordance with one or more pre-processing parameters that have been previously downloaded to said client device.

**17**. The method of claim **13**, wherein said pre-processing comprises pre-processing in accordance with one or more pre-processing parameters that have been downloaded to said client device prior to said identification.

**18**. The method of claim **13**, wherein said pre-processing comprises pre-processing in accordance with one or more pre-processing parameters that have been stored in memory of said client device prior to said identification.

**19**. The method of claim **13**, wherein said retrieving comprises retrieving a user identifier.

**20**. The method of claim **13**, wherein said retrieving comprises retrieving a password.

**21**. The method of claim **13**, wherein said retrieving comprises retrieving in a manner that is transparent to said user.

**22**. The method of claim **13**, wherein said one or more pre-processing parameters enable said client device to place said digital content into a specified form in preparation for publication to one or more devices on which said digital content is to be electronically displayed.

**23**. The method of claim **13**, wherein said pre-processing comprises resizing said digital content.

**24**. A computer implemented method of pre-processing media objects in a local device for subsequent transmission to a remote device, comprising:

a. receiving an identification of a media object for transmission to said remote device;

b. pre-processing said identified media object at said local device in accordance with one or more pre-processing parameters that are received from a device separate from said client device to produce a pre-processed media object, wherein said pre-processing comprises changing a file format of said media object;

c. retrieving information that enables identification of a user, said retrieved information being available to said local device prior to said received identification; and

d. transmitting a message from said local device to said remote device, said transmitted message including said pre-processed media object and said retrieved information.

**25**. A computer implemented method of pre-processing media objects in a local device for subsequent transmission to a remote device, comprising:

a. receiving an identification of a media object for transmission to said remote device;

b. pre-processing said identified media object at said local device in accordance with one or more pre-processing

**12**

parameters that are received from a device separate from said client device to produce a pre-processed media object, wherein said pre-processing comprises encoding or otherwise converting said media object;

c. retrieving information that enables identification of a user, said retrieved information being available to said local device prior to said received identification; and

d. transmitting a message from said local device to said remote device, said transmitted message including said pre-processed media object and said retrieved information.

**26**. A computer implemented method of distributing digital content that is pre-processed by a client device, comprising:

a. transmitting, to a client device, pre-processing parameters for digital content at said client device, said digital content including one or more of image content, video content, and audio content, said pre-processing parameters enabling said client device to place said digital content into a specified form in preparation for distribution to one or more devices that are remote from said client device and said client device;

b. receiving, from said client device, a plurality of pre-processed digital content items that have been pre-processed using said pre-processing parameters;

c. combining at least two of said plurality of pre-processed digital content items into a presentation; and

d. distributing said presentation to one or more devices that are remote from said client device and said client device.

**27**. The method of claim **26**, wherein said pre-processing parameters include a file format for said digital content items.

**28**. The method of claim **26**, wherein said pre-processing parameters include a compression ratio for said digital content items.

**29**. The method of claim **26**, wherein said pre-processing parameters include a media size or aspect ratio for said digital content items.

**30**. The method of claim **26**, wherein said pre-processing parameters include a quality setting for said digital content items.

**31**. The method of claim **26**, further comprising transmitting media object identifier code that enables identification of digital content items.

**32**. The method of claim **26**, further comprising receiving information associated with said plurality of pre-processed digital content items.

**33**. The method of claim **26**, wherein said presentation is animated.

**34**. The method of claim **26**, wherein said pre-processing parameters enable said client device to place said digital content into a specified form in preparation for distribution to one or more devices on which said digital content is to be electronically displayed.

**35**. A computer implemented method for pre-processing digital content at a client device for subsequent electronic publishing, comprising:

a. receiving a command that moves a graphical user interface element in a graphical user interface displayed at said client device, said received command enabling selection of digital content, said digital content including one or more of image content, video content, and audio content;

b. pre-processing said selected digital content in accordance with one or more pre-processing parameters that are received from a remote device to produce pre-processed digital content, said one or more pre-processing parameters enabling said client device to place said digi-

US 7,765,482 B2

13

tal content into a specified form in preparation for pub-
lication to one or more devices that are remote from a
server device and said client device;
c. displaying a preview image of said selected digital con-
tent, said preview image having a reduced size relative to
said selected digital content; and
d. transmitting a message that includes said pre-processed
digital content to said server device for subsequent pub-
lishing to said one or more devices that are remote from
said server device and said client device.

36. A computer implemented method of publishing digital
content that has been pre-processed by a client device, com-
prising:
a. receiving, from said client device, a pre-processed group
of one or more items of digital content that includes one
or more of image content, video content, and audio
content, wherein a collective digital content of said
group of one or more items of digital content is limited
by a specification of an amount of digital content, said
group of one or more items of digital content being
pre-processed in accordance with pre-processing
parameters that were provided to said client device by a
device separate from said client device, said pre-pro-
cessing parameters controlling said client device in a
placement of said identified group of one or more items
of digital content into a specified form in preparation for
distribution to one or more devices that are remote from
a server device and said client device; and
b. distributing, by said server device via an electronic net-
work, information based on said pre-processed group of
one or more items of digital content to one or more
devices that are remote from said server device and said
client device.

37. A computer implemented method of distributing digital
content that has been pre-processed by a client device, com-
prising:
a. receiving, from said client device, pre-processed digital
content that includes one or more of image content,
video content, and audio content, and information
retrieved by said client device that enables identification
of a user, said retrieved information being available to
said client device prior to an identification of said digital
content at said client device, wherein said digital content
is pre-processed by said client device in accordance with
pre-processing parameters that were provided to said
client device by a device separate from said client
device, said pre-processing parameters controlling said
client device in a placement of said digital content into a
specified form in preparation for distribution to one or
more devices that are remote from a server device and
said client device; and
b. distributing, by said server device via an electronic net-
work, information based on said pre-processed digital
content to one or more devices that are remote from said
server device and said client device.

38. A computer implemented method for pre-processing
digital content in a client device for subsequent electronic
distribution, comprising:
a. initiating, by said client device, a transfer of digital
content from said client device to a server device, said
digital content including one or more of image content,
video content, and audio content;

14

b. pre-processing said digital content at said client device in
accordance with one or more pre-processing param-
eters, said one or more pre-processing parameters being
provided to said client device from a device separate
from said client device, said one or more pre-processing
parameters controlling said client device in a placement
of said digital content into a specified form in prepara-
tion for publication to one or more devices that are
remote from a server device and said client device; and
c. transmitting a message from said client device to said
server device for subsequent distribution to said one or
more devices that are remote from said server device and
said client device, said transmitted message including
said pre-processed digital content.

39. The method of claim 38, wherein said pre-processing
comprises pre-processing said digital content in accordance
with pre-processing parameters that are provided to said cli-
ent device by said server device.

40. The method of claim 38, further comprising receiving
an identification of said digital content for transmission prior
to said pre-processing.

41. The method of claim 38, wherein said pre-processing
comprises reducing a file size or compressing said digital
content.

42. The method of claim 38, wherein said pre-processing
comprises resizing said digital content.

43. The method of claim 38, wherein said pre-processing
comprises changing a file format of said digital content.

44. The method of claim 38, wherein said transmitted
message includes identifying information for said digital con-
tent.

45. The method of claim 44, wherein said identifying infor-
mation is retrieved from storage in said client device.

46. The method of claim 45, wherein said identifying infor-
mation includes a file name.

47. The method of claim 45, wherein said identifying infor-
mation includes location information.

48. The method of claim 47, wherein said identifying infor-
mation includes zip code information.

49. The method of claim 45, wherein said identifying infor-
mation includes user information.

50. The method of claim 45, wherein said identifying infor-
mation includes information describing said digital content.

51. A computer implemented method for distributing digi-
tal content that has been pre-processed by a client device,
comprising:
a. receiving, from said client device, digital content that has
been pre-processed at said client device in accordance
with one or more pre-processing parameters that have
been provided to said client device from a device sepa-
rate from said client device, said digital content includ-
ing one or more of image content, video content, and
audio content, said one or more pre-processing param-
eters controlling said client device in a placement of said
digital content into a specified form in preparation for
distribution to one or more devices that are remote from
a server device and said client device; and
b. publishing, by said server device via an electronic net-
work, information based on said pre-processed digital
content to one or more devices that are remote from said
server device and said client device.

* * * * *

# Exhibit C



US008612515B2

(12) **United States Patent**
Wood et al.

(10) **Patent No.:** **US 8,612,515 B2**
(45) **Date of Patent:** *Dec. 17, 2013

(54) **SYSTEM, METHOD AND APPARATUS FOR MEDIA SUBMISSION**

(75) Inventors: **Lisa T. Wood**, Danville, CA (US); **Scott M. Lewis**, Danville, CA (US); **Robin T. Fried**, Berkeley, CA (US)

(73) Assignee: **Summit 6 LLC**, Dallas, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/098,090**

(22) Filed: **Apr. 29, 2011**

(65) **Prior Publication Data**
US 2011/0208811 A1     Aug. 25, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/831,503, filed on Jul. 7, 2010, which is a continuation of application No. 10/961,720, filed on Oct. 8, 2004, now Pat. No. 7,765,482, which is a continuation of application No. 09/357,836, filed on Jul. 21, 1999, now Pat. No. 6,895,557.

(51) **Int. Cl.**
G06F 15/16     (2006.01)
G06F 3/00      (2006.01)

(52) **U.S. Cl.**
USPC ........... **709/203**; 709/201; 709/219; 715/744; 715/748; 715/769; 707/999.102

(58) **Field of Classification Search**
USPC .................. 709/203, 201, 219; 707/999.101; 715/744, 748, 769
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,802,008 A     1/1989  Walling
4,862,200 A     8/1989  Hicks
(Continued)

FOREIGN PATENT DOCUMENTS

EP      0838774 A2     4/1998
EP      0930774 A2     7/1999
(Continued)

OTHER PUBLICATIONS

McDonald, Glenn, "Pictra Puts Your Photo Album on the Web for Free," PC World, Jun. 13, 1997.

(Continued)

*Primary Examiner* — Alina N Boutah
(74) *Attorney, Agent, or Firm* — Duane S. Kobayashi

(57) **ABSTRACT**

The present invention, generally speaking, provides an improved web-based media submission tool. As with some existing tools, operation of the tool is drag and drop or the user can "click" to browse a directory to select media objects. Unlike existing tools, the tool provides the user an opportunity to confirm the submission, for example by generating a thumbnail image of an image file that has been dragged and dropped. Batch submission is provided for in which a user drags and drops a plurality of images or other media objects. Submission from a web page to a web page is also provided for. The submission tool is configurable to perform a variable amount of intelligent preprocessing on media objects prior to upload. In the case of digital images, the tool can perform sizing and formatting, for example. Information capture is performed with information being uploaded together with the media objects. In an exemplary embodiment, information capture is both user-transparent (e.g., user ID and/or password) and user-visible (e.g., the user can provide captions for media objects). The submission of information about the user and the media objects facilitates automatic integration of the media objects within existing databases.

**53 Claims, 5 Drawing Sheets**



## US 8,612,515 B2
Page 2

(56)           **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,001,628 A | 3/1991 | Johnson et al. | |
| 5,063,587 A | 11/1991 | Semasa et al. | |
| 5,179,637 A | 1/1993 | Nardozzi | |
| 5,327,265 A | 7/1994 | McDonald | |
| 5,404,316 A | 4/1995 | Klingler et al. | |
| 5,477,353 A | 12/1995 | Yamasaki | |
| 5,493,677 A * | 2/1996 | Balogh et al. | 382/305 |
| 5,555,388 A | 9/1996 | Shaughnessy | |
| 5,606,365 A | 2/1997 | Maurinus et al. | |
| 5,608,542 A | 3/1997 | Krahe et al. | |
| 5,666,159 A | 9/1997 | Parulski et al. | |
| 5,666,215 A | 9/1997 | Fredlund et al. | |
| 5,675,507 A | 10/1997 | Bobo, II | |
| 5,678,046 A * | 10/1997 | Cahill et al. | 707/829 |
| 5,694,546 A | 12/1997 | Reisman | |
| 5,696,850 A | 12/1997 | Parulski et al. | |
| 5,706,457 A | 1/1998 | Dwyer et al. | |
| 5,715,397 A | 2/1998 | Ogawa et al. | |
| 5,729,741 A | 3/1998 | Liaguno et al. | |
| 5,748,194 A | 5/1998 | Chen | |
| 5,751,950 A | 5/1998 | Crisan | |
| 5,754,172 A | 5/1998 | Kubota et al. | |
| 5,760,916 A | 6/1998 | Dellert et al. | |
| 5,760,917 A | 6/1998 | Sheridan | |
| 5,761,404 A | 6/1998 | Murakami et al. | |
| 5,761,601 A | 6/1998 | Nemirofsky et al. | |
| 5,764,235 A | 6/1998 | Hunt et al. | |
| 5,765,152 A | 6/1998 | Erickson | |
| 5,778,164 A | 7/1998 | Watkins et al. | |
| 5,778,198 A | 7/1998 | Kadota | |
| 5,778,430 A | 7/1998 | Ish et al. | |
| 5,781,725 A | 7/1998 | Saito | |
| 5,781,773 A | 7/1998 | Vanderpool et al. | |
| 5,781,901 A | 7/1998 | Kuzma | |
| 5,787,459 A | 7/1998 | Stallmo et al. | |
| 5,787,466 A | 7/1998 | Berliner | |
| 5,790,708 A | 8/1998 | Delean | |
| 5,794,217 A | 8/1998 | Allen | |
| 5,799,063 A | 8/1998 | Krane | |
| 5,802,312 A | 9/1998 | Lazaridis et al. | |
| 5,802,314 A | 9/1998 | Tullis et al. | |
| 5,802,518 A | 9/1998 | Karaev et al. | |
| 5,806,005 A | 9/1998 | Hull et al. | |
| 5,809,280 A | 9/1998 | Chard et al. | |
| 5,813,009 A | 9/1998 | Johnson et al. | |
| 5,819,032 A | 10/1998 | De Vries et al. | |
| 5,819,092 A | 10/1998 | Ferguson et al. | |
| 5,835,735 A | 11/1998 | Mason et al. | |
| 5,844,969 A | 12/1998 | Goldman et al. | |
| 5,845,299 A | 12/1998 | Arora et al. | |
| 5,848,415 A | 12/1998 | Guck | |
| 5,852,435 A | 12/1998 | Vigneaux et al. | |
| 5,859,956 A | 1/1999 | Sugiyama et al. | |
| 5,890,170 A | 3/1999 | Sidana | |
| 5,890,213 A | 3/1999 | Sokolov | |
| 5,897,622 A | 4/1999 | Blinn et al. | |
| 5,903,277 A | 5/1999 | Sutherland et al. | |
| 5,903,728 A | 5/1999 | Semenzato | |
| 5,907,640 A | 5/1999 | Delean | |
| 5,913,088 A | 6/1999 | Moghadam et al. | |
| 5,918,213 A | 6/1999 | Bernard et al. | |
| 5,923,846 A | 7/1999 | Gage et al. | |
| 5,926,288 A | 7/1999 | Dellert et al. | |
| 5,933,646 A | 8/1999 | Hendrickson et al. | |
| 5,937,232 A * | 8/1999 | Taguchi et al. | 399/81 |
| 5,953,488 A | 9/1999 | Seto | |
| 5,956,716 A | 9/1999 | Kenner et al. | |
| 5,960,411 A | 9/1999 | Hartman et al. | |
| 5,974,401 A * | 10/1999 | Enomoto et al. | 705/40 |
| 6,006,231 A | 12/1999 | Popa | |
| 6,012,068 A | 1/2000 | Boezeman et al. | |
| 6,017,157 A | 1/2000 | Garfinkle et al. | |
| 6,018,774 A | 1/2000 | Mayle et al. | |
| 6,028,603 A | 2/2000 | Wang et al. | |
| 6,035,323 A * | 3/2000 | Narayen et al. | 709/201 |
| 6,038,295 A | 3/2000 | Mattes | |
| 6,058,399 A * | 5/2000 | Morag et al. | 709/203 |
| 6,058,417 A | 5/2000 | Hess et al. | |
| 6,058,428 A | 5/2000 | Wang et al. | |
| 6,076,111 A | 6/2000 | Chiu et al. | |
| 6,084,581 A | 7/2000 | Hunt | |
| 6,085,195 A | 7/2000 | Hoyt et al. | |
| 6,085,249 A * | 7/2000 | Wang et al. | 709/229 |
| 6,088,732 A | 7/2000 | Smith et al. | |
| 6,094,684 A | 7/2000 | Pallmann | |
| 6,097,389 A | 8/2000 | Morris et al. | |
| 6,104,468 A | 8/2000 | Bryniarski et al. | |
| 6,119,101 A | 9/2000 | Peckover | |
| 6,125,352 A | 9/2000 | Franklin et al. | |
| 6,128,600 A | 10/2000 | Imamura et al. | |
| 6,128,655 A | 10/2000 | Fields et al. | |
| 6,133,985 A * | 10/2000 | Garfinkle et al. | 355/40 |
| 6,167,382 A | 12/2000 | Sparks et al. | |
| 6,167,442 A | 12/2000 | Sutherland et al. | |
| 6,167,469 A | 12/2000 | Safai et al. | |
| 6,167,568 A | 12/2000 | Gandel et al. | |
| 6,177,934 B1 * | 1/2001 | Sugiura et al. | 715/748 |
| 6,182,116 B1 | 1/2001 | Namma et al. | |
| 6,182,279 B1 | 1/2001 | Buxton | |
| 6,199,082 B1 | 3/2001 | Ferrel et al. | |
| 6,202,061 B1 | 3/2001 | Khosla et al. | |
| 6,223,190 B1 | 4/2001 | Aihara et al. | |
| 6,233,590 B1 | 5/2001 | Shaw et al. | |
| 6,233,600 B1 | 5/2001 | Salas et al. | |
| 6,237,010 B1 | 5/2001 | Hui et al. | |
| 6,253,216 B1 | 6/2001 | Sutcliffe et al. | |
| 6,266,681 B1 | 7/2001 | Guthrie | |
| 6,275,829 B1 | 8/2001 | Angiulo et al. | |
| 6,281,874 B1 | 8/2001 | Sivan et al. | |
| 6,301,586 B1 | 10/2001 | Yang et al. | |
| 6,301,607 B2 | 10/2001 | Barraclough et al. | |
| 6,308,188 B1 | 10/2001 | Bernardo et al. | |
| 6,320,588 B1 * | 11/2001 | Palmer et al. | 345/473 |
| 6,320,672 B1 * | 11/2001 | Itoh | 358/1.9 |
| 6,324,538 B1 * | 11/2001 | Wesinger et al. | 1/1 |
| 6,330,572 B1 | 12/2001 | Sitka | |
| 6,330,575 B1 | 12/2001 | Moore et al. | |
| 6,343,302 B1 | 1/2002 | Graham | |
| 6,353,445 B1 | 3/2002 | Babula et al. | |
| 6,374,260 B1 | 4/2002 | Hoffert et al. | |
| 6,381,029 B1 | 4/2002 | Tipirneni | |
| 6,385,596 B1 * | 5/2002 | Wiser et al. | 705/51 |
| 6,421,429 B1 * | 7/2002 | Merritt et al. | 379/93.17 |
| 6,424,429 B1 * | 7/2002 | Takahashi et al. | 358/1.16 |
| 6,456,591 B1 | 9/2002 | Mishra | |
| 6,489,954 B1 | 12/2002 | Powlette | |
| 6,489,980 B1 | 12/2002 | Scott et al. | |
| 6,501,472 B1 | 12/2002 | Hunt et al. | |
| 6,502,194 B1 * | 12/2002 | Berman et al. | 726/28 |
| 6,505,160 B1 | 1/2003 | Levy et al. | |
| 6,510,418 B1 | 1/2003 | Case et al. | |
| 6,513,069 B1 | 1/2003 | Abato et al. | |
| 6,516,340 B2 | 2/2003 | Boys | |
| 6,519,046 B1 * | 2/2003 | Kinjo | 358/1.1 |
| 6,522,418 B2 | 2/2003 | Yokomizo et al. | |
| 6,532,079 B1 | 3/2003 | Serex et al. | |
| 6,535,294 B1 * | 3/2003 | Arledge et al. | 358/1.15 |
| 6,535,296 B1 | 3/2003 | Oak | |
| 6,539,420 B1 | 3/2003 | Fields et al. | |
| 6,542,936 B1 | 4/2003 | Mayle et al. | |
| 6,567,983 B1 | 5/2003 | Shiimori | |
| 6,571,271 B1 * | 5/2003 | Savitzky et al. | 709/200 |
| 6,583,799 B1 | 6/2003 | Manolis et al. | |
| 6,621,938 B1 | 9/2003 | Tanaka et al. | |
| 6,628,417 B1 * | 9/2003 | Naito et al. | 358/1.15 |
| 6,657,702 B1 | 12/2003 | Chui et al. | |
| 6,690,417 B1 | 2/2004 | Yoshida et al. | |
| 6,693,635 B1 | 2/2004 | Yokomizo | |
| 6,711,297 B1 | 3/2004 | Chang et al. | |
| 6,718,340 B1 * | 4/2004 | Hartman et al. | 1/1 |
| 6,721,802 B1 | 4/2004 | Wright et al. | |
| 6,732,162 B1 * | 5/2004 | Wood et al. | 709/219 |
| 6,799,165 B1 | 9/2004 | Boesjes | |
| 6,853,461 B1 | 2/2005 | Shiimori | |

**US 8,612,515 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,871,231 B2 | 3/2005 | Morris | |
| 6,895,557 B1 | 5/2005 | Wood et al. | |
| 6,930,709 B1 | 8/2005 | Creamer et al. | |
| 7,010,587 B1 | 3/2006 | Shiimori | |
| 7,032,030 B1 * | 4/2006 | Codigonto | 709/246 |
| 7,036,081 B2 | 4/2006 | Powlette | |
| 7,038,713 B1 * | 5/2006 | Matama | 348/207.2 |
| 7,043,527 B2 | 5/2006 | Shiimori et al. | |
| 7,146,575 B2 | 12/2006 | Manolis et al. | |
| 7,158,172 B2 | 1/2007 | Kawaoka et al. | |
| 7,246,147 B2 * | 7/2007 | Kim et al. | 709/203 |
| 7,257,158 B1 | 8/2007 | Figueredo et al. | |
| 7,263,497 B1 * | 8/2007 | Wiser et al. | 705/51 |
| 7,280,702 B2 | 10/2007 | Chang et al. | |
| 7,308,413 B1 | 12/2007 | Tota et al. | |
| 7,313,604 B2 | 12/2007 | Wood et al. | |
| 7,315,386 B1 | 1/2008 | Shiimori et al. | |
| 7,509,270 B1 | 3/2009 | Hendricks et al. | |
| 7,624,344 B2 | 11/2009 | Mindrum et al. | |
| 7,761,537 B2 | 7/2010 | Wood et al. | |
| 7,765,482 B2 | 7/2010 | Wood et al. | |
| 2002/0067500 A1 | 6/2002 | Yokomizo et al. | |
| 2005/0239454 A1 | 10/2005 | Kawashima et al. | |
| 2005/0262437 A1 | 11/2005 | Patterson et al. | |
| 2008/0201236 A1 | 8/2008 | Field et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 8-153183 | 6/1996 |
| JP | 11-69072 | 3/1999 |
| JP | 11-184943 | 7/1999 |
| JP | 1076302 A1 | 2/2001 |
| WO | WO 97/04353 A1 | 2/1997 |
| WO | WO 97/39580 A1 | 10/1997 |
| WO | WO 98/36556 A1 | 8/1998 |
| WO | WO 98/49631 A2 | 11/1998 |
| WO | WO 99/19811 A3 | 4/1999 |

OTHER PUBLICATIONS

Pictra Incorporated website, Oct. 9, 1997.
"Pictra first to make publishing and sharing photo albums over Internet a snap for PC users; award-winning software offers easy, fun way to create digital photo albums to share over Internet," Business Wire, May 12, 1997. (Missing pp. 3-4).
Blatner, David, "The Automatic Publisher," Macworld, May 1999.
Weger, Chuck, "Stick to the Script," American Printer, Dec. 1995.
Lowe et al., "WebReport: A World Wide Web Based Clinical Multimedia Reporting System," 1996.
Lowe et al., "The Image Engine™ HPCC Project. A Medical Digital Library System using Agent-Based Technology to Create an Integrated View of the Electronic Medical Record," Proceedings of ADL, 1996.
Adding Images to the Engine Database, Jun. 25, 1997.
Image Engine Client, Jun. 25, 1997.
Bodoh, Dan, "Making the Most of the Internet for Failure Analysis," Proceedings from the 24th International Symposium for Testing and Failure Analysis, Nov. 15-19, 1998.
Martiner, William, "Visual Basic Programmer's Guide to Web Development," Chapters 1 and 12, John Wiley & Sons, 1997.
Degenhart, Curt, "AOL in a Nutshell: A Desktop Guide to America Online," O'Reilly Media, Jul. 8, 1998.
Popa, Sorin, "WarpRes™ Technology—White Paper," Jan. 14, 1998.
Warp 10 Technologies, Inc., "Rubie's Costumes Warps into High Tech," Jan. 21, 1998.
Kervella et al., "MHEGAM—A Multimedia Messaging System," 1997.
Schurmann, Gerd, "Multimedia mail," Multimedia Systems, Springer Verlag, 1996.
Internet Assistant for PowerPoint, The PowerPoint 95 to World Wide Web Document Converter, Feb. 2, 1997.
Microsoft, Internet Assistant for PowerPoint, Nov. 20, 1996.

Bernard, Ryan, "The Corporate Intranet," 2nd Edition, 1996.
InfoAccess Home Page, Jan. 12, 1998.
InfoAccess, HTML Transit, Jan. 12, 1998.
Postel et al., "File Transfer Protocol," Oct. 1985.
Garner et al., "The application of telepresence in medicine," BT Technology Journal, vol. 15, No. 4, Oct. 1997.
M. Sirbu, "A Content-Type Header Field for Internet Messages," Mar. 1988.
Borenstein et al., "MIME (Multipurpose Internet Mail Extensions): Mechanisms for Specifying and Describing the Format of Internet Message Bodies," Jun. 1992.
Borenstein, "MIME and Metamail: Making Multimedia Mail More Mainstream," USENIX Conference, Jan. 29, 1993.
Novell, GroupWise, Version 4.1.
Open Mobile Alliance, "Multimedia Messaging Service—Encapsulation Protocol," Version 1.1, Oct. 2002.
ETSI, "Digital Cellular telecommunications system (Phase 2+); Technical realization of the Short Message Service (SMS) Point-to-Point (PP)," GSM 03.40, Version 5.3.0, Jul. 1996.
3rd Generation Partnership Project; Technical Specification Group Terminals; Multimedia Messaging Service (MMS); Functional description; Stage 2, 3G TS 23.140 vesion 0.1.0, Oct. 1999.
CCITT, Information Technology—Digital Compression and Coding of Continuous-Tone Still Images—Requirements and Guidelines, Recommendation T.81, Sep. 1992.
Knowledge Base, "In Unix, what is metamail and how do I use it?," Dec. 2, 2009.
T. Negrino, "Dueling HTML editors," Macworld, Dec. 1996.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A1 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A2 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A3 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A4 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A5 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A6 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A7 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A8 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A9 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A10 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit All of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A12 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A13 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Summit 6 LLC, v. Research in Motion Corporation, et al., Civil Action No. 3:11-CV-00367-0, Exhibit A14 of Defendants' Invalidity Contentions, Sep. 9, 2011.

US 8,612,515 B2

Page 4

(56)            **References Cited**

OTHER PUBLICATIONS

*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B1 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B2 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B3 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B4 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B5 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B6 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B7 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B8 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B9 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B10 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B11 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B12 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B13 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B14 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B15 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B16 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B17 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B18 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B19 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B20 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B21 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B22 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B23 of Defendants' Invalidity Contentions, Sep. 9, 2011.

*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B24 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B25 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B26 of Defendants' Invalidity Contentions, Sep. 9, 2011.
*Summit 6 LLC*, v. *Research in Motion Corporation, et al.*, Civil Action No. 3:11-CV-00367-0, Exhibit B27 of Defendants' Invalidity Contentions, Sep. 9, 2011.
Ethan Wilde, "AppleScript for the Internet," Chapters 6, 9 and 16, Peachpit Press, 1998.
Pruett et al., "Visual Basic Controls Desk Reference CD," Waite Group Press, 1995.
Peal, David, "America Online Official Internet Guide," Second Edition, Osborne/McGraw-Hill, 1998.
Godin, Seth, "You've Got Pictures! AOL's Guide to Digital Imaging," AOL Press, 1998.
Lu et al., "e*World—The Official Guide for Macintosh Users," Hayden Books, 1994.
Tyler et al., "Microsoft FrontPage 98," Sams.net Publishing, 1997.
Lehto et al., "Official Microsoft FrontPage 98 Book," Microsoft Press, 1997.
Barbara Kasser, "Using Microsoft PowerPoint 97," Que Corporation, 1997.
Nokia 9000i Communicator Users Manual, 1998.
Smart Messaging Specification, Revision 1.0.0, Nokia Mobile Phones, Ltd., Sep. 15, 1997.
Microsoft Outlook 98 Step by Step, Microsoft Press, 1998.
Timothy Webster, "The Smart Way to Build Web Sites—NetObjects Fusion Handbook," Hayden Books, 1996.
RealAudio and RealVideo Content Creation Guide Version 5.0, RealNetworks, Inc.
Inside MAPI, Irving De la Cruz and Les Thaler, Microsoft Press (1996).
RealPublisher, Getting Started with RealPublisher, Part 1, Version 5.1, RealNetworks, Inc.
Mobile Data Report, New Software Allows Most Windows Files to be Sent with MASC Mobidem Via Ram, vol. 6, No. 20, Oct. 10, 1994.
Emily Cohen, "Set Your Sites High," PC Magazine, May 26, 1998.
Plante et al., "The NCSA Astronomy Digital Image Library: From Data Archiving to Data Publishing," Sep. 21, 1998.
Augot et al., "Secure Delivery of Images over Open Networks," Proceedings of the IEEE, vol. 87, Issue 7, pp. 1251-1266, Jul. 1999.
Persits, Peter, "Browser-Based File Uploading Under the Microscope," 15 Seconds, Nov. 21, 1998.
Dean, Doug, "Down and Dirty Browser Uploading with a VB ASP Component," Mar. 11, 1999.
Horstmann et al., "Distributed Authoring on the Web with the BSCW Shared Workspace System," StandardView, vol. 5, No. 1, Mar. 1997.
Netscape Communications Corporation, "Creating Web Pages," Apr. 27, 1999.
Steinberg, Jill, "New Start-Up Releases Java Application and Enabling Software," JavaWorld, Oct. 1, 1996.
Bilson, Rob, "Net-It Central 1.0," IDM, Jul. 31, 1997.
Warp 10 Technologies Inc., Jul. 10, 1998.
Pictra Incorporated, Nov. 11, 1998.
Letter from Terry Anderson to Craig Hamway, Oct. 16, 1997.
PictureWorks ADP Demo, May 1, 1998.
Letter from Terry Anderson to Ken Karutz, May 1, 1998.
Email from Scott Lewis to Lisa Wood, Jul. 2, 1998.
Email from Robin Fried to Scott Lewis et al., Jul. 5, 1998.
Email from Scott Lewis to Robin Fried, Jul. 8, 1998.
Email from Robin Fried to Martha White, Jul. 9, 1998.
Email from Robin Fried to Scott Lewis et al., Jul. 9, 1998.
Email from Don Strickland to Lisa Wood et al., Jul. 14, 1998.
Emails from Scott Lewis to Lisa Wood et al., Jul. 17-18, 1998.
PictureWorks Technology, Inc. Board Update, Jun. 20, 1998.
Letter from Terry Anderson, Jul. 22, 1998.
Email from Don Strickland to Lisa Wood et al., Jul. 22, 1998.
Emails from Don Strickland, Jul. 27 and Aug. 7, 1998.

**US 8,612,515 B2**

Page 5

(56)          **References Cited**

OTHER PUBLICATIONS

Email from Robin Fried to Scott Lewis et al., Jul. 28, 1998.
Email from Scott Lewis to Lisa Wood et al., Jul. 29, 1998.
Prioritized Activities for Enterprise Team, Jul. 31, 1998.
Email from Don Strickland to Criag Hamway, Aug. 2, 1998.
Board Update from Don Strickland, Aug. 7, 1998.
Email from Lisa Wood, Aug. 10, 1998.
Email from Scott Lewis to Terry Anderson, Aug. 13, 1998.
Letter from Terry Anderson to Randy Kau, Aug. 14, 1998.
Email from Kirby Lunger to Don Strickland et al., Aug. 14, 1998.
Email from Kirby Lunger to Lisa Wood, Aug. 26, 1998.
Email from Terry Anderson to Don Strickland, Aug. 25, 1998.
Email from Kirby Lunger to Lisa Wood, Aug. 31, 1998.
Email from Robin Fried to Scott Lewis et al., Sep. 1, 1998.
Email from Scott Lewis to Lisa Wood et al., Sep. 1, 1998.
Email from Don Strickland to Terry Anderson et al., Sep. 8, 1998.
Email from Scott Lewis to Jeff Paradise, Sep. 11, 1998.
Letter from Terry Anderson to Howard Latham, Sep. 15, 1998.
Email from Scott Lewis to Jim McCarthy, Sep. 17, 1998.
Email from Terry Anderson to Don Strickland et al., Sep. 18, 1998.
Email from Scott Lewis to Lisa Wood et al., Sep. 22, 1998.
Letter from Anthony Delli Colli to Wayne Mangold, Sep. 18, 1998.
Email from Scott Lewis to Lisa Wood et al., Sep. 23, 1998.
Email from Robin Fried to Stu Roberson, Sep. 21, 1998.
Letter from Terry Anderson to Sei-Wai Lee, Sep. 24, 1998.
Email from Scott Lewis to Lisa Wood et al., Sep. 25, 1998.
Email from Terry Anderson to Lisa Wood et al., Sep. 29, 1998.
Letter from Scott Lewis to Karim El-Fishaway, Oct. 2, 1998.
Email from Anthony Delli Colli to Stu Roberson et al., Oct. 2, 1998.
PictureWorks presentation to eBay, Oct. 16, 1998.
Email from Scott Lewis to Gary Dillabough, Oct. 20, 1998.
Email from Don Strickland to PWT Employees, Oct. 31, 1998.
Press Release, Moore Data Management Services and PictureWorks Technology Inc., Announce Partnership to Revolutionize Use of Real Estate Photos on the Internet, Nov. 6, 1998.
Press Release, PictureWorks Technology Inc., Streamlines Posting of Photos to the Internet, Nov. 6, 1998.
Email from Laurie Fleming to Andrew Hunter et al., Nov. 13, 1998.
Letter from Scott Lewis to Wayne Graves, Nov. 16, 1998.
Email from Scott Lewis to Terry Anderson et al., Nov. 20, 1998.
Screenshots from Prepare and Post Video, Nov. 20, 1998.
Laura Roe, "New Software Gives Real Estate a View of the Future," National Real Estate Investor, Dec. 1, 1998.
PictureWorks Information, Dec. 9, 1998.
PictureWorks Prepare & Post, Fourth Quarter, 1998.
Prepare & Post Product Overview, Fourth Quarter, 1998.
Letter from Terry Anderson to Neil Shafran, Jan. 12, 1999.
Letter from Stu Roberson to James Rowley, Jan. 29, 1999.
Product Picks, Realtor Magazine, Feb. 1, 1999.
PictureWorks Kodak Presentation, Feb. 24, 1999.
Letter from Don Strickland to Phil Ashe, Mar. 2, 1999.
PictureWorks ADP Presentation, Mar. 11, 1999.
PictureWorks Press Release, "PictureWorks Releases New Free Digital Imaging Software; MediaCenter Offers Essential Tools for Web Imaging," Mar. 31, 1999.
PictureWorks Press Release, "PictureBay.com to Give-Away 30 Digital Cameras in 30 Days," Apr. 12, 1999.
PictureWorks Press Release, "PictureWorks Technology's PictureBay Solves #1 Frustration of eBay Members, Adding Pictures to Auctions," Apr. 12, 1999.
PictureWorks Press Release, "PictureWorks Technology's Rimfire Empowers any Website to Easily Accept, Process, and Display Visitor Photos and Media," Apr. 12, 1999.
Rimfire real-time integrated media brochure, Apr. 12, 1999.
Letter from Terry Anderson to Jonathan Graff, Apr. 26, 1999.
Sales Update, Apr. 30, 1999.
"PictureWorks Plans to Become Powerhouse in Internet Imaging—Exlusive Interview with CEO," The Future Image Report, vol. 7, Issue 1, May 1, 1999.
Email from Laurie Fleming to Terry Anderson et al., May 7, 1999.

Roland Woerner et al., "eBay for Dummies," Chapter 12, May 10, 1999.
Letter from Scott Lewis to Rolan Woerner, May 10, 1999.
Letter from Stu Roberson to Jim Ferras, May 25, 1999.
Rimfire real-time integrated media, May 27, 1999.
Letter from Scott Lewis to Candace Gates, May 28, 1999.
Letter of Intent between PictureWorks Technology, Inc. and Auction Universe, May 31, 1999.
Letter from Scott Lewis to Matthew Lengfelder, Jun. 1, 1999.
"Casio and PictureWorks Announce Co-Branding and Distribution Agreement; MediaCenter Offers Essential Tools for Web Imaging," Jun. 3, 1999.
Sales Update, Jun. 4, 1999.
Email from Laurie Fleming to Terry Anderson et al., Jun. 7, 1999.
PictureWorks pricing for prototype, Jun. 9, 1999.
PictureWorks proposal, Jun. 9, 1999.
PictureWorks scope of work, Jun. 9, 1999.
Letter from Terry Anderson to Amazon, Jun. 9, 1999.
"PictureWorks Announces Co-Branding and Distribution Agreements with On-Line Photo Services Companies," Jun. 14, 1999.
PictureWorks Polaroid presentation, Jun. 15, 1999.
Email from Lisa Wood to Don Strickland et al., Jun. 30, 1999.
East Bay Business Times, "PictureWorks Founder Keeps True to Original Vision," Jul. 2, 1999.
PictureWorks Technology Proposal, Jul. 9, 1999.
Press Release, "PictureWorks Releases New, Free Imaging Weblication; MediaCenter 1.1 Offers Essential Photo Tools for Internet Imaging and Web Publishing, Ideal for Digital Camera Users," Jul. 19, 1999.
Press Release, "Picturebay is the Fastest and Easiest Way to Add Pictures to Auctions," Aug. 3, 1999.
Picturebay Screenshot, Oct. 13, 1999.
Office Action dated Sep. 6, 2002 for U.S. Appl. No. 09/440,461.
Office Action dated Apr. 21, 2003 for U.S. Appl. No. 09/440,461.
Office Action dated Nov. 23, 2001 for U.S. Appl. No. 09/357,836.
Office Action dated Jun. 5, 2002 for U.S. Appl. No. 09/357,836.
Office Action dated Nov. 8, 2002 for U.S. Appl. No. 09/357,836.
Office Action dated Jun. 4, 2003 for U.S. Appl. No. 09/357,836.
Office Action dated Feb. 22, 2007 for U.S. Appl. No. 10/736,285.
Office Action dated Oct. 17, 2008 for U.S. Appl. No. 11/935,340.
Office Action dated Aug. 11, 2009 for U.S. Appl. No. 11/935,340.
Office Action dated Jan. 4, 2011 for U.S. Appl. No. 12/790,487.
Fred Delobaerde, "Development of Multimedia Courseware Technology for Use in Hydrology and Water Management Instruction," Thesis, Department of Agricultural and Biosystems Engineering, McGill University, Aug. 1998.
RIM's Supplemental Invalidity Contentions, Civil Action No. 3:11-CV-00367-O, May 4, 2012.
Publication List from Invalidity Contentions, May 14, 2012.
"An Interpersonal Multimedia Visualization System," Richard L. Phillips, Los Alamos National Laboratory, IEEE Computer Graphics and Applications, pp. 20-27 (May 1991).
"MediaView, A General Multimedia Digital Publication System," Richard L. Phillips, Communications of the ACM, pp. 75-83 (Jul. 1991, vol. 34, No. 7).
"MediaView: An Editable Multimedia Publishing System Developed with an Object-Oriented Toolkit," Richard L. Phillips, Los Alamos National Laboratory, Usenix (Summer 1991).
"Media Maker," Greg Burd, NeXTWORLD, p. 13 (Fall 1992, vol. 2, No. 3).
"TrueSpectra Announces the Availability of Photo>Graphics with Full ColorWave 2.0 Support," Business Wire, p. 7250080 (Jul. 25, 1996).
"Toronto-Based Graphics-Engine Developer to Expand Functionality of HP's Imaging for the Internet; TruesSpectra's ColorWave to Add Groundbreaking Capabilities to HP's Imaging for Internet," Business Wire, p. 9170271 (Sep. 17, 1997).
"Finally, Graphics Power for OS/2 Users," Kevin Linfield, Computing Canada, p. 28 (Oct. 14, 1997).
"Grubb & Ellis Uses TrueSpectra Image Server to Enhance Intranet Capabilities," Business Wire (Dec. 2, 1998).

## US 8,612,515 B2

Page 6

(56)              **References Cited**

OTHER PUBLICATIONS

"TrueSpectra Debuts Iris Image Server Solutions; New Technology Addresses Critical Visual Requirements for Making E-commerce the Dominant Selling Medium," Business Wire, p. 0161 (Apr. 14, 1999).

"TrueSpectra Announces Support for Sun's Java Advanced Imaging API; Imaging Solution for E-commerce Embraces Java Technology," Business Wire, p. 0246 (Jun. 15, 1999).

"PictureWorks Technology Inc. Aggressively Develops Imaging Intensive E-commerce Solutions Using IIP and FlashPix Technologies," Business Wire, p. 6250179, (Jun. 25, 1998).

"Internet: PictureWorks Builds Imaging for E-Commerce," Network Briefing (Jun. 29, 1998).

"Getting Started with RealPublisherTM Version 5.1," RealNetworks, Inc. (1998).

"Getting Started with RealPublisherTM Premiere Plug-in Version 5.0," RealNetworks, Inc. (1997).

"RealFlash and RealAudio Content Creation Guide Beta 5.0," RealNetworks, Inc. (1997).

http://web.archive.org/web/19980215082307/http://www8.real. com/publisher/hpindex.html#webpages "Add Audio and Video to Your Web Pages with RealPublisherTM," RealNetworks, Inc. (Feb. 15, 1998).

http://web.archive.org/web/19980215084737/http://www8.real. com/publisher/resources.html "RealPublisher Resources," RealNetworks, Inc. (Feb. 15, 1998).

http://web.archive.org/web/19980215093245/http://www8.real. com/publisher/quickstart.html "Quick Start Online Guide," RealNetworks, Inc. (Feb. 15, 1998).

http://web.archive.org/web/19980211180507/http://service.real. com/help/faq/rpub5faqa1.htm "RealPublisher 5.0 & 5.1 Frequently Asked Questions, Encoding Questions," RealNetworks, Inc. (Feb. 11, 1998).

http://web.archive.org/web/19980211180513/http://service.real. com/help/faq/rpub5faqa2.htm "RealPublisher 5.0 & 5.1 Frequently Asked Questions, Publishing Questions," RealNetworks, Inc. (Feb. 11, 1998).

http://web.archive.org/web/19980211180520/http://service.real. com/help/faq/rpub5faqa4.htm "RealPublisher 5.0 & 5.1 Frequently Asked Questions, Special Topics Questions," RealNetworks, Inc. (Feb. 11, 1998).

http://web.archive.org/web/19980211180539/http://service.real. com/help/faq/rpub5faqa4.htm "RealPublisher 5.0 & 5.1 Frequently Asked Questions, RealPublisher 5.1 Specific Questions," RealNetworks, Inc. (Feb. 11, 1998).

"Pictra lets make publishing and sharing photo albums over the Internet a snap for PC uses; award-winning software offers easy, fun way to create digital photo albums to share over Internet," Business Wire (May 12, 1997).

"Pictra Puts Your Photo Album on the Web for Free," Glenn McDonald, PCWorld (Jun. 13, 1997).

"Put Your Photo Album on the Web," Glenn McDonald, PCWorld, p. 128 (Sep. 1997).

"Software and CD-ROM Reviews on File," p. 537 (Sep. 1997, vol. 13, Issue 9).

Stan Miastkowski, "WinFax Pro takes the pain out of sharing fax/ modems," Infoworld, Oct. 11, 1993.

Announcing WinFax Pro, Version 2.0, Aug. 26, 1991.

Claim Construction Order, Civil Action No. 3:11-cv-367-O, May 21, 2012.

Info Access, Inc., HTML Transit—HTML Conversion Tool, Jan. 12, 1998.

Nebel et al., Form-Based File Upload in HTML, Nov. 1995.

Nebel, Ernesto, File Upload in HTML Forms, Sep. 23, 1994.

Point2 Internet Systems, Inc., Point2 Equipment Exchange, Making the World a Smaller Place.

HTML 4.0 Specification, Dec. 18, 1997.

Point2 Internet Systems, Inc. website screen shots, 1996-2000.

PictureWorks Technology, Inc. website screen shots, 1996-1998.

Transcript of Trial, vol. 1, 3:11-cv-00367-o, Dallas, TX, Mar. 29, 2013.

Transcript of Trial, vol. 2, 3:11-cv-00367-o, Dallas, TX, Mar. 29, 2013.

Transcript of Trial, vol. 1, 3:11-cv-00367-o, Dallas, TX, Apr. 1, 2013.

Transcript of Trial, vol. 2, 3:11-cv-00367-o, Dallas, TX, Apr. 1, 2013.

Transcript of Trial, vol. 3, 3:11-cv-00367-o, Dallas, TX, Apr. 1, 2013.

Transcript of Trial, vol. 1, 3:11-cv-00367-o, Dallas, TX, Apr. 2, 2013.

Transcript of Trial, vol. 2, 3:11-cv-00367-o, Dallas, TX, Apr. 2, 2013.

Transcript of Trial, vol. 4A, 3:11-cv-00367-o, Dallas, TX, Apr. 3, 2013.

Transcript of Trial, vol. 2, 3:11-cv-00367-o, Dallas, TX, Apr. 3, 2013.

Transcript of Trial, vol. 1, 3:11-cv-00367-o, Dallas, TX, Apr. 4, 2013.

Transcript of Trial, vol. 1, 3:11-cv-00367-o, Dallas, TX, Apr. 5, 2013.

Part 2 of Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, Civil Action No. 3:11-cv-367-O, May 20, 2013.

Part 3 of Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, Civil Action No. 3:11-cv-367-O, May 20, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Reply Brief in Support of Their Motion to Strike Summit 6's Trial Exhibit PX-1003, Civil Action No. 3:11-cv-367-O, Jun. 5, 2013.

Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Reply Brief in Support of Their Motion to Strike Summit 6's Trial Exhibit PX-1003, Civil Action No. 3:11-cv-367-O, Jun. 5, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Reply in Support of Their Renewed Motion for Judgment as a Matter of Law No. 3: Invalidity, Civil Action No. 3:11-cv-367-O, Jun. 17, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Reply Brief in Support of Their Renewed Motion for Judgment as a Matter of Law No. 3: Invalidity, Civil Action No. 3:11-cv-367-O, Jun. 17, 2013.

Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Reply Brief in Support of Their Renewed Motion for Judgment as a Matter of Law No. 3: Invalidity, Civil Action No. 3:11-cv-367-O, Jun. 17, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Reply Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, Civil Action No. 3:11-cv-367-O, Jun. 17, 2013.

Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Reply Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, Civil Action No. 3:11-cv-367-O, Jun. 17, 2013.

Memorandum Opinion and Order, Civil Action No. 3:11-cv-367-O, Jun. 26, 2013.

Final Judgment, Civil Action No. 3:11-cv-367-O, Jun. 26, 2013.

Report on the Filing or Determination of an Action Regarding a Patent or Trademark, Civil Action No. 3:11-cv-367-O, Jun. 27, 2013.

Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Brief in Support of Their Renewed Motion for Judgment as a Matter of Law No. 3: Invalidity, Civil Action No. 3:11-cv-367-O, May 20, 2013.

Part 2 of Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Brief in Support of Their Renewed Motion for Judgment as a Matter of Law No. 3: Invalidity, Civil Action No. 3:11-cv-367-O, May 20, 2013.

Part 4 of Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, Civil Action No. 3:11-cv-367-O, May 20, 2013.

Part 5 of Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, Civil Action No. 3:11-cv-367-O, May 20, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Renewed Motion for Judgment as a Matter of Law No. 3: Invalidity, Civil Action No. 3:11-cv-367-O, May 20, 2013.

## US 8,612,515 B2

Page 7

(56)            **References Cited**

OTHER PUBLICATIONS

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Brief in Support of Their Renewed Motion for Judgment as a Matter of Law No. 3: Invalidity, Civil Action No. 3:11-cv-367-O, May 20, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Motion to Strike Plaintiff's Trial Exhibit PX-1003, May 9, 2013.

Order Granting Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Motion to Strike Plaintiff's Trial Exhibit PX-1003, May 9, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Brief in Support of Their Motion to Strike Plaintiff's Trial Exhibit PX-1003, May 9, 2013.

Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, May 20, 2013.

Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Post-Trial Brief Regarding Unenforceability of the '482 Patent Due to Inequitable Conduct, May 20, 2013.

*Summit 6 LLC* v. *Research In Motion Corp.*, Civil Action No. 3:11-cv-367-O, Bench Trial Transcript vol. 1, May 6, 2013.

*Summit 6 LLC* v. *Research In Motion Corp.*, Civil Action No. 3:11-cv-367-O, Bench Trial Transcript vol. 2, May 8, 2013.

*Summit 6 LLC* v. *Research In Motion Corp.*, Civil Action No. 3:11-cv-367-O, Bench Trial Transcript vol. 3, May 13, 2013.

Request for Ex Parte Reexamination for U.S. Patent No. 7,765,482, Sep. 10, 2013.

* cited by examiner



Homes
Realtor Services
Getting Started
Send Photos
Homes
Financing
Offer & Closing
Help
Today's Rates
30-Year Fixed 6.75%
15-Year Fixed 6.45%
1-Year Adjustable 5.6%
*National average rates
Find a Loan
Rate News
Highlights
Welcome to Homes!
We hope you enjoy our site
Please send us your
feedback
Home & Rate Trackers
Receive free e-mail updates
Adding Photos to your listings
Get better exposure for your listings by including some pictures of the property. Its easy! Just locate the folder on your computer containing your photos, and then drag them into the boxes below. Select a descriptive caption for each photo and then click the "Send Photos" button.
Frequently Asked Questions
Drag Photo Here
Front View
Drag Photo Here
Front View
Drag Photo Here
Front View
Drag Photo Here
Front View
Listing Name
Send Photos

FIG. 1



Picture? PIC
Digital Image Processing by PictureWorks
☐ ($.25 charge) (optional)
Adding a photo of your item
Get better exposure for your items by including a picture. Its easy! Just locate the folder on your computer containing your photos, and then drag a photo into the box below.
Click Here to Select Images
SurroundView?
Digital Image Processing by PictureWorks
☐ ($2.00 charge) (optional)
Adding a SurroundView
Really show off your item. Add a SurroundView. Its easy! Just locate the folder on your computer containing your photos, and then drag up to six photos into the boxes below. The photos will be combined into an animated presentation.
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images
Click Here to Select Images

*FIG. 2*

PWImageControl Interface:

| Interface Name | Type | Definition | Signature |
|---|---|---|---|
| ScaleImage | function | Scales an image in place or to a temporary file | ScaleImage( destinationType as String, changeDimensions as Integer, destWidth As Integer, destHeight As Integer, destQuality As Integer, '0-100 generateOutputFilename As Boolean ' create tempfile ) As String |
| DelTempFile | sub | Deletes temporary file created with ScaleImage | DelTempFile() |
| fileName | String property | Name of file shown in image well | fileName as String |
| imageName | String property | String value from image caption box | imageName as String |
| ClearImage | sub | Clears the image from the display and redisplays the logo and instructional text | ClearImage() |
| backgroundColor | String property | Hexidecimal RGB string value in format "FFFFFF" or #FFFFFF" | backgroundColor as String |
| textColor | String property | Hexidecimal RGB string value in format "FFFFFF" or #FFFFFF" | textColor as String |

*FIG. 3*

PWMediaSendControl Interface:

| Interface Name | Type | Definition | Signature |
|---|---|---|---|
| SubmitMediaRequest | function | Transfers image and returns a status code. The action is successful if the return code is 0. If non-zero return code examine ServerRetString for a reason. | SubmitMediaRequest(<br>UserID As String, 'partner UID<br>Password As String, 'partner password<br>ServiceType As String, '"HOST" or "MIRROR"<br>IndustryCode As Integer, 'e.g., 65=real estate<br>MediaType As Integer, '1=image 2=video 3=sound<br>OpCode As Integer, '1=Add, 2=Update, 3=Delete<br>IPAddr As String, 'Destination IP address<br>filename As String, 'File to send<br>MediaGroupID As String, 'Used to build unique key<br>MediaExtendedID As String,<br>MediaSequenceNum As Integer, ' '""<br>Desc1 As String, '255 chars<br>Desc2 As String, '255 chars<br>Desc3 As String<br>preScaled as Integer) as Integer '255 chars |
| ServerRetString | String property | Return value from SubmitMediaRequest. If call made on HOST service, this string contains the IMG SRC url | ServerRetString as String |

*FIG. 4A*

```
Usage Example (VB Script)
tempFileName=DragImage1.ScaleImage(320, 240, 89, 1) 'scale the image object 'DragImage1'
result=UplHandler.SubmitMediaRequest(                 'transmit to mad central
     UserID,
     Password,
     ServiceType,
     0,
     1,
     1,
     ipAddress,
     tempFileName,
     misNum.Value,
     zipcode,
     imageCount,
     title,
     desc2,
     desc3,
     1)
DragImage3.DelTempFile                                 'delete the temp file
```

*FIG. 4B*



| FIG. 4A |
|---------|
| FIG. 4B |

*FIG. 4*

− A188 −

US 8,612,515 B2

**1**

## SYSTEM, METHOD AND APPARATUS FOR MEDIA SUBMISSION

This application is a continuation of non-provisional application Ser. No. 12/831,503, filed Jul. 7, 2010, which is a continuation of non-provisional application Ser. No. 10/961, 720, filed Oct. 8, 2004 (now U.S. Pat. No. 7,765,482), which is a continuation of non-provisional application Ser. No. 09/357,836, filed Jul. 21, 1999 (now U.S. Pat. No. 6,895,557). Each of the applications and patents identified above is incorporated by reference herein, in its entirety, for all purposes.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the handling, manipulation and processing of digital content and more particularly to the transportation and Internet publishing of digital content, particularly image media objects and rich media.

2. State of the Art

Much of the phenomenal success of the web is attributable to its graphical nature. Literally, a picture is worth a thousand words. The capture of digital images has become routine, using digital cameras and scanners. Nevertheless, although the handling of images by website creators has achieved a high degree of automation, for the average technology user (the "imaging civilian"), manipulating and sharing digital images over the Internet remains a cumbersome and daunting process. Piecemeal solutions that have been devised for handling digital images require a level of sophistication that is beyond that of the ordinary user. For example, transferring a digital image may require first downloading a FTP program, then installing it, then running it and connecting to an FTP server by typing the server name in the connection dialog, then navigating to the proper subdirectory, selecting the files to be uploaded, making sure that the program is in binary transfer mode, then sending the files. For the imaging civilian, such an involved process can be daunting to say the least.

Additionally, as technologies advance and casual users begin to experiment with other media objects, such as streaming video, 3D objects, slide shows, graphics, movies, and even sound files that accompany imaging data, the processes required to share these rich media types on the Internet becomes exponentially more complicated and prohibitive. As the realization of the Internet as an interactive, content rich medium becomes more and more a reality, the need for enabling the use and distribution of rich content and media on the Internet will become the gating factor to its long term success.

A broad-based solution to the foregoing problem requires a web-based media submission tool that allows for submission of media objects in a convenient, intuitive manner. A company named Caught in the Web, has attempted to create a broad-based media submission tool known as "ActiveUpload". ActiveUpload allows an arbitrary file to be dragged and dropped onto a web page control for upload to the web server. An ActiveUpload control allows users to, without leaving a web page, transfer files to a server (Internet or intranet) by selecting the files on the user's desktop that the user wants to transfer, then dragging them onto the web page. For example, a user, having visited a web page, can contribute pictures, documents, zip files, etc., without having to leave the web page and use an FTP program. Standard web authoring tools can be used to integrate ActiveUpload into web pages and change the behavior of the control.

Although Caught in the Web's ActiveUpload tool simplifies the user experience, it does little toward furthering "back-

**2**

end" automation in the handling and distribution of media objects and has no built in "intelligence" to streamline the process of handling and transporting rich media objects from the front end.

## SUMMARY

The present invention, generally speaking, provides an improved web-based media submission tool. As with some existing tools, operation of the tool is drag and drop or the user can "click" to browse a directory to select media objects. Unlike existing tools, the tool provides several unique and valuable functions. For example, the tool provides the user an opportunity to confirm the submission with a visual representation, for example by generating a thumbnail image of the rich media file that has been selected. Additionally, batch submission is provided to allow a user to drag and drop or select a plurality of images or other media objects. Submission from a web page to a web page is also provided for. Even more importantly, the submission tool is configurable to perform a variable amount of intelligent preprocessing on media objects prior to upload. In the case of digital images, the tool can perform sizing and formatting, for example. Information capture is performed with information being uploaded together with the media objects. In an exemplary embodiment, information capture is both user-transparent (e.g., user ID and/or password) and user-visible (e.g., the user can provide captions for media objects). The submission of information about the user and the media objects facilitates automatic integration of the media objects within existing databases.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention may be further understood from the following description in conjunction with the appended drawing. In the drawing:

FIG. **1** is a diagram of an exemplary web page providing media object acquisition functions;

FIG. **2** is a diagram of another exemplary web page providing image acquisition functions;

FIG. **3** is a table pertaining to a first portion of the Prepare and Post component design; and

FIGS. **4**A and **4**B illustrate a table pertaining to a second portion of the Prepare and Post component design.

## DETAILED DESCRIPTION

The following describes the Prepare and Post™ tools, which prepares and submits media objects from inside a standard browser, referred to as the first location, to a second location or server. The media objects may be pictures (images), movies, videos, graphics, sound clips, etc. Although in the following description the submission of images is described in greatest detail, the same principles apply equally to media objects of all descriptions.

The Prepare and Post tools refers to browser-side components which together provide the ability to submit and transport media objects over the web to be stored and served. Using the Prepare and Post tools, end users can submit images in an immediate, intuitive manner. No technical sophistication is required. In particular, understanding technical terms such as JPEG, resolution, pixel, kilobyte, transfer protocol, IP address, FTP etc., is not required, since the Prepare and Post tools handles all of these tasks for the user. The benefits of the Prepare and Post tool are:

US 8,612,515 B2

3

a) to the image submitter, the ability to submit media objects to web pages immediately without needing to overcome technical obstacles;

b) to the image submitter, the ability to submit media objects to web pages "as is" without making modifications to the media objects prior to sending;

c) to PictureWorks web site partner, access to a uniform, standardized, reliable and secure channel for media acquisition;

d) to PictureWorks web site partner, access to contributed media "made to order", it meets their imaging specifications every time without human intervention;

e) to PictureWorks web site partner, the ability to provide web site visitors with an easy, error free way to contribute media;

f) to PictureWorks web site partner, access to contributed media in "real time" with no time delays.

The two primary components used in the Prepare and Post tools which carry out these functions are 1) the media object identifier and 2) the media sender.

In general, the media object identifier functions to provide a graphical interface for placing and associating a media object from a user's desktop onto a web page. The media sender carriers out the function of transmitting media objects to a second location.

There are two ways media objects on the first location become associated with a media object identifier. The first is through a "drag and drop" behavior where the user clicks on a media object to select the one they want to submit. The media object is then dragged to the media object identifier. Releasing the mouse button associates the media object with the media object identifier. This behavior is allowed in web browsers that support drag and drop functionality. The Prepare and Post tools enable these browsers to accept media objects via drag and drop by providing the media object identifier as an ActiveX component.

The second way to associate a media object on the first location with the media object identifier is to click on the media object identifier to browse for media objects, then select the media object of choice. This method is made available for web browsers where the media object identifier needs to be a pure Java component. (Such "signed applet browsers" like Netscape Navigator) In this instance, the user may be asked to choose a media object in a similar manner as when choosing a file to be opened, either by graphical navigation or by specifying a path name. For example, a prompt associated with the media object identifier may be displayed prompting the user to click within the media object identifier. Clicking within the media object identifier brings up a browse dialog. Using the browse dialog, the user selects the desired media object, which is then placed in the media object identifier. The Prepare and Post tools will generate a visual representation or thumbnail of the media object, a feature currently not available in signed applet browsers.

Real estate is an example of a prime application of the Prepare and Post tools. "Curb appeal" is of great importance in the realty industry and can only be judged by "drive-bys," which are time-consuming and laborious, or by the availability of images. The Prepare and Post tools make real estate images readily available with a minimal amount of effort.

Referring to FIG. 1, an example is shown of a realty web page featuring the described Prepare and Post tools functionality. The user associates images with a media object identifier via the methods described above and selects appropriate captions for the images, e.g., living room, family room, etc. The captions may be typed in or selected from menus. The user also supplies identifying information, in this instance the

4

MLS listing number. When the user clicks the Send button, the images are uploaded and processed immediately according to the configuration of the Prepare and Post tools.

The Prepare and Post tools also support a batch interface, allowing a plurality of images to be submitted simultaneously as in the case of a professional photographer, for example. The opportunity for user confirmation is again provided, e.g., by displaying a visual representation of the images in the batch.

If a mistake is made such that the wrong image is placed in a media object identifier, the correct image may be placed in the media object identifier. The correct image will replace the mistaken image. Alternatively, the user may remove an image from a media object identifier by right-clicking on the media object identifier and selecting Remove within a resulting pop-up menu.

Note that any number of media object identifiers may be provided on a web page and that the media object identifiers may be separate or grouped. This is evident in FIG. 2. The number of media object identifiers provided on a page can be pre-configured and fixed, allowing no user intervention, or the media object identifiers can be generated dynamically, allowing the user to determine how many media object identifiers they need for media submission. FIG. 2 shows a web page with various sizes of media object identifiers. If a media object identifier is separate, its image will be transmitted separately to the second location. If an media object identifier is part of a group, its image will be transmitted to the second location as part of a group of images that are stored together and cataloged together. Media object identifiers that are associated together as a group are noted as such in the web page interface and transparently in the media object identifier object code. Moreover, a web page may have multiple groups of media object identifiers, or "groups of groups."

The usefulness of images is greatly enhanced by capturing and identifying information about the images and submitting the identifying information with the images. Information may be image-specific, user-specific or both. The submission of information about the user and the media objects facilitates automatic integration of the media objects within existing databases. Information capture may be overt or covert or both. This unique automatic database integration enables the images to be served with the proper web page data. Overt information capture relies upon the user to make menu selections of appropriate captions as illustrated in FIG. 1, or to make text entries within text fields, or both. The Prepare and Post tools are easily customized to accept menu selections and text fields for different applications. Covert information capture occurs by having the web browser automatically pass to the Prepare and Post tools known information such as a user ID or, password used to access the web page.

A key differentiator of the Prepare and Post tools is the browser, or client-side intelligence built into the tools. This intelligence directly provides features including those already outlined such as associating data with media objects, generating a visual representation of the media objects and generating media object identifiers dynamically or in a preset manner. Other features are also provided via this intelligence, specifically, the ability to control the width and height of the media object identifier and the ability to preprocess the media objects in any number of ways prior to transporting to a second location. In the case of an image media object for example, the Prepare and Post tools may resize the image, (i.e., increase or decrease its size as defined by either physical dimensions, pixel count, or kilobytes). Compression, for example, is a type of sizing. The Prepare and Post tools may also change the image's file format (a way of a media object

US 8,612,515 B2

5

being identified as to a "type" or "kind" of media), change the quality setting of the image, crop the image or change the aspect ratio, add text or annotations, encode or combine (including stitching) the media object, or enhance the media object by changing image values, for example, relating to contrast or saturation. This intelligence may be executed in a manner that is transparent to the end user. This transparency allows the end user to submit media to the Prepare and Post tools "as is," since the tools will automatically prepare it to meet the requirements of the second location. Note that, although image submission may involve client-side processing, image processing is not required.

The Prepare and Post tools are available for customers to integrate into their own web pages. The Prepare and Post tools are easily integrated into web sites (customers) to allows those sites to accept media objects from web site visitors (users). Appendix A is a generic HTML HostTemplate illustrating how Prepare and Post components are integrated into a web page. The HTML template file (which is a complete working example) contains instructions and a few small code snippets that the customer pastes into the web page. Integrating the Prepare and Post components requires an Initialization Section, a Configuration Section, an ImageWell (media object identifier) Section, a Submission Section and an ImageUpLoad Control Section. To include the Prepare and Post tools media object identifiers on a web page, the customer cuts and pastes code snippets for these sections from the template into the web page.

The Initialization Section consists of a few lines of JavaScript code that will download all of the needed Prepare and Post submission components.

The Configuration Section overrides various configurable default settings that the customer can control. In the Configuration Section, the media object identifier component is sized and configured to perform any preprocessing of the image that may be desired prior to upload. Configurable parameters include both fixed values for all submissions (per submission values) and fixed values for all images within a submission (per image values), as will be explained presently.

Fixed values for all submissions include DefaultImageWidth and DefaultImageHeight, as well as include DefaultControlWidth and DefaultControlHeight. The former specify the default width and height of the images after they have been compressed for transmission. The latter specify the default width and height of all media object identifiers. To create media object identifiers having different sizes, the customer specifies the desired size when creating the media object identifier. Another fixed value for all submissions is Quality. This determines the quality level of the images after they have been compressed for transmission (0 is the lowest quality/highest compression and 100 is the highest quality/lowest compression).

Fixed values for all media objects within a submission include Key**1** and Key**2**. Key**1** is the primary value that determines the filename of the resulting image file and, consequently, its URL. It is important that each submitted image have a unique name to prevent one image from overwriting another. Key**2** is an optional secondary key that is appended to Key**1** before the image's filename and URL are created. While default values for Key**1** and Key**2** can be specified in the configuration section, more likely this value will be supplied from a field in the web form. If the web page form contains a control named "Key1," then its value will be used for this key. For example, the field Key**1** might be labeled as "MLS Number" on the web page. Similarly, the field Key**2-** might be labeled "Zip Code" on the web page. A sequence number is appended to the Key**1**/Key**2** combination. When

6

there are multiple media object identifiers on a page, this will ensure that each image has a unique key.

All media object identifiers on a web page must be contained within an HTML form. A single line of JavaScript code is inserted into the web page (within the HTML form) in each place where a media object identifier is desired. The Media object identifier Section can specify the width and height for each media object identifier. If the width and height are omitted, then the default width and height from the Configuration Section are used.

The Submission Section contains HTML code that creates the button that submits both the images to the second locations and the form to the customer's server. Within the Submission Code Section, an HTML "href" parameter is required for the Send Button that causes the images to be sent. After the images have been sent, the web page form will be submitted in the standard manner. The form must define two hidden fields named "url" and imagecount." The imagecount field will contain the number of images actually transmitted. In an exemplary embodiment, the URL for images **2** through "n" are generated by replacing the initial sequence number at the end of the returned URL with the desired image number.

The ImageUpload Control Section holds a small piece of JavaScript code that is placed at the very end of the body section of the web page. This code creates the non-visible Image Upload control, or media sender, that performs the transfer of images from the user's machine to the second location.

The Prepare and Post components support multiple browsers and dynamically adjust their behavior according to the type of browser that is currently running For example, under supported versions of Microsoft's browsers, media object identifiers are implemented as ActiveX controls, while under supported Netscape browsers, media object identifiers are implemented as Java Applets. This multiple browser support is completely automatic.

FIGS. **3** and **4**A-**4**B present further details of the media object identifier and media sender components, respectively.

From the foregoing description, it will be appreciated that the present media submission tool, besides offering convenience to the end user, offers convenience and flexibility to technology partners. In particular, web page integration is designed to facilitate automatic server-side integration of media content.

It will be apparent to those of ordinary skill in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential character thereof. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes which come within the meaning and range of equivalents thereof are intended to be embraced therein.

What is claimed is:

**1**. A method for pre-processing in a client device, comprising the following computer implemented steps:

  transmitting information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier at a host server;

  receiving an identification of one or more image files, video files or audio files to associate with said account;

  receiving, by said client device, a confirmation of an intent to associate said one or more image files, video files or audio files with said account;

  pre-processing said identified one or more image files, video files or audio files using pre-processing parameters received from a remote server, said received pre-

US 8,612,515 B2

7

processing parameters enabling said client device to pre-process said identified one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content, which is based on said pre-processed one or more image files, video files or audio files, to one or more devices separate from said client device; and

transmitting said pre-processed one or more image files, video files or audio files.

**2**. The method of claim **1**, wherein said transmitting information comprises transmitting an identifier associated with a user and a password from said client device to said host server.

**3**. The method of claim **1**, wherein said receiving an identification comprises receiving a selection of one or more image files, video files or audio files in a directory listing within a user interface.

**4**. The method of claim **1**, wherein said receiving an identification comprises receiving a command that drags and drops one or more image files, video files or audio files in a user interface.

**5**. The method of claim **1**, wherein said receiving an identification comprises receiving via a web browser user interface.

**6**. The method of claim **1**, further comprising displaying a thumbnail preview of said identified one or more image files, video files or audio files.

**7**. The method of claim **1**, wherein said pre-processing comprises pre-processing using pre-processing parameters that originate with said host server.

**8**. The method of claim **7**, wherein said pre-processing comprises pre-processing using pre-processing parameters that are received in HTML code.

**9**. The method of claim **7**, wherein said pre-processing comprises pre-processing using Java code or an ActiveX component.

**10**. The method of claim **1**, wherein said pre-processing comprises reducing a file size or compressing said one or more image files, video files or audio files.

**11**. The method of claim **1**, wherein said pre-processing comprises resizing said one or more image files, video files or audio files.

**12**. The method of claim **1**, wherein said pre-processing comprises changing a file format of said one or more image files, video files or audio files.

**13**. The method of claim **1**, wherein said pre-processing comprises changing a quality of said one or more image files, video files or audio files.

**14**. The method of claim **1**, wherein said pre-processing comprises encoding or otherwise converting said one or more image files, video files or audio files.

**15**. The method of claim **1**, wherein said transmitting comprises transmitting caption information for said one or more image files, video files or audio files.

**16**. The method of claim **1**, wherein said transmitting comprises transmitting information that describes said one or more image files, video files or audio files.

**17**. The method of claim **1**, wherein said transmitting comprises transmitting information associated with an individual.

**18**. The method of claim **1**, wherein said transmitting comprises transmitting location information.

**19**. The method of claim **1**, further comprising reporting a status of said transmission of said pre-processed one or more image files, video files or audio files.

8

**20**. A client device for pre-processing, comprising:

a transmitter that transmits information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier at a host server;

a computer usable medium having computer readable program code means embodied therein for enabling a receipt of an identification of one or more image files, video files or audio files to associate with said account; and

a pre-processor that pre-processes said identified one or more image files, video files or audio files in preparation for transmission by said client device, said pre-processor using pre-processing parameters received from a remote server, said pre-processing parameters enabling said client device to pre-process said identified one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content, which is based on said pre-processed one or more image files, video files or audio files, to one or more devices separate from said client device.

**21**. A method for receiving one or more pre-processed image files, video files or audio files, comprising the following computer implemented steps:

receiving, from a client device, information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier;

transmitting pre-processing parameters to said client device, said pre-processing parameters enabling said client device to pre-process one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content to one or more devices separate from said client device;

receiving, from said client device, one or more image files, video files or audio files that have been pre-processed at said client device in accordance with said transmitted pre-processing parameters; and

storing said received pre-processed one or more image files, video files or audio files, said stored pre-processed one or more image files, video files or audio files used for subsequent transfer of content to said one or more devices separate from said client device.

**22**. A system for receiving one or more pre-processed image files, video files or audio files, comprising:

a receiver that receives, from a client device, information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier;

a transmitter that transmits pre-processing parameters to said client device, said pre-processing parameters enabling said client device to pre-process said one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content to one or more devices separate from said client device; and

a storage medium that stores one or more image files, video files or audio files received from said client device that have been pre-processed at said client device in accordance with said transmitted pre-processing parameters, said stored pre-processed one or more image files, video files or audio files used for subsequent transfer of content to said one or more devices separate from said client device.

**23**. A method for pre-processing in a client device, comprising the following computer implemented steps:

US 8,612,515 B2

9

transmitting information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier at a host server;

receiving an identification of one or more image files, video files or audio files to associate with said account;

receiving, by said client device, a confirmation of an intent to associate said one or more image files, video files or audio files with said account;

pre-processing said identified one or more image files, video files or audio files using pre-processing parameters that have been loaded onto said client device by a device separate from said client device, said pre-processing parameters enabling said client device to pre-process said identified one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content, which is based on said pre-processed one or more image files, video files or audio files, to one or more devices separate from said client device; and

transmitting said pre-processed one or more image files, video files or audio files.

**24**. The method of claim **23**, wherein said pre-processing comprises pre-processing said identified one or more image files, video files or audio files using pre-processing parameters that are received from a server device.

**25**. The method of claim **23**, further comprising receiving said pre-processing parameters from a transmission by said device that is separate from said client device.

**26**. The method of claim **23**, wherein said transmitting information comprises transmitting an identifier associated with a user and a password from said client device to said host server.

**27**. The method of claim **23**, wherein said receiving an identification comprises receiving a selection of one or more image files, video files or audio files in a listing within a user interface.

**28**. The method of claim **23**, further comprising displaying a thumbnail preview of said identified one or more image files, video files or audio files.

**29**. The method of claim **23**, wherein said pre-processing comprises reducing a file size or compressing said one or more image files, video files or audio files.

**30**. The method of claim **23**, wherein said pre-processing comprises resizing said one or more image files, video files or audio files.

**31**. The method of claim **23**, wherein said pre-processing comprises changing a file format of said one or more image files, video files or audio files.

**32**. The method of claim **23**, wherein said pre-processing comprises changing a quality of said one or more image files, video files or audio files.

**33**. The method of claim **23**, wherein said pre-processing comprises encoding or otherwise converting said one or more image files, video files or audio files.

**34**. The method of claim **23**, wherein said transmitting comprises transmitting caption information for one or more image files, video files or audio files.

**35**. The method of claim **23**, wherein said transmitting comprises transmitting information that describes one or more image files, video files or audio files.

**36**. The method of claim **23**, wherein said transmitting comprises transmitting information associated with an individual.

**37**. The method of claim **23**, wherein said transmitting comprises transmitting location information.

10

**38**. The method of claim **23**, further comprising reporting a status of said transmission of said pre-processed one or more image files, video files or audio files.

**39**. A client device for pre-processing, comprising:

a transmitter that transmits information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier at a host server;

a computer usable medium having computer readable program code means embodied therein for enabling a receipt of an identification of one or more image files, video files or audio files to associate with said account; and

a pre-processor that pre-processes said identified one or more image files, video files or audio files in preparation for transmission by said client device, said pre-processor using pre-processing parameters that have been loaded onto said client device by a device separate from said client device, said pre-processing parameters enabling said client device to pre-process said identified one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content, which is based on said pre-processed one or more image files, video files or audio files, to one or more devices separate from said client device.

**40**. A method for receiving one or more pre-processed image files, video files or audio files, comprising the following computer implemented steps:

receiving, from a client device, information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier;

receiving, from said client device, one or more image files, video files or audio files that have been pre-processed at said client device in accordance with pre-processing parameters that have been loaded onto said client device by a device separate from said client device, said pre-processing parameters enabling said client device to pre-process said one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content to one or more devices separate from said client device; and

storing said received pre-processed one or more image files, video files or audio files, said stored pre-processed one or more image files, video files or audio files used for subsequent transfer of content to said one or more devices separate from said client device.

**41**. A system for receiving one or more pre-processed image files, video files or audio files, comprising:

a receiver that receives, from a client device, information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier; and

a storage medium that stores one or more image files, video files or audio files received from said client device that have been pre-processed at said client device in accordance with pre-processing parameters that have been loaded onto said client device by a device separate from said client device, said pre-processing parameters enabling said client device to pre-process said one or more image files, video files or audio files in a manner specified by a distributing party for transfer of content to one or more devices separate from said client device, said stored pre-processed one or more image files, video files or audio files used for subsequent transfer of content to said one or more devices separate from said client device.

US 8,612,515 B2

11

**42**. The method of claim **1**, wherein said transmitting comprises transmitting an IP address.

**43**. The method of claim **1**, wherein said receiving an identification comprises receiving an identification of a plurality of image files, video files or audio files.

**44**. The method of claim **18**, wherein said location information is associated with said one or more image files, video files or audio files.

**45**. The method of claim **44**, wherein said location information includes a zip code related to said one or more image files, video files or audio files.

**46**. The method of claim **23**, wherein said transmitting comprises transmitting an IP address.

**47**. The method of claim **23**, wherein said receiving an identification comprises receiving an identification of a plurality of image files, video files or audio files.

**48**. The method of claim **37**, wherein said location information is associated with said one or more image files, video files or audio files.

**49**. The method of claim **48**, wherein said location information includes a zip code related to content of said one or more image files, video files or audio files.

**50**. A method for pre-processing in a client device, comprising the following computer implemented steps:

transmitting information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier at a host server;

receiving an identification of a plurality of image files, video files or audio files to associate with said account;

pre-processing said identified plurality of image files, video files or audio files using pre-processing parameters received from a remote server, said received pre-processing parameters enabling said client device to pre-process said identified plurality of image files, video

12

files or audio files in a manner specified by a distributing party for transfer of content, which is based on said pre-processed plurality of image files, video files or audio files, to one or more devices separate from said client device; and

transmitting said pre-processed plurality of image files, video files or audio files.

**51**. The method of claim **50**, further comprising displaying thumbnail previews of said plurality of image files, video files or audio files.

**52**. A method for pre-processing in a client device, comprising the following computer implemented steps:

transmitting information that enables access to an account that is associated with a user, said access to said account conditioned on a receipt of an identifier at a host server;

receiving an identification of a plurality of image files, video files or audio files to associate with said account;

pre-processing said identified plurality of image files, video files or audio files using pre-processing parameters that have been loaded onto said client device by a device separate from said client device, said pre-processing parameters enabling said client device to pre-process said identified plurality of image files, video files or audio files in a manner specified by a distributing party for transfer of content, which is based on said pre-processed plurality of image files, video files or audio files, to one or more devices separate from said client device; and

transmitting said pre-processed plurality of image files, video files or audio files.

**53**. The method of claim **52**, further comprising displaying thumbnail previews of said plurality of image files, video files or audio files.

\* \* \* \* \*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| SUMMIT 6 LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>HTC CORPORATION, HTC AMERICA, INC., LG ELECTRONICS INC., LG ELECTRONICS USA, INC., LG ELECTRONICS MOBILECOMM USA, INC., MOTOROLA MOBILITY LLC, APPLE INC., and TWITTER, INC.,<br><br>                    Defendants. | Case No. 7:14-cv-00014-O |

**DEFENDANTS' MOTION TO TRANSFER**
**TO THE NORTHERN DISTRICT OF CALIFORNIA**

Defendants HTC Corporation, HTC America, Inc., LG Electronics Inc., LG Electronics USA, Inc., LG Electronics MobileComm USA Inc., Motorola Mobility LLC, Apple Inc., and Twitter, Inc. (collectively, "Defendants") hereby file this Motion to Transfer to the Northern District of California.  For the reasons given in Defendants' Brief, Defendants respectfully request that the Court grant Defendants' Motion in its entirety.

Dated:  June 10, 2014

Respectfully submitted,

By:  *s/ David J. Silbert*
David J. Silbert  (*pro hac vice*)
Leo L. Lam (*pro hac vice*)
Julie A. Duncan (*pro hac vice*)
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
dsilbert@kvn.com
llam@kvn.com
jduncan@kvn.com

Brett C. Govett
FULBRIGHT & JAWORSKI
2200 Ross Ave., Suite 2800
Dallas, TX 75201-2784
Telephone:  214.855.8118
Facsimile:  214.855.8200
brett.govett@nortonrosefulbright.com

***Attorneys for Defendant TWITTER, INC.***

*s/ Hilda C. Galvan*

Hilda C. Galvan
State Bar No. 00787512
hcgalvan@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, TX 75201-1515
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

William C. Rooklidge *(pro hac vice)*
wrooklidge@jonesday.com
Mark A. Finkelstein *(pro hac vice)*
mafinkelstein@jonesday.com
Frank P. Cote *(pro hac vice)*
fcote@jonesday.com
Michelle Stover *(pro hac vice)*
mstover@jonesday.com
Doug L. Clark *(pro hac vice)*
dlclark@jonesday.com
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612-4408
Telephone:  (949) 851-3939
Facsimile:  (949) 553-7539

***Attorneys for Defendant APPLE INC.***

s/ Debora L. Sterling

Deborah L. Sterling
Texas Bar No. 19170950
QUILLING SELANDER LOWNDS
    WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Telephone:  214-871-2111
Facsimile:  214-871-2111
*dsterling@qslwm.com*

Steven J. Routh *(pro hac vice)*
ORRICK HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Tel.: (202) 339-8400
Fax: (202) 339-8500

Robert M. Isackson *(pro hac vice)*
ORRICK HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103-0001
Tel.: (212) 506-5000
Fax: (212) 506-5151

Stacey E. Stillman *(pro hac vice)*
ORRICK HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Tel: (650) 614-7400
Fax: (650) 614-7401

Hsiwen Lo *(pro hac vice)*
ORRICK HERRINGTON & SUTCLIFFE LLP

2

2050 Main Street
Suite 1100
Irvine, CA 92614-8255
Tel: (949) 567-6700
Fax: (949) 567-6710

***Attorneys for Defendants LG
ELECTRONICS, INC., LGE
ELECTRONICS USA, INC., AND LG
ELECTRONICS MOBILECOMM USA,
INC.***

 *s/ Bonnie M. Grant*                    *s/ Mashhood Rassam*

Steven D. Moore (*pro hac vice*)          Yar R. Chaikovsky (*admission pending*)
smoore@kilpatricktownsend.com             Mashhood Rassam (*pro hac vice*)
KILPATRICK TOWNSEND LLP                   Bryan K. James (*pro hac vice*)
Eighth Floor                              Philip Ou (*pro hac vice*)
Two Embarcadero Center                    Darryl J. Ong (*pro hac vice application
San Francisco, CA 94111                   pending*)
(415) 576.0200 (telephone)                MCDERMOTT WILL & EMERY LLP
(415) 576.0300 (facsimile)                275 Middlefield Road, Suite 100
                                          Menlo Park, California  94025-4004
D. Clay Holloway (*pro hac vice*)         Telephone: +1 650 815 7400
dholloway@kilpatricktownsend.com          Facsimile: +1 650 815 7401
Bonnie M. Grant (Tex. Bar No. 24067634)   Email: ychaikovsky@mwe.com
bgrant@kilpatricktownsend.com             Email: mrassam@mwe.com
Akarsh P. Belagodu (*pro hac vice*)       Email: bjames@mwe.com
abelagodu@kilpatricktownsend.com          Email: pou@mwe.com
Shayne E. O'Reilly (*pro hac vice*)       Email: djong@mwe.com
soreilly@kilpatricktownsend.com
KILPATRICK TOWNSEND LLP
Suite 2800
1100 Peachtree Street                     E. Leon Carter (Texas Bar No. 03914300)
Atlanta, Georgia 30309-4530               Linda R. Stahl (Texas Bar No. 00798525)
(404) 815-6500 (Telephone)                CARTER SCHOLER ARNETT HAMADA &
(404) 815-6555 (Facsimile)                MOCKLER, PLLC
                                          Campbell Centre II
                                          8150 N. Central Expressway, 5th Floor
GRUBER HURST JOHANSEN HAIL                 Dallas, Texas 75206
SHANK                                     Telephone: +1 214 550 8160
MICHAEL K. HURST (Bar No. 10316310)       Facsimile: +1 214 550 8185
mhurst@ghjhlaw.com                        Email: lcarter@carterscholer.com
JOSHUA M. SANDLER (Bar No. 24053680)
jsandler@ghjhlaw.com
1445 Ross Avenue                          ***Attorneys for Defendants***
Suite 2500                                ***HTC CORPORATION and HTC***
                                          ***AMERICA, INC.***

3

Dallas, Texas 75202
Telephone: 214 855 6800
Facsimile:  214 855 6808

*Attorneys for Defendant MOTOROLA*
*MOBILITY LLC*

## **<u>CERTIFICATE OF CONFERENCE</u>**

I certify that on June 3, 2014, I, along with counsel for each Defendant, conferred with Ashley Moore, counsel for Plaintiff, regarding the relief requested in this Motion to Transfer to the Northern District of California and was informed that Plaintiff opposes the relief.

*s/ David J. Silbert*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this 10th day of June, 2014, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule 5.1(d).  Any other counsel of record will be served by a facsimile transmission and/or first class mail.


_s/ David J. Silbert_

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| SUMMIT 6 LLC,<br><br>                 Plaintiff,<br><br>   v.<br><br>HTC CORPORATION, HTC AMERICA, INC., LG ELECTRONICS INC., LG ELECTRONICS USA, INC., LG ELECTRONICS MOBILECOMM USA, INC., MOTOROLA MOBILITY LLC, APPLE INC., and TWITTER, INC.,<br><br>                 Defendants. | Case Action No. 7:14-cv-00014-O |

**[PROPOSED] ORDER GRANTING DEFENDANTS'
MOTION TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA**

Having considered the papers submitted by counsel, the applicable law, the relevant pleadings and papers on file in this action, and the arguments of counsel, the Court concludes that Defendants' Motion to Transfer to the Northern District of California should be and is hereby GRANTED.

IT IS SO ORDERED.

Dated: _____, 2014

_____
Hon. Reed O'Connor
United States District Court Judge

828632.01

1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 10th day of June, 2014, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule 5.1(d). Any other counsel of record will be served by a facsimile transmission and/or first class mail.

<u>/s/ David J. Silbert</u>

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| SUMMIT 6 LLC,<br><br>                        Plaintiff,<br><br>        v.<br><br>HTC CORPORATION, HTC AMERICA, INC., LG ELECTRONICS INC., LG ELECTRONICS USA, INC., LG ELECTRONICS MOBILECOMM USA, INC., MOTOROLA MOBILITY LLC, APPLE INC., and TWITTER, INC.,<br><br>                        Defendants. | Case No. 7:14-cv-00014-O |

<u>**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA**</u>

# TABLE OF CONTENTS

Page

I.    SUMMARY OF ARGUMENT ........................................................................1

II.   RELEVANT FACTS ....................................................................................3

      A.    The development of the claimed inventions in the Northern District of
            California. ........................................................................................3

      B.    Summit 6's continued presence in Northern California and lack of
            connections to Texas. ........................................................................4

      C.    Defendants' extensive connections to California and lack of relevant
            connections to the Northern District of Texas. ..................................5

      D.    Prior litigation against Samsung. ........................................................8

      E.    Claims against Defendants in this case. ..............................................9

III.  ARGUMENT ...............................................................................................9

      A.    This case should be transferred to the Northern District of California. ..................9

            1.    This action could have been brought in the Northern District of
                  California. ..............................................................................10

            2.    The private interest factors overwhelmingly favor transfer. .....................11

                  a.    The Northern District of California would be a far more
                        convenient forum for all known witnesses. ..................................11

                  b.    The Northern District of California could compel the
                        attendance of critical third-party witnesses. ................................16

                  c.    The Northern District of California has easier access to
                        sources of proof. ....................................................................17

                  d.    Litigating in the Northern District of California would
                        resolve practical problems and make trial easier, more
                        expeditious, and less expensive. ..............................................19

            3.    The public interest factors either favor transfer to the Northern
                  District of California or are neutral. ......................................................22

                  a.    The Northern District of California has a strong local
                        interest in resolving the dispute, favoring transfer. ......................22

b.      The court congestion factor is neutral............................................24

c.      The Northern District of California is equally familiar with
        the law governing the case, and there are no
        conflicts-of-laws issues. ................................................................25

IV.     CONCLUSION.......................................................................................25

CERTIFICATE OF SERVICE .................................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*01 Communique Lab., Inc. v. LogMeIn, Inc.*
  687 F.3d 1292 (Fed. Cir. 2012) ..............................................................21

*Adaptix, Inc. v. HTC Corp.*
  937 F. Supp. 2d 867 (E.D. Tex. 2013)......................................................25

*Adkins v. Apple Inc.*
  No. 3:13-cv-00402, D.I. 55 (S.D. Tex. Apr. 3, 2014)................................25

*AllChem Performance Prods., Inc. v. Oreq Corp.*
  No. 3:11-cv-3577-D, 2013 WL 180460 (N.D. Tex. Jan. 17, 2013)............24

*EON Corp. IP Holdings, LLC v. Sensus, USA, Inc.*
  No. 2:10-cv-448, 2012 WL 122562 (E.D. Tex. Jan. 9, 2012) ...................19

*Evolutionary Intelligence, LLC v. Apple Inc.*
  No. 6:12-cv-00783, 2013 U.S. Dist. LEXIS 187467 (E.D. Tex. Aug. 27, 2013).....................25

*FutureVision.com, LLC. v. Time Warner Cable, Inc.*
  No. 6:12-cv-386, 2013 WL 5496810 (E.D. Tex. Apr. 22, 2013) .......................................16, 17

*Gates Learjet Corp. v. Jensen*
  743 F.2d 1325 (9th Cir. 1984) ...............................................................24

*Gulf Oil Corp. v. Gilbert*
  330 U.S. 501 (1947)...............................................................................22

*H-W Tech. LLC v. Apple Inc.*
  No. 3:12-cv-02580, 2012 U.S. Dist. LEXIS 106118 (N.D. Tex. July 27, 2012).....................25

*Hopewell Culture & Design, LLC v. Adobe Sys. Inc.*
  No. 2:10-cv-00586-DF, D.I. 139 (E.D. Tex. Jan. 09, 2012).....................25

*In re Acer Am. Corp.*
  626 F.3d 1252 (Fed. Cir. 2010) .................................................15, 17, 18

*In re Genentech, Inc.*
  566 F.3d 1338 (Fed. Cir. 2009) ...................................................... *passim*

*In re Hoffman-La Roche Inc.*
  587 F.3d 1333 (Fed. Cir. 2009) ..........................................................19, 22

*In re Microsoft Corp.*
630 F.3d 1361 (Fed. Cir. 2011) ............................................................23

*In re Morgan Stanley*
417 F. App'x 947 (Fed. Cir. 2011) .........................................................20

*In re TS Tech USA Corp.*
551 F.3d 1315 (Fed. Cir. 2008) ..............................................9, 17, 23, 25

*In re Verizon Bus. Network Servs. Inc.*
635 F.3d 559 (Fed. Cir. 2011) ................................................19, 20, 21

*In re Volkswagen AG*
371 F.3d 201 (5th Cir. 2004) ("*Volkswagen I*") ...............................15, 22

*In re Volkswagen of Am., Inc.*
545 F.3d 304 (5th Cir. 2008) (*en banc*) ("*Volkswagen II*").............................. *passim*

*In re Zimmer Holdings, Inc.*
609 F.3d 1378 (Fed. Cir. 2010) ..........................................20, 21, 23, 24

*Landmark Tech., LLC v. Ann Inc.*
No. 6:12-cv-00672-MHS-JDL, 2013 WL 3354451 (E.D. Tex. July 1, 2013)..........................23

*MemSmart Semiconductor Corp. v. Apple Inc.*
No. 2:13-cv-00518-JRG, D.I. 32 (E.D. Tex. Apr. 21, 2014) .................................25

*Odom v. Microsoft Corp.*
596 F. Supp. 2d 995 (E.D. Tex. 2009).....................................................22

*PersonalWeb Techs. LLC v. Apple Inc.*
No. 6:12-cv-00660-LED, D.I. 101 (E.D. Tex. Feb. 12, 2014) .................................25

*QR Spex, Inc. v. Motorola, Inc.*
507 F. Supp. 2d 650 (E.D. Tex. 2007)......................................................11

*Red River Fiber Optic Corp. v. Verizon Servs. Corp.*
No. 08-cv-0215, 2010 WL 3064012 (E.D. Tex. Aug. 3, 2010).................................20

*Summit 6 LLC v. Research in Motion Corp.*
No. 3:11-cv-367-O, 2013 U.S. Dist. LEXIS 95164 (N.D. Tex. June 26, 2013)
("*Samsung*")......................................................................... *passim*

*Synopsis, Inc. v. Ricoh Co., Ltd.*
343 F. Supp. 2d 883 (N.D. Cal. 2003) ....................................................10

*Touchscreen Gestures, LLC v. HTC Corp.*
No. 6:12-cv-00261-MHS, D.I. 17 (E.D. Tex. Mar. 27, 2013)..................................25

*USPG Portfolio Two, LLC v. John Hancock Real Estate Fin., Inc.*
   No. 3:10-cv-2466-D, 2011 WL 1103372 (N.D. Tex. Mar. 25, 2011) ................................24, 25

*VE Holding Corp. v. Johnson Gas Appliance Co.*
   917 F.2d 1574 (Fed. Cir. 1990) ................................................................................................10

**Federal Statutes**

28 U.S.C. § 1391 ...........................................................................................................................10

28 U.S.C. § 1400 ...........................................................................................................................10

28 U.S.C. § 1404 ................................................................................................................ *passim*

35 U.S.C. § 299 ................................................................................................................................1

**Federal Rules**

Fed. R. Civ. P. 45 ......................................................................................................................2, 16

Pursuant to 28 U.S.C. § 1404(a), Defendants[1] jointly respectfully request that the Court transfer this case to the United States District Court for the Northern District of California, the locus of operative facts and a clearly more convenient venue for all parties and witnesses.

## I.    SUMMARY OF ARGUMENT

Plaintiff filed a single complaint against application developer Twitter and four mobile device manufacturers and their affiliates, alleging infringement against Twitter because it "makes, uses, sells, imports, and/or offers applications, APIs, and/or functionality added to the native content sharing options for devices from co-defendants HTC Corp., HTC America, LGE Inc., LGE USA, LGE MobileComm, Motorola, and Apple"; and alleging infringement against the device makers based on each device's messaging technology and use of "the integrated Twitter content upload functionality" and "MMS-to-Twitter functionality."

The Northern District of California is a clearly more convenient venue for all five Defendants,[2] none of which has any relevant witnesses or documents in the Northern District of Texas. Twitter is headquartered in the Northern District of California, and all of its relevant evidence and witnesses are there; it has no meaningful presence in or connection with the Northern District of Texas.[3] Apple, too, is headquartered in the Northern District of California, and virtually all of its relevant documents and witnesses are there. Motorola keeps a large office in the Northern District of California that focuses on designing and finance of the mobile devices and digital-imaging technology accused in this case, so many of its relevant witnesses and documents are also in that District. The Northern District of California is also a more convenient

---

[1] "Defendants" collectively refers to Twitter, Inc. ("Twitter"); Apple Inc. ("Apple"); HTC Corporation and HTC America, Inc.; LG Electronics, Inc. ("LGE Inc."), LG Electronics USA, Inc. ("LGE USA"), and LG Electronics MobileComm USA, Inc. ("LGE MobileComm"); and Motorola Mobility LLC.

[2] For purposes of this motion, Defendants count the affiliated HTC defendants and the affiliated LGE defendants as one Defendant each, referred to as "HTC" and "LGE".

[3] It is unclear how Summit 6 purports to overcome the bar against improper joinder under 35 U.S.C. § 299 to justify suing different Defendants here in the same case. If Summit 6 is targeting Twitter technology as an alleged point of commonality among all Defendants, then its case certainly should not proceed in a venue lacking any meaningful connection to Twitter.

venue for LGE, because LG MobileComm USA, the only LGE entity that imports and sells LGE's accused devices, is headquartered in San Diego and has offices in the Northern District of California where activities related to LGE's accused devices occur. Finally, litigating this case in Northern California would be much more convenient for HTC, because its relevant U.S.-based witnesses and evidence are in Bellevue, Washington, which is significantly closer to the Northern District of California than to this District.

The Northern District of California is also a clearly more convenient venue for Plaintiff Summit 6. One of Summit 6's two employees lives in the Northern District of California, and the other lives in Midway, Utah, which is more than 200 miles closer to San Francisco than to Wichita Falls. Based on Defendants' investigation, Summit 6 has no employees or operations in Texas.

Finally, the alleged inventions were developed in the Northern District of California by companies headquartered in that District. In fact, one of the three named inventors still resides there. The patentees also investigated key prior art and took other actions relevant to Defendants' affirmative defenses in the Northern District of California. Moreover, to the extent that Summit 6's infringement allegations require Defendants to call trial witnesses with knowledge of the Android operating system (*e.g.*, Google personnel), the relevant subpoena power stems from the Northern District of California, as Google's headquarters is in that District. *See* Dkt. No. 6 ¶ 107 (accusing "the Twitter Application for Android [and] Android Tablet"). Similarly, employees of the various Defendants outside the subpoena power of this Court (*e.g.*, low-ranking engineers at Twitter knowledgeable about the Twitter functionality in the accused products) would be subject to subpoena power in the Northern District of California, where they reside, but not in this District, if, for example, Plaintiff's claims against Defendants are severed or tried sequentially one Defendant at a time or if a Defendant settles and is therefore no longer a party. *See* Fed. R. Civ. P. 45(c).

While this Court is familiar with two of the three patents-in-suit from prior litigation,[4] this case involves different defendants, witnesses, and accused technologies, and the access to sources of proof, witness convenience, availability of absolute subpoena power, local interest, and other factors weighing in favor of transfer under § 1404(a) outweigh any judicial economy from this Court hearing Plaintiff's claims against these Defendants.  Allowing the case to proceed in this District would only reward Summit 6 for its gamesmanship in establishing a sham presence in Dallas, inappropriately joining disparate defendants in one case, and bringing this combined case in Wichita Falls.  Whether Summit 6 purports to base its infringement case on the common use of Twitter technology, the native messaging functionality in the four mobile device makers' disparate smartphones, or both, there is no question—given the absence of any relevant witness or document in this District—that the Northern District of California is a clearly more convenient venue than the Northern District of Texas for all parties and witnesses.

For these reasons, and as discussed more fully below, the Court should transfer this action to the Northern District of California, a clearly more convenient venue, pursuant to 28 U.S.C. § 1404(a).

## II.    RELEVANT FACTS

### A.    The development of the claimed inventions in the Northern District of California.

The patents-in-suit are U.S. Patents Nos. 6,895,557 ("the '557 patent"), 7,765,482 ("the '482 patent"), and 8,612,515 ("the '515 patent").  The '557 patent is the parent of the other two, and all three purport to relate to processing digital images.

When the application for the '557 patent was filed, the three named inventors—Lisa Wood, Scott Lewis, and Robin Fried—were employees of PictureWorks Technology, Inc., a company based in the Northern District of California.  *See* Dkt. No. 6 ¶ 1; *see also* APPX011-APPX015 (Combined Decl. and Power of Att'y).  The cover pages of the

---

[4] *Summit 6 LLC v. Research In Motion Corp., et al.*, No. 3:11-cv-367-O (filed Feb. 23, 2011).

patents-in-suit indicate that all three named inventors resided in the Northern District of California.  *See* Dkt. No. 6, Exs. A, B, C.

In 2000, PictureWorks was acquired by iPIX (also known as Internet Pictures Corporation), an imaging technology company with a principal place of business in the Northern District of California.  *See* APPX018-APPX021 (press release).  As part of the acquisition, PictureWorks assigned to iPIX its interest in the application leading to the '557 patent, which issued in 2005.  *See* APPX023-APPX026 (patent assignment abstract of title).

Later in 2005, Sarah Pate, general manager of iPIX and former COO/CFO of PictureWorks, led a management buyout that formed AdMission Corporation.  *See* APPX028 (press release).  As part of the buyout, AdMission acquired the '557 patent and iPIX's interest in a pending continuation application that eventually led to the '482 patent.  *See* APPX025, APPX030 (patent assignment abstracts of title).  The assignments filed with the U.S. Patent & Trademark Office ("PTO") listed AdMission's address as San Ramon, California, which is in the Northern District of California.  *Id.*  On information and belief, AdMission—still operating in the Northern District of California—then tried for three years to commercialize the technology claimed in the patents-in-suit.

In May of 2008, AdMission sold its entire operating business to The Cobalt Group, retaining only its intellectual property—including the patents-in-suit—in its licensing arm, AdMission Licensing LLC.  *See* APPX028, APPX033 (press releases).  Later that year, AdMission Licensing LLC changed its name to Summit 6 LLC.  *See* APPX036 (Delaware LLC Database).  The assignments filed with the PTO to evidence the name change listed Summit 6's address as San Ramon, California.  APPX025, APPX031 (assignments).

### B.    Summit 6's continued presence in Northern California and lack of connections to Texas.

Based on Defendants' investigation, Summit 6 has two employees: Sarah Pate and Scott Lewis.  Ms. Pate resides in the Northern District of California.  *See* APPX038 (mortgage document); APPX040 (LinkedIn profile).  And Mr. Lewis resided in the Northern District of

California until the fall of 2013, moving to Midway, Utah, just months before the Complaint was filed.  APPX046 (mortgage document); APPX156 (contact report).[5]

Summit 6 purports to have its principal place of business in Dallas (not Wichita Falls). *See* Dkt. No. 6 ¶ 4.  But its alleged office at 4925 Greenville Ave., Suite 200, is a mail-stop "virtual office" that, for a monthly fee, allows businesses to use its "local professional business address" and forwards any mail it receives for them.  *See* APPX050, APPX053 (Davinci Virtual Office webpages).  Indeed, ***dozens*** of organizations list 4925 Greenville Ave., Suite 200, as their principal place of business.  *See, e.g.*, APPX055-APPX069 (sampling of other businesses using this address).  Based on Defendants' investigation, Summit 6 has no operations in Dallas, or anywhere in Texas.

### C.    Defendants' extensive connections to California and lack of relevant connections to the Northern District of Texas.

Twitter is a Delaware corporation headquartered in San Francisco, which is in the Northern District of California.  As of April 2014, Twitter employs approximately 1,960 employees in the Northern District of California.  APPX238 (Axelsen Decl.) ¶ 7.  Twitter's senior executive team is based in San Francisco, and decisions related to Twitter's overall business—including the most significant engineering, sales, and marketing decisions related to Twitter's software operations—are made there.  *Id.* ¶ 8.  Twitter's software operations are also based largely at its San Francisco headquarters.  *Id.* ¶ 9.  Indeed, the vast majority, if not all, of Twitter's employees with knowledge of the development, implementation, and operation of the systems or services described in Summit 6's Complaint work at Twitter's headquarters in San Francisco.  *Id.* ¶ 9.  In particular, Twitter's multimedia messaging services are developed by the Mobile Messaging Team, and Twitter's photo features are developed by the Photos Team, both of which are based entirely in San Francisco.  *Id.* ¶ 10.  Even at this early stage of the

---

[5] Midway, Utah, is 200 miles closer to San Francisco than to Wichita Falls.  APPX162, APPX164 (Google Maps).

proceedings, therefore, Twitter has identified two likely witnesses (described below) in the Northern District of California. Moreover, most or all of Twitter's sources of proof are located at, or accessed and managed from, Twitter's San Francisco headquarters. *Id.* ¶ 10. And given that the Complaint accuses "the Twitter Application for Android [and] Android Tablet," Dkt. No. 6 ¶ 107, potentially relevant evidence regarding Android may be in the possession of third party Google, located in Mountain View (also in the Northern District of California). Twitter does not own or lease any real property, employ any individual, or maintain any documents within the Northern District of Texas. APPX238 (Axelsen Decl.) ¶ 11.

Apple is a California corporation with its principal place of business in Cupertino, California, which is in the Northern District of California. Apple's management, research and development, and marketing are primarily based in or near Cupertino, which is also where the bulk of its decision making takes place. APPX240 (Buckley Decl.) ¶ 5. As of March 29, 2014, Apple has more than 17,400 employees who work in or near Cupertino, and it is in the process of building a new campus in Cupertino that will increase its presence there. *Id.* The vast majority, if not all, of the design, development, and marketing efforts for Apple that is relevant to this action occurred or is occurring in or near Cupertino, California. *Id.* ¶ 6. Likewise, the vast majority, if not all, of the sources of proof, including the electronic and paper records of the witnesses' work, relevant technical documents and source code, and relevant financial documents, are also located in or near Cupertino. *Id.* ¶ 7. Even at this preliminary stage of the proceedings, Apple has identified four likely witnesses (described below) in the Northern District of California.

Motorola is a Delaware limited liability company with its principal place of business in Chicago, Illinois, but it operates a large office in Sunnyvale, California, which is in the Northern District of California. As of June 2014, Motorola employs approximately 537 people in its Sunnyvale office. APPX245 (Brown Decl.) ¶ 7. Documents related to the design, development, and sales of Motorola's accused products are located in Sunnyvale, and some of the design and development work on those products occurred in Sunnyvale. *Id.* ¶ 13. Motorola has already

identified three likely witnesses who reside in the Northern District of California (described below), and it expects to identify more as the case progresses. *Id.* ¶¶ 9-10. Although Motorola currently leases real property in Fort Worth and employs 29 people there, Motorola has announced that it will terminate its lease by the end of 2014. *Id.* ¶¶ 17-19. Additionally, no activities related to the research, design, sales, or marketing of Motorola's accused products occurred in Fort Worth. Instead, the design and development of Motorola's products occurred in either Sunnyvale, California, or Chicago, Illinois, and Motorola's relevant witnesses and evidence are located in those cities. *Id.* ¶ 13.

Summit 6 has also sued three LGE entities: LGE MobileComm, LGE Inc., and LGE USA. But LGE MobileComm, a California corporation headquartered in San Diego, is the only LGE entity that imports, markets, and sells LG-branded mobile products—including the accused smartphones and related accessories—in the U.S. APPX297 (Son Decl.) ¶ 6. LGE MobileComm also leases a 25,000-square-foot office in San Jose, California (the "San Jose office"), which is in the Northern District of California. *Id.* ¶ 11. The San Jose office is staffed with one LGE MobileComm sales employee and fifty-six employees of a wholly-owned subsidiary, LG Electronics Mobile Research U.S.A., Inc. ("LGE MR"). *Id.* LGE Inc., which manufactures the accused LGE devices, is a Korean company with its headquarters, relevant employees, and documents in Seoul, South Korea. *Id.* ¶ 5. And the final LGE defendant—LGE USA—is a wholly-owned subsidiary of LGE Inc. that has no role in the importation, design, development, manufacture, or sale or the accused LGE products. *Id.* ¶ 21. Accordingly, LGE USA will not call any Texas-based employees as witnesses in this case and does not keep any relevant documents in Texas. For these reasons, and as explained in more detail below, LGE's relevant U.S. presence is in San Jose, California (which is in the Northern District of California), and in San Diego, California (which is 909 miles closer to San Francisco than to Wichita Falls), and most, if not all, of LGE's relevant U.S.-based witnesses and evidence are in those Districts. Indeed, LGE has already identified eleven likely witnesses (identified below) who reside in the Northern District of California.

Finally, Summit 6 has sued two HTC entities:  HTC Corporation, a Taiwanese parent company, and its subsidiary HTC America, Inc., which is the U.S. operating company headquartered in Bellevue, Washington.  APPX249 (Bariault Decl.) ¶¶ 2, 8.  While witnesses knowledgeable about the design, development, and functionality of HTC's mobile devices are located in Taiwan, the majority of HTC witnesses knowledgeable about the marketing, sales, and distribution of the accused devices are located at HTC America's headquarters in Bellevue, which is over 1,000 miles closer to the Northern District of California than to this District.[6]  *Id.* ¶¶ 8, 11.  Likewise, sources of proof regarding the design, development, and operation of HTC devices are located in Taiwan, while sources of proof regarding the marketing and sale of those devices in the U.S. are located in Bellevue.  *Id.* ¶ 10.  At this preliminary stage of the proceedings, HTC has identified at least one likely witness who resides in Seattle, Washington.

### D.    Prior litigation against Samsung.

In 2011, Summit 6 filed suit against seven companies in the Dallas Division of the Northern District of Texas, alleging infringement of the '557 and '482 patents (two of the three patents asserted here).  One of the defendants in that case—Samsung Telecommunications America LLC ("STA")—is headquartered in Dallas, Texas, and another Defendant—Research in Motion Ltd.—has its U.S. headquarters in Irving, Texas.  *See* APPX229, APPX231.  Thus, the defendants in that case never moved for a transfer pursuant to § 1404(a).  Only Samsung Electronics Co. Ltd. and STA proceeded to trial, where claims 40, 44-46, and 49 of the '482 patent were litigated.[7]  *See Summit 6 LLC v. Research in Motion Corp.*, No. 3:11-cv-367-O, 2013 U.S. Dist. LEXIS 95164, at *6 (N.D. Tex. June 26, 2013) ("*Samsung*").  The jury found infringement and awarded Summit 6 $15 million in damages.  The case is currently on appeal. *See Summit 6, LLC v. Samsung Electronics Co., Ltd.*, Federal Circuit Appeal No. 13-648.

_____

[6] According to Google Maps' distance tool, Bellevue, Washington, is 811 miles from San Francisco and 1,960 miles from Wichita Falls.  *See* APPX077, APPX079 (Google Maps reports).

[7] Summit 6 did not accuse Samsung of infringing the '557 patent.

### E.    Claims against Defendants in this case.

In contrast to the five claims of the '482 patent litigated through trial in the *Samsung* matter, Summit 6 alleges in this case that Defendants infringe between fifty-eight and ninety-five claims of three patents-in-suit. *See* Dkt. No. 6 ¶¶ 23, 47, 83, 95, 107, 121, 145, 181, 193, 205, 219. Summit 6's infringement allegations relate to, among other things, Defendants' respective "Application Program Interfaces" (APIs), "native content sharing options," and "Twitter" functionality, none of which was at issue in *Samsung*. *See, e.g.*, *id.* ¶¶ 5-12. Similarly, none of the dozens of mobile devices alleged to implement these features was at issue in the *Samsung* case. *See id.* ¶¶ 23, 47, 83, 95, 107, 121, 145, 181, 193, 205, 219. Moreover, the accused Apple devices run on a completely different operating system (Apple iOS) than the products at issue in *Samsung*, and Summit 6 bases its allegations against Apple in significant part on that operating system. *See id.* ¶¶ 99, 107, 197, 205.

## III.    ARGUMENT

### A.    This case should be transferred to the Northern District of California.

For the convenience of the parties and witnesses, and in the interests of justice, a district court may transfer a civil action to any other district or division where it might originally have been brought. 28 U.S.C. § 1404(a). Transfer is appropriate under § 1404(a) if, first, the action "might have been brought" in the transferee venue; and if, second, transferring the case would serve the convenience of the parties and witnesses and the interests of justice. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 312 (5th Cir. 2008) (*en banc*) ("*Volkswagen II*").[8]

To determine whether the transferee venue is more convenient, the Fifth Circuit considers both "private" and "public" interest factors. *Volkswagen II*, 545 F.3d at 315. The "private" interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing

---

[8] Fifth Circuit law regarding transfer of venue under § 1404(a) applies to this patent infringement action. *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008).

witnesses; and (4) all other practical problems that make a trial easy, expeditious and inexpensive. *Id.* The "public" interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflicts of laws or in the application of foreign law. *Id.* As set forth below, all of the private interest factors support transfer to the Northern District of California, and one of the public interest factors supports transfer, with the others being neutral.

### 1.    This action could have been brought in the Northern District of California.

Setting aside joinder issues and the impropriety of Summit 6 suing all Defendants in the same case, there can be no reasonable dispute that this action could have been brought in the Northern District of California. Because Defendants Apple and Twitter both reside in the Northern District of California, personal jurisdiction lies there and venue is appropriate under 28 U.S.C. § 1391(b)(1). Motorola and LGE MobileComm each have a regular and established place of business in the Northern District of California, so personal jurisdiction lies there and venue is appropriate under 28 U.S.C. §§ 1400(b) and 1391(c). And because HTC, HTC America, LGE USA,[9] and LGE Inc. do business in the Northern District of California, personal jurisdiction lies there and venue is appropriate under 28 U.S.C. § 1391(c)(2). *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1575-76 (Fed. Cir. 1990). Accordingly, the Northern District of California is a venue in which this action could originally have been brought against every Defendant.

---

[9] LGE USA has been registered with the Secretary of State of California to do business in California under Entity Number C1061050 since December 3, 1981. LGE USA's wholly-owned subsidiary LGE MobileComm and its indirect subsidiary LGE MR are located in California with an established place of business in the Northern District of California relating to the LGE products accused to infringe, and therefore jurisdiction and venue over LGE USA is proper in the Northern District of California. *See Synopsis, Inc. v. Ricoh Co., Ltd.*, 343 F. Supp. 2d 883, 887-88 (N.D. Cal. 2003).

### 2.     The private interest factors overwhelmingly favor transfer.

#### a.     The Northern District of California would be a far more convenient forum for all known witnesses.

Witness convenience is a critical factor under § 1404(a).  *See In re Genentech, Inc.*, 566 F.3d 1338, 1343 (Fed. Cir. 2009).  Further, courts weigh the convenience of non-party witnesses more heavily than the convenience of party witnesses.  Indeed, "the convenience of non-party witnesses is the ***most*** important consideration in analyzing a motion to transfer."  *QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650, 666 (E.D. Tex. 2007) (emphasis added).  The Fifth Circuit has established the "100-mile" rule, recognizing that where—as here—the distance between the existing and proposed venues is more than 100 miles, "the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen II*, 545 F.3d at 317.

Defendants currently know of ***no*** likely witnesses who reside in the Northern District of Texas.  In contrast, even at this early stage, Defendants have collectively identified at least the following 20 witnesses who reside in the Northern District of California who likely possess relevant information:

- **Summit 6 witnesses**
  - **Sarah F. Pate –** Managing director of Summit 6, former CEO of AdMission, and former COO/CFO of PictureWorks.  APPX040.
  - **Lisa T. Wood –** The first named inventor on all three patents-in-suit.  APPX046.
- **Twitter witnesses**
  - **Marcus Hanson** – Manager, Software Engineering, in Twitter's Mobile Messaging Team who has knowledge of the design and operation of Twitter's mobile messaging features.  APPX239 ¶ 10.
  - **Matt Lewis** – Manager, Software Engineering, in Twitter's Photo Team who has knowledge of the design and operation of Twitter's photo features.  *Id*.
- **Apple witnesses**
  - **Justin Wood** – Engineering Manager for iMessages at Apple who has knowledge of the design and operation of some of the accused products and services, including iMessage, MMS messages, and related APIs.  APPX242.

11
**– A219 –**

- o **Guy Fullerton** – Senior Staff Engineer in the iOS Productivity group at Apple who has knowledge of the design and operation of some of the accused products and services, including sharing options accessible without an app and related APIs. *Id.*

- o **Gokul Thirumalai** – Engineering Manager for Push Notification System and iMessage Delivery at Apple who has knowledge of the design and operation of some of the accused products and services, including iMessages. *Id.*

- o **Mark Buckley** – Finance Manager who has knowledge of Apple's finances as they may relate to Summit 6's claims for damages in this action. *Id.*

- **Motorola witnesses**

  - o **Naveen Aerrabotu** – A Director at Motorola who is knowledgeable about messaging-related functionality, including MMS functionality, messaging-related applications, and the use of the same to generate, process, send, and receive an MMS message on Motorola's phones. APPX245 ¶ 9.

  - o **Jason Tsyumora** – An engineer at Motorola who is also knowledgeable about Android, the operating system on Motorola's phones, and regarding the dissemination and loading of Android source code on Motorola phones. *Id.* ¶ 10.

  - o **Ben Sherwin** – An employee in Motorola's finance group who has knowledge of the sales, revenue, and costs associated with Motorola's accused products. *Id.* ¶ 11.

- **LGE witnesses**

  - o **Cecilia Son** – A Director in the Partner Engineering Team of LGE MR, a wholly-owned subsidiary of LGE MobileComm. Ms. Son and her team are located in LGE MobileComm's San Jose, California offices and have knowledge of the accused LG-branded Android devices, including product certification efforts with non-party Google. APPX297 ¶ 1.

  - o **Steven Howard, Bum Suk Bae, Joonhyun Baek, Jae Wook Cho, Dong Ho Han, Jeong Rae Kim, Kush Shrivastava, and Namrata Suryavanshi** – Members of Ms. Son's team in San Jose, California, and employees of LGE MR who are knowledgeable about the accused LG-branded Android devices, including product certification with non-party Google. *Id.* ¶ 9.

- **Additional witnesses for each non-Twitter Defendant**

  - o **Twitter employees –** As discussed herein by Twitter, all Twitter employees with relevant knowledge of the various Twitter applications used in the respective accused products of Apple, Motorola, LGE, and HTC work in Twitter's San Francisco, California headquarters, including Marcus Hanson and Matt Lewis.

- **Additional witnesses from non-party Google**

  - o **Google employees** – To the extent that Summit 6's infringement allegations require Defendants to call trial witnesses with relevant knowledge of the MMS functionalities within the Android operating system used in some of Defendants' accused products (*e.g.*, Google employees), such Google employees are believed to reside in the Northern District of California.

The parties will likely identify even more witnesses who reside in the Northern District of California and are likely to be called at trial after discovery commences, because (1) all of Twitter's employees with relevant knowledge of the accused products and services live near its San Francisco headquarters; (2) the vast majority, if not all, of Apple's employees with relevant knowledge of the accused products and services reside near its Cupertino headquarters; (3) the alleged inventions claimed in the patents-in-suit were developed in the Northern District of California; (4) the two previous owners of the patents-in-suit, PictureWorks and AdMission, were based in that District, and their former employees most likely reside there; (5) one of Summit 6's two employees resides in that District; (6) four of the five Defendants are headquartered or have major offices, and thus collectively thousands of employees, in that District; and (7) Defendants developed a number of the accused products and services there.

In addition, many other potential witnesses are likely to reside in California or in other West Coast districts, because (1) LGE MobileComm has its principal place of business in San Diego, California; (2) HTC America has its principal place of business in the State of Washington; (3) The Cobalt Group, which acquired AdMission's operating business, is headquartered in Seattle; and (4) Swiftsure Capital, which financed the management buyout that formed AdMission Corporation and helped perform the due diligence that uncovered highly relevant prior art,[10] is also headquartered in Seattle. Indeed, Defendants have already identified the following witnesses who are likely to provide relevant testimony at trial and who reside in other parts of California and on the West Coast:

_____

[10] In 2006, while the application for the '482 patent was still pending, AdMission explored opportunities to enhance its patent portfolio. As part of that endeavor, AdMission board members, assisted by Swiftsure Capital and by the Northern California law firm Fenwick & West, performed due diligence on U.S. Patent No. 6,721,802 ("the '802 patent"), which belonged to Point2 Technologies ("Point2"). *See* APPX084-APPX085 (*Samsung* trial transcript). During due diligence, however, AdMission discovered that, in 1997—more than a year before the filing date for the '557 patent—Point2 had publicly disclosed and used a photo upload facility that practiced the claims of the '557 patent. *See* APPX087-APPX099 (*Samsung* trial transcript). Concerned that Point2's photo upload facility "could seriously impair" the value of Summit 6's patent portfolio, AdMission abandoned negotiations to purchase the '802 patent. *See* APPX101-APPX102 (*Samsung* Defendants' Ex. 2029).

- **Peter Yoakum** – Former member of Summit 6's board of managers and former managing partner at Swiftsure Capital. Mr. Yoakum performed due diligence on Point2's photo upload facility and concluded that its public disclosure had endangered Summit 6's patent portfolio. Mr. Yoakum resides near Seattle, Washington. APPX151-APPX152.

- **Scott F. Wilson –** Member of Summit 6's board of managers and founder of Swiftsure Capital who was part of the team that performed due diligence on Point2's photo upload facility, a key piece of prior art. Mr. Wilson resides in Seattle, Washington. APPX048.

- **Gordon Gardiner** – Member of Summit 6's board of managers and managing partner at Swiftsure Capital. Mr. Gardiner resides in Seattle, Washington. APPX160.

- **Stephanie Bariault** – Vice President of Operations at HTC America who is knowledgeable about the design, marketing, and distribution of HTC's mobile devices. Ms. Bariault resides in Seattle, Washington. APPX250.

- **Eric Ley** – Vice President and Director of National Retail Accounts at Defendant LGE MobileComm who is knowledgeable about the sales and account management for customers of LGE's accused devices. Mr. Ley works in the San Diego, California office of LGE MobileComm. APPX297 ¶ 15.

For these witnesses, too, the Northern District of California is a significantly more convenient venue than the Northern District of Texas. For example, the distance between Seattle and the Northern District of California is approximately 1,000 miles less than the distance between Seattle and the Northern District of Texas. *See In re Genentech, Inc.*, 566 F.3d at 1345 (holding that a defendant's research and development facilities in the Southern District of California weighed in favor of transfer to the Northern District of California because "at least some of [the defendant's] employees and managers would have to travel approximately half the distance to attend trial in Northern District of California than in the Eastern District of Texas"). Furthermore, the San Francisco, Oakland, and San Jose Divisions of the Northern District of California are all home to international airports, so all known witnesses could take direct flights to that venue. By contrast, because Wichita Falls does not have a major airport, all witnesses would have to connect through the Dallas/Fort Worth airport, or drive 123 miles from that airport to Wichita Falls.[11] APPX273 (Google Maps). Litigating in Wichita Falls would be particularly

---

[11] The Wichita Falls Municipal Airport only offers four daily flights to and from the Dallas/Fort Worth airport. APPX234 (Wichita Falls Municipal Airport webpage).

inconvenient for HTC's Taiwan-based witnesses, such as Minfeng Hong,[12] who would have to take a minimum of ***three*** flights to reach Wichita Falls due to the lack of direct flights between Taiwan and Dallas-Fort Worth. *See In re Volkswagen AG*, 371 F.3d 201, 204 n.3 (5th Cir. 2004) ("*Volkswagen I*") (noting that the lack of direct flights to a proposed venue increases the inconvenience to witnesses). Similarly, LGE Inc. witnesses coming from Korea can take one of six direct flights from Seoul to San Francisco, with an approximate travel time of 10.5 hours. *See* APPX205 (Orbitz report). But there are no direct flights from Seoul to Wichita Falls, and the shortest connecting flights require an approximate total travel time of 15.5 hours. APPX211 (Orbitz report). And whereas LGE MobileComm witnesses coming from San Diego can take a 90-minute direct flight from San Diego to San Francisco, there are no direct flights to Wichita Falls, and the shortest connecting flights require an approximate total travel time of 4 hours and 45 minutes. APPX190, APPX196 (Orbitz reports).

   In summary, because (1) an overwhelming number of material witnesses reside within the transferee venue and the state of California, (2) the Northern District of California is significantly more convenient for other material witnesses who live on the West Coast and abroad, and (3) no likely witnesses reside within the Northern District of Texas, this factor weighs strongly in favor of transfer. *See In re Genentech*, 566 F.3d at 1345 (holding that the district court "clearly erred" in not finding this factor to weigh "substantially in favor of transfer" where a substantial number of witnesses resided in the transferee district and none resided in the plaintiff's chosen venue); *In re Acer Am. Corp.*, 626 F.3d 1252, 1255 (Fed. Cir. 2010) (holding, where most of the U.S.-based defendants were headquartered in California and no party was headquartered in the plaintiff's chosen district, that this factor "clearly favor[ed] transfer").

---

[12] Minfeng Hong is the manager of the research and development team responsible for HTC's MMS application. APPX249 (Bariault Decl.) ¶ 4.

### b.    The Northern District of California could compel the attendance of critical third-party witnesses.

The second private interest factor is the availability of compulsory service of process to secure the attendance of witnesses. *Volkswagen II*, 545 F.3d at 316. "This factor will weigh more heavily in favor of transfer when more third-party witnesses reside within the transferee venue." *FutureVision.com, LLC. v. Time Warner Cable, Inc.*, No. 6:12-cv-386, 2013 WL 5496810, at *4 (E.D. Tex. Apr. 22, 2013) (citing *Volkswagen II*, 545 F.3d at 316).

The Northern District of California could compel numerous non-party witnesses who reside in that District to attend both deposition and trial.  *See* Fed. R. Civ. P. 45(c)(1).  This includes (1) former employees of Summit 6 predecessors AdMission and PictureWorks who still live in the San Francisco Bay Area; (2) witnesses who investigated the Point2 photo-upload prior art; (3) current employees of both Summit 6 and Defendants who may leave their employment between now and trial and thereby become non-party witnesses but continue to reside in California; (4) employees of non-party Google; and (5) depending on how this case unfolds, employees of a current Defendant who may become non-party witnesses whom another Defendant calls to testify at its trial but who cannot be compelled to attend trial in Wichita Falls because they reside in the Northern District of California.  For example, Twitter employees would be non-party witnesses—no different from any other non-Defendant, non-party witnesses—for purposes of a trial between Summit 6 and LGE.

Because none of the known non-party witnesses resides in or near the Northern District of Texas, however, this Court could not compel their attendance.  And it is unlikely that the California-based non-party witnesses would voluntarily testify at trial in Wichita Falls given that they would have to travel almost 2,000 miles to do so. *See Volkswagen II*, 545 F.3d at 317 (noting that "it is an obvious conclusion that it is more convenient for witnesses to testify at home" and describing the burdens of traveling more than 100 miles (internal quotation marks omitted)).  Accordingly, this factor, too, weighs strongly in favor of transfer. *See In re Genentech*, 566 F.3d at 1345 (holding that where no known witnesses reside in the plaintiff's

chosen district, "[t]he fact that the transferee venue is a venue with usable subpoena power . . . weighs in favor of a transfer, and not only slightly"); *FutureVision.com*, 2013 WL 5496810, at *4 (finding that this factor "weigh[ed] strongly in favor of transfer" where the plaintiff had identified just one potential third-party witness in the chosen district and defendants had identified "several" in the transferee district).

<div align="center">

**c.    The Northern District of California has easier access to sources of proof.**

</div>

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer.  Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech*, 566 F.3d at 1345.  Moreover, the fact that some sources of proof are electronic does not diminish the relevance of this factor. *See In re TS Tech USA Corp.*, 551 F.3d 1315, 1320-21 (Fed. Cir. 2008).

This case is no exception.  Because Defendants Twitter and Apple are both headquartered in the Northern District of California, the vast majority of likely sources of proof, including documentation for the accused systems and services, are also located, accessed, or managed in the Northern District of California.  Both Defendants' relevant technical research, design, development, and testing work regarding the accused products occur in that District.  Furthermore, decisions regarding marketing, sales, and pricing of any such allegedly infringing products and services occurred predominantly at these Defendants' respective headquarters. *See In re Acer Am. Corp.*, 626 F.3d at 1256 (finding that this factor weighed in favor of transfer where the defendant's technical research, design, development, and testing work regarding the accused product occurred in the transferee district).

Similarly, Motorola has a large office in the Northern District of California that specializes in the design of its mobile devices and mobile messaging services.  APPX245-APPX246 (Brown Decl.) ¶¶ 8-10, 13.  Thus, most of Motorola's likely sources of proof are also located, accessed, or managed in the Northern District of California.  Furthermore, at least some of the design and development work of Motorola's accused products takes place in that District:

<div align="center">

17

**– A225 –**

</div>

for example, Mr. Aerrabotu's team at Motorola's Sunnyvale location is responsible for messaging-related functionality, including MMS functionality, messaging-related applications, and the use of the same to generate, process, send, and receive an MMS message at Motorola's phones. *Id.* ¶ 9.

As noted, LGE MobileComm is responsible for the importation, marketing, and sales of the accused LGE devices in the United States. LGE MobileComm anticipates that most of its likely sources of proof relevant to the functionality of the accused devices are located in its San Jose office, in the Northern District of California. APPX297 ¶ 14. Further, relevant evidence regarding the Android operating system (the operating system for some of LGE's accused products) may come from third party Google, located in Mountain View; and evidence regarding the Twitter functionality will come from Twitter, located in San Francisco. *Id.*¶¶ 12-13. Other likely sources of proof relevant to the sales and marketing of the accused LGE devices are at LGE MobileComm's principal place of business in San Diego, California. *Id.* ¶ 16. Thus, the Northern District of California has easier access to LGE MobileComm's sources of proof located in San Jose, San Francisco, Mountain View, and San Diego. *See In re Genentech*, 566 F.3d at 1346-47 (finding that this factor weighed in favor of transfer to the Northern District of California where one defendant was headquartered in that District, all of the other defendant's relevant materials were in San Diego, and no evidence was in Texas). The Northern District of California also has easier access to LGE Inc.'s sources of proof, which are located in Seoul, because (1) Seoul is more than 1,000 miles closer to San Francisco than to Wichita Falls; and (2) there are direct flights between Seoul and San Francisco, but not between Seoul and Wichita Falls. APPX221, APPX223 (Geobytes reports); APPX205, APPX211 (Orbitz reports).

For the reasons given above, the Northern District of California also has easier access to HTC's sources of proof, which are located either in the State of Washington or in Taiwan.

Finally, even Summit 6's evidence is likely to be located in the Northern District of California. The named inventors resided in the San Francisco Bay Area and were employed by Bay-Area companies when they allegedly developed the technology claimed in the

patents-in-suit.  *See* Dkt. No. 6 ¶ 1; *supra* at 3-4.  Moreover, one of Summit 6's two employees lives in the Northern District of California; the other lived there until fall 2013; and one of the three named inventors still resides in that District.  *See* APPX040, APPX044, APPX046.

Summit 6 may argue that its documents and other evidence are now in the Northern District of Texas because of the *Samsung* case, but such "artifacts of litigation" are entitled to no weight in the transfer analysis.  *See In re Verizon Bus. Network Servs. Inc.*, 635 F.3d 559, 561-62 (Fed. Cir. 2011) (rejecting plaintiff's argument that this factor weighed against transfer because plaintiff had "maintained sources of proof in Marshall, Texas[,] from its prior litigation"; those documents were "artifacts of its prior litigation"); *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336-37 (Fed. Cir. 2009) (holding that 75,000 pages of documents transferred them from California to Texas in anticipation of litigation were entitled to no weight in the transfer analysis); *see also EON Corp. IP Holdings, LLC v. Sensus, USA, Inc.*, No. 2:10-cv-448, 2012 WL 122562, at *5 (E.D. Tex. Jan. 9, 2012) (noting that the plaintiff had incorporated in Texas two years prior to filing but that it may still have done so "'in anticipation of litigation,' perhaps as to [its] prior suits in this district").  Accordingly, this factor, too, weighs in favor of transfer.

> **d.    Litigating in the Northern District of California would resolve practical problems and make trial easier, more expeditious, and less expensive.**

The final private interest factor also favors transfer, because trying the case in the Northern District of California will resolve many practical problems.  First, unlike Wichita Falls, the Northern District of California can be accessed via three international airports, which is particularly important for the international Defendants.  Second, a trial in California will greatly reduce the number of people required to travel.  If this case is tried in Wichita Falls, every single witness will have to travel, including Summit 6's witnesses.  While Summit 6 does not produce or market any products, Defendants' operations will be disrupted if their employees are required to travel to Wichita Falls.  *See* APPX243 ¶ 15; APPX247 ¶ 12; APPX254 ¶ 23.  Moreover, key witnesses' attendance may be compelled in California, whereas many non-party witnesses may

choose not to attend a trial in this District.  Finally, the vast majority of relevant evidence is already located in the Northern District of California.  For all of these reasons, litigating in the Northern District of California will be less expensive and more efficient.

Summit 6 will likely argue that it is more efficient to litigate in Texas because this Court presided over the prior *Samsung* case in the Dallas Division of the Northern District of Texas. However, the Federal Circuit has made clear that judicial economy concerns do not control when another venue is clearly more convenient.  *See In re Morgan Stanley*, 417 F. App'x 947, 949 (Fed. Cir. 2011) ("[T]he proper administration of justice may be to transfer to the far more convenient venue even when the trial court has some familiarity with a matter from prior litigation."); *In re Zimmer Holdings, Inc.*, 609 F.3d 1378, 1382 (Fed. Cir. 2010) (explaining that "the fact that [plaintiff] had also filed suit against another defendant in the same forum" did not "negate[] the significance of having trial close to where most of the identified witnesses reside and where the other convenience factors clearly favor").

In *In re Verizon*, for example, the district court denied a transfer motion based on principles of judicial economy, noting that it had issued a claim construction order in a prior case involving the same patent and asserting that, if it transferred the case, "the past two years of litigation before [it would] have to be duplicated."  635 F.3d at 561 (quoting *Red River Fiber Optic Corp. v. Verizon Servs. Corp.*, No. 08-cv-0215, 2010 WL 3064012, at *1 (E.D. Tex. Aug. 3, 2010)).  The Federal Circuit reversed, stating that "[t]o interpret § 1404(a) to hold that any prior suit involving the same patent can override a compelling showing of transfer would be inconsistent with the policies underlying § 1404(a)."  *Id.* at 562.  Principles of judicial economy would have weighed more strongly against transfer, said the court, had the other suit still been pending.  *Id.*  Because the other case had settled years before, however, any judicial economy was "too tenuous a reason to support denial of transfer."  *Id.*

Here, as in *Verizon*, there is no co-pending litigation (the *Samsung* case is on appeal and is no longer pending in the Northern District of Texas), so judicial economy concerns do not weigh strongly against transfer.  Moreover, none of products and services accused here was at

issue in the prior matter.  And whereas the *Samsung* trial involved five claims of a single patent, here Summit 6 accuses each Defendant of infringing between fifty-eight and ninety-five claims of the three patents-in-suit.  Because this case involves different defendants, different claims, an additional patent, and different accused products and services (*e.g.*, different APIs, different "native" content sharing options, and, in Apple's case, a different operating system altogether), any anticipated judicial economy is significantly lessened.  *See Zimmer*, 609 F.3d at 1382 (noting that because the two actions "involve[d] different products with only a single overlapping patent and no defendant [was] involved in both actions," it was "likely that [the] cases [would] result in significantly different discovery, evidence, proceedings, and trial").

Finally, the five claims of the '482 patent for which the jury returned a judgment of infringement are currently under reexamination, and the PTO recently issued a Final Rejection that held all five claims unpatentable.  *See* APPX107-APPX108.  It is therefore likely that these claims will be canceled or at least amended, thus eliminating any overlap with the claims this Court tried in the *Samsung* case.[13]  Even if the original claims do survive, this case will require new claim-construction proceedings that take into account additional prosecution history in light of the reexamination, which is considered intrinsic evidence in the context of construing any disputed claim terms.  *See 01 Communique Lab., Inc. v. LogMeIn, Inc.,* 687 F.3d 1292, 1298 (Fed. Cir. 2012).  In short, claim construction will have to be revisited in the present case in light of the pending reexamination.  The Northern District of California participates in the Patent Pilot Program and is equally capable of performing this new analysis.

In conclusion, the witnesses' convenience, the location of sources of proof, the availability of compulsory process, and the interests of justice all overwhelmingly favor transfer.  Further, as in *Verizon*, any judicial economy to be gained from retaining the case is minimal.

---

[13] The PTO's statistics indicate that the patent's original claims are confirmed in just 8% of *inter partes* reexams and 21% of *ex parte* reexams.  *See* APPX171 (*Inter Partes* Reexamination Filing Data); APPX178 (*Ex Parte* Reexamination Filing Data).

3.    **The public interest factors either favor transfer to the Northern District of California or are neutral.**

a.    **The Northern District of California has a strong local interest in resolving the dispute, favoring transfer.**

An important public interest factor analyzes "the local interest in having localized interests decided at home." *Volkswagen II*, 545 F.3d at 317. This factor weighs in favor of transfer where the transferee district has more factual connections to the suit than the current venue. *Id.* A district may also have a local interest in a case when it is home to a party, because the suit may call into question the reputation of individuals who work and conduct business in the community. *In re Hoffman-La Roche Inc.*, 587 F.3d at 1336. As the Fifth Circuit has explained, the local-interest factor is important because "jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Volkswagen I*, 371 F.3d at 206 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947)).

There can be no question that the Northern District of California has a strong local interest in resolving this dispute. First, one of Summit 6's two employees resides in Northern California, and the other resided there until October 2013. Second, this action concerns claimed inventions allegedly conceived and developed in, and attributed to residents of, the Northern District of California. *See* Dkt. No. 6 ¶ 1; *id.* Exs. A, B, C. Third, many of the actions giving rise to Defendants' inequitable conduct defense—namely, the due diligence performed on the Point2 prior art—took place in the Northern District of California. *See Odom v. Microsoft Corp.*, 596 F. Supp. 2d 995, 1003 (E.D. Tex. 2009) (weighing in favor of transfer the fact that agreements relevant to affirmative defenses had been negotiated in the transferee district). And finally, four of the five Defendants are headquartered or have offices in the Northern District of California, which is also where they developed many of the accused products and services, including the operating systems on the accused devices and the Twitter functionality. All together, the Defendants employ nearly 20,000 employees in the Northern District of

California.[14]  Because Summit 6's infringement allegations call into question the work and reputation of thousands of people in and around the Northern District of California, that District has a substantial local interest in the case.  *See Landmark Tech., LLC v. Ann Inc.*, No. 6:12-cv-00672-MHS-JDL, 2013 WL 3354451, at *4 (E.D. Tex. July 1, 2013) (holding that this factor favored transfer where it called into question the work and reputation of "hundreds of people" at the defendant's headquarters in the transferee district).

In contrast, other than the prior *Samsung* litigation, this case has **no** meaningful connection to the Northern District of Texas.  Nationwide sales of accused products or services do not create any local interest here.  *See In re TS Tech*, 551 F.3d at 1321 (holding that sales of accused products in the district did not create any "more or less of a meaningful connection to th[e] case" for citizens of that district than citizens of any other district where the products were sold); *Volkswagen II*, 545 F.3d at 318 (explaining that construing nationwide sales as creating a local interest "stretches logic in a manner that eviscerates [what] this factor attempts to capture").

Neither does Summit 6's contrived "presence" in Dallas create any local interest here. The Federal Circuit has expressly rejected the "fallacious assumption" that a court "must honor connections to a preferred forum made in anticipation of litigation and for the likely purpose of making that forum appear convenient."  *In re Microsoft Corp.*, 630 F.3d 1361, 1364 (Fed. Cir. 2011).  In *Zimmer Holdings*, for example, the plaintiff, MedIdea, argued that its decision to file suit in the Eastern District of Texas was entitled to deference because its principal place of business was in that district.  609 F.3d at 1381.  The court disagreed, explaining that there was no evidence, aside from MedIdea's "uncorroborated contentions," that its principal place of business was in Texas.  *Id.*  MedIdea was "attempting to game the system," said the court, "by artificially seeking to establish venue by sharing office space with another of the trial counsel's

---

[14] *See* APPX237 ¶ 7 (1,960 Twitter employees); APPX240 ¶ 5 (17,400 Apple employees); APPX245 ¶ 7 (537 Motorola employees); APPX297 ¶ 11 (57 LGE employees).

clients." *Id.* Accordingly, the court held that MedIdea had "no presence in Texas that should be given weight in the transfer analysis." *Id.*

As in *Zimmer Holdings*, Summit 6's presence in this District is "recent, ephemeral, and an artifact of litigation." 609 F.3d at 1381. Based on Defendants' investigation, Summit 6 has no employees in Texas at all. Moreover, Summit 6's attempt to "game the system" by renting virtual office space in Dallas creates no physical presence in this District that should be given weight in the transfer analysis. *Id.* There is no justification for burdening a Wichita Falls jury with a trial on a matter that has no connection to this District. In sum, this factor also weighs in favor of transfer to the Northern District of California, where the alleged inventions and the accused infringing technologies were developed.

### b.     The court congestion factor is neutral.

Another public interest factor evaluates the comparative administrative difficulties due to court congestion in the potential venues—*i.e.*, "whether a trial may be speedier in another court because of its less crowded docket." *In re Genentech*, 566 F.3d at 1347 (quoting *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984)). To answer this question, "courts commonly consider the Federal Judicial caseload statistics." *USPG Portfolio Two, LLC v. John Hancock Real Estate Fin., Inc.*, No. 3:10-cv-2466-D, 2011 WL 1103372, at *5 (N.D. Tex. Mar. 25, 2011). This is the "most speculative" of all the factors, however, because "case-disposition statistics may not always tell the whole story." *In re Genentech*, 566 F.3d at 1347.

According to the federal judiciary's most recent caseload statistics, the median time interval from filing to disposition of civil cases terminated in the Northern District of Texas is 6.8 months, whereas the median time in the Northern District of California is 6.4 months. *See* APPX074-APPX075 (U.S. District Courts—Median Time Intervals from Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2013). Because the difference in time is so small, this factor is neutral. *See AllChem Performance Prods., Inc. v. Oreq Corp.*, No. 3:11-cv-3577-D, 2013 WL 180460 (N.D.

Tex. Jan. 17, 2013) (finding this factor neutral where the difference in time to disposition was one month); *USPG Portfolio Two*, 2011 WL 1103372, at *5 (finding this factor neutral where the difference in time to disposition was 3.9 months).

> **c.     The Northern District of California is equally familiar with the law governing the case, and there are no conflicts-of-laws issues.**

The final two public interest factors—the familiarity of the forum with the governing law and the avoidance of unnecessary conflicts-of-law issues—are neutral. Both this Court and the Northern District of California are equally capable of applying the law regarding patent infringement. *See In re TS Tech*, 551 F.3d at 1320. Both Districts also participate in the Patent Pilot Program. And Defendants are not aware of any conflicts-of-laws issues.

*     *     *

For the reasons given above, all four of the Fifth Circuit's private interest factors weigh strongly in favor of transfer to the Northern District of California, and all of the public interest factors are either neutral or weigh in favor of transfer. Accordingly, the Court should transfer this case to the Northern District of California, a clearly more convenient venue, pursuant to 28 U.S.C. § 1404(a). Many Texas courts, when confronted with a plaintiff that has come to Texas to sue Northern California companies, have reached the same result.[15]

## IV.    CONCLUSION

For the reasons given, the Court should transfer this case to the Northern District of California.

---

[15] *E.g., Adkins v. Apple Inc.,* No. 3:13-cv-00402, D.I. 55 (S.D. Tex. Apr. 3, 2014*); MemSmart Semiconductor Corp. v. Apple Inc.,* No. 2:13-cv-00518-JRG, D.I. 32 (E.D. Tex. Apr. 21, 2014); *Evolutionary Intelligence, LLC v. Apple Inc.,* No. 6:12-cv-00783, 2013 U.S. Dist. LEXIS 187467 (E.D. Tex. Aug. 27, 2013); *PersonalWeb Techs. LLC v. Apple Inc.,* No. 6:12-cv-00660-LED, D.I. 101 (E.D. Tex. Feb. 12, 2014); *H-W Tech. LLC v. Apple Inc.,* No. 3:12-cv-02580, 2012 U.S. Dist. LEXIS 106118 (N.D. Tex. July 27, 2012); *Adaptix, Inc. v. HTC Corp.,* 937 F. Supp. 2d 867 (E.D. Tex. 2013); *Touchscreen Gestures, LLC v. HTC Corp.,* No. 6:12-cv-00261-MHS, D.I. 17 (E.D. Tex. Mar. 27, 2013); *Hopewell Culture & Design, LLC v. Adobe Sys. Inc.,* No. 2:10-cv-00586-DF, D.I. 139 (E.D. Tex. Jan. 09, 2012).

Dated:  June 10, 2014

Respectfully submitted,

By:  *s/ David J.Silbert*
David J. Silbert *Pro Hac Vice*
Leo L. Lam *Pro Hac Vice*
Julie A. Duncan *Pro Hac Vice*
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
dsilbert@kvn.com
llam@kvn.com
jduncan@kvn.com

Brett C. Govett
FULBRIGHT & JAWORSKI
2200 Ross Ave., Suite 2800
Dallas, TX 75201-2784
Telephone:  214.855.8118
Facsimile:  214.855.8200
brett.govett@nortonrosefulbright.com

**Attorneys for Defendant TWITTER, INC.**

*s/ Hilda C. Galvan*
Hilda C. Galvan
State Bar No. 00787512
hcgalvan@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, TX 75201-1515
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

William C. Rooklidge *(pro hac vice)*
wrooklidge@jonesday.com
Mark A. Finkelstein *(pro hac vice)*
mafinkelstein@jonesday.com
Frank P. Cote *(pro hac vice)*
fcote@jonesday.com
Michelle Stover *(pro hac vice)*
mstover@jonesday.com
Doug L. Clark *(pro hac vice)*
dlclark@jonesday.com
JONES DAY

s/ Debora L. Sterling
Deborah L. Sterling
Texas Bar No. 19170950
QUILLING SELANDER LOWNDS
    WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Telephone:  214-871-2111
Facsimile:  214-871-2111
*dsterling@qslwm.com*

Steven J. Routh (admitted *pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Tel.: (202) 339-8400
Fax: (202) 339-8500

Robert M. Isackson (admitted *pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP

26

3161 Michelson Drive, Suite 800
Irvine, CA 92612-4408
Telephone:  (949) 851-3939
Facsimile:  (949) 553-7539

**Attorneys for Defendant APPLE INC.**

666 Fifth Avenue
New York, NY 10103-0001
Tel.: (212) 506-5000
Fax: (212) 506-5151

Stacey E. Stillman (admitted *pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Tel: (650) 614-7400
Fax: (650) 614-7401

Hsiwen Lo (admitted *pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
2050 Main Street
Suite 1100
Irvine, CA 92614-8255
Tel: (949) 567-6700
Fax: (949) 567-6710

**Attorneys for Defendants LG
ELECTRONICS, INC., LGE
ELECTRONICS USA, INC., AND LG
ELECTRONICS MOBILECOMM USA,
Inc.INC.**

*s/ Bonnie M. Grant*

Steven D. Moore (pro hac vice)
smoore@kilpatricktownsend.com
KILPATRICK TOWNSEND LLP
Eighth Floor
Two Embarcadero Center
San Francisco, CA 94111
(415) 576.0200 (telephone)
(415) 576.0300 (facsimile)

D. Clay Holloway (pro hac vice)
dholloway@kilpatricktownsend.com
Bonnie M. Grant (Tex. Bar No. 24067634)
bgrant@kilpatricktownsend.com
Akarsh P. Belagodu (pro hac vice)
abelagodu@kilpatricktownsend.com
Shayne E. O'Reilly (pro hac vice)
soreilly@kilpatricktownsend.com
KILPATRICK TOWNSEND LLP
Suite 2800

*s/ Mashhood Rassam*

Yar R. Chaikovsky (*admission pending*)
Mashhood Rassam (*pro hac vice*)
Bryan K. James (*pro hac vice*)
Philip Ou (*pro hac vice*)
Darryl J. Ong (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, California  94025-4004
Telephone: +1 650 815 7400
Facsimile: +1 650 815 7401
Email: ychaikovsky@mwe.com
Email: mrassam@mwe.com
Email: bjames@mwe.com
Email: pou@mwe.com
Email: djong@mwe.com

E. Leon Carter (Texas Bar No. 03914300)
Linda R. Stahl (Texas Bar No. 00798525)

1100 Peachtree Street
Atlanta, Georgia 30309-4530
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)

GRUBER HURST JOHANSEN HAIL
SHANK
MICHAEL K. HURST (Bar No. 10316310)
mhurst@ghjhlaw.com
JOSHUA M. SANDLER (Bar No. 24053680)
jsandler@ghjhlaw.com
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
Telephone: 214 855 6800
Facsimile:  214 855 6808

*Attorneys for Defendant MOTOROLA
MOBILITY LLC*

CARTER SCHOLER ARNETT HAMADA &
MOCKLER, PLLC
Campbell Centre II
8150 N. Central Expressway, 5th Floor
Dallas, Texas 75206
Telephone: +1 214 550 8160
Facsimile: +1 214 550 8185
Email: lcarter@carterscholer.com

*Attorneys for Defendants
HTC CORPORATION and HTC
AMERICA, INC.*

28
**– A236 –**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 10th day of June, 2014, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule 5.1(d). Any other counsel of record will be served by a facsimile transmission and/or first class mail.


<u>s/  *David J. Silbert*                            </u>
David J. Silbert

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| SUMMIT 6 LLC, | Case No. 7:14-cv-00014-O |
| Plaintiff, | |
| v. | |
| HTC CORPORATION, HTC AMERICA, INC., LG ELECTRONICS INC., LG ELECTRONICS USA, INC., LG ELECTRONICS MOBILECOMM USA, INC., MOTOROLA MOBILITY LLC, APPLE INC., and TWITTER, INC., | |
| Defendants. | |

**APPENDIX TO**

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO TRANSFER TO THE
NORTHERN DISTRICT OF CALIFORNIA**

| No. | Document Description | Page No. |
|---|---|---|
| 1. | Declaration of Julie Duncan in support of Defendants' Motion to Transfer | APPX001 - 009 |
| 2. | Combined Declaration and Power of Attorney for Utility Patent Application for U.S. Patent Application No. 09/357,836 (Exhibit A to Declaration of Julie Duncan) | APPX010 - 016 |
| 3. | Press release jointly issued on March 8, 2000, by iPIX and PictureWorks Technology, Inc. (Exhibit B to Declaration of Julie Duncan) | APPX017 - 021 |
| 4. | USPTO Patent Assignment Abstract of Title for U.S. Patent No. 6,895,557 to Wood et al. (Exhibit C to Declaration of Julie Duncan) | APPX022 - 026 |
| 5. | Press release regarding AdMission from Swiftsure Capital LLC (Exhibit D to Declaration of Julie Duncan) | APPX027 - 028 |
| 6. | USPTO Patent Assignment Abstract of Title for U.S. Patent No. 7,765,482 to Wood et al. (Exhibit E to Declaration of Julie Duncan) | APPX029 - 031 |
| 7. | AdMission Press Release regarding acquisition by Cobalt (Exhibit F to Declaration of Julie Duncan) | APPX032 - 034 |

| No. | Document Description | Page No. |
|---|---|---|
| 8. | Delaware Division of Corporations Entity Details on Summit 6 LLC (Exhibit G to Declaration of Julie Duncan) | APPX035 - 036 |
| 9. | Wells Fargo Bank, N.A., Substitution of Trustee and Full Reconveyance dated August 30, 2013 (Exhibit H to Declaration of Julie Duncan) | APPX037 - 038 |
| 10. | LinkedIn profile of Sarah Pate (Exhibit I to Declaration of Julie Duncan) | APPX039 - 042 |
| 11. | Full Reconveyance recorded with the County Clerk Recorder of Contra Costa County, California, on October 17, 2013 (Exhibit J to Declaration of Julie Duncan) | APPX043 - 044 |
| 12. | Full Reconveyance recorded with the County Clerk Recorder of Contra Costa County, California, on July 16, 2013 (Exhibit K to Declaration of Julie Duncan) | APPX045 - 046 |
| 13. | Scott F. Wilson's biography on the website of Swiftsure Capital LLC (Exhibit L to Declaration of Julie Duncan) | APPX047 - 048 |
| 14. | Davinci Virtual Office Solutions' webpage advertising its virtual office at 4925 Greenville Ave., Dallas, TX 75206 (Exhibit M to Declaration of Julie Duncan) | APPX049 - 051 |
| 15. | Davinci Virtual Office Solutions' "Contact Us" webpage (Exhibit N to Declaration of Julie Duncan) | APPX052 - 053 |
| 16. | YP.com webpage advertising a personal injury law firm located at 4925 Greenville Ave., Suite 200, Dallas, TX 75206 (Exhibit O to Declaration of Julie Duncan) | APPX054 - 056 |
| 17. | LeForce Law, PLLC "Contact Us" webpage (Exhibit P to Declaration of Julie Duncan) | APPX057 - 061 |
| 18. | Dallas Geological Society "Contact Us" webpage (Exhibit Q to Declaration of Julie Duncan) | APPX062 - 063 |
| 19. | Law Office of S. Craig Glickman "Locations" webpage (Exhibit R to Declaration of Julie Duncan) | APPX064 - 065 |
| 20. | The Coles Firm "Contact Us" webpage (Exhibit S to Declaration of Julie Duncan) | APPX066 - 067 |
| 21. | Rothrock Law Firm PL webpage (Exhibit T to Declaration of Julie Duncan) | APPX068 - 071 |
| 22. | Table C-5, U.S. District Courts—Median Time Intervals from Filing to Disposition of Civil Cases Terminated (Exhibit U to Declaration of Julie Duncan) | APPX072 - 075 |
| 23. | Bellevue, Washington, to San Francisco, California - Google Maps (Exhibit V to Declaration of Julie Duncan) | APPX076 - 077 |
| 24. | Bellevue, Washington, to Wichita Falls, Texas - Google Maps (Exhibit W to Declaration of Julie Duncan) | APPX078 - 082 |
| 25. | March 29, 2013 trial transcript excerpt from *Summit 6 LLC v. Research in Motion Corp. et al.*, No. 3:11-cv-00367-O (Exhibit X to Declaration of Julie Duncan) | APPX083 - 085 |

| No. | Document Description | Page No. |
|---|---|---|
| 26. | April 3, 2013 trial transcript excerpt from *Summit 6 LLC v. Research in Motion Corp. et al.*, No. 3:11-cv-00367-O <br> (Exhibit Y to Declaration of Julie Duncan) | APPX086 - 099 |
| 27. | Email from Peter Yoakum dated March 14, 2006, which was submitted as Defendants' Exhibit 2128 in *Summit 6 LLC v. Research in Motion Corp. et al.*, No. 3:11-cv-00367-O <br> (Exhibit Z to Declaration of Julie Duncan) | APPX100 - 102 |
| 28. | USPTO Final Office Action issued on May 21, 2014, in *ex parte* Reexamination No. 90/012,987 <br> (Exhibit AA to Declaration of Julie Duncan) | APPX103 - 134 |
| 29. | Deed of Trust recorded with the Auditor of Kitsap County, Washington, and signed by Peter Yoakum and Julie Yoakum on April 4, 2014 <br> (Exhibit BB to Declaration of Julie Duncan) | APPX135 - 152 |
| 30. | San Diego, California, to San Francisco, California - Google Maps <br> (Exhibit CC to Declaration of Julie Duncan) | APPX153 - 154 |
| 31. | Contact report for Scott Lewis from public records search engine PeopleSmart <br> (Exhibit DD to Declaration of Julie Duncan) | APPX155 - 158 |
| 32. | Gordon Gardiner's biography on Swiftsure Capital LLC's website <br> (Exhibit EE to Declaration of Julie Duncan) | APPX159 - 160 |
| 33. | Midway, Utah, to San Francisco, California - Google Maps <br> (Exhibit FF to Declaration of Julie Duncan) | APPX161 - 162 |
| 34. | Midway, Utah, to Wichita Falls, Texas - Google Maps <br> (Exhibit GG to Declaration of Julie Duncan) | APPX163 - 168 |
| 35. | USPTO *Inter Partes* Reexamination Filing Data <br> (Exhibit HH to Declaration of Julie Duncan) | APPX169 - 175 |
| 36. | USPTO *Ex Parte* Reexamination Filing Data <br> (Exhibit II to Declaration of Julie Duncan) | APPX176 - 188 |
| 37. | Orbitz estimate of travel times and costs for flights from San Diego Airport ("SAN") to San Francisco International Airport ("SFO") <br> (Exhibit JJ to Declaration of Julie Duncan) | APPX189 - 194 |
| 38. | Orbitz estimate of travel times and costs for flights from San Diego Airport ("SAN") to Wichita Falls Municipal Airport ("SPS") <br> (Exhibit KK to Declaration of Julie Duncan) | APPX195 - 203 |
| 39. | Orbitz estimate of travel times and costs for flights from Seoul, South Korea, to San Francisco International Airport ("SFO") <br> (Exhibit LL to Declaration of Julie Duncan) | APPX204 - 209 |
| 40. | Orbitz estimate of travel times and costs for flights from Seoul, South Korea, to Wichita Falls Municipal Airport ("SPS") <br> (Exhibit MM to Declaration of Julie Duncan) | APPX210 - 219 |
| 41. | Distance between Seoul, South Korea, and San Francisco, California - Geobytes.com <br> (Exhibit NN to Declaration of Julie Duncan) | APPX220 - 221 |

| No. | Document Description | Page No. |
|-----|---------------------|----------|
| 42. | Distance between Seoul, South Korea, and Wichita Falls, Texas - Geobytes.com <br> (Exhibit OO to Declaration of Julie Duncan) | APPX222 - 223 |
| 43. | Distance between San Diego, California, and San Francisco, California - Geobytes.com <br> (Exhibit PP to Declaration of Julie Duncan) | APPX224 - 225 |
| 44. | Distance between San Francisco, California, and Wichita Falls, Texas - Geobytes.com <br> (Exhibit QQ to Declaration of Julie Duncan) | APPX226 - 227 |
| 45. | Samsung Telecommunications America – "Our Company" webpage <br> (Exhibit RR to Declaration of Julie Duncan) | APPX228 - 229 |
| 46. | Blackberry – "Contact Information" webpage <br> (Exhibit SS to Declaration of Julie Duncan) | APPX230 - 232 |
| 47. | Wichita Falls Municipal Airport – "Flights & Reservations" webpage <br> (Exhibit TT to Declaration of Julie Duncan) | APPX233 - 236 |
| 48. | Declaration of Ed Axelsen in support of Defendants' Motion to Transfer | APPX237 - 239 |
| 49. | Declaration of Mark Buckley in support of Defendants' Motion to Transfer | APPX240 - 244 |
| 50. | Declaration of Renee Brown in support of Defendants' Motion to Transfer | APPX245 - 248 |
| 51. | Declaration of Stephanie Bariault in support of Defendants' Motion to Transfer | APPX249 - 255 |
| 52. | Orbitz estimate of travel times and costs for flights from Seattle-Tacoma International Airport to San Francisco International Airport <br> (Exhibit 1 to Declaration of Stephanie Bariault) | APPX256 – 261 |
| 53. | Google Maps: Driving Directions showing distance from San Francisco International Airport to the San Francisco Courthouse. <br> (Exhibit 2 to Declaration of Stephanie Bariault) | APPX262 - 264 |
| 54. | Orbitz estimate of travel times and costs for flights from Seattle-Tacoma International Airport to Wichita Falls Municipal Airport <br> (Exhibit 3 to Declaration of Stephanie Bariault) | APPX265 - 271 |
| 55. | Google Directions from Dallas/Fort Worth International Airport ("DFW") to the Wichita Falls Courthouse <br> (Exhibit 4 to Declaration of Stephanie Bariault) | APPX272 - 274 |
| 56. | Orbitz estimate of travel times from Taiwan Taoyuan International Airport ("TPE") to San Francisco International Airport ("SFO") <br> (Exhibit 5 to Declaration of Stephanie Bariault) | APPX275 - 281 |
| 57. | Orbitz estimate of travel times from Taiwan Taoyuan International Airport ("TPE") to Wichita Falls Municipal Airport ("SPS") <br> (Exhibit 6 to Declaration of Stephanie Bariault) | APPX282 - 289 |
| 58. | Directions from Dallas/Fort Worth Airport ("DFW") to Dallas Courthouse – Google Maps <br> (Exhibit 7 to Declaration of Stephanie Bariault) | APPX290 - 292 |

| No. | Document Description | Page No. |
|-----|---------------------|----------|
| 59. | Directions from Dallas/Fort Worth Airport ("DFW") to Fort Worth Courthouse – Google Maps (Exhibit 8 to Declaration of Stephanie Bariault) | APPX293 - 296 |
| 60. | Declaration of Cecilia Son in support of Defendants' Motion to Transfer | APPX297 - 301 |

Dated:  June 10, 2014

Respectfully submitted,

By:  *s/ David J. Silbert*
David J. Silbert (*pro hac vice*)
Leo L. Lam (*pro hac vice*)
Julie A. Duncan (*pro hac vice*)
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
dsilbert@kvn.com
llam@kvn.com
jduncan@kvn.com

Brett C. Govett
FULBRIGHT & JAWORSKI
2200 Ross Ave., Suite 2800
Dallas, TX 75201-2784
Telephone:  214.855.8118
Facsimile:  214.855.8200
brett.govett@nortonrosefulbright.com

***Attorneys for Defendant TWITTER, INC.***

*s/ Hilda C. Galvan*
Hilda C. Galvan
State Bar No. 00787512
hcgalvan@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, TX 75201-1515
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

William C. Rooklidge (*pro hac vice*)

s/ Debora L. Sterling
Deborah L. Sterling
Texas Bar No. 19170950
QUILLING SELANDER LOWNDS
    WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Telephone:  214-871-2111
Facsimile:  214-871-2111
*dsterling@qslwm.com*

5
**– A242 –**

wrooklidge@jonesday.com
Mark A. Finkelstein (*pro hac vice*)
mafinkelstein@jonesday.com
Frank P. Cote (*pro hac vice*)
fcote@jonesday.com
Michelle Stover (*pro hac vice*)
mstover@jonesday.com
Doug L. Clark (*pro hac vice*)
dlclark@jonesday.com
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612-4408
Telephone: (949) 851-3939
Facsimile: (949) 553-7539

**Attorneys for Defendant APPLE INC.**

Steven J. Routh (*pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Tel.: (202) 339-8400
Fax: (202) 339-8500

Robert M. Isackson (*pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103-0001
Tel.: (212) 506-5000
Fax: (212) 506-5151

Stacey E. Stillman (*pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Tel: (650) 614-7400
Fax: (650) 614-7401

Hsiwen Lo (*pro hac vice*)
ORRICK HERRINGTON & SUTCLIFFE LLP
2050 Main Street
Suite 1100
Irvine, CA 92614-8255
Tel: (949) 567-6700
Fax: (949) 567-6710

**Attorneys for Defendants LG ELECTRONICS, INC., LGE ELECTRONICS USA, INC., AND LG ELECTRONICS MOBILECOMM USA, INC.**

*s/ Bonnie M. Grant*

Steven D. Moore (*pro hac vice*)
smoore@kilpatricktownsend.com
KILPATRICK TOWNSEND LLP
Eighth Floor
Two Embarcadero Center
San Francisco, CA 94111
(415) 576.0200 (telephone)

*s/ Mashhood Rassam*

Yar R. Chaikovsky (*admission pending*)
Mashhood Rassam (*pro hac vice*)
Bryan K. James (*pro hac vice*)
Philip Ou (*pro hac vice*)
Darryl J. Ong (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100

6

**– A243 –**

(415) 576.0300 (facsimile)

D. Clay Holloway (*pro hac vice*)
dholloway@kilpatricktownsend.com
Bonnie M. Grant (Tex. Bar No. 24067634)
bgrant@kilpatricktownsend.com
Akarsh P. Belagodu (*pro hac vice*)
abelagodu@kilpatricktownsend.com
Shayne E. O'Reilly (*pro hac vice*)
soreilly@kilpatricktownsend.com
KILPATRICK TOWNSEND LLP
Suite 2800
1100 Peachtree Street
Atlanta, Georgia 30309-4530
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)

GRUBER HURST JOHANSEN HAIL
SHANK
MICHAEL K. HURST (Bar No. 10316310)
mhurst@ghjhlaw.com
JOSHUA M. SANDLER (Bar No. 24053680)
jsandler@ghjhlaw.com
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
Telephone: 214 855 6800
Facsimile:  214 855 6808

*Attorneys for Defendant MOTOROLA
MOBILITY LLC*

Menlo Park, California  94025-4004
Telephone: +1 650 815 7400
Facsimile: +1 650 815 7401
Email: ychaikovsky@mwe.com
Email: mrassam@mwe.com
Email: bjames@mwe.com
Email: pou@mwe.com
Email: djong@mwe.com

E. Leon Carter (Texas Bar No. 03914300)
Linda R. Stahl (Texas Bar No. 00798525)
CARTER SCHOLER ARNETT HAMADA &
MOCKLER, PLLC
Campbell Centre II
8150 N. Central Expressway, 5th Floor
Dallas, Texas 75206
Telephone: +1 214 550 8160
Facsimile: +1 214 550 8185
Email: lcarter@carterscholer.com

*Attorneys for Defendants
HTC CORPORATION and HTC
AMERICA, INC.*

7

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 10th day of June, 2014, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule 5.1(d). Any other counsel of record will be served by a facsimile transmission and/or first-class mail.

_s/  David J. Silbert_

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| SUMMIT 6 LLC, | Case Action No. 7:14-cv-00014-O |
| Plaintiff, | |
| v. | |
| HTC CORPORATION, HTC AMERICA, INC., LG ELECTRONICS INC., LG ELECTRONICS USA, INC., LG ELECTRONICS MOBILECOMM USA, INC., MOTOROLA MOBILITY LLC, APPLE INC., and TWITTER, INC., | |
| Defendants. | |

## DECLARATION OF JULIE DUNCAN IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA

I, JULIE DUNCAN, declare as follows:

1.      I am an attorney with the law firm of Keker & Van Nest LLP, counsel for Defendant Twitter, Inc. in this proceeding.

2.      I am a member in good standing of the State Bar of California, have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would testify competently to such facts under oath.

3.      I make this Declaration in support of Defendants' Motion to Transfer to the Northern District of California.

4.      Attached hereto as Exhibit A is a true and correct copy of the Combined Declaration and Power of Attorney for Utility Patent Application for U.S. Patent Application No. 09/357,836, which led to the issuance of U.S. Patent No. 6,895,557.  On page APPX015, Picture Works Technology, Inc.'s address is listed as 649 San Ramon Valley Blvd., Danville, California.

5.      Attached hereto as Exhibit B is a true and correct copy of a press release jointly issued on March 8, 2000, by iPIX and PictureWorks Technology, Inc., which was attached as Exhibit 99.1 to Internet Picture Corporation's March 14, 2000 Form 8-K, and is available at http://www.sec.gov/Archives/edgar/data/1088022/000095014400003143/0000950144-00-003143.txt.  Page APPX021 indicates that iPIX was co-headquartered in Oak Ridge, Tennessee, and in Palo Alto, California.

6.      Attached hereto as Exhibit C is a true and correct copy of the Patent Assignment Abstract of Title for U.S. Patent No. 6,895,557, last accessed on April 25, 2014, via the following link: http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=6895557&pub=&asnr=&asnri=&asne=&asnei=&asns.

7.      Attached hereto as Exhibit D is a true and correct copy of a webpage hosted by Swiftsure Capital, last accessed on April 4, 2014, via the following link: http://www.swiftsurecapital.com/admission.html.

1

APPX002

8.      Attached hereto as Exhibit E is a true and correct copy of the Patent Assignment Abstract of Title for U.S. Patent No. 7,765,482, last accessed on April 1, 2014, via the following link:

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=7765482&pub=&asnr=&asnri=&asne=&asnei=&asns.

9.      Attached hereto as Exhibit F is a true and correct copy of a press release dated May 7, 2008, obtained from the Internet Archive's October 20, 2008 entry for http://admission.net/cobalt/.  The webpage is also available via the following link:

http://web.archive.org/web/20081020053818/http://admission.net/cobalt/.

10.      Attached hereto as Exhibit G is a true and correct copy of the Entity Details on Summit 6 LLC, obtained from the website of the Delaware Division of Corporations on April 21, 2014.

11.      Attached hereto as Exhibit H is a true and correct copy of the Substitution of Trustee and Full Reconveyance that Wells Fargo Bank, N.A., recorded with the County Clerk-Recorder of Contra Costa County, California, on August 30, 2013.  The first paragraph indicates that Sarah F. Pate and David V. Pate executed the relevant Deed of Trust, and the address listed on the top left-hand corner indicates that, at least as of August 30, 2013, they resided in Alamo, CA 94507.

12.      Attached hereto as Exhibit I is a true and correct copy of Sarah Pate's LinkedIn profile, last accessed on May 27, 2014, via the following link:

https://www.linkedin.com/profile/view?id=8529028&authType=NAME_SEARCH&authToken=adqC&locale=en_US&srchid=526176331398208945112&srchindex%E2%80%A6.  Ms. Pate's profile indicates that she resides in the "San Francisco Bay Area."

13.      Attached hereto as Exhibit J is a true and correct copy of a Full Reconveyance recorded with the County Clerk-Recorder of Contra Costa County, California, on October 17, 2013.

APPX003

14.     Attached hereto as Exhibit K is a true and correct copy of a Full Reconveyance recorded with the County Clerk-Recorder of Contra Costa County, California, on July 16, 2013. The address in the upper left indicates that, at least as of July 16, 2013, Lisa T. Wood resided in Danville, California.

15.     Attached hereto as Exhibit L is a true and correct copy of Scott F. Wilson's biography as hosted on Swiftsure Capital's website, last accessed on May 23, 2014, via the following link: http://www.swiftsurecapital.com/scott-f-wilson.html.

16.     Attached hereto as Exhibit M is a true and correct copy of Davinci Virtual Office Solutions' webpage advertising its virtual office at 4925 Greenville Ave., Dallas, Texas, last accessed on May 23, 2014, via the following link:

http://www.davincivirtual.com/loc/us/texas/dallas-virtual-offices/facility-664.

17.     Attached hereto as Exhibit N is a true and correct copy of Davinci Virtual Office Solutions' "Contact Us" webpage, last accessed on April 25, 2014, via the following link: http://www.davincivirtual.com/contact-us?s=664.  Immediately above the "Comments" box, the webpage contains a drop-down menu indicating that Davinci Virtual Office Solutions has a virtual office in Suite 200 of the building located at 4925 Greenville Ave., Dallas, Texas.

18.     Attached hereto as Exhibit O is a true and correct copy of a webpage last accessed on May 23, 2014, via the following link: http://www.yellowpages.com/dallas-tx/mip/attorneys-at-law-rick-weaver-personal-injury-law-firm-480112070.  This webpage advertises 4925 Greenville Ave., Suite 200, Dallas, TX 75206, as the location of a personal-injury law firm.

19.     Attached hereto as Exhibit P is a true and correct copy of a webpage last accessed on May 23, 2014, via the following link: http://leforcelaw.com/contact-us/.  The webpage advertises 4925 Greenville Ave., Suite 200, Dallas, TX 75206, as the location of LeForce Law, PLLC.

20.     Attached hereto as Exhibit Q is a true and correct copy of a webpage last accessed on May 27, 2014, via the following link: http://dgs.org/memberships/applications.  The webpage

APPX004

advertises 4925 Greenville Ave., Suite 200, Dallas, TX 75206, as the location of the Dallas Geological Society.

21.    Attached hereto as Exhibit R is a true and correct copy of a webpage last accessed on April 4, 2014, via the following link: http://craigglickmanlaw.com/map. The webpage advertises 4925 Greenville Ave., Suite 200, Dallas, TX 75206, as the location of the law offices of S. Craig Glickman.

22.    Attached hereto as Exhibit S is a true and correct copy of a webpage last accessed on April 4, 2014, via the following link: http://www.colesfirm.com/ContactUs.html.  The webpage advertises 4925 Greenville Ave., Suite 200, Dallas, TX 75206, as the location of The Coles Firm.

23.    Attached hereto as Exhibit T is a true and correct copy of a webpage last accessed on May 27, 2014, via the following link: http://www.rothrocklawfirm.com/.  The webpage advertises 4925 Greenville Ave., Suite 200, Dallas, TX 75206, as the location of Rothrock Law Firm PL.

24.    Attached hereto as Exhibit U is a true and correct copy of Table C-5, U.S. District Courts—Median Time Intervals from Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period ending March 31, 2014.  This PDF is also available via the following link:

http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJudicialCaseloadStatistics/2013/tables/C05Mar13.pdf.

25.    Attached hereto as Exhibit V is a true and correct copy of a report from the website http://maps.google.com.  The report indicates that the driving distance from Bellevue, Washington, to San Francisco, California, is 809 miles, and that a direct flight between the two cities is 1 hour and 55 minutes long.

26.    Attached hereto as Exhibit W is a true and correct copy of a report from the website http://maps.google.com.  The report indicates that the driving distance from Bellevue, Washington, to Wichita Falls, Texas, is 1,960 miles.

APPX005

27.    Attached hereto as Exhibit X is a true and correct copy of an excerpt from the March 29, 2013 trial transcript in *Summit 6 LLC v. Research in Motion Corp. et al.*, Cv. No. 3:11-cv-00367-O, which was included in the Appendix to Defendant Samsung's Brief in Support of Its Opposition to Plaintiff Summit 6 LLC's Motion for Judgment As a Matter of Law That There Can Be No Inequitable Conduct Based on the Jury's Verdict that the Patent In Suit is Valid Over the Point2 Reference, Docket # 574.  The transcript indicates that Sarah F. Pate testified that Peter Yoakum had investigated the Point2 reference with help from two attorneys from Fenwick & West.

28.    Attached hereto as Exhibit Y is a true and correct copy of an excerpt from the April 3, 2013 trial transcript in *Summit 6 LLC v. Research in Motion Corp. et al.*, Cv. No. 3:11-cv-00367-O, which was included in the Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Brief in Support of Their Opposition to Plaintiff Summit 6 LLC's Motion for Judgment As a Matter of Law That There Can Be No Inequitable Conduct Based on the Jury's Verdict that the Patent In Suit is Valid Over the Point2 Reference, Docket # 574.  The transcript indicates that Peter Yoakum testified, via video deposition, that he had performed due diligence on the Point2 reference with help from two attorneys from Fenwick & West and that, as of April 13, 2006, he believed that the early disclosure of the Point2 Photo Upload Facility could "seriously impair" value of the '557 patent.

29.    Attached hereto as Exhibit Z is a true and correct copy of an email from Peter Yoakum dated 04/13/2006, which was submitted as Defendants' Exhibit 2029 in *Summit 6 LLC v. Research in Motion Corp. et al.*, Cv. No. 3:11-cv-00367-O, and which was included in the Appendix to Defendants Samsung Electronics Co., Ltd. and Samsung Telecommunications America, LLC's Brief in Support of Their Renewed Motion for Judgment As a Matter of Law No. 3: Invalidity, Docket # 621.  In paragraph 3 of the email, Peter Yoakum indicates that he told individuals from Point2 that "Point2's early disclosure . . . could seriously impair the value of several commercially important features contained in 557 [patent's] claims" and that Summit 6

5

APPX006

(then AdMission) "may be obligated to spend more $ to improve or resuscitate [its] own patent(s) as a result of the Point2 disclosure."

30.    Attached hereto as Exhibit AA is a true and correct copy of the Final Office Action mailed on May 21, 2014, in *ex parte* reexamination proceeding No. 90/012,987.

31.    Attached hereto as Exhibit BB is a true and correct copy of an unofficial copy of the Deed of Trust recorded on April 8, 2014, with the Auditor of Kitsap County, Washington, and signed by Peter Yoakum and Julie Yoakum on April 4, 2014.  A PDF of this document is also available via the following link:

http://kcwaimg.co.kitsap.wa.us/recorder/eagleweb/viewAttachment.jsp?docName=20140408017 1&id=DOC460S1549.A0&parent=DOC460S1549.

32.    Attached hereto as Exhibit CC is a true and correct copy of a report from the website http://maps.google.com.  The report indicates that the driving distance from San Diego, California, to San Francisco, California, is 501 miles, and that a direct flight between the two cities is 1 hour and 25 minutes long.

33.    Attached hereto as Exhibit DD is a true and correct copy of a report from public records search engine Peoplesmart.  The report lists Scott Lewis's most recent address as 47 W. Village Circle, Midway, Utah.

34.    Attached hereto as Exhibit EE is a true and correct copy of Gordon Gardiner's biography on Swiftsure Capital's website, last accessed on June 5, 2014, via the following link: http://www.swiftsurecapital.com/gordon-a-gardiner.html.

35.    Attached hereto as Exhibit FF is a true and correct copy of a report from the website http://maps.google.com.  The report indicates that the driving distance from Midway, Utah, to San Francisco, California, is 707 miles, and that a direct flight between San Francisco and Salt Lake City is two hours long.

36.    Attached hereto as Exhibit GG is a true and correct copy of a report from the website http://maps.google.com.  The report indicates that the driving distance from Midway, Utah, to Wichita Falls, Texas, is 1,086 miles.

6

APPX007

37.    Attached hereto as Exhibit HH is a true and correct copy of the document entitled "*Inter Parte* [sic] Reexamination Filing Data – Septeber [sic] 30, 2013," published by the United States Patent and Trademark Office.  A PDF of this document is also available at: http://www.uspto.gov/patents/stats/inter_parte_historical_stats_roll_up_EOY2013.pdf.

38.    Attached hereto as Exhibit II is a true and correct copy of the document entitled "*Ex Parte* Reexamination Filing Data – September 30, 2013," published by the United States Patent and Trademark Office.  A PDF of this document is also available at: http://www.uspto.gov/patents/stats/ex_parte_historical_stats_roll_up_EOY2013.pdf.

39.    Attached hereto as Exhibit JJ is a true and correct copy of an Orbitz estimate of travel times and costs for June 9, 2014 flights from San Diego International Airport ("SAN") to San Francisco International Airport ("SFO"), sorted by quickest route.

40.    Attached hereto as Exhibit KK is a true and correct copy of an Orbitz estimate of travel times and costs for June 9, 2014 flights from San Diego International Airport ("SAN") to Wichita Falls Municipal Airport ("SPS"), sorted by quickest route.

41.    Attached hereto as Exhibit LL is a true and correct copy of an Orbitz estimate of June 9, 2014 travel times from Seoul ("ICN" and/or "GMP") to San Francisco International Airport ("SFO"), sorted by quickest route.

42.    Attached hereto as Exhibit MM is a true and correct copy of an Orbitz estimate of June 9, 2014 travel times from Seoul ("ICN" and/or "GMP") to Wichita Falls Municipal Airport ("SPS"), sorted by quickest route.

43.    Attached hereto as Exhibit NN is a true and correct copy of a printout from Geobytes.com calculating the distance between Seoul, South Korea, and San Francisco, California.

44.    Attached hereto as Exhibit OO is a true and correct copy of a printout from Geobytes.com calculating the distance between Seoul, South Korea, and Wichita Falls, Texas.

APPX008

45.     Attached hereto as Exhibit PP is a true and correct copy of a printout from Geobytes.com calculating the distance between San Diego, California, and San Francisco, California.

46.      Attached hereto as Exhibit QQ is a true and correct copy of a printout from Geobytes.com calculating the distance between San Francisco, California, and Wichita Falls, Texas.

47.     Attached hereto as Exhibit RR is a true and correct copy of a webpage hosted by Samsung Telecommunications America and entitled "Our Company," available at: http://www.samsungtelecom.com/life-at-samsung/our-company.asp.

48.     Attached hereto as Exhibit SS is a true and correct copy of a webpage hosted by Blackberry, available at: http://ca.blackberry.com/company/about-us/contact.html.

49.     Attached hereto as Exhibit TT is a true and correct copy of a webpage hosted by the Wichita Falls Municipal Airport, available at: http://flywichitafalls.net/flights-reservations/.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this ninth day of June, 2014, at San Francisco, California.

*/s/ Julie Duncan*
JULIE DUNCAN

APPX009

# Exhibit A

APPX010

07/09/1999 13:49    9258554355    ▪▪▪▪ SALUOLA    FAX NO. ▪▪▪▪338034    P. 04

| COMBINED DECLARATION AND POWER OF ATTORNEY FOR UTILITY PATENT APPLICATION | Attorney's Docket No. 032374-003 |
|---|---|

As a below-named Inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name;

I BELIEVE I AM THE ORIGINAL, FIRST AND SOLE INVENTOR (if only one name is listed below) OR AN ORIGINAL, FIRST AND JOINT INVENTOR (if more than one name is listed below) OF THE SUBJECT MATTER WHICH IS CLAIMED AND FOR WHICH A PATENT IS SOUGHT ON THE INVENTION ENTITLED:

WEB-BASED MEDIA SUBMISSION TOOL _____

_____

the specification of which

(check one)    ☒    is attached hereto;

☐    was filed on _____ as

Application No. _____

and was amended on _____ ;
                              (if applicable)

I HAVE REVIEWED AND UNDERSTAND THE CONTENTS OF THE ABOVE-IDENTIFIED SPECIFICATION, INCLUDING THE CLAIMS, AS AMENDED BY ANY AMENDMENT REFERRED TO ABOVE;

I ACKNOWLEDGE THE DUTY TO DISCLOSE TO THE OFFICE ALL INFORMATION KNOWN TO ME TO BE MATERIAL TO PATENTABILITY AS DEFINED IN TITLE 37, CODE OF FEDERAL REGULATIONS, Sec. 1.56 (as amended effective March 16, 1992);

I do not know and do not believe the said invention was ever known or used in the United States of America before my or our invention thereof, or patented or described in any printed publication in any country before my or our invention thereof or more than one year prior to said application; that said invention was not in public use or on sale in the United States of America more than one year prior to said application; that said invention has not been patented or made the subject of an inventor's certificate issued before the date of said application in any country foreign to the United States of America on any application filed by me or my legal representatives or assigns more than twelve months prior to said application;

I hereby claim foreign priority benefits under Title 35, United States Code Sec. 119 and/or Sec. 365 of any foreign application(s) for patent or inventor's certificate as indicated below and have also identified below any foreign application for patent or inventor's certificate on this invention having a filing date before that of the application(s) on which priority is claimed:

Page 1 of 2                                                      (01/99)

APPX011

– A256 –

07/09/1999  13:45    9258954555    BURNS DOAN SWECKER    FAX NO. 8??338934    P. 05

| COMBINED DECLARATION AND POWER OF ATTORNEY | | Attorney's Docket No. 032374-003 |
|---|---|---|

| COUNTRY/INTERNATIONAL | APPLICATION NUMBER | DATE OF FILING (day, month, year) | PRIORITY CLAIMED |
|---|---|---|---|
| | | | YES_ NO_ |
| | | | YES_ NO_ |

I hereby appoint the following attorneys and agent(s) to prosecute said application and to transact all business in the Patent and Trademark Office connected therewith and to file, prosecute and to transact all business in connection with international applications directed to said invention:

| William L. Mathis | 17.337 | George A. Hovanec, Jr. | 28.223 | Peter K. Skiff | 31.917 |
|---|---|---|---|---|---|
| Peter H. Smolen | 15.913 | James A. LaBarre | 28.632 | Richard J. McGrath | 29.193 |
| Robert S. Swecker | 19.885 | B. Joseph Gess | 28.510 | Matthew L. Schneider | 32.814 |
| Platon N. Mandros | 22.124 | R. Danny Huntington | 27.903 | Michael G. Savage | 32.596 |
| Benian S. Duffieu, Jr. | 22.030 | Eric H. Weisblatt | 30.505 | Gerald F. Swiss | 30.113 |
| Norman H. Stepno | 22.716 | James W. Peterson | 26.057 | Michael J. Ure | 32.089 |
| Ronald L. Grudziecki | 24.970 | Teresa Stanek Rea | 30.427 | Charles P. Wieland III | 33.096 |
| Frederick G. Michaud, Jr. | 26.003 | Robert E. Krebs | 25.883 | Bruce T. Wieder | 33.815 |
| Alan E. Kopecki | 25.813 | William C. Rowland | 30.888 | Todd R. Walters | 34.040 |
| Regis E. Slutter | 26.999 | T. Gene Dillahunty | 25.423 | Ronni S. Jillions | 31.979 |
| Samuel C. Miller, III | 27.360 | Patrick C. Keane | 32.858 | Harold R. Brown III | 36.341 |
| Ralph L. Freeland, Jr. | 16.110 | Bruce J. Boggs, Jr. | 32.244 | Allen R. Baum | 36.086 |
| Robert G. Mukai | 28.531 | William H. Benz | 25.952 | Steven M. du Bois | 35.023 |

and: Susan E. Henninger

Address all correspondence to:    Michael J. Ure, Esq.
BURNS, DOANE, SWECKER & MATHIS, L.L.P.
P.O. Box 1404
Alexandria, Virginia 22313-1404

Address all telephone calls to: Michael J. Ure, Esq. _____ at (650) 854-7400.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| FULL NAME OF SOLE OR FIRST INVENTOR | SIGNATURE | DATE |
|---|---|---|
| Lisa T. Wood | | 7.9.99 |
| RESIDENCE | | CITIZENSHIP |
| One Woodside Court, Danville, California 94506 | | USA |
| POST OFFICE ADDRESS | | |
| Same As Above | | |

| FULL NAME OF SECOND JOINT INVENTOR, IF ANY | SIGNATURE | DATE |
|---|---|---|
| Scott M. Lewis | | 7-9-99 |
| RESIDENCE | | CITIZENSHIP |
| 314 Squirrel Ridge Way, Danville, California 94506 | | USA |
| POST OFFICE ADDRESS | | |
| Same As Above | | |

| FULL NAME OF THIRD JOINT INVENTOR, IF ANY | SIGNATURE | DATE |
|---|---|---|
| Robin T. Fried | | |
| RESIDENCE | | CITIZENSHIP |
| 2316 Corona Court, Berkeley, California 94708 | | USA |
| POST OFFICE ADDRESS | | |
| Same As Above | | |

Page 2 of 2                                                    (01/99)

APPX012

Sent By: RETURN WORKS; Case: IPR2014-00014-O  Document: 25-155 Filed: 06/10/14 JUN  13 2010 2:04  Page: 13 of 102  PageID #: 1099; Page 1099  FAX NO. 65    8934    P. 04

| COMBINED DECLARATION AND POWER OF ATTORNEY FOR UTILITY PATENT APPLICATION | Attorney's Docket No. 032374-003 |
|---|---|

As a below-named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name;

I BELIEVE I AM THE ORIGINAL, FIRST AND SOLE INVENTOR (if only one name is listed below) OR AN ORIGINAL, FIRST AND JOINT INVENTOR (if more than one name is listed below) OF THE SUBJECT MATTER WHICH IS CLAIMED AND FOR WHICH A PATENT IS SOUGHT ON THE INVENTION ENTITLED:

WEB-BASED MEDIA SUBMISSION TOOL _____

_____

the specification of which

(check one)   ☒   is attached hereto;

☐   was filed on _____ as

Application No. _____

and was amended on _____ ;
(if applicable)

I HAVE REVIEWED AND UNDERSTAND THE CONTENTS OF THE ABOVE-IDENTIFIED SPECIFICATION, INCLUDING THE CLAIMS, AS AMENDED BY ANY AMENDMENT REFERRED TO ABOVE;

I ACKNOWLEDGE THE DUTY TO DISCLOSE TO THE OFFICE ALL INFORMATION KNOWN TO ME TO BE MATERIAL TO PATENTABILITY AS DEFINED IN TITLE 37, CODE OF FEDERAL REGULATIONS, Sec. 1.56 (as amended effective March 16, 1992);

I do not know and do not believe the said invention was ever known or used in the United States of America before my or our invention thereof, or patented or described in any printed publication in any country before my or our invention thereof or more than one year prior to said application; that said invention was not in public use or on sale in the United States of America more than one year prior to said application; that said invention has not been patented or made the subject of an inventor's certificate issued before the date of said application in any country foreign to the United States of America on any application filed by me or my legal representatives or assigns more than twelve months prior to said application;

I hereby claim foreign priority benefits under Title 35, United States Code Sec. 119 and/or Sec. 365 of any foreign application(s) for patent or inventor's certificate as indicated below and have also identified below any foreign application for patent or inventor's certificate on this invention having a filing date before that of the application(s) on which priority is claimed:

APPX013

– A258 –

JUL-15-99 THU 12:54 PM   BURNS DOAN SWECKER    FAX NO. 6502338934    P. 03

| COMBINED DECLARATION AND POWER OF ATTORNEY | | Attorney's Docket No. 032374-003 | |
|---|---|---|---|
| COUNTRY/INTERNATIONAL | APPLICATION NUMBER | DATE OF FILING (day, month, year) | PRIORITY CLAIMED |
| | | | YES  NO |
| | | | YES  NO |

I hereby appoint the following attorneys and agent(s) to prosecute said application and to transact all business in the Patent and Trademark Office connected therewith and to file, prosecute and to transact all business in connection with International applications directed to said invention:

| | | | | | |
|---|---|---|---|---|---|
| William L. Mathis | 17,327 | George A. Kovaroc, Jr. | 28,223 | Peter K. Skiff | 31,917 |
| Peter M. Smolka | 15,913 | James A. LaBarre | 28,623 | Richard J. McGrath | 29,126 |
| Robert S. Swecker | 19,885 | R. Joseph Gan | 28,510 | Matthew L. Schneider | 32,814 |
| Elston N. Mandros | 23,134 | R. Danny Huntington | 27,901 | Michael G. Savage | 32,596 |
| Benton S. Duffett, Jr. | 22,620 | Eric H. Weisblatt | 30,903 | Gerald F. Swiss | 30,113 |
| Norman H. Stepno | 22,716 | James W. Prentzan | 26,057 | Michael J. Ure | 33,089 |
| Donald L. Gmelneski | 24,970 | Teresa Stanek Rea | 28,427 | Charles P. Wisloed III | 33,096 |
| Frederick G. Michaud, Jr. | 26,603 | Robert R. Krebs | 25,226 | Royce T. Winder | 33,815 |
| Alan R. Kamrad | 25,815 | William C. Rowland | 30,486 | Todd R. Walters | 34,043 |
| Regis E. Slutter | 26,990 | T. Gene Dillahunty | 31,423 | Ronni S. Jillson | 31,979 |
| Samuel C. Miller, III | 27,360 | Patrick C. Keane | 32,838 | Harold E. Brown III | 36,341 |
| Ralph L. Freeland, Jr. | 16,110 | Bruce J. Boggs, Jr. | 32,344 | Allen R. Baum | 36,090 |
| Robert G. Mukai | 28,531 | William H. Bens | 23,952 | Steven M. du Bois | 35,023 |

and:  Susan E. Hepninger

Address all correspondence to:    Michael J. Ure, Esq.
BURNS, DOANE, SWECKER & MATHIS, L.L.P.
P.O. Box 1404
Alexandria, Virginia 22313-1404

Address all telephone calls to:  Michael J. Ure, Esq.    at (650) 854-7400.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| FULL NAME OF SOLE OR FIRST INVENTOR | | SIGNATURE | | DATE |
|---|---|---|---|---|
| Lisa T. Wood | | | | |
| RESIDENCE | | | CITIZENSHIP | |
| One Woodside Court, Danville, California 94506 | | | USA | |
| POST OFFICE ADDRESS | | | | |
| Same As Above | | | | |
| FULL NAME OF SECOND JOINT INVENTOR, IF ANY | | SIGNATURE | | DATE |
| Scott M. Lewis | | | | |
| RESIDENCE | | | CITIZENSHIP | |
| 314 Squirrel Ridge Way, Danville, California 94506 | | | USA | |
| POST OFFICE ADDRESS | | | | |
| Same As Above | | | | |
| FULL NAME OF THIRD JOINT INVENTOR, IF ANY | | SIGNATURE | | DATE 7/15/99 |
| Robin T. Fried | | | | |
| RESIDENCE | | | CITIZENSHIP | |
| 1316 Cornou Court, Berkeley, California 94708 | | | USA | |
| POST OFFICE ADDRESS | | | | |
| Same As Above | | | | |

Patent
Attorney's Docket No. 032374-003

Applicant or Patentee: **Lisa T. Wood, Scott M. Lewis, and Robin T. Fried**

Application or Patent No.: _____

Filed or Issued: _____

For: **WEB-BASED MEDIA SUBMISSION TOOL** _____

## VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY STATUS (37 C.F.R. §§ 1.9(f) AND 1.27(c)) - SMALL BUSINESS CONCERN

I hereby declare that I am

[ ]   the owner of the small business concern identified below:
[X]   an official of the small business concern empowered to act on behalf of the concern identified below:

NAME OF CONCERN **PictureWorks Technology, Inc.** _____

ADDRESS OF CONCERN **649 San Ramon Valley Blvd., Danville, California 94526.** _____

I hereby declare that the above-identified small business concern qualifies as a small business concern as defined in 13 C.F.R. § 1.21 for purposes of paying reduced fees under Sections 41(a) and 41(b) of Title 35, United States Code, in that the number of employees of the concern, including those of its affiliates, does not exceed 500 persons. For purposes of this statement, (1) the number of employees of the business concern is the average, over the previous fiscal year of the concern, of the persons employed on a full-time, part-time, or temporary basis during each of the pay periods of the fiscal year, and (2) concerns are affiliates of each other when either, directly or indirectly, one concern controls or has the power to control the other, or a third party or parties controls or has the power to control both.

I hereby declare that rights under contract or law have been conveyed to and remain with the small business concern identified above with regard to the invention entitled **Web-Based Media Submission Tool** by Inventor(s) **Lisa T. Wood, Scott M. Lewis, and Robin T. Fried** described in

[X]   the specification filed herewith
[ ]   Application No. _____ , filed _____ .
[ ]   Patent No. _____ , issued _____ .

If the rights held by the above-identified small business concern are not exclusive, each individual, concern, or organization having rights to the invention is listed below,* and no rights to the invention are held by any person, other than the inventor, who would not qualify as an independent inventor under 37 C.F.R. § 1.9(c), or by any concern that would not qualify as either a small business concern under 37 C.F.R. § 1.9(d) or a nonprofit organization under 37 C.F.R. § 1.9(e).

*NOTE:  Separate verified statements are required from each named person, concern, or organization having rights to the invention averring to their status as small entities. (37 C.F.R. § 1.27.)

-1-                                         (12/97)

APPX015

07/09/1999  13:49   9258554355        JOHN BRECKER         FAX NO. 6   338934              P. 03

Application No. ____
Attorney's Docket No. 032374-003

NAME _____

ADDRESS _____
        [ ] Individual    [ ] small business concern    [ ] nonprofit organization

NAME _____

ADDRESS _____
        [ ] Individual    [ ] small business concern    [ ] nonprofit organization

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earlier of the issue fee and any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 C.F.R. § 1.28(b).)

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code; and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

NAME OF PERSON SIGNING  Lisa T. Wood _____

TITLE OF PERSON OTHER THAN OWNER  Vice President, New Business Development & Marketing  *Engineering*

ADDRESS OF PERSON SIGNING  649 San Ramon Valley Blvd., Danville, California 94526 _____

SIGNATURE _____          DATE  7-2-99 _____

-2-                                                          (12/97)

APPX016

# Exhibit B

APPX017

```
<TEXT>


<PAGE>    1
Editorial Contacts:                                    EXHIBIT 99.1
Corey Cutler/Peter Molineaux
Media: Eileen King/Emily Brunner
Morgen-Walke Associates, Inc.
(212) 850-5600


Ed Lewis
iPIX
(423) 482-3000
lewise@ipix.com


Stu Roberson
PictureWorks Technology
(925) 855-2001 x181
sroberson@pictureworks.com


          IPIX TO ACQUIRE PICTUREWORKS TECHNOLOGY, INC. TO FORM END-
                  TO-END INTERNET IMAGING SOLUTIONS COMPANY


     $175 Million Acquisition to Create Industry Leader in B2B and B2C Visual
   Content Infrastructure--Building the "Imaging Infranet" to Drive E-commerce


OAK RIDGE, Tenn. and PALO ALTO, Calif. (3/8/00)--Internet Pictures Corporation
(Nasdaq: IPIX, "iPIX"), a leader in visual content infrastructure solutions for
the Internet, and PictureWorks Technology, a leader in digital media solutions
which enable end-users to easily publish still photos and other rich media
content to the Web, announced today that they have signed a definitive
agreement for iPIX to acquire PictureWorks in a stock-for-stock transaction
valued at approximately $175 million. The combined companies and their
technologies will create the first "Imaging Infranet," an extensive global
infrastructure of services, networks, and content delivery systems for visual
content. This combination of robust infrastructure and services will make iPIX
the choice for one-stop Internet imaging solutions in the real estate,
e-retail, travel, publishing, entertainment, consumer online auctions,
architecture/engineering/construction and insurance markets.


Upon closing, this acquisition will position iPIX as the only end-to-end
provider of visual content solutions including:


          -       Full-service virtual tours provided by iPIX's photographer
                  network
          -       Self-service 360 by 360 degree virtual tours using iPIX
                  camera kits
          -       Instant publishing of still photos to Web sites using
                  PictureWorks' Rimfire solution
          -       iPIX interactive WebCams
          -       iPIX Movies
          -       Transformation and enhancement (watermarking, annotation,
                  PhotoMovies(TM), SurroundView(TM), etc.) of user-supplied
                  images using Rimfire
          -       Visual content hosting and distribution to leading Web sites
                  across the Internet


 "By combining with PictureWorks, we will create the leading provider of visual
```

content solutions for e-commerce applications on the Internet," said Jim
Phillips, chairman and CEO of iPIX. "PictureWorks' industry leading technology
and proven track record, together with iPIX's innovative technology and global
visual content infrastructure, will create a winning and complementary imaging
solution. This merger will solidify iPIX's position as the leader in imaging
for the Internet and will provide our B2B and B2C customers with the most
comprehensive, end-to-end content acquisition and delivery solution in the
market today."

Under terms of the agreement, iPIX will acquire all of the outstanding shares
of PictureWorks stock in exchange for iPIX common stock. iPIX will issue
5,367,670 shares of iPIX Common Stock to the PictureWorks stockholders. The
agreement provides that if the average closing price of iPIX Common

<PAGE>    2

Stock is more than $37.06, then the PictureWorks stockholders will receive
4,668,106 shares of iPIX Common Stock, and if the average price of iPIX Common
Stock is less than $27.39, then the PictureWorks stockholders will receive
6,240,981 shares of iPIX Common Stock. The merger will be effected on a
tax-free basis to iPIX stockholders and will be accounted for as a purchase.
The acquisition is subject to certain closing conditions and is expected to
close during March 2000.

The combined companies will continue to extend their highly scalable `Imaging
Infranet' solutions by leveraging relationships with Akamai and Exodus, and
will support emerging streaming media formats and all leading digital camera
manufacturers including Kodak, Nikon, Olympus, Epson, and Sony. The companies
will have over 1,000 customers, including AOL, Homestore.com, Discovery.com,
Microsoft, CNN, General Motors, IBM, NBC, Travelocity, Disney, Viacom, ADP,
Auctions.com and Polaroid plus a network of more than 500 iPIX photographers
covering over 5,500 cities around the globe.

NEW MARKET OPPORTUNITIES IN AUCTIONS, A/E/C AND INSURANCE
iPIX, which provides imaging solutions for e-commerce applications, will
combine its visual content infrastructure with PictureWorks' Rimfire Internet
media services and infrastructure. PictureWorks' Rimfire services will enable
iPIX to capture media including still photos, sound, audio and video directly
from end-users and host and distribute it using iPIX's back-end content
distribution and management system. This acquisition allows iPIX to enhance its
offering to the real estate industry as well as new markets requiring
large-scale visual content management including consumer online auctions,
architecture/engineering/construction and insurance.

"PictureWorks and iPIX are rapidly building market share and penetration of
their Internet imaging solutions," said Alexis Gerard, president of digital
imaging advisors, Future Image. "The combined services and visual content
infrastructure of the two companies provides a complete turnkey Internet imaging
solution for numerous markets, including real estate, insurance, travel, and
auctions. That includes a full service photographer network, and do-it-yourself
support for the over ten million digital camera owners using the Internet today.
This is a combination that will be hard for competitors to match."

By acquiring PictureWorks, iPIX believes it will be best positioned in the
market to offer B2B and B2C imaging Infranet solutions to leading e-commerce

providers. With the addition of PictureWorks' services and infrastructure to
iPIX's visual content infrastructure, iPIX adds easy-to-use media collection
and transformation services that allow e-commerce sites to deploy large-scale
online visual content. Using a content management solution from the combined
companies, consumers can drag and drop still photos and other user-created
media including sound, audio and video into a Web based client/server solution
that collects, formats and distributes the data.

"By joining forces with an organization of iPIX's caliber, we can truly empower
businesses with the broadest range of visual content solutions and
infrastructure available. Our combined company will create the de facto standard
for B2B and B2C imaging technologies and services for the Internet," said Don
Strickland, CEO of PictureWorks Technologies. "The benefit to our combined and
future customers is one-stop outsourcing of all imaging requirements for the
Internet."

This acquisition allows iPIX to enhance its offering to the real estate industry
with still photo submission, management and distribution in addition to the iPIX
Virtual Tour. Homestore.com recently selected PictureWorks' Rimfire solution to
provide "Instant Photo Submission" for adding multiple photos to real estate
listings. Using Rimfire, real estate professionals have the ability to instantly
and easily enhance their property listings with additional photos. It allows the
simple drag and drop of images from any digital camera, scanner, CD, or floppy
disk directly into the Rimfire-enabled Web page. Rimfire automatically previews,
resizes and formats the photos, saving time for the user.

THE `IMAGING INFRANET'
"With the acquisition of PictureWorks, iPIX is positioned to be a leading
provider of B2B imaging for the Internet," said Kristy Holch, principal,
InfoTrends Research Group. "The addition of Rimfire to iPIX's end-to-end visual
content infrastructure will provide businesses robust, easy-to-use and highly
scaleable imaging solutions for e-commerce applications."

<PAGE>    3

The combined companies offer an end-to-end visual content infrastructure:

- -      Visual Content Capture and Processing - Meeting business and consumer
        demand for full-service and do-it-yourself imaging solutions, the
        combined company provides the easiest to use content creation tools
        and applications in addition to a global network of photographers
        covering over 5,500 cities around the world and full service image
        processing centers.

- -      Visual Content Management and Hosting - Integrating PictureWorks
        Rimfire, an industry leading drag-and-drop media submission,
        management and delivery infrastructure with iPIX's advanced visual
        content hosting solution provides businesses and consumers a high
        performance and scaleable digital media management infrastructure.

- -      Visual Content Distribution - Offering the broadest range of
        end-to-end visual content solutions, iPIX seamlessly distributes
        visual content to many of the Internet's most trafficked sites and
        iPIX View Always technology enables users to view images on multiple
        platforms from personal computers to wireless, handheld devices.

The company's headquarters will remain in Oak Ridge, Tennessee and Palo Alto, California, and will include offices in Atlanta, Chicago, Danville, London, Los Angeles, New York, and Tokyo.

==ABOUT IPIX==

iPIX (NASDAQ: IPIX) provides global visual content infrastructure solutions for leading e-commerce and new media Web sites. The iPIX end-to-end solutions enable the creation, hosting and distribution of rich visual content to thousands of Internet sites. A broad array of industries, including real estate, e-retail, automotive, travel, publishing and entertainment are capitalizing on iPIX visual content to give viewers more information, more interaction and a richer online experience. ==The company is headquartered in Oak Ridge, Tennessee with co-headquarters in Palo Alto, California==

==ABOUT PICTUREWORKS TECHNOLOGY==

PictureWorks Technology, Inc. is an award-winning developer and marketer of pioneering Internet imaging technologies. The company provides media infrastructure and services to web sites requiring high volumes of user-supplied content. Their Internet services make it easy for customers to collect, transform, and deploy millions of media objects in just seconds. PictureWorks currently markets its services to the online auctions, real estate, classifieds, insurance and A/E/C industries. ==Founded in 1994, PictureWorks is a privately held company headquartered in Danville, California.==

                         ###

IPIX, Interactive Pictures, iPIX, Internet Pictures and bamboo.com are trademarks of Internet Pictures Corporation. Infranet(R) is the trademark of Portal Software Inc.

This press release contains forward-looking information within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, and is subject to the safe harbors created by those sections. Statements concerning the implementation of Internet Pictures Corporation's services and the benefits expected to result from those services constitute forward-looking statements and are based on current expectations. Actual results may differ materially from those projected in the forward-looking statements. Factors that could cause actual results to differ include the failure of Internet Pictures Corporation to complete the merger, and the failure to successfully integrate PictureWorks' business and operations into its own. The matters discussed in this press release also involve risks and uncertainties described from time to time in Internet Pictures Corporation's filings with the Securities and Exchange Commission (SEC). In particular, see "Risk Factors" in the proxy statement included in the Registration Statement for bamboo.com, Inc. (now known as Internet Pictures Corporation) on Form S-4 declared effective by the SEC on December 16, 1999 (www.sec.gov). <http://www.sec.gov>.
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# Exhibit C

APPX022



**United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Assignments on the Web** > **Patent Query**

# Patent Assignment Abstract of Title
## NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Total Assignments: 12**
**Patent #:** 6895557    **Issue Dt:** 05/17/2005    **Application #:** 09357836    **Filing Dt:** 07/21/1999
**Inventors:** LISA T. WOOD, SCOTT M. LEWIS, ROBIN T. FRIED
**Title:** WEB-BASED MEDIA SUBMISSION TOOL
**Assignment: 1**
**Reel/Frame:** 010128/0651    **Recorded:** 07/21/1999    **Pages:** 5
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignors:** WOOD, LISA T.    **Exec Dt:** 07/09/1999
LEWIS, SCOTT M.    **Exec Dt:** 07/09/1999
FRIED, ROBIN T.    **Exec Dt:** 07/15/1999
**Assignee:** PICTUREWORKS TECHNOLOGY, INC.
649 SAN RAMON VALLEY BLVD.
DANVILLE, CALIFORNIA 94526
**Correspondent:** BURNS, DOANE, SWECKER & MATHIS, L.L.P.
MICHAEL J. URE
P.O. BOX 1404
ALEXANDRIA, VA 22313-1404
**Assignment: 2**
**Reel/Frame:** 012743/0132    **Recorded:** 04/01/2002    **Pages:** 3
**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).
**Assignor:** PICTUREWORKS TECHNOLOGY, INC.    **Exec Dt:** 04/26/2000
**Assignee:** PW TECHNOLOGY, INC.
3160 CROW CANYON ROAD, 4TH FLR.
SAN RAMON, CALIFORNIA 94583
**Correspondent:** BURNS, DOANE, SWECKER & MATHIS, L.L.P.
JOSEPH P. O'MALLEY
P.O. BOX 1404
ALEXANDRIA, VA 22313-1404
**Assignment: 3**
**Reel/Frame:** 011828/0054    **Recorded:** 05/23/2001    **Pages:** 13
**Conveyance:** INTELLECTUAL PROPERTY SECURITY AGREEMENT
**Assignor:** INTERNET PICTURES CORPORATION    **Exec Dt:** 05/14/2001
**Assignee:** IMAGE INVESTOR PORTFOLIO, A SEPARATE SERIES OF MEMPHIS ANGELS, LLC, A DELAWARE LIMITED LIABILITY COMPANY
SUITE 395
6410 POPULAR AVENUE
MEMPHIS, TENNESSEE 38119
**Correspondent:** BARBARA SMILEY
COOLEY GODWARD LLP

11951 FREEDOM DRIVE
RESTON TOWN CENTER
RESTON, VA 20190-5601

– A268 –

## Assignment: 4

| | | |
|---|---|---|
| **Reel/Frame:** 011828/0088 | **Recorded:** 05/23/2001 | **Pages:** 14 |
| **Conveyance:** INTELLECTUAL PROPERTY SECURITY AGREEMENT | | |
| **Assignor:** PW TECHNOLOGY, INC. | **Exec Dt:** 05/14/2001 | |

**Assignee:** IMAGE INVESTOR PORTFOLIO, A SEPARATE SERIES OF MEMPHIS ANGELS, LLC, A DELAWARE LIMITED
LIABILITY COMPANY
6410 POPLAR AVENUE, SUITE 395
MEMPHIS, TENNESSEE 38119

**Correspondent:** COOLEY GODWARD LLP
BARBARA SMILEY
11951 FREEDOM DRIVE
RESTON TOWN CENTER
RESTON, VA 20190-5601

## Assignment: 5

| | | |
|---|---|---|
| **Reel/Frame:** 011837/0431 | **Recorded:** 05/23/2001 | **Pages:** 14 |
| **Conveyance:** INTELLECTUAL PROPERTY SECURITY AGREEMENT | | |
| **Assignor:** INTERACTIVE PICTURES CORPORATION | **Exec Dt:** 05/14/2001 | |

**Assignee:** IMAGE INVESTOR PORFOLIO, A SEPARATE SERIES OF MEMPHIS ANGELS, LLC, A DELAWARE LIMITED
LIABILITY COMPANY
6410 POPLAR AVENUE, SUITE 395
MEMPHIS, TENNESSEE 38119

**Correspondent:** COOLEY GODWARD LLP
BARBARA SMILEY
11951 FREEDOM DRIVE
RESTON TOWN CENTER
RESTON, VA 20190-5601

## Assignment: 6

| | | |
|---|---|---|
| **Reel/Frame:** 012295/0978 | **Recorded:** 11/09/2001 | **Pages:** 4 |
| **Conveyance:** RELEASE | | |
| **Assignor:** IMAGE INVESTOR PORTFOLIO, A SEPARATE SERIES OF MEMPHIS ANGELS, LLC | **Exec Dt:** 09/26/2001 | |

**Assignee:** PW TECHNOLOGY, INC.
3160 CROW CANYON RD.
SAN RAMON, CALIFORNIA 94583

**Correspondent:** COOLEY GODWARD LLP
BARBARA SMILEY
11951 FREEDOM DRIVE
RESTON, VA 20190

## Assignment: 7

| | | |
|---|---|---|
| **Reel/Frame:** 012295/0982 | **Recorded:** 11/09/2001 | **Pages:** 4 |
| **Conveyance:** RELEASE | | |
| **Assignor:** IMAGE INVESTOR PORTFOLIO, A SEPARATE SERIES OF MEMPHIS ANGELS, LLC | **Exec Dt:** 09/26/2001 | |

**Assignee:** INTERACTIVE PICTURES CORPORATION
1009 COMMERCE PARK DR.

OAK RIDGE, TENNESSEE 37830

**Correspondent:** COOLEY GODWARD LLP
BARBARA SMILEY
11951 FREEDOM DRIVE
RESTON, VA 20190

## Assignment: 8

| | | |
|---|---|---|
| **Reel/Frame:** 012295/0986 | **Recorded:** 11/09/2001 | **Pages:** 4 |
| **Conveyance:** RELEASE | | |
| **Assignor:** IMAGE INVESTOR PORTFOLIO, A SEPARATE SERIES OF MEMPHIS ANGELS, LLC | **Exec Dt:** 09/26/2001 | |

**Assignee:** INTERNET PICTURES CORPORATION
1009 COMMERCE PARK DR.
OAK RIDGE, TENNESSEE 37830

**Correspondent:** COOLEY GODWARD LLP
BARBARA SMILEY
11951 FREEDOM DRIVE
RESTON, VA 20190

## Assignment: 9

**Reel/Frame:** 016216/0092    **Recorded:** 05/13/2005    **Pages:** 10

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors:** PW TECHNOLOGY, INC.    **Exec Dt:** 02/11/2005
PICTUREWORKS TECHNOLOGY, INC.    **Exec Dt:** 02/11/2005

**Assignee:** IPIX CORPORATION
1009 COMMERCE PARK
SUITE 400
OAK RIDGE, TENNESSEE 37830

**Correspondent:** VICTOR C. MORENO
FROST BROWN TODD LLC
2200 PNC CENTER
201 E. FIFTH STREET
CINCINNATI, OH 45202

## Assignment: 10

**Reel/Frame:** 016216/0102    **Recorded:** 05/13/2005    **Pages:** 16

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** IPIX CORPORATION    **Exec Dt:** 02/11/2005

**Assignee:** ADMISSION CORPORATION
2430 CAMINO RAMON
SUITE 122
SAN RAMON, CALIFORNIA 94583

**Correspondent:** VICTOR C. MORENO
FROST BROWN TODD LLC
2200 PNC CENTER
201 E. FIFTH STREET
CINCINNATI, OHIO 45202

## Assignment: 11

**Reel/Frame:** 018911/0565    **Recorded:** 02/21/2007    **Pages:** 5

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** ADMISSION CORPORATION    **Exec Dt:** 02/01/2007

**Assignee:** ADMISSION LICENSING LLC
3000 EXECUTIVE PARKWAY, SUITE 150
SAN RAMON, CALIFORNIA 94583

**Correspondent:** ALBERT S. PENILLA, ESQ.
710 LAKEWAY DR., #200
SUNNYVALE, CA 94085

## Assignment: 12

**Reel/Frame:** 022177/0417    **Recorded:** 01/30/2009    **Pages:** 4

**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Assignor:** ADMISSION LICENSING LLC    **Exec Dt:** 12/19/2008

**Assignee:** SUMMIT 6 LLC
300 EXECUTIVE PARKWAY
SUITE 150
SAN RAMON, CALIFORNIA 94583

**Correspondent:** LAW OFFICE OF DUANE S. KOBAYASHI
P.O. BOX 4160

LEESBURG, VA 20177

Search Results as of: 04/25/2014 02:24 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.4
Web interface last modified: Jul 8, 2013 v.2.3.4

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

– A271 –

# Exhibit D

APPX027





## Summit6/AdMission

**Swiftsure Board Member: Scott Wilson**

Swiftsure sponsored the management buyout of the AdMission division from a public company, IPIX, in 2005. AdMission was a leading provider of dynamic online advertising solutions used for creating, distributing, and optimizing dynamic ads. AdMission uses its proprietary technology to create and distribute intelligent rich media ads that are customized for target consumers in response to behavioral, contextual, and geographic inputs. AdMission's operating business was sold to The Cobalt Group in 2008.

AdMission's patents and other intellectual property were retained and reside in Summit 6 LLC. Summit 6 develops and licenses media processing and management solutions to a wide range of online industries.  The company's technology simplifies and streamlines the collection and redistribution of rich media content.

**www.summit6.com**

*"Swiftsure has worked with us as partners from the beginning of our relationship. They helped us structure a management buyout and obtain subsequent financing.  Scott has served as chairman of our board and his insight has been critical in developing our strategy as our business has evolved."*

  *– **Sarah Pate,** Chief Executive Officer*

Securities offered through Swiftsure Securities, LLC, member **FINRA** and **SIPC**. View our **Privacy Policy and Disclosures.**

# Exhibit E

APPX029



**United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Assignments on the Web** > **Patent Query**

# Patent Assignment Abstract of Title

**NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 4**

**Patent #:** 7765482    **Issue Dt:** 07/27/2010    **Application #:** 10961720    **Filing Dt:** 10/08/2004
**Publication #:** 20050060180    **Pub Dt:** 03/17/2005
**Inventors:** Lisa T. Wood, Scott M. Lewis, Robin T. Fried
**Title:** WEB-BASED MEDIA SUBMISSION TOOL

**Assignment: 1**
**Reel/Frame:** 016216/0092    **Recorded:** 05/13/2005    **Pages:** 10
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignors:** PW TECHNOLOGY, INC.    **Exec Dt:** 02/11/2005
              PICTUREWORKS TECHNOLOGY, INC.    **Exec Dt:** 02/11/2005
**Assignee:** IPIX CORPORATION
              1009 COMMERCE PARK
              SUITE 400
              OAK RIDGE, TENNESSEE 37830
**Correspondent:** VICTOR C. MORENO
                  FROST BROWN TODD LLC
                  2200 PNC CENTER
                  201 E. FIFTH STREET
                  CINCINNATI, OH 45202

**Assignment: 2**
**Reel/Frame:** 016216/0102    **Recorded:** 05/13/2005    **Pages:** 16
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** IPIX CORPORATION    **Exec Dt:** 02/11/2005
**Assignee:** ADMISSION CORPORATION
              2430 CAMINO RAMON
              SUITE 122
              SAN RAMON, CALIFORNIA 94583
**Correspondent:** VICTOR C. MORENO
                  FROST BROWN TODD LLC
                  2200 PNC CENTER
                  201 E. FIFTH STREET
                  CINCINNATI, OHIO 45202

**Assignment: 3**
**Reel/Frame:** 018911/0565    **Recorded:** 02/21/2007    **Pages:** 5
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** ADMISSION CORPORATION    **Exec Dt:** 02/01/2007
**Assignee:** ADMISSION LICENSING LLC
              3000 EXECUTIVE PARKWAY, SUITE 150
              SAN RAMON, CALIFORNIA 94583
**Correspondent:** ALBERT S. PENILLA, ESQ.
                  710 LAKEWAY DR., #200
                  SUNNYVALE, CA 94085

**– A275 –**

**Assignment: 4**

**Reel/Frame:** 022177/0417                    **Recorded:** 01/30/2009                                         **Pages:** 4

**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Assignor:** ADMISSION LICENSING LLC                                             **Exec Dt:** 12/19/2008

**Assignee:** SUMMIT 6 LLC
300 EXECUTIVE PARKWAY
SUITE 150
SAN RAMON, CALIFORNIA 94583

**Correspondent:** LAW OFFICE OF DUANE S. KOBAYASHI
P.O. BOX 4160
LEESBURG, VA 20177

Search Results as of: 04/01/2014 10:09 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.3.4
Web interface last modified: Jul 8, 2013 v.2.3.4

| .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# Exhibit F

APPX032



- **AdMission Home**
- **Advertisers**
  - Advertisers Home
  - Autos
  - Real Estate
  - Retail
  - General Advertising
- **Partners**
  - Partners Home
  - Agencies
  - Publishers
  - Data Providers
  - Resellers
- **Solutions**
  - Solutions Home
  - Rich Media Features
  - Ad Specs
  - Ad Distribution
  - Tracking & Reporting
  - Working with Us
  - Ad Creator
- **Ad Gallery**

Home / Cobalt



May 7, 2008

Dear AdMission Customers and Partners:

As of Tuesday, May 6, 2008, certain assets of AdMission Corporation became a part of The Cobalt Group via the close of an acquisition. Cobalt is a profitable, rapidly growing provider of a suite of digital marketing services to over 10,000 businesses in North America. Cobalt is a top tier partner of Google and Yahoo! and has deep vertical expertise in the automotive industry.

Support for the AdMission platform, partners and customer base will be retained in San Ramon, CA as a division of Cobalt. The majority of customer support, development, IT and integration personnel are remaining on the team. Both Cobalt and AdMission are dedicated to ensuring a smooth transition, and existing customers and partners in the publishing, real estate, and financial services industries will experience no immediate change to their existing or planned ad orders or integrations. All AdMission services and technical support will continue to be fully accessible and available.

This acquisition represents tremendous opportunity for AdMission advertising solutions because of Cobalt's commitment to the expansion of the AdMission platform. Several exciting upgrades, including ad creator 2.0, will launch in the near term continuing AdMission's tradition of providing unprecedented display advertising reach, engagement and effectiveness.

The focus for both Cobalt and the AdMission division remains customer revenue generation, success and satisfaction, and throughout the coming months, we'll be working personally with many of you to devise exciting new solutions that serve you better. If you have questions regarding the acquisition, please see the attached Customer Q&A document. You may also call AdMission directly on 925-328-1200 or email admission-pr@admission.net.

Your business is important to Cobalt and to the AdMission division. The entire blended team thanks you in advance for your continued patronage, and your trust in us to provide you with world-class advertising solutions and services.

Best Regards,

Sarah F. Pate
AdMission President & CEO

## Questions and answers regarding the Cobalt acquisition of certain assets of AdMission Corporation.

Click a question below to view the answer.

- Who is AdMission?
- Who is Cobalt?
- Why is AdMission selling certain assets of AdMission Corporation?
- Why is Cobalt acquiring certain assets of AdMission?
- How does AdMission's acquisition benefit customers?
- Our company is not in the automotive industry. Will Cobalt continue to support our business needs?
- Will we still have the same support team?
- Will the platform continue to be enhanced?
- Will AdMission continue to accept automotive customers with this deal?
- Will AdMission be accepting new non-automotive customers and resellers (i.e. resale real estate, new home builders, and radio broadcast groups)?
- Our company is in the process of testing prior to going live with AdMission Classifieds. Can and should we continue this process?
- We are part of a publishing group corporate agreement. We planned to launch with AdMission by the end of the year. Should we continue to plan on this?
- How long does Cobalt expect to maintain AdMission Classifieds-only customers?
- We work with AdMission via a publishing vendor (i.e. Mactive, DTI or Atex). How will this change effect our implementation?
- Will you continue to market AdMission ad products to the newspaper channel?
- Will current newspaper customers be able to continue the use of Cars.com data in AdMission ads?

## Letter to Customers

Download the announcement from AdMission CEO Sarah Pate.

Download PDF

## FAQ

Download all questions and answers on this page.

Download PDF

## Questions?

Chat with us live via your computer now, or call us on 925-328-1200 to speak with a sales rep.



About Us   |   Contact Us   |   Support   |   Terms of Use   |   Privacy Policy   |   We're Hiring   |   Site Map

© 2007 AdMission Corporation

# Exhibit G

APPX035

4/21/2014    Case 7:14-cv-00014-O    Document 91-1 Filed 06/10/14 - Page 96 of 102    PageID 1122

Privacy Policy    Frequently Asked Questions    View Search Results    Summary of Charges    Logout

---

# Entity Details

| | | | |
|---|---|---|---|
| **File Number:** | **4248539** | **Incorporation Date / Formation Date:** | **11/08/2006** (mm/dd/yyyy) |
| **Entity Name:** | **SUMMIT 6 LLC** | | |
| **Entity Kind:** | **LIMITED LIABILITY COMPANY (LLC)** | **Entity Type:** | **GENERAL** |
| **Residency:** | **DOMESTIC** | State: | **DE** |
| **Status:** | **GOOD STANDING** | Status Date: | **11/08/2006** |

## TAX INFORMATION

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | **NO REPORTS ON FILE** | Tax Due: | **$ 0.00** |
| Annual Tax Assessment: | **$ 250.00** | Total Authorized Shares: | **0** |

## REGISTERED AGENT INFORMATION

| | |
|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** |
| City: | **WILMINGTON** | County: | **NEW CASTLE** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **(302)658-7581** |

## FILING HISTORY (Last 5 Filings)

| Seq | Document Code | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1 | 0240 | Amendment; Domestic | 1 | 12/22/2008 | 13:06 | 12/22/2008 |
| | **Former Name:** | ADMISSION LICENSING LLC | | | | |
| 2 | 0102Y | Register L.L.C. | 1 | 11/08/2006 | 09:24 | 11/08/2006 |

Back to Entity Search

To contact a Delaware Online Agent click here.

**– A281 –**

# Exhibit H

Recording Requested By:
Nationwide Title Clearing
When Recorded Return To:
DAVID V PATE
3412 STONE VALLEY ROAD
ALAMO, CA 94507

CONTRA COSTA Co Recorder Office
JOSEPH CANCIAMILLA, Clerk-Recorder
DOC- 2013-0216156-00

Check Number

Friday, AUG 30, 2013 12:04:35
MOD     $2.00|REC    $22.00|FTC    $0.00
DAF     $5.40|REF    $0.60|RED    $2.00
ERD     $2.00|

Ttl Pd    $34.00      Rcpt # 0001774735

Loan #: 0224945279

## SUBSTITUTION OF TRUSTEE and FULL RECONVEYANCE

The undersigned, **WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WELLS FARGO HOME MORTGAGE, INC.**, as the current beneficiary of that certain Deed of Trust executed by **DAVID V PATE AND SARAH F PATE** (Trustor), and recorded 07/01/2003 in the Office of the Recorder of CONTRA COSTA County, State of California, Instrument # 2003-0311483-00, and/or Book , Page , of Official Records, does in accordance with the provisions of said Deed of Trust hereby substitute **WELLS FARGO BANK, N.A.** as Trustee in place and stead of the Trustee therein, and does hereby vest WELLS FARGO BANK, N.A. as substituted Trustee with all rights, title, estate, power, duty and trusts conferred by said Deed of Trust;

WHEREAS the current beneficiary having represented to the Trustee that the obligation secured by said Deed of Trust has been fully paid and/or satisfied.

Dated on ___8/27___/2013 (MM/DD/YYYY)
**WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WELLS FARGO HOME MORTGAGE, INC.**

*Kimberly Nance* (signature)

Kimberly Nance    **VICE PRESIDENT LOAN DOCUMENTATION**

All Authorized Signatories whose signatures appear above are employed by NTC and have reviewed this document and supporting documentation prior to signing.

NOW THEREFORE, **WELLS FARGO BANK, N.A.**, as substituted Trustee, DOES HEREBY GRANT AND RECONVEY unto the parties entitled thereto, without warranty, all the estate and interest granted to said Trustee under said Deed of Trust in the lands therein described, situated in the County of CONTRA COSTA, State of California. Reference being hereby made specifically to said Deed of Trust and the record thereof for a particular description of said lands.

**WELLS FARGO BANK, N.A.**

*Susan Schotsch* (signature)

Susan Schotsch    **VICE PRESIDENT LOAN DOCUMENTATION**

STATE OF FLORIDA     COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on ___8/27___/2013 (MM/DD/YYYY), by **Kimberly Nance** and **Susan Schotsch** as VICE PRESIDENT LOAN DOCUMENTATION and VICE PRESIDENT LOAN DOCUMENTATION , respectively, on behalf of their respective entities, who, as such VICE PRESIDENT LOAN DOCUMENTATION and VICE PRESIDENT LOAN DOCUMENTATION being authorized to do so, executed the foregoing instrument for the purposes therein contained. They are personally known to me.

*Elizabeth A. Mustard* (signature)

Elizabeth A. Mustard EE 088429
Notary Public - State of FLORIDA
Commission expires: 08/27/2015

Elizabeth A. Mustard
Notary Public State of Florida
My Commission # EE 088429
Expires August 27, 2015
Bonded Thru Notary Public Underwriters

Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
WFHRC 21503582 -@   DOCR T2013081210  [C] RCNCA61

*D0003148505*

APPX038

**– A283 –**

# Exhibit I

APPX039



| | | |
|---|---|---|
| 9 ▼ | Search for people, jobs, companies, and more... | 🔲 Advanced |

Home    Profile    Network    Jobs    Interests          Business Services    Try Premium

Are You A Director? - Apply Now to the Worldwide Who's Who network for Distinguished Individuals | **Read More »**



**Sarah Pate**
Managing Director at Summit 6 LLC
San Francisco Bay Area | Marketing and Advertising

| Current | Summit 6 LLC, AdMission Corporation |
|---|---|
| Previous | IPIX Corporation, PictureWorks Technology, Household International |
| Education | University of Washington |

**196**
connections



www.linkedin.com/pub/sarah-pate/2/a33/944

Background

### People Similar to Sarah



**Christopher Lien**
Executive Chairman at Marin Software
**Connect**

## Experience

**Managing Director**
Summit 6 LLC
April 2009 – Present (5 years 2 months)

**Founder and CEO**
AdMission Corporation
January 2005 – Present (9 years 5 months)

AdMission's proprietary technology merges the advertiser's brand messaging and live product inventory on-the-fly, to create hybrid search/display ads that perform significantly better than traditional display ads. AdMission ads are compatible with leading third-party ad servers and can be distributed throughout existing ad networks and websites. www.admission.net

**EVP, General Manager**
IPIX Corporation
April 2000 – January 2005 (4 years 10 months)

Responsible for the advertising business unit of IPIX with key customers such as Move.com and eBay. Successfully led an MBO to spin the business unit out of IPIX in early 2005.

**COO/CFO**
PictureWorks Technology
July 1998 – April 2000 (1 year 10 months)

Helped build this inovative start up into a profitable company from inception to successfull aquisition in April of 2000.

**President, Division General Manager**
Household International
1982 – 1994 (12 years)

Division General Manger 1991-1994
President, Household Bank 1990-1991
VP Human Resources, Household Bank 1988-1989
Household Finance Corp. Sales 1982-1987

Skills & Endorsements

### Attract new customers on LinkedIn.

Free resources to market your business.

**View resources >>**

### People Also Viewed


**Scott L.**
Managing Director


**Scott Wilson**
Managing Partner, Swiftsure Capital


**Christine Imfeld**
Integrative Wellness Coach and Marketing Specialist


**Jason Golding**
Manager, Bus Devt/Corp Law at Point2 Technologies Inc.


**Jason W. Hardin**
Attorney at Fabian & Clendenin, P.C.


**Peter Yoakum**
Web Tester at Foundry Interactive


**Elizabeth Perlman**
Executive Director, The Intuitive Writing Project


**Eddie Cleland**
Territory Developer at Newcomers Welcome Service


**Vicky Bevilacqua-True**
Founder, BetterWorld B2B consulting, partner at Reva Athletic Apparel


**Laura Humphrey**
Business Consultant



Top Skills

| | |
|---|---|
| 18 | Start-ups |
| 11 | Advertising |
| 8 | Strategic Partnerships |
| 7 | Management |
| 6 | Corporate Development |
| 5 | Product Management |
| 5 | Sales |
| 5 | Entrepreneurship |
| 4 | Business Development |
| 2 | SaaS |

Sarah also knows about...

| 2 | E-commerce | 1 | Strategy | 1 | Product Marketing | 1 | Executive Management |

Education

### University of Washington
BA, Business and Finance

Recommendations                                           Given (5)

**Edward Cleland**



" I strongly recommend Edward. I have been studying with him through the Master's program at JFKU and we both are on track for graduation this June. In working on joint projects I have always sought out Edward due to his business acumen, diligence, intelligence, and he's just plain fun to work with.

March 25, 2014, Sarah studied with Edward at John F. Kennedy University

**Jon Howe**
Director of Manufacturing and Partner Development

" I originally hired Jon as a Quality Assurance Engineer at PictureWorks Technology in 1997. As the company grew, Jon assumed the responsibility for IT in 1999. Jon remained in this position following the acquisition of the company in 2000 by iPIX Corporation where he was promoted into product management in 2002. Across Jon's multiple roles he continually demonstrated an... **more**

August 4, 2010, Sarah managed Jon indirectly at Ecast

**Mitch Hertz**
Director

" I have had the opportunity to work with Mitch for fifteen years and five commercial lease negotiations. Mitch is far more than a typical broker. Yes he is an exceptional negotiator with a strong background in real estate law as well as very personable, but that still is not what makes him stand out. Mitch takes the time to really know his clients, their personal and... **more**

August 31, 2009, Sarah was Mitch's client



**Terry Delisa**
Affiliate Sales Manager

" Terry worked as a regional sales manager for AdMission Corporation working directly for the VP of sales. As CEO I had the opportunity to join her on several sales calls as well as work alongside her at industry specific tradeshows. Terry was exceptional at building rapport with clients that went well beyond a mere sales support relationship. Her genuine interest in her... **more**

July 24, 2009, Sarah managed Terry indirectly at Admission

**Laurie Boone**
Account Manager

" I have had the opportunity to work with Laurie for over ten years in her capacity of Project Management across three companies, from early start up to public corporation. Laurie has the unique ability to balance the needs of the customer with the needs of the company while still driving a project to its successful conclusion. She is tenacious, pragmatic and creative and... **more**

March 25, 2009, Sarah managed Laurie indirectly at AdMission Corporation

∨  See More  ∧

**Groups**

**GSV**

**Global Silicon Valley**
Join

**Following**

**Schools**

**University of Washington**
Greater Seattle Area
Follow

Help Center  |  About  |  Press  |  Blog  |  Careers  |  Advertising  |  Talent Solutions  |  Small Business  |  Mobile  |  Developers  |  Publishers  |  Language
Upgrade Your Account
LinkedIn Corporation © 2014  |  User Agreement  |  Privacy Policy  |  Community Guidelines  |  Cookie Policy  |  Copyright Policy  |  Send Feedback

# Exhibit J

APPX043

20139024677300001
**CONTRA COSTA Co Recorder Office**
**JOSEPH CANCIAMILLA, Clerk-Recorder**
DOC-2013-0246773-00
Acct 3039-E-ReconTrust
**Thursday, OCT 17, 2013** 14:23:07
MOD  $1.00|REC  $11.00|FTC  $0.00
DAF  $2.70|REF  $0.30|RED  $1.00
ERD  $1.00|       |
Ttl Pd  $17.00    Rcpt # 0001811685
AOA/RC/1-1

RECORDING REQUESTED BY:
ReconTrust Company, N.A.
2575 W. Chandler Blvd.
Mail Stop: AZ1-804-02-11
Chandler AZ 85224

AND WHEN RECORDED MAIL TO
SCOTT M LEWIS, KRISTA E LEWIS
24 Diamond Dr
Danville CA 94526

DOCID_97710989154597797
MERS MIN#:
MERS PHONE#:

## FULL RECONVEYANCE

SCOTT M LEWIS, KRISTA E LEWIS , is the trustor and ReconTrust Company, N.A. is the current trustee ("Trustee") under that certain Deed of Trust dated 07/19/2005 , and recorded on 07/27/2005 as Instrument or Document No. 2005-0277199-00 , in Book N/A , Page N/A , of the Official Records in the Office of the Recorder of Contra Costa County, State of California ;

The Trustee, having been requested in writing by the beneficiary of the Deed of Trust to reconvey the estate granted to Trustee under said Deed of Trust, does hereby reconvey to the person or persons legally entitled thereto, without warranty, all the estate, title and interest acquired by Trustee under said Deed of Trust.

Dated: 10/17/2013
Trustee:
ReconTrust Company, N.A.

*Valenzuela*

Jacqueline N. Valenzuela, Assistant Vice President

STATE OF ARIZONA
COUNTY OF Maricopa } S.S.

On 10/17/2013 , before me, Shirley Humberd , Notary Public, personally appeared Jacqueline N. Valenzuela , Assistant Vice President , of ReconTrust Company, N.A. , whose identity was proven to me on the basis of satisfactory evidence to be the person who he or she claims to be and whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.
IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year last written.

*S Humberd*

Shirley Humberd
Notary Public for said State and County
Phone # (800) 540-2684

SHIRLEY HUMBERD
Notary Public - Arizona
My Commission Expires
February 15, 2015

**APPX044**

**– A289 –**

# Exhibit K

APPX045



Recording Requested By:
VERDUGO TRUSTEE SERVICE CORPORATION

When Recorded Return To:
Current Trustor:
JAMES D WOOD
LISA T WOOD
1 WOODSIDE CT
DANVILLE, CA 94506-1139

CONTRA COSTA Co Recorder Office
JOSEPH CANCIAMILLA, Clerk-Recorder
**DOC- 2013-0177753-00**

Check Number
**Tuesday, JUL 16, 2013 10:55:25**
MOD   $1.00|REC   $11.00|FTC   $0.00
DAF   $2.70|REF   $0.30|RED   $1.00
ERD   $1.00|
Ttl Pd   $17.00   Rcpt # 0001729576
                          CLM/RV/1-1

## FULL RECONVEYANCE

CITIMORTGAGE, INC. #:0011386321 "WOOD"  Lender ID:07405/000000132355371  Contra Costa, California
**Prepared By: DENNIS MYERS, VERDUGO TRUSTEE SERVICE CORP PO BOX 10003, HAGERSTOWN, MD 21747-0003**
**1-800-283-7918**

VERDUGO TRUSTEE SERVICE CORPORATION as present Trustee for the Deed of Trust executed by JAMES D
WOOD LISA T WOOD HUSBAND AND WIFE as Trustor(s), Dated: 03/25/2003 Recorded: 04/02/2003 in
Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.: 2003-0150132-00 of official Records in the office of the
County Recorder of Contra Costa, California having been requested in writing, by the holder of the obligations
secured by said Deed of Trust, to reconvey the estate granted to trustee under said Deed of Trust, does hereby
reconvey to the person or persons legally entitled thereto, without warranty, all the estate, title and interest acquired
by Trustee under said Deed of Trust.

IN WITNESS WHEREOF, VERDUGO TRUSTEE SERVICE CORPORATION as the Trustee has caused its
corporate name to be affixed by a duly authorized officer on the date shown in the acknowledgment certificate below:

On July 11th, 2013
By: VERDUGO TRUSTEE SERVICE CORPORATION as Trustee

TERRI SHEFFLER , VICE PRESIDENT

STATE OF Maryland
COUNTY OF Washington

On July 11th, 2013, before me, JESSICA L. SCHROYER, a Notary Public in and for Washington in the State of
Maryland, personally appeared TERRI SHEFFLER , VICE PRESIDENT, personally known to me (or proved to me on
the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by
his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

JESSICA L. SCHROYER
Notary Expires: 02/21/2017

Jessica L. Schroyer
Notary Public
Washington Co., MD

(This area for notarial seal)

*VM*VM2CITM*06/30/2013 10:22:00 PM* CITM01CITM00000000000000007464139*.CACONTR* 0011386321 CASTATE_TRUST_REL *CM*CM2CITM*

APPX046

**– A291 –**

# Exhibit L

APPX047



**SWIFTSURE**
CAPITAL

*Navigating Private Equity With Confidence*

ABOUT US    PORTFOLIO    TEAM    REGION    CONTACT US



## Scott F. Wilson

Prior to founding Swiftsure in 2004, Scott spent 27 years in Silicon Valley in a variety of both operational and financial positions. He was a Co-Founder and Managing Partner of Transcontinental Capital Partners, a boutique investment banking firm headquartered in Palo Alto serving mid-market businesses.

Scott's extensive operational experience includes positions as Founder, CEO, CFO and Director of Corporate Development in emerging growth companies in the communications, semiconductor and pharmaceutical industries. He is currently a director of Summit 6, CoCo Communications and Viableware, and is a board observer of Yapta.

Scott was born and raised in Seattle where he went to Roosevelt High School and earned his BA and a JD from the University of Washington. After graduating from law school, Scott was an attorney with the Securities and Exchange Commission in Washington, DC for two years. Subsequently, he received an MBA from Stanford University Graduate School of Business.

Scott serves as a member of the Board of Ambassadors of The Fred Hutchinson Cancer Research Center, and a member of the Board of Directors of both the Seattle Goodwill and ACT Theatre. Scott enjoys skiing, hiking and fishing in Sun Valley and biking around the Northwest. He and his wife Shirley have three grown children.

Securities offered through Swiftsure Securities, LLC, member **FINRA** and **SIPC**. View our **Privacy Policy and Disclosures.**

# Exhibit M

APPX049

Case: 15-101    Document: 2-2    Page: 318    Filed: 10/23/2014

Virtual Office Address at 4925 Greenville Ave., Dallas, Texas 75206 | Davinci Virtual Of...   Page 1 of 2
Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 50 of 102   PageID 1136



 Need Help?
Chat Live

Davinci Virtual > Virtual Office Locations > United States > Texas > Dallas Virtual Offices > Park Cities



## Park Cities
## $75.00/month

4925 Greenville Ave.
Dallas, TX 75206
1.888.VOFFICE (1.888.863.3423)

**THIS VIRTUAL OFFICE PACKAGE INCLUDES:**

- Local professional business address
- Use of address for business cards, licensing, website, etc.
- Mail Receipt
- Lobby greeter to welcome your walk-in clients
- Access to network of over 3000 meeting spaces worldwide (pricing may vary by location)
- Business Support Center (additional fee)
- Client drop off/pick up point
- Private day offices – varies by location, avg $10-$35/hr
- Conference rooms – varies by location, avg $25-$45/hr



Would you like to see this
Virtual Office space in person?
Schedule a Tour. Tours must be scheduled in advance.
**> SCHEDULE A TOUR**

**AVAILABLE ADD ONS:**

Lobby Directory Listing (extra fee where avail.) - $20.00/month

2 Hours Optional Meeting Room Package ($30/month extra fee) - $30.00/month

10 Hours Optional Meeting Room Package ($150/month extra fee) - $150.00/month

Bi-Monthly Mail Forwarding (Extra Monthly Fee) - $15.00/month

Daily Mail Forwarding (Extra Monthly Fee) - $40.00/month

Monthly Mail Forwarding (Extra Monthly Fee) - $7.00/month

Weekly Mail Forwarding (Extra Monthly Fee) - $20.00/month



Thank you for visiting Davinci Virtual. At our virtual office locations in Park Cities, 4925 Greenville Ave., Dallas, TX 75206 we have everything to meet your virtual business needs. Continue your telecommuting or home working and impress your clients with a virtual address at Park Cities, 4925 Greenville Ave., Dallas, TX 75206.

Find business centers, day offices, part-time offices, and other virtual meeting facilities all equipped with live receptionist

Need more than a virtual address at Park Cities, 4925 Greenville Ave., Dallas, TX 75206? If you want to have a face-to-face with

services and professional lobby greeters at Park Cities. Ask about call answering, a virtual assistant, or web chat services for your virtual office at this prime address when you make your reservation. We will make your experience at our executive virtual office suites as smooth and effortless as possible.

your client, want to do some office sharing or desk sharing, Davinci offers to turn your virtual address at Park Cities into an actual work space you may rent for your touchdown or mobile working needs. Reserving a collaboration space online is fast and easy!

Call 1.888.863.3423 now to reserve a location or select a virtual office center at Park Cities, 4925 Greenville Ave., Dallas, TX 75206 above to view pricing and additional facility features. Booking your Davinci Virtual location is convenient and hassle free.

**About Davinci Virtual**

About Davinci
Buzz
Happy Clients
Awards
Employment
Become an Affiliate
Join Partner Network
Mobile Site

**Our Services**

Live Receptionist Services
Virtual Office Locations
Live Chat Services
Remarkable Offers
Davinci Meeting Rooms
Resources

**Customer Care**

FAQ's
Contact Us
Live Chat
Refer a Friend
Log In / My Account
Calculator

**Community**

Blog
Contest
Facebook
LinkedIn
LinkedIn Group
Twitter
YouTube



Copyright © 2014 Davinci Virtual Office Space & Solutions. All Rights Reserved. Terms | Privacy Policy | Site Map



# Exhibit N

APPX052




Need Help?
**Chat Live**

### SEND US A MESSAGE

Please contact us with any questions or comments.
A Davinci Virtual representative will contact you shortly.

**Phone:**
1.888.V.OFFICE (888.863.3423)

**Fax:**
1.877.990.4251

**Email:**
support@davincivirtual.com

\* Required Fields

**First Name**                    **Last Name**

**Email Address**                 **Phone Number**

**How did you hear about us?**  [ ▼ ]   Mobile

Company                           Address

**Address:**
2150 South 1300 East, Suite 200
Salt Lake City, UT 84106
United States

City                   State  [ ▼ ]   Zip

**View Map**

Interested in a tour of 4925 Greenville Ave., Suite 200 Dallas, TX 75206   [ ▼ ]



**Comments**

33 ○ 4 =      Answer

### About Davinci Virtual

About Davinci
Buzz
Happy Clients
Awards
Employment
Become an Affiliate
Join Partner Network
Mobile Site

### Our Services

Live Receptionist Services
Virtual Office Locations
Live Chat Services
Remarkable Offers
Davinci Meeting Rooms
Resources

### Customer Care

FAQ's
Contact Us
Live Chat
Refer a Friend
Log In / My Account
Calculator

### Community

Blog
Contest
Facebook
LinkedIn
LinkedIn Group
Twitter
YouTube
 0

Copyright © 2014 Davinci Virtual Office Space & Solutions. All Rights Reserved. Terms | Privacy Policy | Site Map



APPX053
5/23/2014

# Exhibit O

APPX054

Browse | What Do You Want To Find? near San Francisco, CA | Sign In | Join

Home > Accident & Property Damage Attorneys near Dallas, TX > Attorneys At Law Ric...

# Attorneys At Law Rick Weaver Personal Injury Law Firm

OPEN
Today: Open 24 Hours
Tomorrow: Open 24 Hours

4925 Greenville Ave, #200, Dallas, TX 75206
(214) 495-1300

Email Business

**Personalize this business!**
Add a personal note here, and keep this business handy in **mybook!**

**mybook It**

**BUSINESS DETAILS** | GALLERY | REVIEWS

**We'll Fight For You!**
**Call for Free Consultation: 214-495-1300**

22 YEARS in Business

**Hours:** Mon - Sun Open 24 Hours

**More Info:** Personal Injury lawyers at Weaver Injury Law Firm have helped Texas who have been injured for over 30 years, offering clients exceptional legal representation with an array of injuries and types of accidents. From car accidents, slip and fall accidents, and more complex truck accidents. Our legal team has a track record of assisting those who
More »

**Services/Products:**
- Truck Accidents
- 18-wheeler accidents
- Auto Accidents

More »

**Brands:** 18-wheeler accidents, Animal Bites , Auto Accidents, Birth Injuries, Car accidents, Dog Bites, Medical Malpractice, Motorcycle Accidents, Nursing Home Injuries Neglect , Premises liability, Product Liability,
More »

**Payment method:** Insurance

**Location:** Call 214-495-1300 for help finding us, or get a free consultation over the phone.

More »

**Amenities:**
- Free Parking
- 24-7 Emergency Appointments
- Free Phone Consultation

More »

**Languages:** English, Spanish

**Accreditation:** BBB - Better Business Bureau
State Bar of Texas

**Associations:**
- State Bar of Texas
- BBB - Better Business Bureau

**AKA:** Dallas Personal Injury Lawyer
Personal Injury Lawyer Dallas
Dallas Auto Accident Lawyer
More »

**Categories:** Accident & Property Damage Attorneys, Automobile Accident Attorneys, Personal Injury Law Attorneys, Attorneys, Wrongful Death Attorneys

**Improve Business Info »**

GALLERY

Browse the Gallery »

SPONSORED BY

**Cowboy Bail Bonds**
314 S Riverfront Blvd, Dallas, TX 75207
(214) 741-7600

Put your ad here »

MORE LIKE THIS

**Bankruptcy Firm of Fears Nachawati**
(2)
4925 Greenville Ave, Dallas, TX

**Turley Law Firm**
6440 N Central Expy, Dallas, TX

**The Law Office of Donald E. Hood, PLLC**
(5)
6440 N Central Expy Ste 204, Dallas, TX

**DWI Lawyer Rick Weaver & Associates**
(2)
4925 Greenville Ave, Suite 200, Dallas, TX

**Allmand Law**
(5)
5646 Milton St Suite 201, Dallas, TX

*Paid Advertisement*

mybook – Organize All Your Business Contacts in One Place! Take the Tour







REVIEWS Browse

What Do You Want To Find? near San Francisco, CA

Sign In | Join

Write a review...

Click to rate

Sponsored Links

**Attorney Accident**
www.injuryhelplineattorney.com/ We Have Helped **Injured** Victims for 30+ Yrs. Free **Lawyer** Consultation!
Construction Accident Dog Bite
Slip and Fall Truck Accident
Car Accident

**Personal Injury Attorney**
www.accidentattorneys.com/ — Free Evaluation with an **Attorney**. We'll Help You Get Compensated!
Enter Your Zip Code Submit Free Case Review
No Fee Unless We Win Contact Us Today
Ask A Question?

**Injury Attorney**
www.personalinjury-law.com/ Is Your **Injury** Case Worth Money? Speak To A Local **Attorney** Today.
Do you have a case? Auto Accident
Slip and Fall Free Evaluation

ABOUT

About YP
Site Feedback
Contact us
Advertise with Us
Careers - We're Hiring
Engineering Blog
Legal | Terms of Service and Use
Privacy Policy
Small Business Advertising
Advertising Choices
About Call Recording

SITE DIRECTORY

News & Articles
Find a Business
Maps & Directions
White Pages
Mobile Apps
Reverse Phone Lookup
Site Map
Browse Restaurants

CITY GUIDES More Cities »

Atlanta
Austin
Baltimore
Boston
Charlotte
Chicago
Dallas
Denver
Detroit
Houston
Indianapolis
Kansas City
Las Vegas
Los Angeles
Louisville
Memphis
Miami
Milwaukee
New York
Oklahoma City
Orlando
Philadelphia
Phoenix
Saint Louis

YP FAMILY

Corporate Site
Advertising Solution
AnyWho

AT&T FAMILY

AT&T
AT&T Wireless

© 2014 YP Intellectual Property LLC. All rights reserved.
YP, the YP logo and all other YP marks contained herein are trademarks of YP Intellectual Property LLC and/or YP affiliated companies.
AT&T, the AT&T Logo and all AT&T related marks are trademarks of AT&T Inc. or AT&T affiliated companies. All other marks contained herein are the property of their respective owners.

TRUSTe Certified Privacy

mybook – Organize All Your Business Contacts in One Place! Take the Tour

# Exhibit P

MENU

## CONTACT US

There are four easy ways to contact LeForce Law, PLLC:

Call us at 214-800-5196.
Email us at info@leforcelaw.com. (Download V-Card)
By mail at our office below. (Directions)
Complete and submit the contact form below.



4925 Greenville Avenue
Suite 200
Dallas, TX 75206
Directions

**Name** *

APPX058
5/23/2014

**– A303 –**

Case: 15-101     Document: 2-2     Page: 327     Filed: 10/23/2014

Contact Us | Dallas, Texas | LeForce Law                    Page 2 of 4
Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 59 of 102   PageID 1145

[                                                  ]

**Phone** *

[                                                  ]

**Email** *

[                                                  ]

**How did you hear about us?**

[ Internet                                    ▼ ]

**Message**

[                                                  ]

[ Submit ]

**Please note that sending us a message via our website or any other online property does not create an attorney-client relationship between you and any lawyer at LeForce Law PLLC.**

## PRACTICE AREAS

Commercial Bankruptcy

Corporate Restructuring

Corporate Law & Business Transactions

Banking & Finance

Collections & Creditors' Rights

*Jeff has always been extremely competent, responsive, and professional in his representation of our business. We trust his judgment and advice, and would recommend him to anyone needing superior legal services.*

**MICHAEL MATTHEWS**

**CO-FOUNDER AND PRESIDENT**

**TOWER ACQUISITION, LLC**

---

**NAVIGATION**

Home

Attorney Profile

Practice Areas

Testimonials

News & Updates

Contact Us

**PRACTICE AREAS**

Commercial Bankruptcy

Corporate Restructuring

Corporate Law & Business Transactions

Banking & Finance

Collections & Creditors' Rights

**LEFORCE LAW PLLC**

4925 Greenville Avenue

Suite 200

Dallas, TX 75206

tel: 214-800-5196

fax: 214-800-5197

email: info@leforcelaw.com

Download V-Card



Copyright 2014 LeForce Law PLLC   |

Disclaimer   |   Web Design by Southern Web

# Exhibit Q

APPX062



Home | About DGS | Events | Join DGS | Jobs | Contact DGS | Make a Payment
DGS Young Professionals

# Membership Applications

A list of all membership applications

1. ## DGS Membership Application

   We welcome and thank you for your interest in the DGS.  Please read the following explanation of the DGS membership structure.

   **MEMBERSHIP CRITERIA AND DUES SCHEDULE**
   **ACTIVE MEMBERS** Any person of integrity holding both a degree in earth science, and involved in earth sciences, who is interested in furthering the purposes of the DGS, is eligible to become an Active Member, and is thereby eligible to vote and hold office. Exceptions to the qualifications may be made by an unanimous vote of the BOD, or for Active Members of The American Association of Petroleum Geologists (AAPG). The BOD, at its discretion, may appoint Active Members to one or more DGS committees. Dues $25/ year.

   **HONORARY LIFE MEMBERS** Any Active Member who has brought distinction to the profession through public-spirited activity or scientific achievements may be approved by a majority vote of the BOD to Honorary Life Membership. Potential Honorary Life Members are nominated by the Awards Committee and following election shall thereafter be exempt from payment of dues and shall be eligible to vote and hold office.

   **ASSOCIATE MEMBERS** Any person failing to qualify for the status of Active Member, but who is otherwise interested in the activities and purposes of the DGS, may become an Associate Member, but shall not be eligible to vote or hold office. Dues $25/ year.

   **STUDENT MEMBER** Any person who is a student in good standing, studying for a degree in earth science, is eligible to become a Student Member, but shall not be eligible to vote or hold office. Dues $5/ year.

   **Administrative year covers <u>June 1st to May 31</u>.**
   Payment by credit card can be completed when the online form is completed.  The second option is payment by check to the Dallas Geological Society and mailed to the DGS mailbox at: 4925 Greenville Avenue, Suite #200, Dallas, TX, 75206.

   **NOTE:** You must meet the qualifications for membership and approved by the Board of Directors before your membership is active.

   **Membership is not automatic upon payment of dues.**

## Event Photos



## Contact Us

4925 Greenville Avenue, Suite #200
Dallas, TX 75206
Phone: (214) 800-2642
Email: Webmaster.DGS@gmail.com

Log in | Site Map | Feed | Schipul Web Design | Tendenci® Membership Management Software |

APPX063

# Exhibit R

APPX064

*Law Office of S. Craig Glickman*

*Criminal Defense, Personal Injury, Civil Litigation*

*Sometimes You Need a Tough Lawyer*

Home    Services    Profiles    Locations    Facts    Contact Us    Payments    Photos    News    Weather

**Locations**

**Primary**
Our primary location is 4925 Greenville Ave., Suite 200, in the Reeder Energy Building at the northwest corner of University and Greenville Ave in north Dallas.

**Secondary**
We also have conference rooms in Central Plano, West Plano, Galleria/Addison, Uptown Dallas/Turtle Creek, Uptown Dallas/McKinney Ave,  North Dallas/Mockingbird Station, North Dallas/Preston Hollow, North Dallas/LBJ, Grapevine, Ft. Worth, Las Colinas, North Houston and Houston Galleria.

**Schedule your meeting with us at the location nearest you!**

| **Plano/Central** | **Plano/West** | **Addison/Galleria** | **Dallas/Turtle Creek** |
|---|---|---|---|
| 555 Republic | 1400 Preston Rd | 13155 Noel Rd. | 3102 Maple Ave. |
| Suite 200 | Suite 400 | Suite 900 | Suite 400 |
| Plano, TX 75074 | Plano, TX 75093 | Dallas, TX 75240 | Dallas, TX 75201 |

| **Dallas/Uptown** | **Dallas/Mockingbird** | **Dallas/Pres. Hollow** | **Dallas/LBJ** |
|---|---|---|---|
| 3131 McKinney Ave. | 6060 N. Central | 7557 Rambler Rd. | 3010 LBJ |
| Suite 600 | Suite 560 | Suite 700 | Suite 1200 |
| Dallas, TX 75204 | Dallas, TX 75206 | Dallas, TX 75231 | Dallas, TX 75234 |

| **Grapevine** | **Ft. Worth** | **Las Colinas** | **Houston/North** |
|---|---|---|---|
| 1701 NW Hwy | 9500 Ray White | 320 Decker Dr. | 11811 North Frwy. |
| Suite 100 | Suite 200 | Suite 100 | Suite 500 |
| Grapevine, TX 76051 | Ft. Worth, TX 76244 | Irving, TX 75062 | Houston, TX 77060 |

| **Houston/Galleria** |
|---|
| 5100 Westheimer |
| Suite 200 |
| Houston, TX 77056 |

*Contact us by phone, mail or email.*

Cell: 214-407-2607
Firm: 214-800-5145

4925 Greenville Avenue,
Suite 200
Dallas, Texas
75206

Cell: 214-407-2607
Firm: 214-800-5145
Fax: 214-447-9151
craig.glickman@gmail.com

Disclaimer    Terms    Directory    [Login]
Patent Pending 12/500,798    © 2007-2014 MagicWebsiteMaker.com™

**– A310 –**

# Exhibit S

APPX066

4/4/2014

http://www.colesfirm.com/ContactUs.html

The Coles Firm - Contact Us

Home
About Michael
Our Services
Immigration Login
A Fresh Alternative
Government
Our Community
Contact Us



Physical Address
One Energy Square
**4925 Greenville Avenue**
**Suite 200**
**Dallas, Texas 75206**

Phone
214-443-7862
Fax
972-692-7145

Confidential Intake Questionnaire click here.

Copyright 2013, The Coles Firm P.C., One Energy Square, 4925 Greenville Ave. Suite 200, Dallas, Texas 75206
Telephone (214) 443-7862, Facsimile (972) 692-7145 All rights reserved.

APPX067

– A312 –

# Exhibit T

APPX068



# Bankruptcy and Tax Attorneys in Dallas Fort Worth

Rothrock Law Firm
(214) 432-5780

Home - Bankruptcy And Tax Attorneys In Dallas/Fort Worth

Process Of Filing Bankruptcy In Dallas/Fort Worth

Exempt Property In Texas

Chapter 7 Attorney In Dallas/Fort Worth

Chapter 13 Attorney In Dallas/Fort Worth

Life After Bankruptcy

Frequently Asked Questions About Bankruptcy In Dallas/Fort Worth

Contact Bankruptcy Attorneys In Dallas/Fort Worth

About Rothrock Law Firm, Bankruptcy And Tax Lawyers In Dallas/Fort Worth

Blog

IRS Liens In Dallas/Fort Worth: Same Day Release Available

IRS Levies In Dallas/Fort Worth: Wage Garnishments Released Immediately

Offers In Compromise: Pay Pennies On The

**Rothrock Law Firm - Bankruptcy and Tax  Lawyers in Dallas/Fort Worth**
4925 Greenville Ave., Suite 200, Dallas, TX 75206.  (214) 432-5780



## Filing Bankruptcy in Dallas and Fort Worth

Carl Rothrock is a bankruptcy attorney/lawyer in Dallas/Fort Worth.  He is the founder of Rothrock Law Firm, which serves the DFW area.  Bankruptcy may help you stop foreclosure and repossession, reduce or eliminate IRS debts, and wipe out second mortgages and credit card debts.   Unlike bill consolidation agencies that negotiate with creditors, bankruptcy provides your creditors very limited options.  If you file bankruptcy, you will be protected by federal law. This website concentrates on chapter 7 and chapter 13 consumer bankruptcy cases filed in the Dallas area.  If you are a business or an individual with real estate debt exceeding one million dollars, please visits our Chapter 11 website.

APPX069

Dollar To Settle Your
Debt

Delinquent Taxes And
Unfiled Returns

Back Taxes Owed In
Dallas/Fort Worth

Innocent Spouse
Defense In Dallas/Fort
Worth

Installment Agreements
To Resolve Back Taxes

Tax Appeals In
Dallas/Fort Worth

IRS Notices And Forms

Not Collectible Status

Bankruptcy And The IRS

Statute Of Limitations
For IRS Cases

Penalty Abatement

Requests For
Reconsideration

Payment

### Why Choose Rothrock Law Firm as your Dallas/Fort Worth Bankruptcy Attorney?

If you live in the counties of Dallas, Ellis, Hunt, Johnson, Kaufman, Navarro, Rockwall, Comance, Erath, Hood, Jack, Palo Pinto, Parker, Tarrant, or Wise, it is important to hire a local attorney who understands the local rules of the bankruptcy judges and trustees in the area.  All cases filed in these counties will be heard in the United States Bankruptcy Court for the Northern District of Texas.  Carl Rothrock is admitted to practice law before the Northern District of Texas.  He has been practicing law for 18 years.  The attorneys of the Rothrock Law Firm are experienced bankruptcy attorneys in Dallas/Fort Worth.

### Why Choose Rothrock Law Firm as your Dallas/Fort Worth Tax Attorney?

**YOU ONLY HAVE AN ATTORNEY CLIENT PRIVILEGE WITH AN ATTORNEY, NOT A C.P.A. OR OTHER TAX PROFESSIONAL.  IF THE IRS BELIEVES YOU HAVE COMMITTED A CRIME, IT CAN SUBPOENA YOUR ACCOUNTANT TO TESTIFY AGAINST YOU!**  Hire an experienced attorney in tax if you have a tax problem.  The attorneys at Rothrock Law Firm have more than 38 years of combined experience.  In addition to being licensed attorneys, they are also certified IRS tax preparers.  They can analyze your tax situation to see if it will best be handled through filing bankruptcy or dealing with the IRS directly.  All the attorneys in the Rothrock Law Firm are admitted to practice before the United States Tax Court in all fifty states.

# SOME OF OUR RECENT RESULTS



Carl Rothrock, Dallas Bankruptcy Lawyer

Successfully discharged over $20 million dollars of debt for real estate developer in Chapter 7 case.  Client was able to keep all assets and pay nothing to creditors.

Successfully discharged over $14 million dollars of debt for investor in Chapter 7 case.  Client was able to keep home and repay $14,000 to creditors to repay $14 million dollars of debt.

Successfully confirmed chapter 11 plan where client paid $5,500 to settle $500,000 of past due IRS debt.

Successfully confirmed bankruptcy plan where client kept home and wiped out second mortgage of $500,000.

Successfully confirmed chapter 11 plan where client kept multiple investment properties for $400,000 where total debt owed was $2.5 million.

Discharged over $100,000 of credit card debt and stripped second mortgage.  As a result, clients were able to reduce monthly expenses by $3,000 per month, modify mortgage, and save their home.

**APPX070**

**Contact a Bankruptcy Lawyer in Dallas for a free consultation**

**Name** *

First                              Last

**Phone Number** *

**Email** *

**Comment** *

Submit

My Profile

---

**Rothrock Law Firm (214) 432-5780**

**Bankruptcy and Tax Attorneys in Dallas/Fort Worth, Tx**

4925 Greenville Ave., Suite 200, Dallas, TX 75206

Copyright 2013 by Rothrock Law Firm

Photos used under Creative Commons from dustin.askins , R Hensley

APPX071

**– A316 –**

# Exhibit U

APPX072

## Table C–5.
### U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2013

| Circuit and District | Total Cases | | No Court Action | | Before Pretrial | | Court Action — During or After Pretrial | | Trial | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| TOTAL | 198,301 | 8.4 | 43,423 | 5.0 | 128,042 | 8.5 | 24,058 | 12.7 | 2,778 | 23.8 |
| DC | 1,974 | 8.9 | 721 | 7.3 | 1,201 | 9.8 | 10 | 38.4 | 42 | 43.5 |
| 1ST | 4,940 | 9.6 | 1,067 | 3.9 | 2,543 | 9.6 | 1,228 | 15.2 | 102 | 27.5 |
| ME | 373 | 7.8 | 137 | 6.2 | 220 | 8.8 | 12 | 19.3 | 4 | - |
| MA | 2,434 | 8.3 | 623 | 3.0 | 803 | 6.9 | 953 | 14.9 | 55 | 30.6 |
| NH | 468 | 9.6 | 81 | 3.9 | 206 | 6.7 | 169 | 15.2 | 12 | 19.3 |
| RI | 652 | 13.7 | 85 | 6.7 | 522 | 14.7 | 34 | 16.1 | 11 | 40.4 |
| PR | 1,013 | 11.6 | 141 | 6.7 | 792 | 11.6 | 60 | 19.9 | 20 | 26.0 |
| 2ND | 18,455 | 8.8 | 3,799 | 5.0 | 10,820 | 8.6 | 3,515 | 12.1 | 321 | 32.2 |
| CT | 1,656 | 10.7 | 776 | 5.2 | 760 | 11.1 | 69 | 21.5 | 51 | 37.9 |
| NY,N | 1,163 | 11.8 | 251 | 5.2 | 580 | 11.5 | 300 | 17.3 | 32 | 28.8 |
| NY,E | 5,533 | 8.8 | 1,162 | 5.5 | 3,096 | 8.6 | 1,176 | 11.7 | 99 | 31.0 |
| NY,S | 8,441 | 8.3 | 1,198 | 4.4 | 5,176 | 7.5 | 1,944 | 11.4 | 123 | 28.8 |
| NY,W | 1,389 | 7.4 | 377 | 2.9 | 976 | 9.6 | 24 | 34.6 | 12 | 67.1 |
| VT | 273 | 8.9 | 35 | 3.8 | 232 | 9.5 | 2 | - | 4 | - |
| 3RD | 23,315 | 9.2 | 2,467 | 4.0 | 17,015 | 9.3 | 3,506 | 11.9 | 327 | 27.0 |
| DE | 1,226 | 8.0 | 441 | 4.6 | 648 | 8.8 | 78 | 14.3 | 59 | 34.2 |
| NJ | 5,908 | 6.1 | 544 | 4.0 | 3,326 | 3.6 | 1,974 | 13.2 | 64 | 35.1 |
| PA,E | 12,617 | 14.6 | 579 | 3.1 | 10,626 | 17.9 | 1,290 | 9.4 | 122 | 17.8 |
| PA,M | 1,472 | 7.7 | 459 | 4.7 | 913 | 8.1 | 57 | 22.4 | 43 | 28.6 |
| PA,W | 1,870 | 6.2 | 325 | 2.9 | 1,491 | 7.0 | 33 | 24.3 | 21 | 29.2 |
| VI | 222 | 18.0 | 119 | 14.0 | 11 | 11.5 | 74 | 19.9 | 18 | 29.0 |
| 4TH | 12,392 | 7.4 | 2,302 | 5.3 | 8,437 | 7.1 | 1,467 | 10.4 | 186 | 20.2 |
| MD | 3,191 | 7.1 | 404 | 6.3 | 2,151 | 5.6 | 582 | 13.5 | 54 | 30.1 |
| NC,E | 1,012 | 9.0 | 300 | 7.8 | 697 | 9.5 | 7 | - | 8 | - |
| NC,M | 551 | 10.1 | 361 | 9.0 | 159 | 12.2 | 22 | 16.4 | 9 | - |
| NC,W | 930 | 8.2 | 298 | 4.8 | 533 | 8.7 | 84 | 14.7 | 15 | 22.6 |
| SC | 2,484 | 8.8 | 265 | 3.7 | 2,051 | 9.0 | 135 | 12.1 | 33 | 25.4 |
| VA,E | 2,358 | 5.0 | 330 | 3.0 | 1,434 | 4.1 | 554 | 7.7 | 40 | 11.1 |
| VA,W | 678 | 5.0 | 167 | 3.0 | 449 | 8.9 | 46 | 12.5 | 16 | 11.2 |
| WV,N | 428 | 8.8 | 115 | 3.8 | 302 | 9.2 | 8 | - | 3 | - |
| WV,S | 760 | 8.7 | 62 | 2.6 | 661 | 9.1 | 29 | 17.9 | 8 | 12.0 |

APPX073

– A318 –

## Table C-5. (March 31, 2013—Continued)

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **5TH** | **22,514** | **10.9** | **4,961** | **6.0** | **15,381** | **12.2** | **1,838** | **13.6** | **334** | **20.2** |
| LA,E | 6,391 | 26.0 | 169 | 0.9 | 5,315 | 30.4 | 861 | 14.4 | 46 | 18.1 |
| LA,M | 579 | 12.1 | 192 | 10.3 | 347 | 12.1 | 24 | 16.6 | 16 | 35.0 |
| LA,W | 1,358 | 12.5 | 489 | 8.9 | 777 | 14.0 | 58 | 20.1 | 34 | 24.1 |
| MS,N | 581 | 10.6 | 196 | 7.9 | 347 | 10.4 | 15 | 14.2 | 15 | 22.2 |
| MS,S | 1,392 | 10.8 | 631 | 9.2 | 715 | 11.7 | 23 | 19.5 | 23 | 18.4 |
| TX,E | 3,200 | 8.7 | 603 | 5.4 | 2,547 | 7.1 | 4 | – | 46 | 20.2 |
| **TX,N** | 2,234 | **6.8** | 572 | 6.9 | 1,593 | 9.0 | 33 | 24.4 | 36 | 20.2 |
| TX,S | 4,506 | 7.5 | 1,402 | 4.3 | 2,454 | 8.4 | 581 | 14.2 | 69 | 19.8 |
| TX,W | 2,273 | 7.0 | 707 | 6.2 | 1,418 | 6.6 | 99 | 15.8 | 49 | 19.0 |
| **6TH** | **16,864** | **8.9** | **4,882** | **4.6** | **8,073** | **9.0** | **3,737** | **12.5** | **172** | **24.9** |
| KY,E | 1,187 | 8.3 | 158 | 4.6 | 994 | 8.4 | 24 | 21.8 | 11 | 23.2 |
| KY,W | 1,114 | 8.5 | 323 | 4.5 | 752 | 9.4 | 31 | 18.4 | 8 | – |
| MI,E | 4,388 | 7.7 | 997 | 3.1 | 1,559 | 5.3 | 1,795 | 13.2 | 37 | 20.4 |
| MI,W | 1,143 | 7.0 | 210 | 1.7 | 668 | 6.8 | 249 | 11.9 | 16 | 23.1 |
| OH,N | 3,239 | 8.9 | 864 | 4.2 | 1,533 | 12.5 | 819 | 9.6 | 23 | 24.7 |
| OH,S | 2,266 | 9.9 | 869 | 5.5 | 717 | 11.1 | 654 | 13.3 | 26 | 31.9 |
| TN,E | 1,266 | 10.4 | 578 | 5.5 | 509 | 12.4 | 132 | 14.2 | 19 | 33.3 |
| TN,M | 1,208 | 10.4 | 175 | 10.0 | 1,005 | 10.2 | 10 | 19.3 | 18 | 26.3 |
| TN,W | 1,081 | 10.7 | 708 | 9.5 | 336 | 11.5 | 23 | 22.8 | 14 | 23.5 |
| **7TH** | **15,666** | **7.6** | **4,480** | **5.4** | **8,717** | **6.9** | **2,270** | **12.7** | **199** | **27.6** |
| IL,N | 8,741 | 6.6 | 2,519 | 5.8 | 5,404 | 6.2 | 714 | 11.5 | 104 | 33.7 |
| IL,C | 724 | 9.0 | 291 | 11.7 | 412 | 9.7 | 6 | – | 15 | 36.7 |
| IL,S | 1,141 | 11.0 | 519 | 11.7 | 589 | 10.2 | 11 | 32.3 | 22 | 24.5 |
| IN,N | 1,293 | 9.9 | 399 | 3.2 | 407 | 8.7 | 469 | 16.3 | 18 | 29.9 |
| IN,S | 2,053 | 9.2 | 277 | 3.4 | 944 | 6.9 | 817 | 12.5 | 15 | 24.8 |
| WI,E | 1,045 | 6.7 | 218 | 3.2 | 790 | 7.2 | 25 | 16.3 | 12 | 16.4 |
| WI,W | 669 | 6.0 | 257 | 2.5 | 171 | 6.6 | 228 | 11.2 | 13 | 16.4 |
| **8TH** | **13,983** | **12.2** | **4,887** | **7.1** | **8,027** | **13.6** | **909** | **13.3** | **160** | **21.9** |
| AR,E | 4,204 | 46.3 | 1,084 | 47.1 | 3,091 | 45.7 | 3 | – | 24 | 19.6 |
| AR,W | 863 | 11.7 | 121 | 8.5 | 722 | 11.8 | 3 | – | 17 | 18.8 |
| IA,N | 406 | 9.7 | 85 | 7.6 | 311 | 9.8 | 9 | – | 9 | – |
| IA,S | 507 | 7.9 | 89 | 4.1 | 308 | 7.1 | 99 | 14.7 | 11 | 23.5 |
| MN | 2,825 | 5.4 | 1,301 | 2.4 | 753 | 5.1 | 745 | 12.4 | 26 | 23.2 |
| MO,E | 2,232 | 10.6 | 1,038 | 9.6 | 1,159 | 11.0 | 9 | – | 22 | 22.1 |
| MO,W | 2,054 | 8.4 | 1,010 | 4.4 | 987 | 9.1 | 35 | 17.2 | 22 | 22.1 |
| NE | 498 | 6.7 | 430 | 2.8 | 430 | 11.0 | 11 | 17.8 | 19 | 18.9 |
| ND | 159 | 9.0 | 8 | – | 150 | 8.5 | 0 | – | – | 28.8 |
| SD | 237 | 11.4 | 115 | 10.2 | 116 | 12.4 | 1 | – | 5 | – |

APPX074

## Table C-5. (March 31, 2013—Continued)

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **9TH** | **34,756** | **6.7** | **9,346** | **4.7** | **22,196** | **6.8** | **2,750** | **13.8** | **464** | **23.4** |
| AK | 250 | 9.2 | 53 | 7.4 | 187 | 7.0 | 2 | - | 8 | 31.0 |
| AZ | 2,538 | 7.0 | 82 | 2.4 | 2,388 | 7.0 | 42 | 24.2 | 26 | 31.0 |
| CA.N | 5,054 | 6.4 | 827 | 3.6 | 2,747 | 4.7 | 1,424 | 12.5 | 56 | 27.5 |
| CA.E | 3,046 | 8.3 | 1,119 | 5.8 | 1,832 | 9.6 | 68 | 18.2 | 27 | 30.2 |
| CA.C | 12,112 | 5.4 | 4,097 | 4.9 | 7,716 | 5.5 | 146 | 16.8 | 153 | 20.0 |
| CA.S | 2,316 | 6.7 | 321 | 3.5 | 1,251 | 5.2 | 709 | 12.9 | 35 | 26.9 |
| HI | 673 | 9.4 | 333 | 7.0 | 265 | 9.3 | 55 | 22.8 | 20 | 15.6 |
| ID | 513 | 10.2 | 43 | 1.7 | 375 | 9.8 | 80 | 19.0 | 15 | 27.3 |
| MT | 442 | 9.1 | 166 | 4.5 | 161 | 8.9 | 106 | 14.3 | 9 | - |
| NV | 2,207 | 8.8 | 343 | 6.0 | 1,753 | 9.0 | 84 | 10.2 | 27 | 37.8 |
| OR | 1,805 | 10.1 | 676 | 7.3 | 1,079 | 11.2 | 9 | - | 41 | 21.4 |
| WA.E | 703 | 9.4 | 315 | 4.9 | 372 | 13.1 | 7 | - | - | - |
| WA.W | 3,042 | 6.2 | 942 | 2.8 | 2,051 | 7.6 | 11 | 16.4 | 38 | 20.0 |
| GUAM | 26 | 16.2 | 5 | - | 16 | 18.4 | 5 | - | 0 | - |
| NMI | 29 | 24.5 | 24 | 19.8 | 3 | - | 0 | - | 0 | - |
| **10TH** | **8,600** | **8.4** | **2,288** | **5.0** | **5,069** | **8.5** | **1,100** | **13.6** | **163** | **22.7** |
| CO | 2,602 | 6.0 | 749 | 3.7 | 1,654 | 6.2 | 139 | 18.6 | 60 | 23.1 |
| KS | 1,305 | 7.6 | 373 | 4.5 | 808 | 8.2 | 102 | 18.1 | 22 | 24.9 |
| NM | 890 | 8.6 | 316 | 6.6 | 332 | 8.7 | 226 | 11.3 | 16 | 24.0 |
| OK.N | 729 | 12.0 | 55 | 4.1 | 652 | 12.3 | 8 | 19.8 | 9 | - |
| OK.E | 398 | 11.7 | 251 | 10.3 | 135 | 13.1 | 3 | - | 9 | - |
| OK.W | 1,188 | 8.7 | 297 | 3.7 | 447 | 8.1 | 423 | 11.7 | 21 | 16.4 |
| UT | 1,277 | 11.2 | 172 | 6.7 | 984 | 10.9 | 98 | 22.2 | 23 | 38.8 |
| WY | 213 | 10.1 | 55 | 5.8 | 57 | 6.3 | 91 | 12.2 | 10 | 15.6 |
| **11TH** | **24,842** | **7.3** | **2,243** | **4.0** | **20,563** | **7.2** | **1,728** | **12.7** | **308** | **18.9** |
| AL.N | 2,631 | 7.9 | 126 | 5.3 | 2,448 | 7.9 | 22 | 25.2 | 35 | 21.9 |
| AL.M | 639 | 10.2 | 51 | 4.1 | 532 | 9.7 | 41 | 16.3 | 15 | 23.2 |
| AL.S | 566 | 8.4 | 93 | 3.7 | 455 | 8.8 | 11 | 15.8 | 7 | - |
| FL.N | 1,277 | 7.4 | 41 | 3.9 | 1,210 | 7.4 | 12 | 10.6 | 14 | 21.1 |
| FL.M | 7,451 | 10.2 | 410 | 5.5 | 6,833 | 10.2 | 129 | 18.4 | 79 | 20.5 |
| FL.S | 6,685 | 5.2 | 554 | 3.7 | 5,918 | 5.2 | 96 | 12.0 | 117 | 16.3 |
| GA.N | 4,236 | 6.4 | 480 | 2.6 | 2,331 | 4.7 | 1,401 | 11.6 | 24 | 20.9 |
| GA.M | 755 | 8.7 | 262 | 6.0 | 481 | 10.3 | 2 | - | 10 | 16.3 |
| GA.S | 602 | 8.1 | 226 | 5.8 | 355 | 9.7 | 14 | 25.0 | 7 | - |

NOTE: Median time intervals are not computed when fewer than 10 cases reported. This table excludes land condemnations, prisoner petitions, deportation reviews, recovery of overpayments, and enforcement of judgments. Includes cases filed in previous years as consolidated cases that thereafter were severed into individual cases. For fiscal years prior to 2001, this table included data on recovery of overpayments and enforcement of judgments.

# Exhibit V

APPX076

6/5/2014

Bellevue

San Francisco, CA

✈ Seattle, WA—San Francisco, CA

Nonstop (26–31 per day)

2 h

Connecting                    3 h 15 min+
Round-trip price, Jun 21 – 25    from $218
Alaska, Delta, United

🔷 See results on Google Flights    Sponsored ⓘ

🚗 Via I-5 S                   13 h 21 min

🚗 Via US-97 S and I-5 S       13 h 42 min

Google Maps



APPX077

https://www.google.com/maps/dir/Bellevue/San+Francisco,+CA/@42.6028208,-126.9871663,6z/data=!3m1!4b1!4m12!1m5!1m1!1s0x54906c6833b0e94d:0x6d4032f8c301a0f!2m2!1d-122.1636756!2d47.601155...    1/1

# Exhibit W

APPX078

Case: 15-101    Document: 2-2    Page: 347    Filed: 10/23/2014

Bellevue to Wichita Falls, TX - Google Maps                                      Page 1 of 4
Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 79 of 102   PageID 1165



Case: 15-101     Document: 2-2     Page: 348     Filed: 10/23/2014

Bellevue to Wichita Falls, TX - Google Maps                                    Page 2 of 4
Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 80 of 102   PageID 1166

**Bellevue**

| | | |
|---|---|---|
| 1. | Head **west**<br>About 2 mins | go 0.3 mi<br>total 0.3 mi |
| 2. | Turn right onto **SE 4th Pl** | go 299 ft<br>total 0.4 mi |
| 3. | Turn right to stay on **SE 4th Pl**<br>About 46 secs | go 0.2 mi<br>total 0.5 mi |
| 4. | Turn left onto **128th Ave SE** | go 0.2 mi<br>total 0.7 mi |
| 5. | Turn right onto **SE 7th Pl**<br>About 1 min | go 0.4 mi<br>total 1.1 mi |
| 6. | Continue onto **SE 8th St**<br>About 59 secs | go 0.4 mi<br>total 1.5 mi |
| 7. | Turn left onto the ramp to **I-405 S** | go 33 ft<br>total 1.5 mi |
| 8. | Keep right at the fork and merge onto **I-405 S**<br>About 2 mins | go 1.2 mi<br>total 2.6 mi |
| 9. | Take exit **11** for **I-90 E** toward **Spokane**<br>About 56 secs | go 0.8 mi<br>total 3.4 mi |
| 10. | Turn right onto **I-90 E**<br>About 1 hour 29 mins | go 100 mi<br>total 104 mi |
| 11. | Take exit **110** to merge onto **I-82 E/US-97 S** toward **Yakima**<br>Continue to follow I-82 E<br>Entering Oregon<br>About 2 hours 4 mins | go 143 mi<br>total 247 mi |
| 12. | Keep left at the fork, follow signs for **I-84 E/Pendleton** and merge onto **I-84 E**<br>Entering Idaho<br>About 6 hours 9 mins | go 420 mi<br>total 667 mi |
| 13. | Take the **Interstate 84 E** exit toward **Ogden/Salt Lake** | go 0.5 mi<br>total 667 mi |
| 14. | Merge onto **I-84 E**<br>Entering Utah<br>About 1 hour 50 mins | go 134 mi<br>total 801 mi |
| 15. | Slight right to stay on **I-84 E** (signs for **Cheyenne**)<br>About 36 mins | go 39.0 mi<br>total 840 mi |
| 16. | Keep left at the fork, follow signs for **I-80 E/Cheyenne** and merge onto **I-80 E**<br>Entering Wyoming<br>About 4 hours 51 mins | go 342 mi<br>total 1,182 mi |
| 17. | Take exit **313** for **US-287/3rd St** toward **Ft Collins Colo** | go 0.1 mi<br>total 1,182 mi |
| 18. | Keep right at the fork, follow signs for **FT Collins** and merge onto **US-287 S/S 3rd St**<br>Continue to follow US-287 S<br>Entering Colorado<br>About 56 mins | go 59.6 mi<br>total 1,242 mi |
| 19. | Turn left onto **CO-14 E/US-287 S**<br>About 6 mins | go 3.6 mi<br>total 1,245 mi |

Case: 15-101     Document: 2-2     Page: 349     Filed: 10/23/2014

Bellevue to Wichita Falls, TX - Google Maps                                    Page 3 of 4
Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 81 of 102   PageID 1167

| | | | |
|---|---|---|---|
| | 20. Turn left onto **Jefferson St**<br>About 59 secs | go 0.4 mi<br>total 1,246 mi | |
| | 21. Continue onto **Riverside Ave**<br>About 1 min | go 0.6 mi<br>total 1,246 mi | |
| (14) | 22. Slight left onto **CO-14 E/E Mulberry St**<br>About 5 mins | go 3.1 mi<br>total 1,249 mi | |
| (I-25) | 23. Merge onto **I-25 S** via the ramp to **Denver**<br>Entering New Mexico<br>About 4 hours 0 mins | go 278 mi<br>total 1,528 mi | |
| ↱ | 24. Take exit **451** for **US-64 E/US-87 E** toward **Clayton/Raton** | go 0.2 mi<br>total 1,528 mi | |
| (64) | 25. Turn left onto **US-64 E/Clayton Rd**<br>Continue to follow US-64 E<br>About 1 hour 12 mins | go 81.1 mi<br>total 1,609 mi | |
| (87) | 26. Continue onto **US-87 S/S 1st St**<br>Continue to follow US-87 S<br>Entering Texas<br>About 57 mins | go 61.0 mi<br>total 1,670 mi | |
| (385) | 27. Take the ramp onto **US-385 S**<br>About 25 mins | go 28.4 mi<br>total 1,699 mi | |
| ↰ | 28. Turn left onto **Ranch Rd 1061**<br>About 5 mins | go 5.8 mi<br>total 1,704 mi | |
| | 29. Continue onto **Tascosa Rd**<br>About 11 mins | go 11.8 mi<br>total 1,716 mi | |
| | 30. Continue onto **Farm to Market Rd 1061**<br>About 58 secs | go 1.1 mi<br>total 1,717 mi | |
| | 31. Continue onto **Tascosa Rd**<br>About 15 mins | go 14.7 mi<br>total 1,732 mi | |
| ↱ | 32. Turn right onto **W Amarillo Blvd** | go 0.3 mi<br>total 1,732 mi | |
| ↰ | 33. Slight left onto **Bell St**<br>About 3 mins | go 1.4 mi<br>total 1,734 mi | |
| ↰ | 34. Turn left onto **I-40 Frontage Rd** | go 0.3 mi<br>total 1,734 mi | |
| (40) | 35. Take the ramp on the left onto **I-40 E**<br>About 11 mins | go 11.4 mi<br>total 1,745 mi | |
| (287) | 36. Take exit **78** to merge onto **US-287 S** toward **Fort Worth**<br>About 3 hours 5 mins | go 211 mi<br>total 1,957 mi | |
| ↰ | 37. Take the **I-44 W/US-287 S** exit toward **Wichita Falls/Ft Worth** | go 0.6 mi<br>total 1,957 mi | |
| (44) | 38. Merge onto **I-44/US-287 S** | go 0.6 mi<br>total 1,958 mi | |
| ↱ | 39. Take exit **1D** toward **US-287 BUS** | go 492 ft<br>total 1,958 mi | |
| | 40. Merge onto **Central Fwy** | go 0.2 mi<br>total 1,958 mi | |
| ↰ | 41. Turn left onto **Old Iowa Park Rd**<br>About 46 secs | go 0.4 mi<br>total 1,959 mi | |

Bellevue to Wichita Falls, TX - Google Maps                Page 4 of 4

| 42. | Continue onto **N Scott Ave** | go 1.4 mi |
| | About 3 mins | total 1,960 mi |

 Wichita Falls, TX

---

These directions are for planning purposes only. You may find that construction projects, traffic, weather, or other events may cause conditions to differ from the map results, and you should plan your route accordingly. You must obey all signs or notices regarding your route.

Map data ©2014 Google, INEGI

Directions weren't right? Please find your route on maps.google.com and click "Report a problem" at the bottom left.

# Exhibit X

**APPX083**

Pate - Direct
Page 43

06:17  1          MR. NELSON:  Yes.  To my understanding he -- he had

06:17  2    seen it and he had written it.

06:18  3          THE COURT:  All right.  Well, I think the document --

06:18  4    I think the information in the document, at a minimum, is

06:18  5    admissible as non-hearsay under notice and, as I mentioned in

06:18  6    the pretrial conference, is also admissible under 80 -- I

06:18  7    believe it was 801 is my memory this evening, and I will

06:18  8    conditionally admit it at this time conditioned on me seeing

06:18  9    the videotape deposition of Peter Yoakum that establishes that

06:18  10   he authenticated the document --

06:18  11         MR. NELSON:  Yes, sir.

06:18  12         THE COURT:  -- in the deposition.

06:18  13         MR. NELSON:  May I --

06:18  14         THE COURT:  Yes.

06:18  15         MR. NELSON:  -- show the document?

06:18  16   BY MR. NELSON:

06:18  17   Q.  As we've discussed just a minute ago, this is an e-mail

06:19  18   from Peter Yoakum to a number of people, but you and Mr. Lewis

06:19  19   are on the list.  Is that correct?

06:19  20   A.  Correct.

06:19  21   Q.  And what does this e-mail relate to?

06:19  22   A.  Peter Yoakum is relaying a conversation that he had with

06:19  23   Wendell Willick and Jason Golding who worked for Point2.

06:19  24   Q.  And the subject says notes from Point2 discussion.  What

06:19  25   was going -- what was Mr. Yoakum involved in at this time?

Case: 15-101    Document: 2-2    Page: 353    Filed: 10/23/2014

Case 7:14-cv-00014-O    Document 91-1    Filed 06/10/14    Page 85 of 102    PageID 1171
Case 3:11-cv-00367-O    Document 574    Filed 04/17/13    Page 210 of 215    PageID 25288

Pate - Direct
Page 44

06:19  1    Was he -- was he trying -- was this part of his report on his

06:19  2    discussions with Point2?

06:19  3    A.  So he was looking for additional information from Point2

06:19  4    and he is updating us on what that -- I believe the intent of

06:19  5    this is to relay the conversation he had as part of those

06:19  6    negotiations.

06:19  7    Q.  Okay.  Let's -- Let's go to -- you've mentioned

06:19  8    Wendell Willick and Jason Golding.  Who are they?

06:19  9    A.  Wendell Willick I believe is CEO of Point2 and

06:19  10   Jason Golding, I'm not sure, is an attorney that works for

06:20  11   Point2.

06:20  12          THE COURT:  Go ahead.  I'm sorry.

06:20  13   BY MR. NELSON:

06:20  14   Q.  And paragraph one says I know the results of our due

06:20  15   diligence.  So, who is doing the due diligence on the '802

06:20  16   Patent?

06:20  17   A.  Peter Yoakum and I believe he is being assisted by two

06:20  18   attorneys from Fenwick & West.

06:20  19   Q.  Okay.  And he said that the commercial value of '802 had

06:20  20   been compromised by the early disclosures.  Do you know what

06:20  21   he was referring to by early disclosures?

06:20  22   A.  He was concerned --

06:20  23          MR. CALDWELL:  Objection, Your Honor.  It calls for

06:20  24   hearsay and there's also no foundation for what someone else

06:20  25   said he said to someone else in a different conversation.

*DENVER B. RODEN, RMR*
*United States Court Reporter*

APPX0207

**APPX085**

**– A330 –**

# Exhibit Y

APPX086

Yoakum - By Video Deposition
Page 138

1   Q.  What does that mean?  What does that word mean to you?

2   A.  Resolution, I'm certain, in the context of this, was just

3   that we had been working on this transaction since January,

4   and, you know, it was time to come to some sort of a

5   conclusion as to where we were going to go with it.

6   Q.  And you tell them you have a conference call scheduled for

7   that day at 2:00 p.m. Pacific time with two individuals,

8   Mr. Woo and Mr. Granatelli at Fenwick & West.  They were your

9   lawyers on this transaction; correct?

10  A.  That's correct.

11  Q.  It says during that call we are going to try and come to

12  and con he $regarding the information we received during our

13  due diligence.  Do you see that?

14  A.  I do.

15  Q.  So you had already received information from Point2 during

16  due diligence another of April 12, 2006.  Direct?

17  A.  Yes.

18  Q.  And your plan was, on a phone call that day with your

19  lawyers, to try to come to a consensus on that information;

20  correct?

21  A.  That's correct.

22  Q.  And you then say, if either of you have any more

23  information that would be helpful to us in reaching a

24  conclusion regarding the questions we've posed, it might be a

25  great time to send it along.  Do you see that?

Yoakum - By Video Deposition
Page 139

```
 1   A.  I do.

 2   Q.  Do you have a specific recollection as to what information

 3   or what questions you had posed you were talking about there?

 4   A.  I don't recall specifically, but this points out very

 5   nicely the frustration we were having in obtaining

 6   information.  So I was basically saying if you've got any more

 7   information, now would be the time to send it along.

 8   Q.  I hand you what we're marking as defense Exhibit 5.  You

 9   have seen Defendant's Exhibit 5 before, sir?

10   A.  Yes.

11   Q.  And I want to direct your attention to the e-mail that

12   says from Peter Yoakum, on DX 5, sent Thursday, April 13,

13   20006, at 11:12 a.m.  This is the next morning after the

14   e-mail we just looked at, Defendant's 147; correct?

15   A.  I see that, yes.

16   Q.  And you sent this to Mr. Woo and Mr. Granatelli at Fenwick

17   & West and you copied three people.  Who did you also share

18   this with on April 13th?

19   A.  Scott Lewis, Sarah Pate, Scott Wilson.

20   Q.  And why did you share this information with Mr. Lewis,

21   Ms. Pate, and Mr. Wilson?

22   A.  Well, Sarah and Scott were fellow board members for

23   AdMission.  Scott was most actively involved in patent

24   prosecution and inventing.

25   Q.  Were you relying on Mr. Lewis to help evaluate the Point2
```

Case: 15-101    Document: 2-2    Page: 357    Filed: 10/23/2014

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 89 of 102   PageID 1175
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 194 of 215   PageID 25272

Yoakum - By Video Deposition
Page 140

1   information?

2   A.  I'm not -- no, I'm not -- I don't know that that's

3   correct, because -- no, I don't believe that's the case.

4   Q.  Did you ever talk to him about the e-mail, that you

5   recall?

6   A.  Talk to him about this e-mail?

7   Q.  Yes.

8   A.  No, I don't believe so.

9   Q.  Did you talk to him about the subject matter of this

10  e-mail at any point, sir?

11  A.  I don't believe so.

12  Q.  But the purpose of the e-mail was to apprise the board or

13  keep the board informed, to use your words, about your

14  discussions with Point2?

15  A.  Yes.

16  Q.  The e-mail in Exhibit 5 on the first page that carries

17  over into the second.

18  A.  Yes.

19  Q.  And it says in the first line, I spoke to Wendell Willick

20  and Jason Golding today -- which means you had the

21  conversation ultimately on the 13th of April; right?

22  A.  Yes.

23  Q.  -- passing along the conclusions from our recent '802

24  Patent due diligence exercise.  Now, '802 Patent means the

25  Point2 '802 Patent; correct?

*DENVER B. RODEN, RMR*
*United States Court Reporter*

APPX0191

**APPX089**

Case: 15-101    Document: 2-2    Page: 358    Filed: 10/23/2014

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 90 of 102   PageID 1176
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 195 of 215   PageID 25273

Yoakum - By Video Deposition
Page 141

1   A.   Yes.

2   Q.   And so as of Thursday, April 13, 2006, Summit 6's

3   predecessor had reached conclusions from its due diligence

4   exercise relating to Point2's '802 Patent.   True?

5   A.   Yes.

6   Q.   And what you go on to say is what follow $my recollection

7   of the discussion, that being the discussion you had on April

8   13 with Point2; right?

9   A.   That's what it says, yes.

10  Q.   Point one.   I noted the results it of our due diligence

11  demonstrated to us that the commercial value of '802 Patent

12  had been compromised by the early disclosures.   I want to

13  unpack that sentence a little bit, sir.   First of all, another

14  of April 13, you had results from your due diligence with

15  respect to the '802 Patent; correct?

16  A.   At that point we had, yes, some results.

17  Q.   And the result it's of your due diligence at Summit 6 had

18  demonstrated to you that the commercial value of the '802

19  Patent had been compromised by the early disclosures; correct?

20  A.   That's what this letter -- that's what the sentence says.

21  Q.   Sir, is that a true statement or not?

22  A.   Well, it's -- I mean, the sentence speaks for itself.

23  Q.   I'm asking you, was it true when you said it, sir?

24  A.   The commercial value to us had been compromised because of

25  the lack of the disclosures by Point2.

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 91 of 102   PageID 1177
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 196 of 215   PageID 25274
Yoakum - By Video Deposition
Page 142

```
1    Q.  So your testimony is, sir, that you were passing along to

2    your board in DX 5, your negotiating posture, not the

3    conclusions of your due diligence exercise.

4    A.  That's correct.

5    Q.  Who came up with the conclusions of the due diligence

6    exercise, the lawyers or you?

7    A.  Again, I don't think we ever reached a conclusion about

8    due diligence.

9    Q.  And as of April 13, 2006, what were your conclusions about

10   the '802 Patent from your due diligence exercise?

11   A.  That they failed to provide us with sufficient information

12   to allow us to complete our due diligence as we expected.

13   Q.  Is that conclusion you just identified reflected here,

14   sir, in the ten points that you included in your April 13,

15   2006 e-mail?

16   A.  Agree.  I believe it's a team in a lot of them.  In point

17   one of the defense Exhibit 5, your told Ms. Pass the witness

18   and Mr. Wilson and Mr. Lewis and others that the results it of

19   your due diligence demonstrate mop stated the commercial value

20   of the '802 Patent had been compromised by the early

21   disclosures.  Do you see that?

22   A.  I do.

23   Q.  And the early disclosures refers to Point2 disclosures of

24   their photo uploading facility; correct?

25   A.  Yes.  That's -- it was the two that I mentioned earlier,
```

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 92 of 102   PageID 1178
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 197 of 215   PageID 25275
Yoakum - By Video Deposition
Page 143

1    the CD and the software development that they referred to.

2    Q.  By software deployment, you understood that to mean the

3    availability of the photo uploading facility to users on the

4    internet.

5    A.  I think it's more specific than that.

6    Q.  What do you mean?

7    A.  I think it's the patent -- uploading facility -- because

8    they had a server side program and they had a client side

9    program at some later date.

10   Q.  Well, sir, you understood the '802 Patent dealt with the

11   client side processing. Correct?

12   A.  I did.

13   Q.  And you said the '802 Patent had been compromised by the

14   early disclosures; correct?

15   A.  Yes.

16   Q.  So those disclosures that you're talking about are Point2

17   disclosures of their photo uploading facility with client side

18   processing.  True?

19   A.  Yes.

20   Q.  And you said the value of the '802 Patent had been

21   compromised by the early disclosures.  What did you mean by

22   comprised?

23   A.  Just that it was less than what we had anticipated going

24   in.

25   Q.  Reduced --

Case: 15-101    Document: 2-2    Page: 361    Filed: 10/23/2014

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 93 of 102   PageID 1179
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 198 of 215   PageID 25276
Yoakum - By Video Deposition
Page 144

1    A.  Yes.

2    Q.  -- is another way to --

3    A.  Yeah.

4    Q.  And so the value of the '802 Patent had been reduced by

5    the early disclosures by Point2; correct?

6    A.  That's what I said here, yes.

7    Q.  And it's your testimony, sir, that when you told Ms. Pate,

8    Mr. Wilson and Mr. Lewis and others that the results of your

9    due diligence revealed to you that the commercial value of the

10   '802 Patent had been reduced due to Point2's early

11   disclosures, that what you were suggesting was not that it --

12   there had been such early disclosures, but that you just

13   didn't have enough information on the early disclosures?

14   A.  Yes.

15   Q.  And where would one glean that -- if you were on the board

16   or Mr. Lewis or someone else and you're reading that first

17   sentence, where in that first sentence would I get that from?

18   A.  It says -- it says, I noted that the results of our due

19   diligence demonstrated to us that the commercial value of the

20   '802 Patent had been compromised by its early disclosures.  I

21   was relating a statement or the essence of a statement that I

22   made to Wendell Willick and Jason Golding where I was

23   essentially telling them that the value of the patent was not

24   what it was in -- that we had originally anticipated because

25   they did not provide us with the information that we needed.

*DENVER B. RODEN, RMR*
*United States Court Reporter*

APPX0195

**APPX093**

**– A338 –**

Case: 15-101    Document: 2-2    Page: 362    Filed: 10/23/2014

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 94 of 102   PageID 1180
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 199 of 215   PageID 25277

Yoakum - By Video Deposition
Page 145

1    Q.   So the second entry on DX 5 is that Summit had concluded

2    that Summit 6 could have no confidence that the '802 Patent

3    could be successfully defended in the event we were required

4    to do so as its assignee.

5    A.   I see that.

6    Q.   And that's something that you told Point2 was a conclusion

7    of your due diligence; correct?

8    A.   Yes.

9    Q.   And that's something you also told, on April 13,

10   Mr. Lewis, Ms. Pate, and Mr. Wilson?

11   A.   As well as Larry and Darrell; correct.

12   Q.   Let's look at the third entry on DX 5.   You say, Point2's

13   early disclosure also could seriously impair the value of

14   several commercially important features contained in '557

15   claims desperate its earlier filing date.   Do you see that?

16   A.   I see that, yes.

17   Q.   Is that a true statement?

18   A.   It's true in that's that's what I sold Jason and Wendell.

19   Q.   But when you told Point2 that, were you tell them the

20   truth?

21   A.   I was telling them that we had concerns, yes.

22   Q.   So the concerns reflected in the entry No. 3 on DX 5 were

23   concerns you actually had; right?

24   A.   We had -- we had concerns, and we did not obtain

25   information to allay those concerns.   And again, there is this

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 95 of 102   PageID 1181
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 200 of 215   PageID 25278
Yoakum - By Video Deposition
Page 146

1    early disclosure issue in the sentence you're describing, and

2    we did not get the business records that we knew -- that we

3    knew we needed in order to have a good solid conclusion about

4    what we were trying to acquire.  And what I was conveying here

5    was that they could -- I was negotiating with Jason and

6    Wendell and was essentially telling them that there were

7    problems with '802; and if they couldn't give us the

8    information that we wanted, we might have a problem and

9    potentially could impact one or more of our claims.  .

10   Q.  And as of April 13, 2006, you and other members of the

11   board of Summit 6 knew that Point2's early disclosure could

12   seriously impair the value of several features claimed in the

13   '557 Patent.  True?

14   A.  I -- yes, it could seriously impair.

15   Q.  And when you say seriously impair the value of the things

16   claimed in the '557 Patent, what do you mean?

17   A.  I don't know.  It could be a problem for a claim being

18   deemed to be invalid, something like that.

19   Q.  So at the time in 20006 that you wrote this e-mail in D

20   index 5, you were telling Point2 that their early disclosure

21   could seriously impair some of the claims of the 577 patent;

22   correct?

23   A.  That's what I said, yes.

24   Q.  And by seriously impair some of the claims of the '557

25   Patent, that could mean that the claim would be deemed

Case: 15-101    Document: 2-2    Page: 364    Filed: 10/23/2014

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 96 of 102   PageID 1182
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 201 of 215   PageID 25279

Yoakum - By Video Deposition
Page 147

1    invalid; right?

2    A.   That's correct.

3    Q.   And you told that to Point2 in the exhibit, DX 5; and you

4    also then told that to Summit 6's board as well as Mr. Lewis;

5    correct?

6    A.   I was -- again, I was relating the content of the

7    conversation that I had with Wendell and Jason.

8    Q.   And one of the things you relayed to Ms. Pate and

9    Mr. Wilson and Mr. Lewis on October 13, 2006 is that you had

10   said Point2's early disclosure could seriously impair claims

11   of the 557 patent; right?

12   A.   I said that, yes.

13   Q.   And by that, you meant that it could potentially have

14   those claims be invalid.  Are correct?

15   A.   It could.

16   Q.   And you didn't say it might -- those those early

17   disclosures might just impair the value of the '557 Patent

18   claims; you said it could seriously impair them; correct?

19   A.   Yeah.  But I said -- I said it could, not it. I mean, I

20   was not making a -- an opinion of my own.

21   Q.   This was based on the analysis that had been done in due

22   diligence?

23   A.   I think, in general, what it was, was that we were not

24   getting information that we needed from Point2 in order to

25   substantiate some of the information that we had learned from

*DENVER B. RODEN, RMR*
*United States Court Reporter*

APPX0198

**APPX096**

**– A341 –**

Yoakum - By Video Deposition
Page 148

1    them about their early disclosures.

2    Q.  If you didn't have the information, how did could it

3    impair the value of or invalidate your own patent?

4    A.  That's why I put "could" in here.  Because we didn't have

5    the answers.

6    Q.  But based on what you had been provided, the concern about

7    the potential invalidation of the '557 Patent was at least

8    something that had been raised.

9    A.  No, I think you're reading too much into it.  I do.  This

10   is a statement that I made to Point2 when I was trying to

11   renegotiate the transaction, lower the amount of money we were

12   willing to pay up front.

13   Q.  You weren't telling them your actual conclusions?

14   A.  Well, I don't think I would have told them that the actual

15   conclusions.  Again, I was referring -- I was referring to the

16   fact that they had not provided the information.  That's why,

17   in the e-mail that preceded this, I said if you've got

18   anything you want to send to us, now is the time to send it to

19   us, which was essentially reiterating a whole bunch of

20   requests for information.  We never got it.  So I had a

21   conversation with them and spelled out all of the reasons why

22   we couldn't pay them what we originally offered.

23   Q.  So you uncovered unfavorable information about the early

24   disclosures it.

25   A.  The absence of information was information to us, and it

Case: 15-101    Document: 2-2    Page: 366    Filed: 10/23/2014

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 98 of 102   PageID 1184
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 203 of 215   PageID 25281
Yoakum - By Video Deposition
Page 149

1  was unfavorable to us that we were not able to get answers to

2  our questions.  The critical information was what we dug up,

3  which was the CD and then these -- this timeline, to which we

4  never got any contemporaneous business records.

5  Q.  The next bullet says, I stated we may be obligated to

6  spend more money to improve or resuscitate our own at any

7  times -- paren S, so potentially plural -- as a result of the

8  Point2 disclosure.  Do you see that?

9  A.  Uh-huh.

10  Q.  The Point2 disclosure, in bullet five of DX 5, means

11  Point2's early disclosure of their photo uploading facility;

12  correct?

13  A.  Yes.

14  Q.  And improve, we can agree, means make better in some way.

15  A.  Uh-huh.

16  Q.  What does resuscitate mean?

17  A.  If there's a problem that needs to be rectified, maybe it

18  requires going in and filing a continuation claim or

19  something.  I don't know.  I mean --

20  Q.  Was that something that had been discussed at Summit 6

21  after the due diligence, that perhaps unit want to file a

22  continuation application on the '557?

23  A.  I don't believe so.

24  Q.  Had it already been discussed that you might do that?

25  A.  I -- we were in the process of filing continuation claims

Case: 15-101   Document: 2-2   Page: 367   Filed: 10/23/2014

Case 7:14-cv-00014-O   Document 91-1   Filed 06/10/14   Page 99 of 102   PageID 1185
Case 3:11-cv-00367-O   Document 574   Filed 04/17/13   Page 204 of 215   PageID 25282
Yoakum - By Video Deposition
Page 150

1    separate and apart from the Point2 acquisition.

2    Q.  Did you spend more money to improve your resuscitate your

3    own Summit 6 patents after you learned about this information?

4    A.  Not as a result of this information.  But we did spend

5    more money on patents, continuation claims and additional

6    filings, but I don't think there was any linkage.

7    Q.  The PUF or photo uploading facility, that's the Point2

8    software feature that is the topic of the early disclosures

9    referenced early in your e-mail; correct?

10   A.  Well, no, this says the patent application for photo

11   upload facility or whatever.  So that's all I can read into

12   it.

13   Q.  Well, I understood that the thing you were looking into

14   and whether or not it was disclosed more than a year before

15   the filing dates of the '802 and the '557 Patent was Point2's

16   photo uploading facility.

17   A.  Yes.

18   Q.  And that's what is referred to by PUF here in point nine;

19   correct?  Photo uploading facility.

20   A.  Appears to be, yeah.

21   Q.  And you understood that the '802 was a patent that covered

22   or related to Point2's photo uploading facility; correct?

23   A.  Yes.

24   Q.  Of all these questions you asked on March 28th, is your

25   view that they didn't ever answer any of them at Point2?

# Exhibit Z

APPX100

I'm available at 3:15 - 3:45pm today. (650) 335-7151. Larry

From: Peter Yoakum [pyoakum@swiftsurecap.com]
Sent: Thursday, April 13, 2006 11:12 AM
To: Darryl Woo; Larry Granatelli
Cc: Scott Lewis; Sarah Pate; Scott Wilson
Subject: Notes from Point2 discussion - confidential

I spoke to Wendell Willick and Jason Golding today, passing along the conclusions from our recent 802 due diligence exercise. What follows is my reccllection of the discussion.

1. I noted that the results of our due diligence demonstrated to us that the commercial value of 802 had been compromised by the early disclosures. I also mentioned the defect associated with their inventor's declaration.

2. I stated that we had concluded we could have no confidence that 802 could be successfully defended in the event we were required to do so as it's assignee.

3. I stated that Point2's early disclosure also could seriously impair the value of several commercially important features contained in 557 claims, despite its earlier filing date.

4. I stated that we had spent a considerable amount of money (and time) uncovering critical (and unfavorable) information that wasn't disclosed up front.

5. I stated that we may be obligated to spend more $ to improve or resuscitate our own patent(s) as a result of the Point2 disclosure.

6. I stated that, as a result of these factors, we weren't interested in paying material upfront $.

7. I suggested two ways we could proceed further:

    a. We can unwind the term sheet, cross-license 557 and 802 to each other as the consideration, and then discuss the terms on which 162 might be licensed to them, assuming that the post-processing functions contained in 162 remain on Point2's product roadmap. or,

    b. Point2 can transfer 802 to us in exchanged for a non-transferable license to use all three patents, with no $ up-front, plus a 20% share of net revenues (cumulative licensing revenues, less any resuscitation costs plus a 15% cost of capital) up to $500k.

8. Wendell did not appear surprised at our position or the new proposal.
He stated that he and Jason had learned many new things about the 802 patent during our due diligence process, intimating that they were recognizing less value than they previously thought.

PRIVLEDGED AND CONFIDENTIAL

CONFIDENTIAL

Summit 6 v. RIM et al.

DX-2029

3:11-cv-00367-O

EXHIBIT
5
10-29-12

SUMMIT6-00113959

9. He stated that the idea of filing a patent application for the PUF was pushed on them by their previous owners, Bid.com (who has since gone out of business), rather than being an internally generated initiative.

He stated to me that Point2 had more pressing operating matters than thinking about their IP, especially in light of these revelations.

10. Wendell asked for the weekend to think about this; Jason promised to revert Monday.

I suspect they will accept a Plan B alternative, under the circumstances.

PFY

---

Subject:    Follow Up
Date:       Mon, 17 Apr 2006 15:27:11 -0600
From:       Jason Golding <jgolding@point2.com>
To:         Peter Yoakum - Swiftsure <pyoakum@swiftsurecap.com>

Hi Peter,

As a follow-up to our conversation last week, Point2's feelings are that we want to ensure our focus is on our most critical paths at present. As such, we are willing to consider a proposal from you on an alternative deal for the patent but effectively want it to be driven from your end.

In a nutshell, we understand that any deal is likely to be at a discount from what was initially agreed. However, at the same time we do not want to do a deal for insignificant value because it is simply not worth it. As per our discussion, like you, I believe that option 2) is the most desirable as we discussed.

I am assuming that generally the terms and conditions from the original contract are still good for any deal under option 2) and as such all that we need to agree on is the alternative fixed and variable consideration.

If you desire, please provide me with an alternative offer and/or additional discussion points (if necessary) so I can pose them to Wendell to see if it is palatable to him.

Regards,

Jason Golding
Manager, Business Development/Corporate Law
Point2 Technologies Inc.
(306) 955-9736 ext. 215

PRIVLEDGED AND CONFIDENTIAL

CONFIDENTIAL                                SUMMIT6-00113960

# Exhibit AA

APPX103

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,987 | 09/10/2013 | 7765482 | 347269-000059 | 7602 |

34611        7590        05/21/2014
LAW OFFICE OF DUANE S. KOBAYASHI
P.O. Box 4160
Leesburg, VA 20177

| EXAMINER |
|---|
| HEYMAN, JOHN S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/21/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

APPX104

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

DLA PIPER LLP (US)

401 CONGRESS

SUITE 2500

AUSTIN, TX 78701

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,987*.

PATENT NO. *7765482*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

APPX105

Control Number: 90/012,987                    Paper No. 20140519 - Page 2
Art Unit: 3992

### Ex Parte reexamination – Final Office Action

#### Preliminary Matters

#### *Information Disclosure Statement*

In addition to the IDS flied on 09/10/2013, and already acknowledged on 11/06/2013, the information disclosure statements (IDSs) submitted on 04/24/2014 (1) and on 03/31/2014 (23) were filed after the mailing date of the instant reexam application on 09/10/2013.  It is to be noted, however, that where patents, publications, and other such items of information are submitted by a patent owner in compliance with the requirements of the rules, the requisite degree of consideration to be given to such information will be limited by the degree to which the patent owner has explained the content and relevance of the information. In instances where no explanation of citations (items of information) is provided for an information citation, only a cursory review of that information is required.  The examiner need only perform a cursory evaluation of each unexplained item of information, to the extent that he/she needs in order to determine whether he/she will evaluate the item further. If the cursory evaluation reveals the item not to be useful, the examiner may simply stop looking at it. This review may often take the form of considering the documents in the same manner as other documents in Office search files are considered by the examiner while conducting a search of the prior art in a proper field of search. The initials of the examiner, in this proceeding, placed adjacent to the citations on the PTO-1449 or PTO/SB/08A and 08B or its equivalent, without an indication in the record to the contrary in the record, do not signify that the information has been considered by the examiner any further than to the

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                          Paper No. 20140519 - Page 3
Art Unit: 3992

extent noted above. See MPEP 609, seventh paragraph, Revision 5, Aug. 2006 [page

600-141].

In order to expedite issuance of reexamination certificates, the Office eliminates

printing of the listing of documents on reexamination certificates (See Official Gazette of

the USPTO issued on October 11th, 2011, vol. 1371, Number 2, page 95 - "Elimination

of the Listing of Prior Art Documents on Reexamination Certificate").

## Detailed Action

### Rejections

**III. A.**                 **The Creamer Patent (Ground #1)**

As stated on page 3 of the First Office Action (incorporated herein by reference),

Claims 38. 40, 44-46 and 49 remain rejected under 35 USC 102(e) as anticipated by the

Creamer patent (US Patent 6,930,709).  As stated therein, the details of each of the

limitations recited by these claims are shown in the Claim Chart of the Requester on

pages 13-20 of the Request which is incorporated herein by reference.

This analysis of the item matching of Claims 38, 40, 44-46 and 49 in the Request

by the Requester was accepted, and thus, these claims are held unpatentable under 35

USC 102(e) as being anticipated by Creamer.

**B.**                      **The Mattes Patent (Ground #2)**

As stated on page 4 of the First Office Action (incorporated herein by reference),

Claims 38, 40, 44-46 and 49 remain rejected under 35 USC 102(e) as anticipated by the

Mattes patent (US Patent 6,038,295).  As stated therein, the details of each of the

*Ex Parte Reexamination – Final Office Action*

APPX107

## – A352 –

Control Number: 90/012,987                          Paper No. 20140519 - Page 4
Art Unit: 3992

limitations recited by these claims are shown in the Claim Chart of the Requester on

pages 21-25 of the Request which is incorporated herein by reference.

This analysis of the item matching of Claims 38, 40, 44-46 and 49 in the Request

by the Requester was accepted, and thus, these claims are held unpatentable under 35

USC 102(e) as being anticipated by Mattes.

**C.    Claim 46 remains unpatentable under 35 USC 103 based upon**

**Mattes in view of Creamer (Ground #3)**

In the Response, the Patent Owner does not separately argue the '103 rejection

of claim 46 based upon Mattes in view of Creamer, but instead relies on the features of

independent Claim 38 to support the patentability of dependent Claim 46.  Thus, this

claim rejection will stand or fall with the rejection of claim 38.


**RESPONSE TO PO'S ARGUMENTS MADE ON 03/31/2014**

**Response to Patent Owner's remarks on claim interpretation**

1. Patent Owner improperly narrows the meaning of "specified form"

In **§ II(A)** of the Remarks, Patent Owner asserts that the Non-Final Rejection, in

incorporating the explanation in the Request into the action, dissected the

"preprocessing element of claim 38 using a four-part construction" (Remarks, p. 6)

resulting in an interpretation inconsistent with the meaning of the '482 patent (Remarks,

p. 6).  While it is clear that the parts were separated, this was seen done only for the

purposes of explanation, not to alter the meaning.  As such, Examiner respectfully

disagrees that there is any such dissection or misinterpretation of the claimed "pre-

*Ex Parte Reexamination – Final Office Action*

APPX108

Control Number: 90/012,987                    Paper No. 20140519 - Page 5
Art Unit: 3992

processing element". By contrast, Examiner respectfully submits that Patent Owner is

reading limitations from the specification into the claims.

In particular Patent Owner asserts that parts labeled "III" and "IV" (Remarks,

page 7) were separated, but should be read together, as follows:

> III: said one or more pre-processing parameters controlling said client device in a
> placement of said digital content into a specified form
>
> IV: in preparation for publication to one or more devices that are remote from a
> server device and said client device;

From this, Patent Owner concluded that the applied art relied on for teaching this

feature, either of Creamer and Mattes, fails to teach that the pre-processing parameters

place the digital content into a form that is "in preparation for publication to one or more

devices" (Remarks, p. 7, last ¶).

Examiner respectfully maintains (1) that there is no reason to read the

explanation of the rejection that way, (2) that Patent Owner's conclusion is based on

reading limitations in to the claims form the specification, and (3) that at least Creamer

teaches the claim feature, even as narrowly construed by Patent Owner.

During reexamination, claims are given the broadest reasonable interpretation

consistent with the specification and limitations in the specification are not read into the

claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984)).

The Merriam-Webster online dictionary defines "publication" and "specify" as

follows:

> Pub-li-ca-tion noun \ˌpə-blə-ˈkā-shən\
> : the act or process of producing a book, magazine, etc., and making it available
> to the public

*Ex Parte Reexamination – Final Office Action*

APPX109

: a book, magazine, etc., that has been printed and made available to the public

: the act of printing something (such as an article or photograph) in a magazine, newspaper, etc.

(http://www.merriam-webster.com/dictionary/publication)

Spec·i·fy transitive verb \ˈspe-sə-ˌfī\

: to name or mention (someone or something) exactly and clearly

: to be specific about (something)

(http://www.merriam-webster.com/dictionary/specify)

Patent Owner appears to argue that the claim language implicitly requires the choice of "specified form…for publication" to be based on knowledge of the requirements of the "one or more devices", e.g. the requirements of a particular website:

> The act of pre-processing modifies the digital content and places the digital a specific form "in preparation for publication to one or more devices."  Col. 2, line 60 to col. 3, line 6 of the '482 Patent describes the act of pre-processing in modifying digital content **to meet certain imaging specifications** for an example web site as follows:
>
> > "The benefits of the Prepare and Post tool are . d) to PictureWorks web site partner, access to contributed media 'made to order', it meets their **imaging specifications every time** without human intervention" (Emphasis Added)
>
> As this excerpt sets forth, the example act of pre-processing modifies digital content **to meet certain "imaging specifications"** for publication to a web site. This modification enables consistency in **meeting the imaging needs** for publication.
>
> For example, a web site can receive media contributions from millions of different users and know that every image received from every user will meet t**heir exact specifications** for publication every time.  In contrast, if users upload images that fail to adhere to a web site's imaging specifications, then uploaded images can break web site page layouts, and cause web site pages to be slow-loading, unpredictable, and unreliable.  Thus, the placement of images into a "specified form" enables uploaded images to be **"made to order" for the web site.**
>
> The '482 Patent's description of the act of pre-processing in preparing digital content to **meet certain "imaging specifications"** for publication is consistent with the plain meaning of the recited act of pre-processing in claim 38.  In the

APPX110

three-part construction, the act of pre-processing places digital content into "a specified form in preparation for publication to one or more devices."  The plain meaning of this uninterrupted recitation clarifies the concept of a "specified form" as being a particular form "in preparation for publication to one or more devices." Said another way, in being prepared for publication, the digital content has been placed into a **particular** "specified form."
(Remarks, p. 8; emphasis added)

As can be seen from the explanation, Patent Owner narrows the meaning of

"specified form" to being that form specified by the website, wherein the website is an

example of the claimed "one or more devices", but the claim simply does not say this:

said one or more pre-processing parameters controlling said client device in a placement of said digital content into a specified form **in preparation for** publication to one or more devices that are remote from a server device and said client device
(Emphasis added.)

All this claim feature requires is that the pre-processing place the digital content

"into a specified form **in preparation for** publication to one or more devices" --**not** that

said specified form is **based on the publication requirements** of said one or more

devices.  The claim, as currently drafted, does not limit the term "specified form" to the

publication **requirements** (e.g. "imaging specifications" or "imaging needs") of the

claimed "one or more devices", as asserted by Patent Owner.  In other words, the

phrase "in preparation for publication to" does not somehow limit the "specified form" to

that form required by the "one or more devices" because the term on its face simply

requires the specific form to be "in preparation for publication to" one or more devices

rather than "in the required publication form of" the one or more devices.  Examiner

respectfully maintains that Patent Owner's interpretation requires reading limitations into

*Ex Parte Reexamination – Final Office Action*

APPX111

Control Number: 90/012,987                       Paper No. 20140519 - Page 8
Art Unit: 3992

the claims to limit the term "specified form" to mean, instead, the "specified form

**required by the one or more devices".**

Patent Owner continues by arguing that the term "specified form" is effectively

read out of the claim by the alleged separation of parts III and IV, stating,

> Note that the four-part construction of the act of pre-processing has been erected
> by the Requestor to create an illogical separation between the term "specified
> form" and the clarifying recitation "in preparation for publication to one or more
> devices." This deliberate interpretational concoction **renders the term
> "specified form" generic, without direction or character.** The four-part
> construction effectively nullifies the claimed characteristics of the "specified form"
> in a manner inconsistent with the plain meaning of claim 38 in light of the
> specification.
> (Request, paragraph bridging cols. 8-9; emphasis added)

Examiner respectfully disagrees.  A "specified form" can "prepare" digital content

for publication to one or more devices without being **directed by** any specific

requirement of any specific one of said "**one** or more devices", as evidenced by the '482

patent and the general knowledge of those of skill in the art, and e.g. Creamer.  In this

regard, as those of skill in the art knew at the time of the '482 patent, JPEG, TIFF, and

GIF, *inter alia*, are standardized compressed file formats whose purposes necessarily

included publication, i.e. preparation of the form or format of digital content on a

camera, for example, to make it available to the public, such as by making it viewable

on computers (*supra*).  In particular, the JPEG format was known by 1999 to be

commonly used for publication of photographic images on the web because of its high

compression, thereby leading to less storage requirement and faster transfer time.  TIFF

formats provided less compression and therefore required more storage space and

longer transfer times but yielded better images.  Thus, one of ordinary skill would have

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                    Paper No. 20140519 - Page 9
Art Unit: 3992

chosen the JPEG format for publication on the internet if he wanted the fastest transfers

of the images and the least amount of storage required for the images but would have,

instead, chosen TIFF if he wanted to publish images of higher quality, as those of skill in

the art knew at the time of the invention.  Thus, while specifying a JPEG or TIFF format

pre-processes a digital image to be placed in a form "**in preparation for** publication to

one or more devices", the selection of the format need may be directed by concerns not

necessarily related to any of said "one or more devices".  As such, reading the parts III

and IV separately does not read the term "specified form" out of the claims, as alleged

by Patent Owner.

That the compression of the digital media into a standardized format, e.g. JPEG,

meets the claim limitation of "placement of said digital content into a specified form in

preparation for publication to one or more devices" is consistent with the '482 patent

itself:

> The Prepare and Post tools refers to browser-side components which together
> provide the ability to submit and transport media objects over the web to be
> stored and served.  Using the Prepare and Post tools, end users can submit
> images in an immediate, intuitive manner.  No technical sophistication is
> required.  In particular, understanding technical terms such as **JPEG**, resolution,
> pixel, kilobyte, transfer protocol, IP address, FTP etc., is not required, since the
> Prepare and Post tools handles all of these tasks for the user.
> (The '482 patent, col. 2, lines 52-57; emphasis added)

Patent Owner also further admits in the Remarks that compression is an act of

pre-processing to place digital content in a specified form in preparation for publication

to one or more devices, stating,

> As this summary description of the Requestor sets forth, **the act of
> compressing** the digital image **(i.e., an example act of pre-processing)**
> modifies the digital image to meet certain "publication specifications."

*Ex Parte Reexamination – Final Office Action*

APPX113

– A358 –

(Remarks, p. 10, 1st sentence; emphasis added)

Based on the foregoing, then, even though a user may specify a form, e.g. the JPEG or TIFF format, *inter alia,* for the stored image on a digital camera "in preparation for publication to one or more" computers, the compression format may be chosen on the basis of merits of a particular compression of the published image and/or because the standardized formats are more likely to be recognized by computers than non-standardized formats. Thus, while choosing a compression format meets the claimed requirement of "said one or more pre-processing parameters controlling said client device [e.g. digital camera] in a placement of said digital content [e.g. image file on the camera] into a specified form [e.g. JPEG or TIFF format] in preparation for publication to one or more devices [e.g. computers] that are remote from a server device and said client device", there is simply no requirement that the selected format is a requirement dictated by the "one or more devices", as Patent Owner asserts.

Consequently, there is no reason to conclude, as Patent Owner has done, that reading the parts III and IV separately reads the term "specified form" out of the claims. Nor is there any reason to conclude that reading portions III and IV separately somehow narrows the meaning of the term "specified form" to that form required by **any specific one** of the "one or more devices", e.g. web sites, as asserted by Patent Owner.

As to Patent Owner's continued reliance on the "Prepare and Post" tool from the '482 specification (Remarks, pp. 9-10), this limits the claimed "devices" to web sites and the claimed "specified form" to the requirements of each specific web site. The claims are simply not so limited because the devices are not limited to individual web sites, as

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                          Paper No. 20140519 - Page 11
Art Unit: 3992

discussed above.  A general computer still qualifies as the claimed "one or more

devices" without also being a web site.

As to Patent Owner's allegation that the Requester "recognized the act of pre-

processing in the '482 Patent as modifying digital content to meet a particular

publication" (Remarks, paragraph bridging pp. 9-10), Examiner respectfully disagrees

because the Request indicated it was discussing "[t]he disclosed **embodiment**"

(Request, p. 3, 1st sentence) in the '482 patent, not that it was Requester's attempt to

assert either its own understanding of the meaning of any particular claim term or that

understanding of a person having ordinary skill in the art.  So it is unclear as to how

Patent Owner arrived at the conclusion that the Requester was somehow setting forth

its position on claim construction, when the facts show the Requester was simply

discussing "[t]he disclosed **embodiment**" (*id.*) of the '482 patent.

To any extent that Patent Owner is asserting that those of skill would limit the

claim terminology, above, in the manner that Patent Owner has done (Remarks, ¶

bridging pp. 9-10, and p. 10, 1st full ¶), Examiner respectfully disagrees for the same

reasons as discussed above and furthermore notes that Patent Owner failed to provide

any factual objective evidence to support this position.  Accordingly, Examiner

respectfully disagrees with Patent Owner's conclusion regarding its interpretation of the

claim (at Remarks, p. 10, 2nd full ¶) because it reads limitations from the specification

into the claims, improperly narrowing the "specified form" to "specified form **required by

the one or more devices".**

*Ex Parte Reexamination – Final Office Action*

APPX115

Control Number: 90/012,987                    Paper No. 20140519 - Page 12
Art Unit: 3992

Finally, to the extent that Patent Owner is arguing that the claims somehow require a user to have knowledge of the publication **requirements** of the claimed "one or more devices", the argument is flawed because it is predicated on the notion that if the camera user knows that JPEG format is a requirement of computers to be able to view the image (i.e. the claimed "one or more devices"), then the user is infringing the claim, but if the same user is unaware of this requirement and still chooses the JPEG format, i.e. **without** knowledge of the requirements of the same computer, then the user would **not** be infringing the claim, even though he is carrying out exactly the same step by specifying a format for the digital images.  Examiner respectfully maintains that the intent of the user cannot be the thing that distinguishes the claimed method over the art.


2. Intended use

In § **II(B)** of the Remarks (at pp. 10-12), Patent Owner asserts that the claim term "said one or more pre-processing parameters controlling said client device in a placement of said digital content into a specified form in preparation for publication to one or more devices that are remote from a server device and said client device" does not include a statement of intended use.  While this was a question raised during the interview, it was not a question raised in the Non-Final Rejection mailed 01/31/2014.  As such, Patent Owner's explanation is accepted.  Nonetheless, Examiner respectfully maintains that Patent Owner has improperly narrowed the meaning of this claim feature for the reasons indicated above.

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                     Paper No. 20140519 - Page 13
Art Unit: 3992

### Response to Patent Owner's Remarks on the Rejections

1.As noted above, Claims 38, 40, 44-46, and 49 remain rejected under 35 USC 102(e)

as anticipated by Creamer

In **§ III(A)** of the Remarks, Patent Owner contends that Creamer does not

anticipate claims 38, 40, 44-46, and 49.  Examiner respectfully disagrees for the

reasons that follow.

> **a. Creamer discloses the claim feature "said one or more pre-processing parameters controlling said client device in a placement of said digital content into a specified form in preparation for publication to one or more devices that are remote from a server device and said client device"**

In **§ III(A)(i)** of the Remarks, Patent Owner argues that Creamer does not

disclose the claim feature "said one or more pre-processing parameters controlling said

client device in a placement of said digital content into a specified form in preparation

for publication to one or more devices that are remote from a server device and said

client device".  However, Patent Owner predicates the argument on the basis of the

improperly narrow interpretation that "specified form" must be interpreted as the

"specified form **required by the one or more devices**" (Remarks, p. 13), even though

there is no such explicit or implicit requirement in the claims, as discussed above.


Patent Owner asserts,

> The Office Action has not identified where Creamer describes or suggests (1) a **certain specification** for publication to a personal computer 310, and (2) one or more pre-processing parameters provided to the client device for use in the act of pre-processing to modify digital content **to meet a certain specification** for publication to a personal computer 310.

> Moreover, the Office Action has not identified a **particular publication need** met by the asserted pre-processing of Creamer.  Creamer appears silent as to the specifications required for accessing images in a user's shell account.
> (Remarks, p. 14; emphasis added)

*Ex Parte Reexamination – Final Office Action*

APPX117

Control Number: 90/012,987                             Paper No. 20140519 - Page 14
Art Unit: 3992

At the outset, Patent Owner is demonstrably wrong to suggest that the Non-Final

Rejection did not identify these elements, to any extent that they are actually claimed.

The Non-Final Rejection incorporated by reference the explanation in the Request as to

how each of the claim features was met by Creamer:

> Claims 38, 40, 44-46 and 49 are rejected under pre-AIA 35 U.S.C. 102(e) as
> being anticipated by the Creamer patent (cited above). **The details of each of
> the limitations recited by these claims are shown in the Claim Chart of the
> Requester on pages 13-20 of the Request (incorporated herein by
> reference).**
>
> This analysis of the item matching of Claims 38, 40, 44-46 and 49 in the Request
> by the Requester is accepted, and these claims are held unpatentable under 35
> USC 102(e) as being anticipated by Creamer.
> (Non-Final Rejection, p. 3; emphasis added)

As to the feature Patent Owner asserts un-discussed by the Non-Final Rejection,

the incorporated Request states,

> • "said one or more pre-processing parameters controlling said client
> device in a   placement of said digital content into a specified form"

The compression parameter controls the **JPEG compression** for the digital
image into the specified form.  Creamer at **11:27-31**; 310 Application at pg. 17,
lines 6-8 ("The microcontroller 200 controls the compression engine 224 to
compress an image or images held in the image memory, according to attributes
assigned to that particular image (as described later), including compression to a
desired (e.g., **JPEG) compression level."); 19:9- 20**; 310 Application at pg. 26,
lines 1-8 ("In step S38, the compression engine 226 is controlled by the
microcontroller 200, according to settings stored in the IMAGE:FILES:IMAGE
ADJUST, to compress the image in the image memory 220 to the appropriate
slot (identified in steps S28 or S30) in the GP memory 226. If the MISC OPTION:
ADAPTICE parameter is set to change (e.g., reduce or increase) the image
compression depending on the data rate, the compression engine 226 is then set
to increase the compression level by a predetermined amount if the data rate is
lower than a predetermined rate, or decrease the compression level by a
predetermined amount if the data rate is higher than a predetermined rate.")
(Request, pp. 15-16; emphasis added)

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                          Paper No. 20140519 - Page 15
Art Unit: 3992

Thus, the Non-Final Rejection did in fact discuss the claim features.  That Patent Owner wishes to re-contrue the claim by inserting limitations into the claims from the specification is perhaps another story.

First, as explained above, Examiner respectfully maintains that the claims, as currently drafted, do not require the specified form be dictated by any requirement of the "one or more devices".

Second, as those of skill in the art knew at the time of the '482 patent, JPEG, TIFF, and GIF, *inter alia*, are standardized compressed file formats whose purposes necessarily included publication, i.e. dissemination of media, including digital images, via the internet and other means (*supra*) --versus the file format specific to Creamer's own camera, i.e. whatever format the "images held in the image memory" is in before the compression engine 224 modifies the image (Creamer quoted in Request at pp. 15-16, *supra*).  Therefore, selection of the specific kind of compression format, at least one of JPEG, TIFF, or GIF, would have been selected by the user of Creamer's internet camera, for publication on the internet at least based on the user's understanding of the merits of each format (Creamer, Figs. 4A and 4B; col. 8, lines 19-34).  In particular, the JPEG format was known by 1999 to be commonly used for publication of photographic images on the web because of its high compression, thereby leading to less storage and transfer time, as those of skill in the art would readily appreciate.  Therefore, the user of Creamer's camera would have chosen the JPEG format for publication on the internet if he wanted the fastest transfers of the images and the least amount of storage space required for the images.

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                    Paper No. 20140519 - Page 16
Art Unit: 3992

    In other words, while there was intent in developing the standardized formats for

the digital images in said formats to be widely available on computers, thereby

facilitating publication, there is no requirement that a person of ordinary skill in the art

would have recognized the inherent disclosure at the time of invention (i.e. that the

selection of a standardized format such a JPEG prepares a digital image to be viewable

on most computers), but only that the subject matter is in fact inherent in the prior art

reference.  *Schering Corp. v. Geneva Pharm. Inc.*, 339 F.3d 1373, 1377, 67 USPQ2d

1664, 1668 (Fed. Cir. 2003) (rejecting the contention that inherent anticipation requires

recognition by a person of ordinary skill in the art before the critical date and allowing

expert testimony with respect to post-critical date clinical trials to show inherency); see

also *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1320, 69 USPQ2d 1584, 1590 (Fed. Cir.

2004) ("[T]he fact that a characteristic is a necessary feature or result of a prior-art

embodiment (that is itself sufficiently described and enabled) is enough for inherent

anticipation, even if that fact was unknown at the time of the prior invention.")  See also

MPEP 2112(II).  Thus, there is no requirement for the user of Creamer's camera to have

recognized that the placement of the digital images into a format such as JPEG, TIFF,

or GIF for subsequent publication, i.e. placement into the internet-available shell

accounts 306, 314, would have made them readable, i.e. "meet[ing] a certain

specification of a personal computer" (Remarks, *supra*) 310 because this feature is

inherently present in the user having selected a standardized compression format.

*Ex Parte Reexamination – Final Office Action*

APPX120

Control Number: 90/012,987                    Paper No. 20140519 - Page 17
Art Unit: 3992

To be sure, Creamer's intent is to make the images available for viewing by the

public on the internet (Creamer, e.g. col. 2, line 48 to col. 3, line 49, and Figs. 4A and

4B), which meets the definition of "publication" (*supra*).  Creamer states, for example,

> It is a further object of the invention to provide a portable, standalone camera that
> may initiate and independently control scheduled transmission of digital images
> to the Internet, where the **images become available to any authorized user on
> the Internet**.
> (Creamer, col. 2, lines 55-59; emphasis added)

> The digital image files in the user directory of the destination shell account are
> then **available to the accessing device accessing the Internet**."
> (Creamer, col. 3, lines 35-38; emphasis added)

Third, even if, *arguendo*, there were a requirement in the claim for knowledge of

the requirements for "certain specifications" (Remarks, *supra*) of the "one or more

devices" in order to meet the claim feature, "said one or more pre-processing

parameters controlling said client device in a placement of said digital content into a

specified form in preparation for publication to one or more devices", Examiner submits

that the intent is at least implicit, in Creamer.  Even if the camera user has to select from

among formats for the digital images, a user of the camera would recognize that this

choice is not random but is, instead, directed by some requirement of a computer's

ability to read the specified format type, e.g. JPEG or TIFF or GIF, especially given that

Creamer's intent is to make the images available for viewing on the internet (Creamer,

*supra* and Figs. 4A and 4B).  At least, JPEG appears to meet this requirement, based

on the admissions in the '482 patent and in Patent Owner's Remarks, as discussed

above.

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                                   Paper No. 20140519 - Page 18
Art Unit: 3992

As such, Examiner respectfully maintains that it is unreasonable for Patent

Owner, on the one hand, to acknowledge that a compression format, such as JPEG or

TIFF or GIF, can be set for the digital images on Creamer's internet camera for **posting

on the internet to be viewed by others using personal computers** (much the same

as selecting a language for a book to be placed in a bookstore or library), but then, on

the other hand, to infer that the user of the internet camera would fail to consider the

compatibility of the file format requirements of the computers on which the user wished

to make her digital images available.  This would be as unreasonable as a publisher of

an American book to randomly choose any of the languages, Mandarin, Farsi, German,

and English, for a book to be located in an American bookstore or library, without

considering the primary language of those reading the book, i.e. Americans.  While the

other languages may have their merits, English would be the clear choice.  Similarly, a

person choosing a file format for her digital images on her internet camera would not

ignore the requirements of the personal computers on which the digital images would be

expected to be viewed.  Hence, selection of a standardized compression format, e.g.

JPEG, TIFF, GIFF, etc., in Creamer, is at least implicitly selected by the camera user on

the basis of the needs of the personal computers 310 on which she expects her digital

images will be viewed.  To assert otherwise, as Patent Owner has done, is simply

unreasonable.

To the extent that Patent Owner may be contesting that Creamer did not discuss

that its internet-camera user would understand the notoriously well-known facts about

compression formats, e.g. JPEG, TIFF, and GIF, etc. (Creamer col. 8, lines 19-34)

*Ex Parte Reexamination – Final Office Action*

APPX122

Control Number: 90/012,987                          Paper No. 20140519 - Page 19
Art Unit: 3992

being for publication (definition *supra*), this does not negate (1) what those of skill in the

art knew about standardized compression formats at the time of Creamer and of the

'482 patent, or (2) that by Creamer's disclosing that the internet camera used specifies

one of several standardized formats, (JPEG, TIFF, GIF, etc.)  it is proven that the user

would have had the information about each of the formats available to him/her at least

at the time of Creamer.

**b. Creamer is concerned with publication of digital photographs on the
internet**

Continuing in **§ III(A)(i)** of the Remarks, Patent Owner argues that "Creamer's

apparent focus is on a solution for a single user to configure their own Internet/Intranet

camera for the **storage of image files** into their own shell account."  (Remarks, p. 14,

paragraph bridging pp. 14-15; emphasis added.)  This is demonstrably wrong.

Creamer's focus is on making digital images taken on its internet camera accessible to

viewer over the internet, as evidenced by at least Creamer's Figs. 4A and 4B showing a

plurality of personal computers 310 accessing the stored images.  It is further evidenced

at least by the following associated passages from Creamer that were already quoted

above:

> It is a further object of the invention to provide a portable, standalone camera that
> may initiate and independently control scheduled transmission of digital images
> to the Internet, where the **images become available to any authorized user on
> the <u>Internet</u>.**
> (Creamer, col. 2, lines 55-59; emphasis added)

> The digital image files in the user directory of the destination shell account are
> then **available to the accessing device accessing the <u>Internet</u>."**
> (Creamer, col. 3, lines 35-38; emphasis added)

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                    Paper No. 20140519 - Page 20
Art Unit: 3992

Thus, Creamer is transparently concerned with publication of the digital images

taken on its internet camera, i.e. making the digital images available to the public.  (See

definition of "publication", *supra*.)  As such, Examiner respectfully disagrees with Patent

Owner's contention that Creamer is concerned merely with storage of the images.  No

one takes a picture for posting to the internet in an attempt to hide said picture; rather, it

is for the purpose of sharing the pictures with the public.

### c. Creamer discloses the "provision of pre-processing parameters to a client device"

Finally in in **§ III(A)(i)** of the Remarks, Patent Owner argues,

> Claim 38 recites "said one or more pre-processing parameters controlling said
> client device in a placement of said digital content into a specified form in
> preparation for publication to one or more devices." [1] The Office Action has not
> identified where Creamer discloses or suggests certain specifications that are
> purposed for the publication of digital content to one or more devices.  [2]
> Moreover, the Office Action has not identified where Creamer discloses or
> suggests **the provision of** pre-processing parameters to a client device that are
> configured to control the act of pre-processing to meet certain specifications for
> publication to one or more devices.
> (Remarks, p. 15, 1st full ¶; emphasis added)

As to [1], this is merely a restatement of the same argument already made in

paragraphs 3 and 4 on p. 14 of the Remarks, which was just addressed above.

As to [2], Patent Owner is, again, demonstrably wrong to assert that the Non-

Final Rejection somehow fails to discuss how Creamer discloses the "provision of" the

pre-processing parameters.  Although Patent Owner seems to have stated the wrong

claim feature that addresses the **provision** step of the preprocessing parameters, which

reads instead as,

> said one or more pre-processing parameters being **provided to** said client
> device from a device separate from said client device.

*Ex Parte Reexamination – Final Office Action*

APPX124

As noted above, the Non-Final Rejection incorporated by reference the

explanation in the Request as to how each of the claim features was met by Creamer

(Non-Final Rejection, p. 3).  In regard to this feature the Request shows that the claimed

provision step is met by Creamer:

> • "said one or more pre-processing parameters being provided to said
> client   device from a device separate from said client device,"

> All parameters in Figure 5, including the compression parameters, can be
> **provided to the Internet Camera from the Internet.  Creamer** at Figs. 4A and
> 4B and 24:9-14; 310 Application at pg. 33, lines 19-22.  Also, they can be
> provided to the Internet Camera by a setup PC.  Creamer at Figs. 4A, 4B, 17 and
> 20 and 28:57-29:4; 310 Application at pg. 43, lines 6-7.

> In addition to the parameters in Figure 5, all firmware may be provided in the
> same two ways.  Creamer at 27:30-47; 310 Application at pg. 39, lines 3-11
> ("may write or overwrite the firmware in the NVRAM 242").

> Accordingly, everything the Internet Camera does is based on parameters
> **provided from a device separate from the Internet Camera (either from the
> Internet or a setup PC).**
> (Request, p. 15; emphasis added)

Creamer at the Request's cited locations states,

> In this manner, the user may place a setup or configuration file in his destination
> directory in a predetermined format recognizable by the camera 1, and the
> camera may download a new or modified full or partial set of operational
> parameters (e.g., those shown in FIG. 5) permitting remote control of camera
> operation.
> (Creamer, col. 24, lines 9-14; emphasis added)

> In general, **any function initiated via the buttons, triggers, timers, or events
> as described herein, may also be directly initiated via an appropriate
> command received via the port 210**.  The camera 1 is responsive to the
> commands received from dedicated or general purpose software on an attached
> PC 216 that may receive data, command results, and images from the camera 1,
> and that transmits control data, commands and images to the camera 1; or that
> may write or overwrite the firmware in the NVRAM 242 (e.g., O/S, TCP/IP or

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                          Paper No. 20140519 - Page 22
Art Unit: 3992

other protocol stack, FTP or other file transfer application, card drivers, and other drivers and applications).

Accordingly, using the command routines, a user may initiate any operation of the camera 1 via, e.g., internal commands, or external commands sent over the serial/IrDA port 210.
(Creamer, col. 28, line 57 to col. 29, line 4; emphasis added)

Moreover, with regard to setting parameters, e.g. the compression format, and any of the other parameters shown in Fig. 5, over the internet, Creamer more generally states,

The integrated Internet camera may further include a **configuration device**, which includes a configuration information **retrieving** device and a configuration **setting** device. The configuration information **retrieving** device **retrieves configuration information from the destination shell account**, while the configuration **setting** device **sets operational parameters** of one or more of the image capturing circuit, the network interface device, the file transfer device, transport control device, the transmission initiating device, and the first scheduling device, **according to the configuration information**.
(Creamer, col. 4, lines 32-42; emphasis added)

Thus, the Non-Final Rejection did, in fact, show the claimed provision step "said one or more pre-processing parameters being **provided to** said client device **from a device separate from said client device**", i.e. from a PC attached via wire or via the internet.

Patent Owner does not separately argue remaining Claims 40, 44-46 and 49.


2. As noted above, Claims 38, 40, 44-46, and 49 remain rejected under 35 USC 102(e) as anticipated by Mattes

Control Number: 90/012,987                          Paper No. 20140519 - Page 23
Art Unit: 3992

In **§ III(B)** of the Remarks (pp. 15-17), Patent Owner contends that Mattes does not anticipate claims 38, 40, 44-46, and 49, for essentially the same reasons that were applied to Creamer.  Examiner respectfully disagrees.

Patent Owner argues that Mattes does not disclose the same claim feature allegedly absent in Creamer, namely, "said one or more pre-processing parameters controlling said client device in a placement of said digital content into a specified form in preparation for publication to one or more devices that are remote from a server device and said client device".  Again, Patent Owner's arguments are predicated on an improperly narrow construction of the claim feature "specified form" meaning "specified form **required by the one or more devices**", which simply is **not** claimed.  As will be explained in more detail below, Examiner does, however, agree with Patent Owner, that Mattes, unlike Creamer, does not **necessarily** disclose that the "pre-processing parameter [i.e. the quantizing factor for compression] provided to said client device [i.e. the telephone unit TE] from a device separate from said client device [i.e. the control unit ST of the server]" is **necessarily** directed by a requirement of the one or more devices on which the digital images will ultimately be viewed.  Examiner uses "necessarily" because it is not clear that this is the reason, as will become apparent in the subsequent explanation.

Mattes unambiguously discloses each of the features of claim 38 given the broadest reasonable interpretation of the claims, including the features Patent Owner alleges are absent.  With regard to the claim step at issue, step b:

*Ex Parte Reexamination – Final Office Action*

APPX127

> b. pre-processing said selected digital content in accordance with one or more pre-processing parameters that are received from a remote device to produce pre-processed digital content,
>
> said one or more pre-processing parameters enabling said client device to place said digital content into a specified form in preparation for publication to one or more devices that are remote from a server device and said client device;

While the Request at pages 22-23, which was incorporated into the Non-Final

Rejection, clearly shows that Mattes discloses each of the above claim features,

Examiner provides the following similar discussion.

Mattes discloses a telephone unit TE that includes a "digital image recorder" or

"digital image pick up unit", which functions as a digital camera, and a processor P for

compressing the images using a JPEG compression method:

> The telephone unit has a telephone portion and at least one **digital image recorder** which has the **function of a digital camera**, a telephone unit memory for storing the digital images taken by the digital camera and a **data processor for processing the digital image data**.
> (Mattes, col. 2, lines 24-28; emphasis added)
>
> The telephone unit also includes a digital image pick up unit for recording images, the **digital image pick up unit** being integrated into the telephone unit TE.  In **FIG. 2**, the telephone unit TE includes a lens LI and a view finder SU and may possibly include a photoflash BL.
> (Mattes, col. 5, lines 58-62; emphasis added)
>
> The **digital image pick up unit** operates as a **digital photo camera** of the type which is known.  A telephone unit memory TS is provided for storing the images registered by the digital image pick up unit in digital form in the telephone unit TE.  **The digital images may be compressed using still picture image data compression methods such as JPEG.  The compression method is implemented using a data processor P** which includes a memory RAM.  The data processor P serves for processing the digital images.
> (Mattes, col. 5, lines 1-8; emphasis added)

Mattes discloses that a different device from the telephone unit TE, specifically

elements of the server, (1) determines the quality of the image (using the server's image

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                    Paper No. 20140519 - Page 25
Art Unit: 3992

quality analysis unit BAE) and (2) controls the image resolution (via compression).  The

image quality of a digital image being transmitted is determined using the server's

image analysis unit BAE:

> In one embodiment, the servers [sic; server] includes an **image analysis unit BAE** which **determines the quality of the digital image that is provided to the server S**.  For example, the noise level within the digital image is determined by the image analysis unit BAE and the quality of the image is estimated depending upon the amount of noise which is detected.
>
> In addition, a **control unit ST** is provided in the **server S** in one embodiment of the communication system.  The **control unit ST controls the image resolution of the digital images using the image compression** in the telephone unit, for example.  In particular, image compression methods utilize a control parameter to set the **image compression level for the digital images such as the quantizing factor in a JPEG** (joint photographic expert group) image date [sic; data] compression.  The control unit ST determines this quantizing factor to be used to obtain the desired image quality.
> (Mattes, col. 5, lines 14-30; emphasis added)

Mattes also explains how the BAE and ST may function together:
> It is advantageous to provide an **image analysis unit [BAE] in the server [S] to determine the quality of the digital images** so that the relationship between the required image quality and the data transmission rate in the transmission system may be improved.  **When the image quality which is required is higher than the image quality which is supplied, then a higher image resolution for the digital images may be** requested by the server from the telephone unit according to yet another development of the present invention.  When, on other hand the image quality transmitted by the telephone unit is higher than that required in the server, then a **lower data transmission rate can be set and a lower image quality can be** requested from the telephone unit.  Thus, the present communication system may include a **control unit [ST] in the server [S] for** controlling the resolution of the digital images in the telephone unit and/or for controlling the transmission rate of the data to be used in the transmission system.  The transmission rate and the costs for the transmission of the digital images can thereby be reduced.
> (Mattes, col. 4, lines 18-37; emphasis added)

Thus, Mattes unambiguously shows that the compression level (i.e. a "pre-

processing parameter") for the digital image is provided to the telephone unit TE from

*Ex Parte Reexamination – Final Office Action*

APPX129

the control unit ST of the server S upon the image quality analysis unit BAE determining

whether the image resolution is too low or too high.  The telephone unit's image

compression processor P then modifies the compression according to compression

level received from the server's control unit ST (because the "control unit ST controls

the image resolution of the digital images using the image compression **in the**

**telephone unit**"; *supra*) and then re-transmits the digital image.

> With the above in mind then, Mattes discloses

> b. pre-processing said selected digital content in accordance with one or more
> pre-processing parameters [the compression level] that are received from a
> remote device [the server's control unit ST] to produce pre-processed digital
> content [the digital image having the altered compression level],

> said one or more pre-processing parameters [the compression level] enabling
> said client device to place said digital content [a digital photograph] into a
> specified form [the digital image having the altered compression level] **in**
> **preparation for publication to one or more devices that are remote from a**
> **server device and said client device**;

> As to the final portion of the claim feature, highlight in bold, Mattes discloses this

too because Mattes makes the digital images available to the public via a public mailbox

or by posting to web:

> It is a particular advantage to utilize the present invention in conjunction with the
> connection to the **Internet**.  For example, the images may be automatically
> stored or archived on the basis of the classification information OM in either a
> **public** or private **mailbox on the Internet**.  The recorded images may be
> **forwarded to a server via the Internet or may be directly displayed on a**
> **page of the World Wide Web**.
> (Mattes, col. 8, lines 28-35; emphasis added)

> As noted above, while Examiner readily acknowledges that Mattes does not

expressly indicate the compression level set for the digital image is a specified form

**dictated by a requirement of the one or more devices** on which the picture will

*Ex Parte Reexamination – Final Office Action*

ultimately be viewed, no such requirement is **claimed**. The claim only requires that the

pre-processing parameters "place said digital content into a specified form in

preparation for publication to one or more devices", and Mattes clearly modifies the

digital image "in preparation for publication to" the internet (*id.*). Examiner respectfully

maintains that "in preparation for" cannot be limited to meaning "dictated by a

requirement of the one or more devices", as this reads limitations into the claims from

the specification.

   While it is also acknowledged, as Patent Owner notes, that Mattes discusses the

compression level control is used in conjunction with functions other than those

expressly for publication, such as storage and archiving of the digital images (Remarks,

p. 16, 2nd full ¶), it does not negate that the compression level places the digital images

into a specified form (i.e. the form specified by the server's BAE and ST) in preparation

for their ultimate publication on the internet. There is no requirement for the publication

function to direct the choice of compression level, i.e. the claimed "specified form"

because there is no claimed requirement for this, as amply discussed in section A of

these arguments, above. Nor is there a requirement for publication to be the focus of

Mattes because "[t]he use of patents as references is not limited to what the patentees

describe as their own inventions or to the problems with which they are concerned.

They are part of the literature of the art, relevant for all they contain." *In re Heck*, 699

F.2d 1331, 1332-33, 216 USPQ 1038, 1039 (Fed. Cir. 1983) (quoting *In re Lemelson*,

397 F.2d 1006, 1009, 158 USPQ 275, 277 (CCPA 1968)). See also MPEP 2123(I).

*Ex Parte Reexamination – Final Office Action*

Control Number: 90/012,987                    Paper No. 20140519 - Page 28
Art Unit: 3992

As with the Creamer rejection above, claims 40, 44-46 and 49 are not separately

argued.

### Conclusion

Claims 38, 40, 44-46, and 49 remain unpatentable as being anticipated under 35

USC 102(e) by Creamer and Mattes.


**THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire 2 from the

mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination**

**proceedings.** The provisions of 37 CFR 1.136 apply only to "an applicant" and not to

parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR

1.550(a), it is required that reexamination proceedings "will be conducted with special

dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37**

**CFR 1.550(c).** A request for extension of time must specify the requested period of

extension and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g).

Any request for an extension in a third party requested *ex parte* reexamination must be

filed on or before the day on which action by the patent owner is due, and the mere

filing of a request will not effect any extension of time. A request for an extension of time

in a third party requested *ex parte* reexamination will be granted only for sufficient

cause, and for a reasonable time specified.  Any request for extension in a patent owner

*Ex Parte Reexamination – Final Office Action*

APPX132

Control Number: 90/012,987                    Paper No. 20140519 - Page 29
Art Unit: 3992

requested *ex parte* reexamination for up to two months from the time period set in the

Office action must be filed no later than two months from the expiration of the time

period set in the Office action.  A request for an extension in a patent owner requested

*ex parte* reexamination for more than two months from the time period set in the Office

action must be filed on or before the day on which action by the patent owner is due,

and the mere filing of a request for an extension for more than two months will not effect

the extension.  The time for taking action in a patent owner requested *ex parte*

reexamination will not be extended for more than two months from the time period set in

the Office action in the absence of sufficient cause or for more than a reasonable time.

The filing of a timely first response to this final rejection will be construed as

including a request to extend the shortened statutory period for an additional month,

which will be granted even if previous extensions have been granted. In no event,

however, will the statutory period for response expire later than SIX MONTHS from the

mailing date of the final action. See MPEP § 2265.


**Litigation Reminder**

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving the base patent throughout the course of this reexamination

proceeding. The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP§§ 2207, 2282 and 2286.


*Ex Parte Reexamination – Final Office Action*

APPX133

Control Number: 90/012,987                    Paper No. 20140519 - Page 30
Art Unit: 3992

## Correspondence

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed as follows:

By **U.S. Postal Service Mail** to:

       Mail Stop *Ex Parte* Reexam
       ATTN:  Central Reexamination Unit
       Commissioner for Patents
       P.O. Box 1450
       Alexandria, VA  22313-1450
By FAX to:   (571) 273-9900
       Central Reexamination Unit
By hand to:  Customer Service Window
       Randolph Building
       401 Dulany St.
       Alexandria, VA  22314

By EFS-Web:Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered
EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence.  Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.
    Any inquiry concerning this communication should be directed to John Heyman at telephone number 571 272-5730.

    Signed:

    /John Heyman/
    Primary Examiner,
    Art Unit 3992


    Conferees:

    /Erik Kielin/
    Primary Examiner, Art Unit 3992

    /Andrew J. Fischer/
    Supervisory Patent Reexamination Specialist, Art Unit 3992

*Ex Parte Reexamination – Final Office Action*

APPX134

# Exhibit BB

PACIFIC NORTHWEST TITLE SILVERDALE  201404080171
Deed Of Trust   Rec Fee: $89.00
04/08/2014 04:40:46 PM          Page 1 of 17
Walter Washington, Kitsap County Auditor

**Return To:** JPMorgan Chase Bank, NA
601 Oakmont Lane, Suite 300
Westmont, IL 60559

**Assessor's Parcel or Account
Number:** 4169-000-020-0302
**Abbreviated Legal Description:** Resultant Parcel A of BLA 201106200117,
——— PM Tracts 20 & 20½, Rolling Bay City
**Full legal description located on
page:** 3
**Trustee:** Olympic Northwest Escrow, Inc

# Deed of Trust

PNWT- 32473318

**Definitions.** Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) *"Security Instrument"* means this document, which is dated April 4, 2014, together with all Riders to this document.

(B) *"Borrower"* is Peter Yoakum and Julie Yoakum, husband and wife. Borrower is the trustor under this Security Instrument.   *F.   **Rodway

(C) *"Lender"* is JPMorgan Chase Bank, N.A.. Lender is a national banking association organized and existing under the laws of United States of America. Lender's address is 601 Oakmont Lane, Suite 300, Westmont, IL 60559. Lender is the beneficiary under this Security Instrument.

(D) *"Trustee"* is Olympic Northwest Escrow, Inc.

(E) *"Note"* means the promissory note signed by Borrower and dated April 4, 2014. The Note states that Borrower owes Lender one million fifty thousand and 00/100 Dollars (U.S. $1,050,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2044.

(F) *"Property"* means the property that is described below under the heading "Transfer of Rights in the Property."

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services          201404014.1.0.2547-N20131226Y

J.P. Morgan

Initials: _____

106302209
FORM 3048 1/01
09/13
Page 1 of 16

APPX136

**(G)** *"Loan"* means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** *"Riders"* means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider   ☐ Second Home Rider
☐ Balloon Rider   ☐ Planned Unit Development Rider   ☐ 1-4 Family Rider
☐ VA Rider   ☐ Biweekly Payment Rider   ☐ Other(s) [specify]

**(I)** *"Applicable Law"* means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** *"Community Association Dues, Fees, and Assessments"* means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** *"Electronic Funds Transfer"* means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** *"Escrow Items"* means those items that are described in Section 3.

**(M)** *"Miscellaneous Proceeds"* means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property

**(N)** *"Mortgage Insurance"* means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** *"Periodic Payment"* means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** *"RESPA"* means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, RESPA refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** *"Successor in Interest of Borrower"* means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**Transfer of Rights in the Property.** This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose,

APPX137

20140408017146-04/08/2014 04:40:46 PM   Page 3 of 17

Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County [Type of Recording Jurisdiction] of Kitsap [Name of Recording Jurisdiction] See Attached Exhibit A

Parcel ID Number: 4169-000-020-0302 which currently has the address of 8986 FERNCLIFF AVE NE [Street] BAINBRIDGE ISLAND [City], Washington 98110-2941 [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**Uniform Covenants.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services          201404014.1.0.2547-N20131226Y

J.P. Morgan

106302209
FORM 3048 1/01
09/13
Page 3 of 16

Initials: _____

due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services

J.P. Morgan

201404014.1.0.2547-N20131226Y

106302209
FORM 3048 1/01
09/13
Initials: ___ Page 4 of 16

Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the

1100288220                                                        J.P. Morgan                                                              106302209
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                               FORM 3048 1/01
VMP®                                                                                                                               09/13
Wolters Kluwer Financial Services                        201404014.1.0.2547-N20131226Y                    Initials: _____   Page 5 of 16

20140408017 1   04/08/2014 04:40:46 PM   Page 6 of 17

payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

1100288220                                      J.P. Morgan                                      106302209
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                      FORM 3048 1/01
VMP®                                                                                            09/13
Wolters Kluwer Financial Services         201404014.1.0.2547-N20131226Y        Initials: ___   Page 6 of 16

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services                201404014.1.0.2547-N20131226Y

J.P. Morgan

106302209
FORM 3048 1/01
09/13
Initials: _____   Page 7 of 16

APPX142

20140408017116    04/08/2014 04:40:46 PM    Page 8 of 17

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(A) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the**

1100288220    J.P. Morgan    106302209
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    FORM 3048 1/01
VMP®    09/13
Wolters Kluwer Financial Services    20140404014.1.0.2547-N20131226Y    Initials    Page 8 of 16

APPX143

amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(B)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services          201404014.1.0.2547-N20131226Y

J.P. Morgan

Initials: ___

106302209
FORM 3048 1/01
09/13
Page 9 of 16

APPX144

Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services                 201404014.1.0.2547-N20131226Y

J.P. Morgan

106302209
FORM 3048 1/01
09/13
Initials: ___   Page 10 of 16

20140408017l    04/08/2014 04:40:46 PM    Page 11 of 17

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services

J.P. Morgan

201404014.1.0.2547-N20131226Y

Initials: [initials]

106302209
FORM 3048 1/01
09/13
Page 11 of 16

APPX146

Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time

1100288220
WASHINGTON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services          201404014.1.0.2547-N20131226Y

J.P. Morgan

106302209
FORM 3048 1/01
09/13
Page 12 of 16

Initials:

APPX147

period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**Non-Uniform Covenants.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option,**

1100288220
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services                    201404014.1.0.2547-N20131226Y

J.P. Morgan

106302209
FORM 3048 1/01
09/13
Page 13 of 16

Initials: _____

APPX148

Case: 15-101    Document: 2-2    Page: 417    Filed: 10/23/2014

Case 7:14-cv-00014-O    Document 91-2    Filed 06/10/14    Page 47 of 60    PageID 1235
20140408017116    04/08/2014 04:40:46 PM    Page 14 of 17

may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**24. Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Use of Property.** The Property is not used principally for agricultural purposes.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

1100288220                                                    J.P. Morgan                                    106302209
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                            FORM 3048 1/01
VMP®                                                                                                          09/13
Wolters Kluwer Financial Services              201404014.1.0.2547-N20131226Y        Initials:                 Page 14 of 16

APPX149

Case: 15-101    Document: 2-2    Page: 418    Filed: 10/23/2014

20140408017.1    04/08/2014 04:40:46 PM    Page 15 of 17
Case 7:14-cv-00014-O   Document 91-2   Filed 06/10/14   Page 48 of 60   PageID 1236

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**Borrower**

_____   4/4/14
PETER YOAKUM                        **Date**
                                    *Seal*

_____   4/4/14
JULIE YOAKUM                        **Date**
                                    *Seal*

1100288220                                J.P. Morgan                                106302209
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                  FORM 3048 1/01
VMP®                                                                                09/13
Wolters Kluwer Financial Services       20140401.4.1.0.2547-N20131226Y   Initials: ___   Page 15 of 16

APPX150

**Acknowledgment**

**State of Washington**

**County of Kitsap**

I certify that I know or have satisfactory evidence that

<mark>Peter Yoakum and Julie Yoakum</mark> _____

_____

_____

is/are the person(s) who appeared before me, and said person(s) acknowledged that he/she/they signed this instrument and acknowledged it to be his/her/their free and voluntary act for the uses and purposes mentioned in the instrument.

Dated:

4.14.14 _____

*Martha J Lyda*

<mark>Notary Public in and for the state of Washington</mark>

residing at *Kingston*

My appointment expires: 02/26/18 _____

(Seal)

**Loan Origination Organization:**
JPMorgan Chase Bank, N.A.

**NMLS ID:** 399798

**Loan Originator:** Kristen Nonbello

**NMLS ID:** 530270

---

1100288220.
WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services          20140404014.1.0.2547-N20131226Y

J.P. Morgan

106302209
FORM 3048 1/01
09/13
Page 16 of 16

Initials

Unofficial Copy

20140408017l · 04/08/2014 04:40:46 PM   Page 17 of 17



**Exhibit "A"**

Order No.: 32143318

**Parcel I:**

**Resultant Parcel A of Boundary Line Adjustment recorded under Auditor's File No. 201106200114
being the South half of Tracts 20 and 20 1/2, Rolling Bay City, according to Plat recorded in
Volume 3 of Plats, Page 11, in** <mark>Kitsap County, Washington.</mark>

**Parcel II:**

**An easement for ingress and egress over the North 18 feet of Tract 21 of said plat.**

…End of Exhibit "A"…

Unofficial Copy

APPX152

**– A397 –**

# Exhibit CC

APPX153



6/5/2014 Google Maps

San Francisco, CA

San Diego, CA

San Francisco, CA—San Diego, CA

| | |
|---|---|
| Nonstop (17–23 per day) | 1 h 25 min |
| Connecting | 2 h 50 min+ |
| Round trip price, Jun 21 – 25 | from $211 |
| Virgin America, United, US Airways... | |
| See results on Google Flights | Sponsored |
| via I-5 S | 7 h 57 min |
| via I-5 S and I-15 S | 8 h 9 min |

https://www.google.com/maps/dir/San+Francisco,+CA/San+Diego,+CA/@35.2516358,-121.9491939,7z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x80859a6d00690021:0x4a501367f076adff!2m2!1d-122.4194155!2d3... 1/1

# Exhibit DD

APPX155

# Contact Report
**Scott Lewis**

Report Expiration
December 03, 2014

| | |
|---:|:---|
| *Name* | Scott Lewis |
| *Age* | 46 |
| *Date of Birth* | 6/20/1967 |
| *Phone Number* | 925-648-4002 |
| *Additional Phone Number* | |
| *Most Recent Address* | 47 W Village Cir, Midway, UT 84049-6908 |
| *Aliases/Name Variations* | Scott Matthew Lewis, Scott K Lewis, Scott M Lewis |

**Email:**

| | |
|:---|:---|
| s****@ixxx.cxx | **Scott Lewis**<br>24 Diamond Dr<br>Danville, CA 94526 |
| s****@pictureworks.com | **Scott Lewis**<br>24 Diamond Dr<br>Danville, CA 94526-2425 |
| s***@ipix.com | **Scott Lewis**<br>314 Squirrel Ridge Way<br>Danville, CA 94506-4744 |
| s****@hotmail.com | **Scott Lewis**<br>723 N 500 W<br>American Fork, UT 84003-1197 |

**8 addresses were found**

| Address | City, State, Zip |
|:---|:---|
| Phone | |
| Added | |
| Updated | |

| | |
|:---|:---|
| 47 W Village Cir | Midway, UT 84049-6908 |
| 9/2013 | |
| 9/2013 | |
| 24 Diamond Dr | Danville, CA 94526-2425 |

**– A401 –**

6/3/2014     Case 7:14-cv-00014-O   Document 91-2   Filed 06/10/14   Page 55 of 60   PageID 1243

925-648-4002

2004

7/2004

| | |
|---|---|
| 314 Squirrel Ridge Way<br>925-648-4002 | Danville, CA 94506-4744 |
| 10/1999 | |
| 665 N 600 W, Apt 12<br>925-648-4002<br>5/1994<br>5/1994 | Provo, UT 84601-1563 |
| 982 W 600 S<br><br>2/1989<br>2/1989 | Provo, UT 84601-4108 |
| 120 Shoreline Cir, Apt 341<br>925-648-4002<br><br>2/1989 | San Ramon, CA 94582-5083 |
| 665 N 600 W, Apt 71 | Provo, UT 84601-1563 |
| 723 N 500 W | American Fork, UT 84003-1197 |

## Possible Relatives

Possible relatives are people who are likely relatives of Scott Lewis based on matching surname and shared addresses. Please note that this will not include all relatives.

**4 possible relatives were found**

*Name*

**Alan B Lewis**

**Alice Ann Lewis**

**Krista E Lewis**

**Jennifer A Long**

# Exhibit EE

APPX159

# SWIFTSURE
## CAPITAL

### Navigating Private Equity With Confidence

ABOUT US      PORTFOLIO      TEAM      REGION      CONTACT US



Gordie has experience both as an investment banker and as a senior financial executive for public and private technology companies.  Prior to joining Swiftsure in 2006, he served as head of investment banking and then COO of Delafield Hambrecht, Inc., a Seattle-based full service investment bank.

Gordie has served as CFO of technology companies in communications software, IT services and consumer internet services. At the start of his career, he worked for 15 years with J.P. Morgan & Co. and its affiliate Morgan Guaranty Trust Company, in New York, San Francisco and Milan. His experience during this time included a broad variety of corporate finance transactions ranging from public equity and debt offerings to cross border mergers & acquisitions advisory assignments.

Gordie is the former Chairman of Geospiza and currently serves as a director of Concordia Coffee Company, General Biodiesel Seattle and Discovery Bay Games. He is also a member of the Advisory Council of the Seattle International Rescue Committee, an international refugee relief and resettlement organization.

Gordie earned a BA in Biology from Harvard where he was also captain of the heavyweight crew. Later he completed the Executive Program for Growing Companies at Stanford University Graduate School of Business. He is an avid skier and road biker. Gordie and his wife Nina have two children in college and one in high school.

Securities offered through Swiftsure Securities, LLC, member **FINRA** and **SIPC**. View our **Privacy Policy and**

APPX160

# Exhibit FF



Midway, UT
San Francisco, CA
Salt Lake City, UT–San Francisco, CA
Nonstop (8–10 per day) 2 h
Connecting 3 h 30 min+
Round trip price, Jun 21 – 25 from $240
Alaska, US Airways, United…
See results on Google Flights
Sponsored
via I-80 W 11 h 41 min
via Unknown road and I-80 W 13 h 1 min
11 h 41 min
779 miles
2 h
from $240
13 h 1 min
822 miles
San Francisco, CA
Salt Lake
Map data ©2014 Google 50 mi

# Exhibit GG

APPX163

6/5/2014

Case: 15-101   Document: 2-2   Page: 432   Filed: 10/23/2014

Google

Google Maps

Directions from Midway, UT to Wichita Falls, TX

Drive 1,086 miles, 16 h 38 min

O   Midway, UT

Follow UT-113 S to US-189 S in Charleston

➜   1.   Head east on W Main St toward S Center St

4.0 mi / 6 min



APPX164

6/5/2014

Google Maps

2. Take the 1st right onto UT-113 S/S Center St

  ⓘ Continue to follow UT-113 S

0.1 mi

3.9 mi

Take US-6 E, US-191 S, US-491 S, US-550 S,... and US-287 S to **Central E Fwy** in Wichita Falls. Take exit 1D from I-44/US-287 S

1,080 mi / 16 h 28 min

3. Turn right onto US-189 S

24.5 mi

4. Merge onto I-15 S via the ramp to Las Vegas

5.5 mi



APPX165

– A410 –

6/5/2014

Google Maps

5. Take exit 257 B-A for US 6 E toward Utah 156/Spanish Fork/Price/Main St
   0.3 mi

6. Take exit 257 B on the left to merge onto US-6 E toward Price
   127 mi

7. Take the ramp onto I-70 E
   23.6 mi

8. Take exit 182 for US-191 S toward Crescent Jct/Moab
   0.3 mi

9. Turn right onto US-191 S
   85.3 mi

10. Turn left onto US-491 S/E Center St
    i Continue to follow US-491 S
    i Passing through Colorado
    i Entering New Mexico

11. Turn left onto US-64 E
    102 mi

12. Turn right onto US-64 BYP E/W Murray Dr
    26.5 mi

13. Turn right onto NM-371 S
    0.9 mi

14. Turn left onto Co Rd 7100
    5.5 mi

15. Turn left onto Co Rd 7010
    1.7 mi

16. Turn right onto US-550 S
    12.9 mi

17. Take the ramp onto I-25 S
    143 mi

18. Take exit 226A-226B for I-40 E/I-40 W toward Santa Rosa/Gallup
    15.8 mi
    0.2 mi



APPX166

6/5/2014

Google Maps

19. Take exit 226A on the left to merge onto I-40 E toward Santa Rosa

ⓘ Entering Texas

20. Take exit 78 to merge onto US-287 S toward Fort Worth

292 mi

21. Take the I-44 W/US-287 S exit toward Wichita Falls/Ft Worth

211 mi

22. Merge onto I-44/US-287 S

0.6 mi

23. Take exit 1D toward US-287 BUS

0.6 mi

495 ft

## Drive to N Scott Ave

24. Merge onto Central E Fwy

2.0 mi / 4 min

25. Turn left onto Old Iowa Park Rd

0.2 mi

26. Continue onto N Scott Ave

0.4 mi

1.4 mi

APPX167

6/5/2014

Google Maps

Case: 15-101   Document: 2-2   Page: 436   Filed: 10/23/2014

◉ Wichita Falls, TX

These directions are for planning purposes only. You may find that construction projects, traffic, weather, or other events may cause conditions to differ from the map results, and you should plan your route accordingly. You must obey all signs or notices regarding your route.

Map data ©2014 Google, INEGI

https://www.google.com/maps/dir/Mickey,+UT/Wichita+Falls,+TX/@37.9812233,-105.0772531,6z/am=t/data=!3m1!4b1!4m14!4m13!1m6!1m1!1s0x87527540806060f69:0x4d060b0f6d9ffeafe!2m2!1d-111.4743545!2d40...   5/5



APPX168

# Exhibit HH

APPX169



United States Patent and Trademark Office
Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Inter Parte* Reexamination Filing Data - Septeber 30, 2013

1. Total requests filed since start of *Inter Parte* reexam on 11/29/99.................................    1919

2. Number of Filings by dicipline
    a. Chemical Operation                                286    15%
    b. Electrical Operation                              865    45%
    c. Mechanical Operation                              489    25%
    d. Design Patents                                     19    1%

3. Annual *Inter Parte* Reexam Filings

| Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No |
|---|---|---|---|---|---|---|---|
| 2000 | 0 | 2004 | 27 | 2008 | 168 | 2012 | 530 |
| 2001 | 1 | 2005 | 59 | 2009 | 258 | 2013 | NA |
| 2002 | 4 | 2006 | 70 | 2010 | 281 | | |
| 2003 | 21 | 2007 | 126 | 2011 | 374 | | |

4. Number known to be in litigation....................................    1449    76%

5. Decisions on requests....................................    2005
    a. No. granted                                      1872    93%
        (1) By examiner                               1863
        (2) By Director (on petition)                    9
    b. No. denied                                        133    7%
        (1) By examiner                                127
        (2) Reexam vacated                               6

6. Overall reexamination pendency (Filing date to certificate issue date)
    a. Average pendency                               36 (mos.)
    b. Median pendency                              31.8 (mos.)

7. Total ex parte reexamination certificates issued (1999 – present) ..........................    696
    a. Certificates with all claims confirmed            53    8%
    b. Certificates with all claims canceled (or disclaimed)    219    31%
    c. Certificates with claims changes                 424    61%

1 Total decisions on requests does not include requests that have been vacated or are pending.
updated as of 11/22/13

APPX170



United States Patent and Trademark Office

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Inter Partes* Reexamination Filing Data - September 30, 2012

1. Total requests filed since start of *inter partes* reexam on 11/29/99................................ 1919

2. Number of Filings by dicipline
    a. Chemical Operation      350    18%
    b. Electrical Operation      985    51%
    c. Mechanical Operation      564    29%
    d. Design Patents      20    1%

3. Annual *Inter Partes* Reexam Filings

| Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No |
|---|---|---|---|---|---|---|---|
| 2000 | 0 | 2004 | 27 | 2008 | 168 | 2012 | 530 |
| 2001 | 1 | 2005 | 59 | 2009 | 258 | | |
| 2002 | 4 | 2006 | 70 | 2010 | 281 | | |
| 2003 | 21 | 2007 | 126 | 2011 | 374 | | |

4. Number known to be in litigation............................................................... 1272   66%

5. Decisions on requests............................................................................... 1789
    a. No. granted............................................................................ 1682   94%
        (1) By examiner      1673
        (2) By Director (on petition)      9
    b. No. denied............................................................................. 107   6%
        (1) By examiner      101
        (2) Reexam vacated      6

6. Overall reexamination pendency (Filing date to certificate issue date)
    a. Average pendency      39.5 (mos.)
    b. Median pendency      34.1 (mos.)

7. Total *Inter partes* reexamination certificates issued (1999 – present) ........................... 373
    a. Certificates with all claims confirmed      44    12%
    b. Certificates with all claims canceled (or disclaimed)      169    45%
    c. Certificates with claims changes      160    43%

updated 8/5/13

APPX171

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Inter Partes* Reexamination Filing Data – September 30, 2011

1.  Total requests filed since start of *inter partes* reexam on 11/29/99 ............................................................. 1389[1]

2.  Number of filings by discipline

    |   |   |   |   |
    |---|---|---|---|
    | a. | Chemical Operation | 250 | 18% |
    | b. | Electrical Operation | 722 | 52% |
    | c. | Mechanical Operation | 401 | 29% |
    | d. | Design Patents | 16 | 1% |

3.  Annual Reexam Filings

    | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
    |---|---|---|---|---|---|---|---|
    | 2000 | 0 | 2003 | 21 | 2006 | 70 | 2009 | 258 |
    | 2001 | 1 | 2004 | 27 | 2007 | 126 | 2010 | 281 |
    | 2002 | 4 | 2005 | 59 | 2008 | 168 | 2011 | 374 |

4.  Number known to be in litigation…………………..…………………………….……..974………………..70%

5.  Decisions on requests ..................................................................................................................... 1246

    a.  No. granted .................................................................................. 1187 ........................ 95%

    (1) By examiner           1178
    (2) By Director (on petition)    9

    b.  No. not granted ................................................................................... 59 ......................... 5%

    (1) By examiner           54
    (2) Reexam vacated         5

6.  Overall reexamination pendency  (Filing date to certificate issue date)
    a.  Average pendency                          36.2 (mos.)
    b.  Median pendency                           32.9 (mos.)

7.  Total inter partes reexamination certificates issued (1999 - present) ............................................................. 305

    |   |   |   |   |
    |---|---|---|---|
    | a. | Certificates with all claims confirmed | 35 | 11% |
    | b. | Certificates with all claims canceled (or disclaimed) | 133 | 44% |
    | c. | Certificates with claims changes | 137 | 45% |

---

[1] Of the requests received in FY 2011, 3 requests have not yet been accorded a filing date, and 5 requests have had preprocessing terminated, for failure to comply with the requirements of 37 CFR 1.915.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

_Inter Partes_ Reexamination Filing Data – September 30, 2010

1.  Total requests filed since start of *inter partes* reexam on 11/29/99 ...........................................................1015[1]

2.  Number of filings by discipline

    | | | |
    |---|---|---|
    | a. | Chemical Operation | 193 | 19% |
    | b. | Electrical Operation | 506 | 50% |
    | c. | Mechanical Operation | 304 | 30% |
    | d. | Design Patents | 12 | 1% |

3.  Annual Reexam Filings

    | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
    |---|---|---|---|---|---|---|---|
    | 2000 | 0 | 2003 | 21 | 2006 | 70 | 2009 | 258 |
    | 2001 | 1 | 2004 | 27 | 2007 | 126 | 2010 | 281 |
    | 2002 | 4 | 2005 | 59 | 2008 | 168 | | |

4.  Number known to be in litigation……………...…….…………….………694………………..68%

5.  Decisions on requests ....................................................................................................... 881

    a.  No. granted .............................................................................. 843 ........................96%

    | | | |
    |---|---|---|
    | (1) | By examiner | 841 |
    | (2) | By Director (on petition) | 2 |

    b.  No. not granted .............................................................................. 38 ...........................4%

    | | | |
    |---|---|---|
    | (1) | By examiner | 34 |
    | (2) | Reexam vacated | 4 |

6.  Overall reexamination pendency  (Filing date to certificate issue date)

    | | | |
    |---|---|---|
    | a. | Average pendency | 36.1 (mos.) |
    | b. | Median pendency | 31.4 (mos.) |

7.  Total inter partes reexamination certificates issued (1999 - present) ........................................................ 192

    | | | | |
    |---|---|---|---|
    | a. | Certificates with all claims confirmed | 20 | 11% |
    | b. | Certificates with all claims canceled (or disclaimed) | 91 | 47% |
    | c. | Certificates with claims changes | 81 | 42% |

---

[1]Of the requests received in FY 2010, 4 requests have not yet been accorded a filing date, and 24 requests have had preprocessing terminated, for failure to comply with the requirements of 37 CFR 1.915.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

APPX173

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Inter Partes* Reexamination Filing Data - September 30, 2009

1.  Total requests filed since start of *inter partes* reexam on 11/29/99 ................................................................734[1]

2.  Number of filings by discipline

|  |  |  |
|---|---|---|
| a. Chemical Operation | 148 | 20% |
| b. Electrical Operation | 332 | 45% |
| c. Mechanical Operation | 243 | 33% |
| d. Design Patents | 11 | 2% |

3.  Annual Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 2000 | 0 | 2003 | 21 | 2006 | 70 | 2009 | 258 |
| 2001 | 1 | 2004 | 27 | 2007 | 126 | | |
| 2002 | 4 | 2005 | 59 | 2008 | 168 | | |

4.  Number known to be in litigation……………….…………….……………….…………….498………………..68%

5.  Decisions on requests ........................................................................................................................ 650

    a.  No. granted .................................................................................... 619 ........................ 95%

        (1)  By examiner                                   618
        (2)  By Director (on petition)                      1

    b.  No. not granted ............................................................................... 31 .......................... 5%

        (1)  By examiner                                    27
        (2)  Reexam vacated                                 4

6.  Overall reexamination pendency  (Filing date to certificate issue date)
    a.  Average pendency                                  35.8 (mos.)
    b.  Median pendency                                   32.4 (mos.)

7.  Total inter partes reexamination certificates issued (1999 - present) ........................................... 105

|  |  |  |
|---|---|---|
| a. Certificates with all claims confirmed | 6 | 6% |
| b. Certificates with all claims canceled (or disclaimed) | 57 | 54% |
| c. Certificates with claims changes | 42 | 40% |

---

[1]Of the requests received in FY 2009, 4 requests have not yet been accorded a filing date, and 15 requests have had preprocessing terminated, for failure to comply with the requirements of 37 CFR 1.915.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

_Inter Partes_ Reexamination Filing Data  -  September 30, 2008

1.   Total requests filed since start of *inter partes* reexam on 11/29/99 .............................................476[1]

2.   Number of filings by discipline

|   |   |   |   |
|---|---|---|---|
| a. | Chemical Operation | 113 | 24% |
| b. | Electrical Operation | 179 | 38% |
| c. | Mechanical Operation | 173 | 36% |
| d. | Design Patents | 11 | 2% |

3.   Annual Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|
| 2000 | 0 | 2003 | 21 | 2006 | 70 |
| 2001 | 1 | 2004 | 27 | 2007 | 126 |
| 2002 | 4 | 2005 | 59 | 2008 | 168 |

4.   Number known to be in litigation……………...…….………………….……..278………………...58%

5.   Decisions on requests ................................................................................................................ 420

     a.   No. granted ................................................................................. 401 ...................... 95%

         (1)   By examiner                                                401
         (2)   By Director (on petition)                                 0

     b.   No. not granted ........................................................................... 19 ........................... 5%

         (1)   By examiner                                                16
         (2)   Reexam vacated                                             3

6.   Overall reexamination pendency  (Filing date to certificate issue date)
     a.   Average pendency                                            32.6 (mos.)
     b.   Median pendency                                             30.8 (mos.)

7.   Total inter partes reexamination certificates issued (1999 - present) ........................................... 33

|   |   |   |   |
|---|---|---|---|
| a. | Certificates with all claims confirmed | 4 | 12% |
| b. | Certificates with all claims canceled (or disclaimed) | 22 | 67% |
| c. | Certificates with claims changes | 7 | 21% |

---

[1]Of the requests received in FY 2008, 7 requests have not yet been accorded a filing date, and 7 requests had preprocessing terminated, for failure to comply with the requirements of 37 CFR 1.915.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

APPX175

# Exhibit II



United States Patent and Trademark Office
Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**_Ex Parte_ Reexamination Filing Data - September 30, 2013**

1. Total requests filed since start of *Ex Parte reexam* on 07/01/81.....................................  12874
    a. By patent owner    3833   30%
    b. by other member of the public    8874   69%
    c. By order of Commissioner    167   1%

2. Number of Filings by dicipline
    a. Chemical Operation    3435   27%
    b. Electrical Operation    5001   39%
    c. Mechanical Operation    4234   33%
    d. Design Patents    204   2%

3. Annual *Ex Parte* Reexam Filings

| Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No |
|---|---|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos. | 1989 | 243 | 1997 | 376 | 2005 | 524 | 2013 | 305 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 | | |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 | | |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 680 | | |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | 2009 | 658 | | |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | 2010 | 780 | | |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | 2011 | 759 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | 2012 | 787 | | |

4. Number known to be in litigation.....................................  4167   32%

5. Decisions on requests.....................................  12016
    a. No. granted    11013   92%
        (1) By examiner    10891
        (2) By Director (on petition)    122
    b. No. denied    1003   8%
        (1) By examiner    968
        (2) Reexam vacated    35

6. Total examiner denials (includes denials reversed by Director).....................................  1067
    a. Patent owner requester    498   47%
    b. Third party requester    606   57%

7. Overall reexamination pendency (Filing date to certificate issue date)
    a. Average pendency    27.8 (mos.)
    b. Median pendency    20.1 (mos.)

1 Total decisions on requests does not include requests that have been vacated or are pending.
updated as of 11/22/13

8. Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiate | Overall |
|---|---|---|---|---|
| a. All claims confirmed | 6% | 15% | 0% | 21% |
| b. All calims cancled | 3% | 8% | 0% | 11% |
| c. Claims changed | 21% | 40% | 1% | 62% |

9. Total ex parte reexamination certificates issued (1981 – present) ..................... 9991

| | | |
|---|---|---|
| a. Certificates with all claims confirmed | 2241 | 22% |
| b. Certificates with all claims canceled | 1205 | 12% |
| c. Certificates with claims changes | 6545 | 66% |

10. Reexam claim analysis – requester is patent owner or 3rd party or Commissioner initiated.

| | | |
|---|---|---|
| a. Certificates – PATENT OWNER REQUESTER | | 3279 |
|    a. All claims confirmed | 682 | 21% |
|    b. All calims cancled | 283 | 9% |
|    c. Claims changed | 2239 | 68% |
| b. Certificates – 3rd PARTY REQUESTER | | 7174 |
|    a. All claims confirmed | 1541 | 21% |
|    b. All calims cancled | 882 | 12% |
|    c. Claims changed | 4201 | 59% |
| c. Certificates – COMMISSIONER INITIATED REEXAM | | 164 |
|    a. All claims confirmed | 18 | 11% |
|    b. All calims cancled | 40 | 24% |
|    c. Claims changed | 105 | 64% |

1 Total decisions on requests does not include requests that have been vacated or are pending.



United States Patent and Trademark Office

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

_Ex Parte_ Reexamination Filing Data - September 30, 2012

1. Total requests filed since start of *ex parte reexam on 07/01/81*....................................  12569
      a. By patent owner                                 3872     31%
      b. by other member of the public              8532     68%
      c. By order of Commissioner               165     1%

2. Number a. Chemical Operation                   3373     27%
      b. Electrical Operation                     4831     38%
      c. Mechanical Operation                  4178     33%
      d. Design Patents                        187     1%

3. Annual *Ex Parte* Reexam Filings

| Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No | Fiscal Yr. | No |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 680 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | 2009 | 658 |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | 2010 | 780 |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | 2011 | 759 |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | 2012 | 788 |

4. Number known to be in litigation...................................................................  3994     32%

5. Decisions on requests...................................................................................  11737
      a. No. granted.........................................................................  10755     92%
            (1) By examiner                       10762
            (2) By Director (on petition)          122
      b. No. denied.........................................................................  982     8%
            (1) By examiner                       961
            (2) Reexam vacated              35
6. Total examiner denials (includes denials reversed by Director)....................................  1078
      a. Patent owner requester                496     46%
      b. Third party requester                  582     54%

7. Overall reexamination pendency (Filing date to certificate issue date)
      a. Average pendency                     27.9     (mos.)
      b. Median pendency                     20.5     (mos.)

1

APPX179

8. Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiate | | Overall |
|---|---|---|---|---|---|
| a. All claims confirmed | 21% | 22% | 11% | | 21% |
| b. All calims cancled | 8% | 12% | 24% | | 11% |
| c. Claims changed | 71% | 66% | 65% | | 68% |

9. Total ex parte reexamination certificates issued (1981 – present) ..........................  9328
    a. Certificates with all claims confirmed  2029  22%
    b. Certificates with all claims canceled  1063  11%
    c. Certificates with claims changes  6236  67%

10. Reexam claim analysis – requester is patent owner or 3rd party or Commissioner initiated.
    a. Certificates – PATENT OWNER REQUESTER  3176
        a. All claims confirmed  669  21%
        b. All calims cancled  280  9%
        c. Claims changed  2227  70%
    b. Certificates – 3rd PARTY REQUESTER  6026
        a. All claims confirmed  1348  22%
        b. All calims cancled  745  12%
        c. Claims changed  3933  65%
    c. Certificates – COMMISSIONER INITIATED REEXAM  164
        a. All claims confirmed  18  11%
        b. All calims cancled  38  23%
        c. Claims changed  108  66%

APPX180

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
**www.uspto.gov**

*Ex Parte* Reexamination Filing Data  -  September 30, 2011

1.   Total requests filed since start of *ex parte* reexam on 07/01/81...................................11782[1]

|   |   |   |
|---|---|---|
| a. | By patent owner | 3801 | 33% |
| b. | By other member of public | 7815 | 66% |
| c. | By order of Commissioner | 166 | 1% |

2.   Number of filings by discipline

|   |   |   |
|---|---|---|
| a. | Chemical Operation | 3211 | 27% |
| b. | Electrical Operation | 4405 | 37% |
| c. | Mechanical Operation | 3987 | 34% |
| d. | Design Patents | 179 | 2% |

3.   Annual *Ex Parte* Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 680 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | 2009 | 658 |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | 2010 | 780 |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | 2011 | 759 |
| 1988 | 268 | 1996 | 418 | 2004 | 441 |  |  |

4.   Number known to be in litigation...........................................3894...............33%

5.   Decisions on requests.......................................................................................11262

  a.  No. granted....................................................... 10333...............92%

      (1)  By examiner                                       10213
      (2)  By Director (on petition)                        120

  b.  No. denied ...........................................................929...............8%

      (1)  By examiner                                       894
      (2)  Reexam vacated                                    35

---

[1]Of the requests received in FY 2011, 22 requests have not yet been accorded a filing date, and preprocessing of 35 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

1

6.  Total examiner denials (includes denials reversed by Director)…………......................1014

    a.  Patent owner requester                     476    47%
    b.  Third party requester                      538    53%

7.  Overall reexamination pendency (Filing date to certificate issue date)

    a.  Average pendency               25.6 (mos.)
    b.  Median pendency                19.9 (mos.)

8.  Reexam certificate claim analysis:

| | | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|---|
| a. | All claims confirmed | 21% | 24% | 11% | 23% |
| b. | All claims cancelled | 9% | 12% | 23% | 11% |
| c. | Claims changes | 70% | 64% | 66% | 66% |

9.  Total *ex parte* reexamination certificates issued (1981 – present) ………………………8578

    a.  Certificates with all claims confirmed         1943    23%
    b.  Certificates with all claims canceled          974    11%
    c.  Certificates with claims changes          5661    66%

10.  Reexam claim analysis – requester is patent owner or 3rd party or Commissioner initiated.

    a.  Certificates – PATENT OWNER REQUESTER …………………………………3040

        (1)  All claims confirmed         651    21%
        (2)  All claims canceled         264    9%
        (3)  Claim changes          2125    70%

    b.  Certificates – 3rd PARTY REQUESTER ………………………………………5380

        (1)  All claims confirmed       1274    24%
        (2)  All claims canceled        674    12%
        (3)  Claim changes         3432    64%

    c.  Certificates – COMMISSIONER INITIATED REEXAM …………..…….…......158

        (1)  All claims confirmed         18    11%
        (2)  All claims canceled        36    23%
        (3)  Claim changes         104    66%

2

APPX182

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
**www.uspto.gov**

_Ex Parte_ Reexamination Filing Data  -  September 30, 2010

1.  Total requests filed since start of *ex parte* reexam on 07/01/81 ................................. 11023[1]

    a.  By patent owner                                    3697          34%
    b.  By other member of public                     7161          65%
    c.  By order of Commissioner                    165           1%

2.  Number of filings by discipline

    a.  Chemical Operation                        3068          28%
    b.  Electrical Operation                      4010          36%
    c.  Mechanical Operation                    3771          34%
    d.  Design Patents                            174           2%

3.  Annual *Ex Parte* Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 680 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | 2009 | 658 |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | 2010 | 780 |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | | |

4.  Number known to be in litigation ………....….……................. 3568…………….32%

5.  Decisions on requests ………………………………………………………………..10495

    a.  No. granted …………………………………………… …9648…………....92%

        (1)  By examiner                           9534
        (2)  By Director (on petition)           114

    b.  No. denied …………………………………………………847…………......8%

        (1)  By examiner                            812
        (2)  Reexam vacated                    35

---

[1]Of the requests received in FY 2010, 16 requests have not yet been accorded a filing date, and preprocessing of 80 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

1

6.   Total examiner denials (includes denials reversed by Director)…………........................926

   a.   Patent owner requester                              451              49%
   b.   Third party requester                               475              51%

7.   Overall reexamination pendency (Filing date to certificate issue date)

   a.   Average pendency                                    25.5 (mos.)
   b.   Median pendency                                     20.0 (mos.)

8.   Reexam certificate claim analysis:

| | | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|---|
| a. | All claims confirmed | 22% | 25% | 12% | 23% |
| b. | All claims cancelled | 8% | 13% | 23% | 12% |
| c. | Claims changes | 70% | 62% | 65% | 65% |

9.   Total *ex parte* reexamination certificates issued (1981 – present) ………………………7782

   a.   Certificates with all claims confirmed              1817             23%
   b.   Certificates with all claims canceled               893              12%
   c.   Certificates with claims changes                    5072             65%

10.   Reexam claim analysis – requester is patent owner or 3rd party or Commissioner initiated.

   a.   Certificates – PATENT OWNER REQUESTER …………………………………2947

      (1)   All claims confirmed                            638              22%
      (2)   All claims canceled                             251              8%
      (3)   Claim changes                                   2058             70%

   b.   Certificates – 3rd PARTY REQUESTER ……………………………………4681

      (1)   All claims confirmed                            1161             25%
      (2)   All claims canceled                             607              13%
      (3)   Claim changes                                   2913             62%

   c.   Certificates – COMMISSIONER INITIATED REEXAM …………..……….....154

      (1)   All claims confirmed                            18               12%
      (2)   All claims canceled                             35               23%
      (3)   Claim changes                                   101              65%

APPX184

– A429 –



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Ex Parte* Reexamination Filing Data  -  September 30, 2009

1.  Total requests filed since start of *ex parte* reexam on 07/01/81 ................................... 10243[1]

| | | |
|---|---|---|
| a.  By patent owner | 3634 | 35% |
| b.  By other member of public | 6444 | 63% |
| c.  By order of Commissioner | 165 | 2% |

2.  Number of filings by discipline

| | | |
|---|---|---|
| a.  Chemical Operation | 2931 | 29% |
| b.  Electrical Operation | 3596 | 35% |
| c.  Mechanical Operation | 3554 | 34% |
| d.  Design Patents | 162 | 2% |

3.  Annual *Ex Parte* Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 680 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | 2009 | 658 |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | | |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | | |

4.  Number known to be in litigation ............…...….…….….................. 3221 ……….……31%

5.  Decisions on requests ....…………………………………………………………………....9833

    a.  No. granted ...……………………………………………… …..9041……….……....92%

        (1)  By examiner                                                                           8928
        (2)  By Director (on petition)                                                          113

    b.  No. denied ..………………………………………………………792…………......8%

        (1)  By examiner                                                                           757
        (2)  Reexam vacated                                                                      35

---

[1]Of the requests received in FY 2009, 22 requests have not yet been accorded a filing date, and preprocessing of 41 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

1

APPX185

6.    Total examiner denials (includes denials reversed by Director)…………........................870

    a.    Patent owner requester                                  445          51%
    b.    Third party requester                                    425          49%

7.    Overall reexamination pendency (Filing date to certificate issue date)

    a.    Average pendency                  25.2 (mos.)
    b.    Median pendency                  19.7 (mos.)

8.    Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a.    All claims confirmed | 22% | 26% | 12% | 25% |
| b.    All claims cancelled | 8% | 13% | 23% | 11% |
| c.    Claims changes | 70% | 61% | 65% | 64% |

9.    Total *ex parte* reexamination certificates issued (1981 – present) ………………………7089

    a.    Certificates with all claims confirmed          1725      25%
    b.    Certificates with all claims canceled           807      11%
    c.    Certificates with claims changes            4557      64%

10.    Reexam claim analysis – requester is patent owner or 3rd party or Commissioner initiated.

    a.    Certificates – PATENT OWNER REQUESTER …………………………………2827

        (1)  All claims confirmed               625      22%
        (2)  All claims canceled              233       8%
        (3)  Claim changes                 1969      70%

    b.    Certificates – 3rd PARTY REQUESTER ……………………………………………4111

        (1)  All claims confirmed          1082      26%
        (2)  All claims canceled           540      13%
        (3)  Claim changes            2489      61%

    c.    Certificates – COMMISSIONER INITIATED REEXAM …………..…………....151

        (1)  All claims confirmed                18      12%
        (2)  All claims canceled              34      23%
        (3)  Claim changes                 99      65%

APPX186



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

*Ex Parte* Reexamination Filing Data  -  September 30, 2008

1.  Total requests filed since start of *ex partes* reexam on 07/01/81 ................................. 9585[1]

|   |   |   |   |
|---|---|---|---|
| a. | By patent owner | 3567 | 37% |
| b. | By other member of public | 5853 | 61% |
| c. | By order of Commissioner | 165 | 2% |

2.  Number of filings by discipline

|   |   |   |   |
|---|---|---|---|
| a. | Chemical Operation | 2811 | 29% |
| b. | Electrical Operation | 3261 | 34% |
| c. | Mechanical Operation | 3357 | 35% |
| d. | Design Patents | 156 | 2% |

3.  Annual  Ex Parte Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 680 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 |   |   |
| 1986 | 232 | 1994 | 379 | 2002 | 272 |   |   |
| 1987 | 240 | 1995 | 392 | 2003 | 392 |   |   |
| 1988 | 268 | 1996 | 418 | 2004 | 441 |   |   |

4.  Number known to be in litigation…………...…….……................. .2849…………......30%

5.  Decisions on requests………………………………………………………………...9219

    a.  No. granted……………………………………… …..8467…………....92%

        (1)  By examiner                                        8354
        (2)  By Director (on petition)                          113

    b.  No. denied …………………………………………………752…………......8%

        (1)  By examiner                                        717
        (2)  Reexam vacated                                      35

[1]Of the requests received in FY 2008, 7 requests have not yet been accorded a filing date, and preprocessing of 15 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

1

APPX187

6. Total examiner denials (includes denials reserved by Director)…………........................830

    a. Patent owner requester                     441         53%
    b. Third party requester                      389         47%

7. Overall reexamination pendency (Filing date to certificate issue date)

    a. Average pendency                    24.5 (mos.)
    b. Median pendency                    19.0 (mos.)

8. Reexam certificate claim analysis:

| | | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|---|
| a. | All claims confirmed | 22% | 28% | 12% | 25% |
| b. | All claims cancelled | 8% | 13% | 21% | 11% |
| c. | Claims changes | 70% | 59% | 67% | 64% |

9. Total ex parte reexamination certificates issued (1981 – present) ………………………6457

    a. Certificates with all claims confirmed      1624     25%
    b. Certificates with all claims canceled       721     11%
    c. Certificates with claims changes        4112     64%

10. Reexam claim analysis – requester is patent owner or 3rd party; or Comm'r initiated.

    a. Certificates – PATENT OWNER REQUESTER ……………………………………2722

        (1) All claims confirmed        611     22%
        (2) All claims canceled        214      8%
        (3) Claim changes           1897     70%

    b. Certificates – 3rd PARTY REQUESTER ………………………………………….3588

        (1) All claims confirmed        995     28%
        (2) All claims canceled        476     13%
        (3) Claim changes           2117     59%

    c. Certificates – COMM'R INITIATED REEXAM …………………….………......147

        (1) All claims confirmed         18     12%
        (2) All claims canceled         31     21%
        (3) Claim changes            98     67%

APPX188

– A433 –

# Exhibit JJ







Hotels Flights Vacation Packages Cars Cruises Deals Activities New! Welcome Credit Card

Change search | San Diego, CA (SAN) to San Francisco, CA (SFO) | Mon, Jun 9, 2014

LOWEST PRICE

$131.00

Hide Matrix

| | US Airways | Delta Air Lines | Virgin America | American Airlines | United Airlines | Multiple Airlines | Frontier Airlines | Alaska Airlines |
|---|---|---|---|---|---|---|---|---|
| Non-stop | | | $203.00 | | $237.00 | | | |
| 1+ stops | $131.00 | $141.00 | | $208.00 | $248.00 | $348.90 | $408.00 | $433.00 |

## Refine Results

**Select flight times**

Outbound

Take-off: 6:00 AM - 9:00 PM

Show landing time

**Select stops**

- Any
- Non-stop $203
- 1 stop $131
- 2+ stops $210

**Select price range**

- Any
- $131-$270 (75)
- $270-$430 (82)
- $430-$550 (75)
- $550-$560 (92)
- $560-$570 (112)
- $570-$860 (91)

**Select airlines**

- Any
- Multiple Airlines $348
- Alaska Airlines $433
- American Airlines $208
- Delta Air Lines $141
- Frontier Airlines $408
- United Airlines $237
- US Airways $131
- Virgin America $203

**Matching Results: 527**

**Sort by:** Shortest Flight

Additional baggage fees may apply.

---

Flight details

**$203.00** Total cost | FREE Cancel | Select

Mon, Jun 9 — Total time: 1hr 25min

Depart 5:00 PM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2

Arrive 6:25 PM — San Francisco, CA, United States — San Francisco Airport (SFO) | Terminal 2

Virgin America 963 — Economy — Airbus A320 | On-time: 88% — 447 mi | 1hr 25min — Seat map

Earn $2.03 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Flight details

**$203.00** Total cost | FREE Cancel | Select

Mon, Jun 9 — Total time: 1hr 25min

Depart 7:00 AM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2

Arrive 8:25 AM — San Francisco, CA, United States — San Francisco Airport (SFO) | Terminal 2

Virgin America 1951 — Economy — Airbus A319 | On-time: 91% — 447 mi | 1hr 25min — Seat map

Earn $2.03 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Flight details

Site Feedback

**$237.00** Total cost | FREE Cancel | Select

Mon, Jun 9 — Total time: 1hr 26min

Depart 5:28 PM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2

Arrive 6:54 PM — San Francisco, CA, United States — San Francisco Airport (SFO) | Terminal 3

United Airlines 1736 — Economy — Boeing 737 — 447 mi | 1hr 26min — Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Flight details

**$203.00** Total cost | FREE Cancel | Select

Mon, Jun 9 — Total time: 1hr 30min

Depart 7:50 PM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2

Arrive 9:20 PM — San Francisco, CA, United States — San Francisco Airport (SFO) | Terminal 2

Virgin America 969 — Economy — Airbus A319 | On-time: 85% — 447 mi | 1hr 30min — Seat map

Earn $2.03 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Flight details

**$203.00** Total cost | FREE Cancel | Select

Mon, Jun 9 — Total time: 1hr 30min

Depart 12:15 PM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2

Arrive 1:45 PM — San Francisco, CA, United States — San Francisco Airport (SFO) | Terminal 2

Virgin America 961 — Economy — Airbus A319 | On-time: 73% — 447 mi | 1hr 30min — Seat map

Earn $2.03 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$203.00 Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 1hr 30min

Depart 9:25 AM — San Diego, CA , United States, San Diego Airport (SAN) | Terminal 2

Arrive 10:55 AM — San Francisco, CA , United States, San Francisco Airport (SFO) | Terminal 2

Virgin America 953, Economy, Airbus A319 | On-time: 73%, 447 mi | 1hr 30min, Seat map

Earn $2.03 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$237.00 Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 1hr 30min

Depart 3:23 PM — San Diego, CA , United States, San Diego Airport (SAN) | Terminal 2

Arrive 4:53 PM — San Francisco, CA , United States, San Francisco Airport (SFO) | Terminal 3

United Airlines 1715, Economy, Boeing 737 | On-time: 70%, 447 mi | 1hr 30min, Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$237.00 Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 1hr 34min

Depart 12:41 PM — San Diego, CA , United States, San Diego Airport (SAN) | Terminal 2

Arrive 2:15 PM — San Francisco, CA , United States, San Francisco Airport (SFO) | Terminal 3

United Airlines 1424, Economy, Boeing 737, 447 mi | 1hr 34min, Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 3 tickets left at this price!

Flight details

$237.00 Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 1hr 37min

Depart 8:29 PM — San Diego, CA , United States, San Diego Airport (SAN) | Terminal 2

Arrive 10:06 PM — San Francisco, CA , United States, San Francisco Airport (SFO) | Terminal 3

Flight 5493 Operated by SKYWEST DBA UNITED EXPRESS

United Airlines 5493, Economy, CRJ, 447 mi | 1hr 37min, Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$237.00 Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 1hr 37min

Depart 9:45 AM — San Diego, CA , United States, San Diego Airport (SAN) | Terminal 2

Arrive 11:22 AM — San Francisco, CA , United States, San Francisco Airport (SFO) | Terminal 3

Flight 6198 Operated by SKYWEST DBA UNITED EXPRESS

United Airlines 6198, Economy, CRJ, 447 mi | 1hr 37min, Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$237.00 Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 1hr 38min

Depart 6:25 AM — San Diego, CA , United States, San Diego Airport (SAN) | Terminal 2

Arrive 8:03 AM — San Francisco, CA , United States, San Francisco Airport (SFO) | Terminal 3

United Airlines 1212, Economy, Boeing 737, 447 mi | 1hr 38min, Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 3 tickets left at this price!

Flight details

$237.00
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 1hr 38min

Depart 7:22 AM — San Diego, CA , United States — San Diego Airport (SAN) | Terminal 2

Arrive 9:00 AM — San Francisco, CA , United States — San Francisco Airport (SFO) | Terminal 3

United Airlines 1536
Economy
Boeing 737
447 mi | 1hr 38min
Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$237.00
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 1hr 42min

Depart 7:48 PM — San Diego, CA , United States — San Diego Airport (SAN) | Terminal 2

Arrive 9:30 PM — San Francisco, CA , United States — San Francisco Airport (SFO) | Terminal 3

United Airlines 1042
Economy
Boeing 737
447 mi | 1hr 42min
Seat map

Earn $2.37 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$141.00
Total cost
FREE Cancel
Select

Leave Mon, Jun 9

4:36 PM San Diego SAN — 7:24 PM San Francisco SFO — 1 stop 2hr 48min

Delta Air Lines 4504 / 6444
Seat map

Flight 4504 Operated by SKYWEST DBA DELTA CONNECTION
Flight 6444 Operated by COMPASS AIRLINE-DL CONNECTION-DL SHUTTLE

Earn $1.41 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 5 tickets left at this price!

Flight details

$248.00
Total cost
FREE Cancel
Select

Leave Mon, Jun 9

1:41 PM Carlsbad CLD — 4:29 PM San Francisco SFO — 1 stop 2hr 48min

United Airlines 5474 / 560
Seat map

Flight 5474 Operated by SKYWEST DBA UNITED EXPRESS

Earn $2.48 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 5 tickets left at this price!

Flight details

$141.00
Total cost
FREE Cancel
Select

Leave Mon, Jun 9

1:35 PM San Diego SAN — 4:24 PM San Francisco SFO — 1 stop 2hr 49min

Delta Air Lines 4503 / 6438
Seat map

Flight 4503 Operated by SKYWEST DBA DELTA CONNECTION
Flight 6438 Operated by COMPASS AIRLINE-DL CONNECTION-DL SHUTTLE

Earn $1.41 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 1 ticket left at this price!

Flight details

$241.00
Total cost
FREE Cancel
Select

Leave Mon, Jun 9

1:50 PM San Diego SAN — 4:45 PM San Francisco SFO — 1 stop 2hr 55min

American Airlines 2579 / 209
Seat map

Flight 2579 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE

Earn $2.41 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 2 tickets left at this price!





Flight details

$263.00 Total cost FREE Cancel Select

Leave Mon, Jun 9
4:05 PM San Diego SAN — 7:00 PM San Francisco SFO — 1 stop 2hr 55min — American Airlines 2620 / 219 Seat map

Flight 2620 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE

Earn $2.63 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 2 tickets left at this price!

Flight details

$557.99 Total cost FREE Cancel Select

Leave Mon, Jun 9
1:50 PM San Diego SAN — 4:45 PM San Francisco SFO — 1 stop 2hr 55min — US Airways 3082 American Airlines 209 Seat map

Change of airlines.

Flight 3082 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE

Earn $5.58 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$557.99 Total cost FREE Cancel Select

Leave Mon, Jun 9
4:05 PM San Diego SAN — 7:00 PM San Francisco SFO — 1 stop 2hr 55min — US Airways 3121 American Airlines 219 Seat map

Change of airlines.

Flight 3121 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE

Earn $5.58 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 2 tickets left at this price!

Flight details

$562.00 Total cost FREE Cancel Select

Leave Mon, Jun 9
1:50 PM San Diego SAN — 4:45 PM San Francisco SFO — 1 stop 2hr 55min — US Airways 3082 / 209 Seat map

Flight 3082 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE
Flight 209 Operated by American Airlines

Earn $5.62 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$562.00 Total cost FREE Cancel Select

Leave Mon, Jun 9
4:05 PM San Diego SAN — 7:00 PM San Francisco SFO — 1 stop 2hr 55min — US Airways 3121 / 219 Seat map

Flight 3121 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE
Flight 219 Operated by American Airlines

Earn $5.62 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 2 tickets left at this price!

Flight details

$568.99 Total cost FREE Cancel Select

Leave Mon, Jun 9
1:50 PM San Diego SAN — 4:45 PM San Francisco SFO — 1 stop 2hr 55min — American Airlines 2579 US Airways 209 Seat map

Change of airlines.

Flight 2579 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE
Flight 209 Operated by American Airlines

Earn $5.69 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

**$568.99**
Total cost
FREE Cancel
Select

Leave Mon, Jun 9
**4:05 PM** San Diego SAN — **7:00 PM** San Francisco SFO — **1 stop** 2hr 55min — **American Airlines 2620** **US Airways 219** Seat map

Change of airlines.

Flight 2620 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE
Flight 219 Operated by American Airlines

Earn **$5.69** ORBITZ REWARDS Earn **$20** in bonus Orbucks

Act Fast! Only 2 tickets left at this price!

Flight details

**$344.00**
Total cost
FREE Cancel
Select

Leave Mon, Jun 9
**8:40 AM** San Diego SAN — **11:45 AM** San Francisco SFO — **1 stop** 3hr 5min — **American Airlines 2602 / 2455** Seat map

Flight 2602 Operated by SKYWEST AIRLINES AS AMERICAN EAGLE

Earn **$3.44** ORBITZ REWARDS Earn **$20** in bonus Orbucks

**See 25 more result(s)**

Return to top | Change search

Showing: 25 of 527 results

Prices shown are 'from prices' and are an average per traveller including all airfare taxes and fees and any applicable service fees.

Vacation packages | Car rental | Cruises | Travel blog | Flight status | Orbitz Travel Alerts | Customer Support | Español | Labs

About Orbitz | Contact Us | Investors | Careers | Media | Site map | Advertising | Affiliates | Orbitz for Business | Orbitz for Agents | Terms and conditions | Your Privacy Rights

Orbitz Rewards | Orbitz Rewards Visa Card | Best Price Guarantee | Travel deals | Mobile | Facebook | Twitter | Pinterest

Download our free app:

ORBITZ

Orbitz guards your privacy and security. We're certified by TRUSTe and Verisign.
© 2001 - 2014, Orbitz, LLC. All rights reserved.
CST 2063530-50; Hawaii TAR-5627; Iowa 644; Nevada 2003-0387; Washington 602-102-724

TRUSTe CERTIFIED PRIVACY

APPX194

# Exhibit KK

APPX195



















Hotels Flights Vacation Packages Cars Cruises Deals Activities New! Welcome Credit Card

LOWEST PRICE

$348.00

| Hide Matrix | American Airlines | US Airways | Multiple Airlines | Alaska Airlines |
|---|---|---|---|---|
| 1 stop | $348.00 | $650.00 | $656.99 | |
| 2+ stops | $352.00 | $401.00 | $406.49 | $821.00 |

**Refine Results**

**Select flight times**

Outbound

Take-off: 6:00 AM - 11:00 PM

Show landing time

**Select stops**

Any

1 stop $348

2+ stops $352

**Select price range**

Any

$348-$540 (83)

$540-$650 (57)

$650-$690 (145)

$690-$730 (48)

$730-$790 (95)

$790-$1,420 (125)

**Select airlines**

Any

Multiple Airlines $406

Alaska Airlines $821

American Airlines $348

US Airways $401

**Matching Results: 551**

**Sort by:** Shortest Flight

Additional baggage fees may apply.

Act Fast! Only 3 tickets left at this price!

Flight details

**$348.00** Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 4hr 45min

Depart 2:05 PM — San Diego, CA, United States, San Diego Airport (SAN) — American Airlines 58, Economy, Boeing Douglas MD-80, 1,174 mi | 3hr 0min, Seat map

Stop 1 7:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW)

Change of planes. Time between flights: 1hr 0min

Depart 8:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) — American Airlines 3773, Economy, Embraer RJ145, 118 mi | 0hr 45min, Seat map

Arrive 8:50 PM — Wichita Falls, TX, United States, Sheppard AFB (SPS)

Flight 3773 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $3.48 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

**$656.99** Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 4hr 45min

Depart 2:05 PM — San Diego, CA, United States, San Diego Airport (SAN) | Terminal 2 — American Airlines 58, Economy, Boeing Douglas MD-80 | On-time: 80%, 1,167 mi | 3hr 0min, Seat map

Stop 1 7:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal 0

Change of airlines. Time between flights: 1hr 0min

Depart 8:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal B — US Airways 8470, Economy, Embraer RJ145 | On-time: 63%, 112 mi | 0hr 45min, Seat map

Arrive 8:50 PM — Wichita Falls, TX, United States, Sheppard AFB (SPS)

Flight 8470 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.57 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

**$680.00** Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 4hr 45min

Depart 2:05 PM — San Diego, CA, United States, San Diego Airport (SAN) | Terminal 2 — US Airways 58, Economy, Boeing Douglas MD-80 | On-time: 80%, 1,167 mi | 3hr 0min, Seat map

Stop 1 7:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal 0

Change of planes. Time between flights: 1hr 0min

Flight 58 Operated by American Airlines

Depart 8:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal B — US Airways 8470, Economy, Embraer RJ145 | On-time: 63%, 112 mi | 0hr 45min, Seat map

Arrive 8:50 PM — Wichita Falls, TX, United States, Sheppard AFB (SPS)

Flight 8470 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.80 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

**$686.99**
Total cost
FREE Cancel
Select

**Mon, Jun 9** — **Total time: 4hr 45min**

Depart 2:05 PM — San Diego, CA, United States; San Diego Airport (SAN) | Terminal 2
Stop 1 7:05 PM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW) | Terminal 0
US Airways 58 — Economy — Boeing Douglas MD-80 | On-time: 80% — 1,167 mi | 3hr 0min — Seat map

Change of airlines. Time between flights: 1hr 0min
Flight 58 Operated by American Airlines

Depart 8:05 PM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 8:50 PM — Wichita Falls, TX, United States; Sheppard AFB (SPS)
American Airlines 3773 — Economy — Embraer RJ145 | On-time: 63% — 112 mi | 0hr 45min — Seat map

Flight 3773 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.87 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Act Fast! Only 2 tickets left at this price!

Flight details

**$503.00**
Total cost
FREE Cancel
Select

**Mon, Jun 9** — **Total time: 5hr 5min**

Depart 6:25 AM — San Diego, CA, United States; San Diego Airport (SAN)
Stop 1 11:30 AM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW)
American Airlines 1124 — First — Boeing Douglas MD-80 — 1,174 mi | 3hr 5min — Seat map

Change of planes. Time between flights: 1hr 10min

Depart 12:40 PM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW)
Arrive 1:30 PM — Wichita Falls, TX, United States; Sheppard AFB (SPS)
American Airlines 3401 — Economy — Embraer RJ145 — 118 mi | 0hr 50min — Seat map

Flight 3401 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $5.03 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Act Fast! Only 2 tickets left at this price!

Flight details

**$656.99**
Total cost
FREE Cancel
Select

**Mon, Jun 9** — **Total time: 5hr 5min**

Depart 6:25 AM — San Diego, CA, United States; San Diego Airport (SAN) | Terminal 2
Stop 1 11:30 AM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW) | Terminal 0
American Airlines 1124 — Economy — Boeing Douglas MD-80 | On-time: 93% — 1,167 mi | 3hr 5min — Seat map

Change of airlines. Time between flights: 1hr 10min

Depart 12:40 PM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 1:30 PM — Wichita Falls, TX, United States; Sheppard AFB (SPS)
US Airways 8200 — Economy — Embraer RJ145 — 112 mi | 0hr 50min — Seat map

Flight 8200 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.57 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Act Fast! Only 2 tickets left at this price!

Flight details

**$765.00**
Total cost
FREE Cancel
Select

**Mon, Jun 9** — **Total time: 5hr 5min**

Depart 6:25 AM — San Diego, CA, United States; San Diego Airport (SAN) | Terminal 2
Stop 1 11:30 AM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW) | Terminal 0
US Airways 1124 — Economy — Boeing Douglas MD-80 | On-time: 93% — 1,167 mi | 3hr 5min — Seat map

Change of planes. Time between flights: 1hr 10min
Flight 1124 Operated by American Airlines

Depart 12:40 PM — Dallas, TX, United States; Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 1:30 PM — Wichita Falls, TX, United States; Sheppard AFB (SPS)
US Airways 8200 — Economy — Embraer RJ145 — 112 mi | 0hr 50min — Seat map

Flight 8200 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $7.65 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 2 tickets left at this price!

Flight details

$801.99
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 5hr 5min

Depart 6:25 AM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2
Stop 1 11:30 AM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal 0
US Airways 1124 — Economy — Boeing Douglas MD-80 | On-time: 93% — 1,167 mi | 3hr 5min — Seat map
Change of airlines. Time between flights: 1hr 10min
Flight 1124 Operated by American Airlines

Depart 12:40 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 1:30 PM — Wichita Falls, TX, United States — Sheppard AFB (SPS)
American Airlines 3401 — Economy — Embraer RJ145 — 112 mi | 0hr 50min — Seat map
Flight 3401 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $8.02 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$348.00
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 5hr 25min

Depart 10:45 AM — San Diego, CA, United States — San Diego Airport (SAN)
Stop 1 3:40 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW)
American Airlines 1086 — Economy — Boeing 757 — 1,174 mi | 2hr 55min — Seat map
Change of planes. Time between flights: 1hr 50min

Depart 5:30 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW)
Arrive 6:10 PM — Wichita Falls, TX, United States — Sheppard AFB (SPS)
American Airlines 3397 — Economy — Embraer RJ145 — 118 mi | 0hr 40min — Seat map
Flight 3397 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $3.48 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$650.00
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 5hr 25min

Depart 10:45 AM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2
Stop 1 3:40 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal 0
US Airways 1086 — Economy — Boeing 757 — 1,167 mi | 2hr 55min — Seat map
Change of planes. Time between flights: 1hr 50min
Flight 1086 Operated by American Airlines

Depart 5:30 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 6:10 PM — Wichita Falls, TX, United States — Sheppard AFB (SPS)
US Airways 8197 — Economy — Embraer RJ145 — 112 mi | 0hr 40min — Seat map
Flight 8197 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.50 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$656.99
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 5hr 25min

Depart 10:45 AM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2
Stop 1 3:40 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal 0
American Airlines 1086 — Economy — Boeing 757 — 1,167 mi | 2hr 55min — Seat map
Change of airlines. Time between flights: 1hr 50min

Depart 5:30 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 6:10 PM — Wichita Falls, TX, United States — Sheppard AFB (SPS)
US Airways 8197 — Economy — Embraer RJ145 — 112 mi | 0hr 40min — Seat map
Flight 8197 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.57 ORBITZ REWARDS Earn $20 in bonus Orbucks

















Flight details

**$686.99**
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 8hr 25min

Depart 10:45 AM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2
Stop 1 3:40 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal 0
Change of airlines. Time between flights: 1hr 50min
Flight 1086 Operated by American Airlines

US Airways 1086
Economy
Boeing 757
1,167 mi | 2hr 55min
Seat map

Depart 5:30 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 6:10 PM — Wichita Falls, TX, United States — Sheppard AFB (SPS)
Flight 3397 Operated by ENVOY AIR AS AMERICAN EAGLE

American Airlines 3397
Economy
Embraer RJ145
112 mi | 0hr 40min
Seat map

Earn $6.87 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

**$401.00**
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 8hr 20min

Depart 12:30 PM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2
Stop 1 1:46 PM — Phoenix, AZ, United States — Sky Harbor Airport (PHX) | Terminal 4
Change of planes. Time between flights: 1hr 9min

US Airways 1712
Economy
Airbus A321 | On-time: 100%
303 mi | 1hr 16min
Seat map

Depart 2:55 PM — Phoenix, AZ, United States — Sky Harbor Airport (PHX) | Terminal 4
Stop 2 7:20 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal 0
Change of planes. Time between flights: 0hr 45min
Flight 1023 Operated by American Airlines

US Airways 1023
Economy
Boeing Douglas MD-83 | On-time: 80%
865 mi | 2hr 25min
Seat map

Depart 8:05 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 8:50 PM — Wichita Falls, TX, United States — Sheppard AFB (SPS)
Flight 8470 Operated by ENVOY AIR AS AMERICAN EAGLE

US Airways 8470
Economy
Embraer RJ145 | On-time: 63%
112 mi | 0hr 45min
Seat map

Earn $4.01 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

**$437.99**
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 8hr 20min

Depart 12:30 PM — San Diego, CA, United States — San Diego Airport (SAN) | Terminal 2
Stop 1 1:46 PM — Phoenix, AZ, United States — Sky Harbor Airport (PHX) | Terminal 4
Change of planes. Time between flights: 1hr 9min

US Airways 1712
Economy
Airbus A321 | On-time: 100%
303 mi | 1hr 16min
Seat map

Depart 2:55 PM — Phoenix, AZ, United States — Sky Harbor Airport (PHX) | Terminal 4
Stop 2 7:20 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal 0
Change of airlines. Time between flights: 0hr 45min
Flight 1023 Operated by American Airlines

US Airways 1023
Economy
Boeing Douglas MD-83 | On-time: 80%
865 mi | 2hr 25min
Seat map

Depart 8:05 PM — Dallas, TX, United States — Dallas-Fort Worth Airport (DFW) | Terminal B
Arrive 8:50 PM — Wichita Falls, TX, United States — Sheppard AFB (SPS)
Flight 3773 Operated by ENVOY AIR AS AMERICAN EAGLE

American Airlines 3773
Economy
Embraer RJ145 | On-time: 63%
112 mi | 0hr 45min
Seat map

Earn $4.38 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

**$446.50**
Total cost
FREE Cancel
Select

Mon, Jun 9 — Total time: 8hr 20min

Depart 12:30 PM — San Diego, CA, United States — San Diego Airport (SAN)
Stop 1 1:46 PM — Phoenix, AZ, United States — Sky Harbor Airport (PHX)
Change of planes. Time between flights: 1hr 9min
Flight 1712 Operated by US Airways

American Airlines 1712
Economy
Airbus A321
304 mi | 1hr 16min
Seat map

Depart 2:55 PM — Phoenix, AZ, United States, Sky Harbor Airport (PHX) — American Airlines 1023, Economy, Boeing Douglas MD-83, 872 mi | 2hr 25min, Seat map
Stop 2 7:20 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW)
Change of planes. Time between flights: 0hr 45min

Depart 8:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) — American Airlines 3773, Economy, Embraer RJ145, 118 mi | 0hr 45min, Seat map
Arrive 8:50 PM — Wichita Falls, TX, United States, Sheppard AFB (SPS)
Flight 3773 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $4.47 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Flight details

**$495.99** Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 6hr 20min

Depart 12:30 PM — San Diego, CA, United States, San Diego Airport (SAN) | Terminal 2 — US Airways 1712, Economy, Airbus A321 | On-time: 100%, 303 mi | 1hr 16min, Seat map
Stop 1 1:46 PM — Phoenix, AZ, United States, Sky Harbor Airport (PHX) | Terminal 4
Change of airlines. Time between flights: 1hr 9min

Depart 2:55 PM — Phoenix, AZ, United States, Sky Harbor Airport (PHX) | Terminal 4 — American Airlines 1023, Economy, Boeing Douglas MD-83 | On-time: 80%, 865 mi | 2hr 25min, Seat map
Stop 2 7:20 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal 0
Change of planes. Time between flights: 0hr 45min

Depart 8:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal B — American Airlines 3773, Economy, Embraer RJ145 | On-time: 63%, 112 mi | 0hr 45min, Seat map
Arrive 8:50 PM — Wichita Falls, TX, United States, Sheppard AFB (SPS)
Flight 3773 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $4.96 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Flight details

**$709.99** Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 6hr 20min

Depart 12:30 PM — San Diego, CA, United States, San Diego Airport (SAN) | Terminal 2 — US Airways 1712, Economy, Airbus A321 | On-time: 100%, 303 mi | 1hr 16min, Seat map
Stop 1 1:46 PM — Phoenix, AZ, United States, Sky Harbor Airport (PHX) | Terminal 4
Change of airlines. Time between flights: 1hr 9min

Depart 2:55 PM — Phoenix, AZ, United States, Sky Harbor Airport (PHX) | Terminal 4 — American Airlines 1023, Economy, Boeing Douglas MD-83 | On-time: 80%, 865 mi | 2hr 25min, Seat map
Stop 2 7:20 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal 0
Change of airlines. Time between flights: 0hr 45min

Depart 8:05 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal B — US Airways 8470, Economy, Embraer RJ145 | On-time: 63%, 112 mi | 0hr 45min, Seat map
Arrive 8:50 PM — Wichita Falls, TX, United States, Sheppard AFB (SPS)
Flight 8470 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $7.10 ORBITZ REWARDS Earn $20 in bonus Orbucks

---

Flight details

**$709.99** Total cost FREE Cancel Select

Mon, Jun 9 — Total time: 6hr 20min

Depart 12:30 PM — San Diego, CA, United States, San Diego Airport (SAN) | Terminal 2 — American Airlines 1712, Economy, Airbus A321 | On-time: 100%, 303 mi | 1hr 16min, Seat map
Stop 1 1:46 PM — Phoenix, AZ, United States, Sky Harbor Airport (PHX) | Terminal 4
Change of planes. Time between flights: 1hr 9min
Flight 1712 Operated by US Airways

Depart 2:55 PM — Phoenix, AZ, United States, Sky Harbor Airport (PHX) | Terminal 4 — American Airlines 1023, Economy, Boeing Douglas MD-83 | On-time: 80%, 865 mi | 2hr 25min
Stop 2 7:20 PM — Dallas, TX, United States, Dallas-Fort Worth Airport (DFW) | Terminal 0



Change of airlines. Time between flights: 0hr 45min

| | | |
|---|---|---|
| Depart<br>8:05 PM | Dallas, TX , United States<br>Dallas-Fort Worth Airport (DFW) \| Terminal B | US Airways 8470<br>Economy<br>Embraer RJ145 \| On-time: 63% |
| Arrive<br>8:50 PM | Wichita Falls, TX , United States<br>Sheppard AFB (SPS) | 112 mi \| 1hr 45min<br>Seat map |

Flight 8470 Operated by ENVOY AIR AS AMERICAN EAGLE

💜 **Earn $7.10**   🔶 ORBITZ REWARDS   Earn $20 in bonus Orbucks



**$709.99**
Total cost
FREE Cancel

[ Select ]

☐ Flight details

Mon, Jun 9                                          Total time: 6hr 20min

| | | |
|---|---|---|
| Depart<br>12:30 PM | San Diego, CA , United States<br>San Diego Airport (SAN) \| Terminal 2 | American Airlines 1712<br>Economy<br>Airbus A321 \| On-time: 100% |
| Stop 1<br>1:46 PM | Phoenix, AZ , United States<br>Sky Harbor Airport (PHX) \| Terminal 4 | 303 mi \| 1hr 16min<br>Seat map |

Change of airlines. Time between flights: 1hr 9min

Flight 1712 Operated by US Airways

| | | |
|---|---|---|
| Depart<br>2:55 PM | Phoenix, AZ , United States<br>Sky Harbor Airport (PHX) \| Terminal 4 | US Airways 1023<br>Economy<br>Boeing Douglas MD-83 \| On-time: 80% |
| Stop 2<br>7:20 PM | Dallas, TX , United States<br>Dallas-Fort Worth Airport (DFW) \| Terminal 0 | 865 mi \| 2hr 25min<br>Seat map |

Change of planes. Time between flights: 0hr 45min

Flight 1023 Operated by American Airlines

| | | |
|---|---|---|
| Depart<br>8:05 PM | Dallas, TX , United States<br>Dallas-Fort Worth Airport (DFW) \| Terminal B | US Airways 8470<br>Economy<br>Embraer RJ145 \| On-time: 63% |
| Arrive<br>8:50 PM | Wichita Falls, TX , United States<br>Sheppard AFB (SPS) | 112 mi \| 1hr 45min<br>Seat map |

Flight 8470 Operated by ENVOY AIR AS AMERICAN EAGLE

💜 **Earn $7.10**   🔶 ORBITZ REWARDS   Earn $20 in bonus Orbucks



**$739.99**
Total cost
FREE Cancel

[ Select ]

☐ Flight details

Mon, Jun 9                                          Total time: 6hr 20min

| | | |
|---|---|---|
| Depart<br>12:30 PM | San Diego, CA , United States<br>San Diego Airport (SAN) \| Terminal 2 | American Airlines 1712<br>Economy<br>Airbus A321 \| On-time: 100% |
| Stop 1<br>1:46 PM | Phoenix, AZ , United States<br>Sky Harbor Airport (PHX) \| Terminal 4 | 303 mi \| 1hr 16min<br>Seat map |

Change of airlines. Time between flights: 1hr 9min

Flight 1712 Operated by US Airways

| | | |
|---|---|---|
| Depart<br>2:55 PM | Phoenix, AZ , United States<br>Sky Harbor Airport (PHX) \| Terminal 4 | US Airways 1023<br>Economy<br>Boeing Douglas MD-83 \| On-time: 80% |
| Stop 2<br>7:20 PM | Dallas, TX , United States<br>Dallas-Fort Worth Airport (DFW) \| Terminal 0 | 865 mi \| 2hr 25min<br>Seat map |

Change of airlines. Time between flights: 0hr 45min

Flight 1023 Operated by American Airlines

| | | |
|---|---|---|
| Depart<br>8:05 PM | Dallas, TX , United States<br>Dallas-Fort Worth Airport (DFW) \| Terminal B | American Airlines 3773<br>Economy<br>Embraer RJ145 \| On-time: 63% |
| Arrive<br>8:50 PM | Wichita Falls, TX , United States<br>Sheppard AFB (SPS) | 112 mi \| 1hr 45min<br>Seat map |

Flight 3773 Operated by ENVOY AIR AS AMERICAN EAGLE

💜 **Earn $7.40**   🔶 ORBITZ REWARDS   Earn $20 in bonus Orbucks



**$348.00**
Total cost
FREE Cancel

[ Select ]

☐ Flight details

Mon, Jun 9                                          Total time: 6hr 25min

| | | |
|---|---|---|
| Depart<br>9:45 AM | San Diego, CA , United States<br>San Diego Airport (SAN) | American Airlines 1364<br>Economy<br>Boeing 737 |
| Stop 1<br>2:40 PM | Dallas, TX , United States<br>Dallas-Fort Worth Airport (DFW) | 1,174 mi \| 2hr 55min<br>Seat map |

Change of planes. Time between flights: 2hr 50min

| | | |
|---|---|---|
| Depart<br>5:30 PM | Dallas, TX , United States<br>Dallas-Fort Worth Airport (DFW) | American Airlines 3397<br>Economy<br>Embraer RJ145 |
| Arrive<br>8:10 PM | Wichita Falls, TX , United States<br>Sheppard AFB (SPS) | 118 mi \| 0hr 40min<br>Seat map |

Flight 3397 Operated by ENVOY AIR AS AMERICAN EAGLE

APPX201



Earn $3.48 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 1 ticket left at this price!

Flight details

$438.00 Total cost FREE Cancel

Mon, Jun 9 Total time: 8hr 25min

Depart 12:25 PM San Diego, CA , United States San Diego Airport (SAN) American Airlines 1344 Economy Boeing Douglas MD-83

Stop 1 Dallas, TX , United States

Change search San Diego, CA (SAN) to Wichita Falls, TX (SPS) Mon, Jun 9, 2014

Hide

Depart 8:05 PM Dallas, TX , United States Dallas-Fort Worth Airport (DFW) American Airlines 3773 Economy Embraer RJ145 118 mi | 0hr 45min Seat map

Arrive 8:50 PM Wichita Falls, TX , United States Sheppard AFB (SPS)

Flight 3773 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $4.38 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$650.00 Total cost FREE Cancel Select

Mon, Jun 9 Total time: 8hr 25min

Depart 9:45 AM San Diego, CA , United States San Diego Airport (SAN) | Terminal 2 US Airways 1364 Economy Boeing 737 | On-time: 85% 1,167 mi | 2hr 55min Seat map

Stop 1 2:40 PM Dallas, TX , United States Dallas-Fort Worth Airport (DFW) | Terminal 0

Change of planes. Time between flights: 2hr 50min

Flight 1364 Operated by American Airlines

Depart 5:30 PM Dallas, TX , United States Dallas-Fort Worth Airport (DFW) | Terminal B US Airways 8197 Economy Embraer RJ145 112 mi | 0hr 40min Seat map

Arrive 6:10 PM Wichita Falls, TX , United States Sheppard AFB (SPS)

Flight 8197 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.50 ORBITZ REWARDS Earn $20 in bonus Orbucks

Flight details

$656.99 Total cost FREE Cancel Select

Mon, Jun 9 Total time: 8hr 25min

Depart 9:45 AM San Diego, CA , United States San Diego Airport (SAN) | Terminal 2 American Airlines 1364 Economy Boeing 737 | On-time: 85% 1,167 mi | 2hr 55min Seat map

Stop 1 2:40 PM Dallas, TX , United States Dallas-Fort Worth Airport (DFW) | Terminal 0

Change of airlines. Time between flights: 2hr 50min

Depart 5:30 PM Dallas, TX , United States Dallas-Fort Worth Airport (DFW) | Terminal B US Airways 8197 Economy Embraer RJ145 112 mi | 0hr 40min Seat map

Arrive 6:10 PM Wichita Falls, TX , United States Sheppard AFB (SPS)

Flight 8197 Operated by ENVOY AIR AS AMERICAN EAGLE

Site Feedback

Earn $6.57 ORBITZ REWARDS Earn $20 in bonus Orbucks

Act Fast! Only 4 tickets left at this price!

Flight details

$656.99 Total cost FREE Cancel Select

Mon, Jun 9 Total time: 8hr 25min

Depart 12:25 PM San Diego, CA , United States San Diego Airport (SAN) | Terminal 2 American Airlines 1344 Economy Boeing Douglas MD-83 | On-time: 93% 1,167 mi | 3hr 0min Seat map

Stop 1 5:25 PM Dallas, TX , United States Dallas-Fort Worth Airport (DFW) | Terminal 0

Change of airlines. Time between flights: 2hr 40min

Depart 8:05 PM Dallas, TX , United States Dallas-Fort Worth Airport (DFW) | Terminal B US Airways 8470 Economy Embraer RJ145 | On-time: 63% 112 mi | 0hr 45min Seat map

Arrive 8:50 PM Wichita Falls, TX , United States Sheppard AFB (SPS)

Flight 8470 Operated by ENVOY AIR AS AMERICAN EAGLE

Earn $6.57 ORBITZ REWARDS Earn $20 in bonus Orbucks

**See 25 more result(s)**

Return to top | Change search                                          Showing: 25 of 551 results

Prices shown are 'from prices' and are an average per traveller including all airfare taxes and fees and any applicable service fees.

Vacation packages | Car rental | Cruises | Travel blog | Flight status | Orbitz Travel Alerts | Customer Support | Español | Labs

About Orbitz | Contact Us | Investors | Careers | Media | Site map | Advertising | Affiliates | Orbitz for Business | Orbitz for Agents | Terms and conditions | Your Privacy Rights

Orbitz Rewards | Orbitz Rewards Visa Card | Best Price Guarantee | Travel deals | Mobile | Facebook | Twitter | Pinterest

Download our free app:



Orbitz guards your privacy and security. We're certified by TRUSTe and Verisign.
© 2001 – 2014, Orbitz, LLC. All rights reserved.
CST 2063530-50; Hawaii TAR-5627; Iowa 644; Nevada 2003-0387; Washington 602-102-724



APPX203